IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TARYN CHRISTIAN, | ) CIV. NO. 04-00743 DAE-LEK |
| | ) (Habeas Corpus Proceeding) |
| Petitioner, | ) |
| | ) MEMORANDUM IN SUPPORT OF |
| vs. | ) MOTION |
| | ) |
| RICHARD BISSEN, Acting | ) |
| Director, STATE OF | ) |
| HAWAI'I DEPARTMENT OF | ) |
| PUBLIC SAFETY, | ) |
| | ) |
| Respondent. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF MOTION**
**I.**

**INTRODUCTION**

Petitioner seeks production of the following items of physical evidence for inspection and DNA testing:

**REQUESTED ORDER**

In particular, the Petitioner requests that the Court order the State to produce for defense DNA testing these items which are or contain biological evidence:

1 The cap (Item 2);
2 The knife (Item 1);
3 The screwdriver(3);

4  The keys to Vilmar Cabaccang's vehicle;

5  Swabs from the sidewalk (Items 12,12A, and 12B);

6  Swabs from crime scene (Items 10,10A,and 11A);

7  Serena Seidel's clothing (Items 4 and 5);

8  Plaid flannel jacket (Item 6;

9  Blood samples of Vilmar Cabaccang;

10  Blood samples of Taryn Christian;

11  Blood samples of James Burkhart;

12  Original MPD 911 tape recorded conversation between the 911 operator and  Robert Perry dated July 14,1995;

13  Original tape of the recorded conversation between Taryn Christian and Lisa Kimmey dated August 17,1995;

14  The actual copy as provided to the jury of tape recorded conversation between Taryn Christian and Lisa Kimmey

15  Original surveillance video tape from Gas Express;

16  Certified court reporter's transcript of Taryn Christian's alleged confession to the murder of Vilmar Cabbacang;

17  Photographs of latent finger prints recovered from the drivers door of Cabaccang's vehicle and examination reports.


Petitioner also requests the following:


(18) All reports, memoranda, photographs, computer files, bench notes,  raw data, and other records of any type regarding prior DNA testing, blood testing, or any other examination, review, and/or analysis of biological evidence in this case.

(19) Permission to view and photograph all physical evidence in this case and to receive any documentation not previously provided regarding the physical evidence, including updated reports regarding the locations, custodians, and chains of custody for the physical evidence.

(20) An opportunity to request additional DNA testing after receiving information regarding the physical evidence and prior DNA analysis, and after viewing and photographing the physical evidence.

(21) All reports, notes, letters, files, and records of any type regarding James "Hina" Burkhart implicating himself to anyone as being responsible for the murder of Vilmar Cabaccang.

(22) The names, current addresses and telephone numbers of all witnesses who were called to testify against the Petitioner at trial and all percipient witnesses whether or not the prosecution intended to call the witness to testify against the Petitioner at trial;

(23) All statements or utterances by Petitioner and James "Hina" Burkhart, oral or written, however recorded or preserved, whether or not signed or acknowledged by James "Hina" Burkhart.

(24) Examination of all physical evidence obtained in the investigation of the case against Petitioner.

(25) Examination of all photographs, transcriptions, diagrams, motion pictures and videotapes of the scene of the alleged offense.

3

(26) All photographs, motion pictures or videotapes taken of the Petitioner at or near the time of Petitioner's arrest on this case.

(27) Examination of all photographs, transcriptions, videotapes, motion pictures, composites or likewise shown to witnesses and prospective witnesses in this case for the purpose of establishing the identity of suspects in the crime charged against the Petitioner, and all reports of suspects in the crime charged against the Petitioner, and all reports concerning the display of such.

(28) Any exculpatory evidence or evidence, information, documents and other materials favorable to the Petitioner that is material to guilt or punishment in the possession of the State of Hawaii or of any police department involved in the investigation of the case against the Petitioner, or of any agency or person and available to the prosecution through the exercise of due diligence.

(29) An record of criminal arrests or convictions whether for felony or misdemeanors of any witness who were called to testify against Petitioner at the trial.

(30) Any information relevant to impeachment of any witness that the prosecution called at trial, including any threats, promises, inducements, offers of reward or immunity, affirmative representations made or implied, any record of pending charges, probation or parole, of any witness who were called to testify against the Petitioner.

(31) The identity and whereabouts of any material informants.

4

(32) All notes or reports of police officers and investigators concerning the offense charged.

(33) Petitioner asks that this document be treated as a continuing request through the completion of this action.

## INNOCENCE AT ISSUE

Testing the biological evidence is an important step in Petitioner's effort to prove his innocence in the killing of Vilmar Cabaccang ("Cabaccang"). Petitioner asserts that James "Hina" Burkhart has confessed to numerous individuals that he is the person responsible for stabbing and murder of Cabaccang. There exist powerful evidence to support Petitioner's assertions.

### Evidence Regarding James Burkhart "Burkhart".

While Serena Seidel was at the crime scene giving a physical description of the assailant to police, one of the officers responded: "That sounds like James Burkhart". Tesha Santana a friend of Burkhart and Cabaccang who was present, exclaimed to the officer "what, Hina Boy?.

5

James Burkhart, the first suspect in this case, planned to meet one of Cabaccang's neighbors, Tesha Santana, on the night of the fatal stabbing.

A Police Report, places Burkhart in Serena Seidel's apartment prior to Cabaccang's arrival that early morning.  Multiple Burkhart confessions were report to Maui Police Department ("MPD").

A Gas Express employee, Ann Leong reported to MPD an unknown male who appeared to be "intoxicated or loaded" entered the Gas Express store around 3:00 a.m or thereafter  with his right hand  injured and soiled with blood. She said that the man had a flushed face and wide eyes and appeared out of breath, apparently from running. The man was in possession of a fanny-pack with large denomination of bills.

Letha Alexander, another Gas Express employee, stated that the man's right hand was injured and soiled with blood.  Both Alexander and Leong provided a description to MPD from which a composite drawing was made.

6

According to various persons, Burkhart matched a composite drawing of a man who entered a Kihei Gas Express store after the stabbing.[1]

MPD crime stopper reports identify composite drawing printed in the Maui News as James "Hina" Burkhart.

MPD L.T. Wayne Riboa released information to Maui News that a man wanted for questioning in the stabbing death of Cabaccang also was a suspect in an incident in which shots were fired at four teenagers. Ribao stated that the description of the suspect in both cases are similar.

Jeff Makekau  brother of David Makekau informed the defense that his brother David traded a double blade knife like the one printed in the Maui News with Burkhart for drugs/crystal Meth.

At trial, Burkhart was questioned outside the presence of the jury about his admissions to killing

7

---

[1] A Maui Police report, referring to the composite drawing, reflects that a flyer showing James "Hina" Burkhart was being distributed

Cabaccang. Burkhart did not deny his admissions.

Moreover, the enhancement of the 911 tape reveled Cabaccang spoke Burkhart's name as he lay dying.

### Police Interviews Regarding Burkhart's Confessions

Police interview reports contain accounts of numerous Burkhart confessions.

Keleen Norton told police that she overheard details behind the homicide when she went to a Narcotics Anonymous meeting. According to this report, Mr. Burkhart and Ms. Seidel "were in fact boyfriend and girlfriend at one time and that they were still seeing one another, despite the fact that Seidel was dating Cabaccang." Keleen Norton had also been told that Ms. Seidel gave Mr. Burkhart the keys to Mr. Cabaccang's vehicle.[2]

Another person told police a friend volunteered that "Hina Boy" admitted to her that he killed Cabaccang."

8

---

[2] The person who had allegedly been overheard denied making the statements when interviewed by police. Police followup interviews on other second-hand reports also produced denials.

After the homicide, according to this report, Mr. Burkhart was taken "somewhere upcountry" to stay for a while.

Still another report of Mr. Burkhart's involvement appeared to have surfaced during a party at Serena Seidel's residence. One of the persons who attended that party allegedly said Mr. Cabaccang had discovered "Hina" near his vehicle.

Patricia Mullins reported to MPD that her close friend and crime partner Burkhart admitted to her within a few days of the incident that he stabbed and killed Cabaccang and that he had Serena Seidel wrapped around his finger. Mullins reported to defense investigators that MPD detectives attempted to dissuade her from giving this information regarding Burkhart's confessions.

It was later learned by the defense that MPD detective Gapero visited with Mullins neighbors, mother and daughter in an attempt to have them persuade Mullins to "shut up" about Burkhart's confessions.

9

According to mother and daughter detective Gapero informed them that the MPD had evidence that they had arrested the wrong man.

Prior to trial, MPD detective Santos visited with Burkhart at Maui Community Correctional Center in relation to reports received that he was bragging that he was responsible for the murder of Cabaccang. Burkhart was read his constitutional rights and declined to have an attorney present. Burkhart denied bragging.

Prior to trial, defense counsel Anthony Rankin made an offer of proof as to the names of three witnesses he intended to call as to Burkhart's confessions. - Patricia Mullins, William Alud and Boise Pimentel.

During the corroboration hearing, Anthony Rankin withdrew one of three critical witnesses and failed to inform the court that he had a conflict of interest and that the third witness that he had proffered was his client.

Trial counsel made offers of proof regarding the expected testimony of two of these witnesses:

10

-- William Auld would have testified "Mr. Burkhart told him that he was the one who stabbed Vilmar Cabaccang and it felt good to feel the blood running down his hands and arms." (Trial transcript, Vol. 9, p. 4, lines 12-13).

-- Patricia Mullins told Mr. Burkhart that what he had done to Mr. Cabaccang was "fucked up" and Mr. Burkhart responded: "I got to do what I got to do." He told her Vilmar Cabaccang was "stupid for coming after me" and that Burkhart was "going to get away with it" because he had Mr. Cabaccang's girlfriend, Serena Seidel, "wrapped around my finger so good" she would not identify Mr. Burkhart as the killer. (Trial transcript, Vol. 9, p. 6, lines 6- 24)

At trial, the defense was denied permission to present any evidence that Burkhart confessed.

## Crimestoppers Calls, Other Calls

Police reports contain accounts of other calls regarding Mr. Burkhart. For example:

11

Female caller said that rumors are flying all over
Kihei identifying the killer as Hina and said that
Hina carries a knife with him all the time on his
hip. Also said that one of the composites is Hina.

. . . .

Crimestoppers caller # 2383 knows picture in paper
as Burkhart and has pictures of him. Also said
that Burkhart, Hina Alo was seen at Rice Park a
couple of days ago in a gray colored Honda
Accord.

. . . .

Crimestoppers caller # 2372 said that HINA is
hiding at Puuone Terrace, unit #403. He might be
also staying at the Maui Banyan, last building,
floor, right of the parking lot. HINA drives a
white Monte Carlo and a white Toyota Camry.

. . . .

Crimestoppers caller # 2379 reported HINA also
known to caller as JAMES BURKHART hangs around
Kihei and has family in Seattle and may have

gone there. Also said that HINA contacted a
friend by the name of Sean SANTANA for a place to
stay immediately following the crime. SANTANA
lives at Iao Parkside.

. . . .

Crimestoppers caller #2385 said that HINA is
staying on Keala Place with Kaipo WILLIAMS.
House is on the left hand side, unknown color,
single story.

## **911 Tape**

Robert Perry, Jr, who lived in an apartment complex

near the fatal stabbing, made a 911 call to MPD from a

portable phone and walked toward Cabaccang.   The police
recorded the conversation.

A forensic audio expert, John Mitchell examined and
enhanced the 911 tape recording and was able to identify
what is believed to be Cabaccang stating: "James
Burkhart... just walked off".

### Fifth Amendment

When Mr. Burkhart was summoned to Petitioner's
trial, he was questioned outside the presence of the
jury about his admissions to being Mr. Cabaccang's
killer.  Mr. Burkhart did not deny the statements.
Instead, he took the Fifth Amendment.[3]

---

[3] "MR. RANKEN [Trial counsel for Petitioner]: May I put on the record the questions I
will ask him [James Burkhart] too so the court can ascertain whether he's entitled to take the
Fifth?

" I'll ask if he knew Serena Seidel. Shawn Santana used to go to their home in Kihei on
Kulani Hakoi.  Whether he stayed overnight.  When he was in Kihei last on July 14[th] and after.
And where he was in Kihei on July 13[th] and 14.  Whether he entered Vilmar's car. *Whether he
stabbed him.  Whether he made certain statements regarding that to James William Auld, Robert
Pimentel, and Richard Auld* and whether he statements to those individuals, and whether he
owned a knife similar in size and roughly similar in appearance to the knife that was found at the
scene of the incident.

"I would ask –

"THE COURT: Any argument about it?

" MR. RANKEN: Well, I don't know that he's entitled to take the Fifth as to all these
matters.  And I would ask for the right to ask him questions about these matters.  So I guess the
Court needs to rule – Mr. Priest needs to say whether he'll take the Fifth as to all the matters, and
the Court needs to rule whether he's entitled to:

"MR. PRIEST [Representing James Burkhart at the hearing]: We'll take the position that
any and all of those questions would tend to incriminate Mr. Burkhart if asked in the nature of

## Omitted Evidence Favoring Petitioner

The case against Petitioner rested to a large extent on a recorded statement he made to a former girlfriend. The prosecutor informed the jury that the recorded statement represented Taryn Christian's confession to the murder of Vilmar Cabaccang.

The jury was provided a redacted copy of the tape to which the prosecutor stated it was difficult to hear.

Consequently, the jury was unable to hear Petitioner's statements of denial that he was the responsible for the stabbing of Cabaccang.

A transcript of the tape, State's Exhibit A at trial, did not go to the jury, but serves to demonstrate the inability of listeners to make out all the words on an unenhanced version.

14

---

these proceedings before this Court. So *we refuse to answer any of those questions.*"
(Trial transcript, Vol. 9, p. 27, line 11 – p. 28, li ne 13) (emphases added)

Among the statements which are on the tape, but which were not included in the transcript, are these:

> "It didn't happen like that, okay" (Exhibit 65-B, p. 5, line 23 to Rule 40 Petition. (A portion of Petitioner's response when Lisa Kimmey accused him of having no conscience over committing a stabbing. Compare Trial Exhibit A, p. 3.

> "Do you think I took him? How do you think I feel?  I'm not the one who did it."(Exhibit "65-B",p. 11, lines 14-15 to Rule 40 Petition. Compare Trial Exhibit A, p. 6, Exhibit "65-B" To Rule 40 Petition which instead states: "Do you think I feel good? How do you think I feel?(unintelligible);"

> "No, no, I — I wasn't the one who stabbed him and I know that for a fact." (Exhibit "65-B", p.11, lines 19-20 to Rule 40 Petition. Compare Trial Exhibit A, p. 6, Exhibit "65-B" to Rule 40 Petition which instead indicates: "I did not say that (unintelligible).

The tape does correctly reflect that Petitioner was present near the time of the stabbing and felt badly about it.

The combination of denials and admissions in the tape should have made some sense to the jury  if Petitioner had been permitted to testify.

15

Petitioner would have testified that he did not stab Cabaccang., but instead became scared and ran away.

Another person, who Petitioner believes to be James Burkhart, stabbed Cabaccang.

He would have testified that he felt some guilt about running away when Cabaccang was injured, but that he did not stab or kill anyone.

With the direct denials of doing the stabbing omitted, the jury was led to believe that there was only one logical conclusion from the recording: that it constituted a confession.[4]

With the incriminating evidence against Mr. Burkhart not admitted, the jury received no alternative explanation of how Mr. Cabaccang was killed.[5]

16

---

[4] Trial counsel mentioned, and played for the jury, one of Petitioner's denials during closing argument. Considering the quality of the tape, there is no assurance that the jury gave credence to counsel's statements.

As a testament to the poor tape quality, the prosecutor was able to argue in rebuttal that instead of saying "I wasn't the one who stabbed him," Petitioner had said "I wasn't the one who started it." The difference between those two versions of Petitioner's statements is enormous.

Biological testing therefore is necessary as a step in addressing a very basic question: who did it?

### THE DNA HISTORY OF THIS CASE

At the onset, MPD made a formal request to Joanne Furuya Director of the Honolulu Crime Lab, to conduct blood typing and DNA comparison testing on all items of evidence submitted to the lab. This was never done.

Prior to trial, Petitioner requested DNA testing to prove his innocence. The State of Hawaii requested and was granted a trial continuance so the DNA testing could be completed. The prosecutor, Ms. Tengan, stated at a hearing: I have to continue trial to complete DNA testing and I know that's one of the things that the Defendant had wanted Mr. Jung to do, which not many private parties engage in themselves,the payment of DNA testing, but the government is prepared to go forward with that at this time.
...
Transcript of November 20, 1996 motion hearing, p. 19, lines 14-19.

In an affidavit, deputy prosecutor Davelynn Tengan stated to the court that the state intended to send evidence to be tested to the FBI in Washington D.C.

17

prior to trial, No FBI test results were provided to the defense.

At Petitioner's trial crime lab director, Joanne Furuya testified that there was "insufficient" sample to test some areas of blood. However, the reported insufficiency is nonexistent.

The fact that blood could be detected meant that DNA testing was possible.

### **CAPABILITY OF DNA TESTING**

Utilizing technology available to the Honolulu lab in the middle 1990s, it was possible to obtain DNA results if it was possible to determine that blood existed.

Using current technology, DNA results can be recorded from extremely small samples: results can be obtained when the sample size is as small as a tenth of a nanogram **See Affidavit of Thomas Fedor**, attached as Exhibit "B" to State (Motion To Produce Evidence For

18

## LEGAL BASES FOR DNA TESTING

### *Federal Habeas Corpus Legal Standards For Discovery*

To these ends, Rule 6(a) of the Rules Governing Section 2254 Cases expressly permits the Court to authorize discovery:

A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Although a petitioner is not entitled to discovery as a matter of right, this Court retains discretion to order discovery when it would help the court make a reliable determination with respect to the prisoner's claims. Bracy v. Gramley, 520 U. S. 899, 117 S.Ct. 1793, 1796-97 (1997), Herrera v. Collins, 506 U.S. 390, 443, 113 S.Ct. 853 (1993)(Blackmun, J., dissenting on other grounds) (citing Harris v. Nelson, 394 U.S. 286, 299-300 (1969)).

20

The Advisory Committee Note to Rule 6 indicates that the Supreme Court's treatment of discovery in **Harris v. Nelson** should inform the exercise of the district court's discretion in authorizing discovery. In particular, the Note reaffirms the "duty" under Harris to order discovery when a petitioner's specific allegations suggest that full development of the facts may enable him to demonstrate a right to relief.

Habeas Rule 6 also ensures that when an individual's life hangs in the balance, his claims will receive full development and presentation. The Supreme Court has repeatedly insisted that higher standards of reliability and fairness must be observed in death penalty cases. **Lockett v. Ohio,** 438 U.S. 586, 604, 98 S.Ct. 2954 (1978). Because discovery is designed to aid the district court in determining the validity of the petitioner's claims, it can add to, and may even be indispensable to, the reliability of habeas corpus proceedings in capital cases.

22

For this reason, liberal use of <u>discovery is appropriate.</u>
<u>See e.g.</u> **McFarland v. Scott,** <u>512 U. S. 849,859, 114</u>
<u>S.Ct.2568 (1994)(heavy burden that current law places on</u>
<u>petitioners creates need for pre-petition appointment of</u>
<u>counsel and other procedural devices to enable petitioners</u>
<u>to meet that burden). The discovery Rule also gives effect</u>
<u>not only to the principle that justice be done, but that</u>
<u>it be done swiftly. The drafters of Habeas Rule 6</u>
<u>envisioned that discovery would serve not only as an</u>
<u>issue-clarifying preface to evidentiary hearings but also,</u>
<u>in appropriate cases, as a substitute for such hearings.</u>
**Blackledge v. Allison,** <u>431 U.S. 63, 82-83, 97 S.Ct. 1621</u>
<u>(1977)</u>. In the latter role, discovery may generate
information establishing either that the petitioner's
claim is so clearly meritorious that relief must be
granted without a hearing or that the claim is so clearly
without merit that it may be dismissed without further
proceedings. For this reason, discovery requests seeking
information relevant to the claims at issue should be
permitted in habeas cases, unless there are extraordinary

23

factors weighing against discovery. **See Ross v. Kemp,** 785 F. 2d 1467, 1478-79 (11th Cir. 1986); **Coleman v. Zant,** 708 F.2d 541, 547 (11th Cir. 1986).

## I.  Establishing Innocence

There is a constitutional right to discovery of information inculpating a person other than the Defendant. **Brady v. Maryland,** 373 U.S. 83 (1963).

When the case is in a post-conviction posture, requests for testing should be granted under **Brady** and other constitutional provisions when the tests would be relevant to a claim of innocence. **e.g.. State v. Sewell,** 592 N.E.2d 705, 707-08 (Ind. App. 1992); **Commonwealth v. Brison,** 618 A.2d 420, 423 (Pa. Super.Ct. 1992); **Dabbs v Vergari,** 570 N.Y.S.2d 765 (Sup.Ct. 1990). **See Toney v. Gammon,** 79 F.3d 693, 700 (8th Cir. 1996)(DNA testing should be ordered when innocence claimed in federal habeas petition).

There is in fact a  Fourteenth Amendment Due Process right to prove innocence. See **Herrera v. Collins,** 506

24

U.S. 390 (1993) (approaches of Justices varied, but majority recognized it would violate Constitution to punish someone who is innocent).

Innocence has been established in cases which initially seemed far stronger than the prosecution's case against Petitioner.

In a Wisconsin case, DNA exonerated the defendant despite the existence of a confession and bloody clothing.  "Former Suspect in Cudding Murder Released," **Milwaukee Journal** (October 2, 1996).

In other cases, such as the David Vasquez case in Virginia, defendants have pleaded guilty and then been exonerated by DNA.  "At Each Step Justice Faltered," **Washington Post** (July 16, 1989).  Summaries of evidence, often seemingly strong evidence, which convicted innocent persons are contained in **Convicted By Juries, Exonerated By Science** (U.S. Dept. of Justice, June 1996).

In **Williamson v. State**, 812 P.2d 390, 400 (Okla. Crim. 1991), the state's highest court for criminal

appeals ruled 5-0 that it should affirm a conviction and death sentence despite trial error.  The court said: "In light of the strong evidence of guilt, we cannot say that there was a reasonable possibility that the evidence complained of might have contributed to the conviction."

The case involved multiple alleged confessions, evidence that the defendant had been bothering the victim, and scientific evidence which purportedly placed Mr. Williamson at the crime scene.

But there was a problem with the State's evidence: it wasn't true..

DNA testing showed that the hairs which allegedly matched Mr. Williamson were instead inconsistent with Mr. Williamson.  There were motives to lie, undisclosed to the jury, behind some of the snitch evidence. Additionally, the report of Mr. Williamson bothering the victim came from Glen Gore, the person who the DNA did match and who is now charged with the homicide.

Ron Williamson and his co-defendant, Dennis Fritz,

were released after proven innocent by DNA. "DNA Tests Clear Men In Prison," **Daily Oklahoman** (April 16, 1999).

The point is that what at first blush seems to be strong evidence does not always hold up under the scrutiny of DNA testing and/or thorough investigation.

Justice and the federal constitution both call for Petitioner to be given the opportunity to prove his innocence.

Under our country's constitution, there is a constitutional right to scientific testing even to achieve justice in civil cases. **Little v. Streater**, 452 U.S. 1 (1981).

The consequences are greater and the issues more serious in Petitioner's murder case than in the **Little v. Streater** paternity case.

## II. MODERN DNA TESTING CAN POTENTIALLY PROVE PETITIONER'S ACTUAL INNOCENCE

As of April 2005, post-conviction DNA testing has exonerated defendants in more than 156 cases in the United States.

27

The national CODIS databank, started in 1990 as a pilot project, today contains unique STR-DNA profiles from more than *2.167 million* convicted felons – with 247,842 from California alone. See http://www.fbi.gov/hq/lab/codis/clickmap.htm. CODIS is a vast, computerized registry of STR-DNA profiles (from convicted felons and unsolved crimes/missing persons) based on the 13 genetic markers common to all STR testing systems. CODIS allows law enforcement to compare hundreds of thousands of profiles to one another instantaneously.

This rapidly-expanding databank has allowed law enforcement agencies to solve thousands of "cold cases" in an unprecedented manner. As of January 2005, the databank has produced more than 19,600 hits assisting in more than 21,400 criminal investigations. See http://www.fbi.gov/hq/lab/codis/success.htm. To date, 930 California investigations have been aided by information contained in the national CODIS databank. Id.

28

The availability of STR-DNA technology has also produced dozens of astonishing post-conviction DNA exonerations in recent years, revealing grave errors in a host of criminal cases where the defendant's guilt had previously appeared to be beyond dispute. At least seven of these occurred in California. Examples include[6]:

> **Albert Johnson** — In 1992, Mr. Johnson was stopped for speeding and immediately became the prime suspect of a rape committed by a black man driving the same color car. He was convicted of that assault and a second rape in a nearby city. After spending 10 years in prison, DNA testing in 2002 sought by the Northern California Innocence Project revealed that Johnson could not have committed the crime.

> **Peter Rose** — Mr. Rose was convicted in 1994 for the sexual assault, rape and kidnapping of a 13-year-old girl. After unsuccessful appeals and an admission by the victim that her identification of Rose was tenuous, the Northern California Innocence Project sought and obtained DNA testing in late 2004. Rose was ruled out as the perpetrator of the crime and was exonerated in 2005 after spending nearly ten years in prison.

---

Innocence Project at Benjamin N. Cardozo Law School, Case Profile at http://www.innocenceproject.org/case/display_cases.php?sort=year_exoneration (last visited March 20, 2005).          29

***Frederick Daye*** — Mr. Daye was convicted of rape in 1984 after therape victim and a witness positively identified him as the perpetrator.
The victim picked Mr. Daye out of a photo lineup and both she and the witness identified him in a physical lineup. In 1994, DNA tests excluded Daye as the source of spermatozoa found on the victim's pants and he was released after ten years of incarceration.

***Herman Atkins*** — In 1986, Mr. Atkins was convicted of robbery, rape, forcible oral copulation, and using a handgun. After serving more than 11 years in prison, Atkins was exonerated when a DNA test taken from a rape kit cleared him of any wrongdoing.

***Leonard McSherry*** — In 1988, Mr. McSherry was convicted of rape, oral copulation, digital penetration, and kidnapping. In 1992, he sought a new trial based on newly discovered biological evidence. The court denied his request on the grounds that the type of testing and the fragments of evidence were insufficient, despite the fact that available tests excluded him. The evidence was eventually subjected to DNA testing and he was released in 2001 after 13 years in prison when testing excluded him as the donor.

### III. **Hawaii Law**

In June of 2005, Hawaii's Lt. Governor James Aiona signed into law HB 1733 (Section 844D-31, Hawaii Revised Statutes  that allows persons who have been convicted of crimes to request DNA analysis of evidence, and allows deletion of DNA profiles of persons whose underlying conviction has been reversed.

Hawaii's Attorney General, Mark Bennett welcomed the enactment of the legislation. Bennett said. "It also creates procedures by which DNA may help to exonerate people who have been wrongfully convicted."

In addition, the new law requires retention of evidence that can be used for DNA analysis, extends the statute of limitations for felony cases where DNA evidence has been recovered.

Access to evidence for DNA testing was requested prior to trial and has never been granted.

It is time that the right to "the truth" be honored.

31

## IV.  <u>**Relevance to Ineffective Assistance Claims**</u>

In Petitioner's Rule 40 petition, ineffective assistance of counsel is raised in various contexts.

The testing is important to establishing these claims because:

(1) Petitioner has asserted trial counsel was ineffective in relation to forensic testing;

(2) Obtaining scientific evidence pointing toward a third party would constitute a persuasive additional basis for establishing that trial counsel's shortcomings were prejudicial to Petitioner.

If testing could have supported Petitioner's case, Petitioner is entitled to relief on the basis of ineffective assistance of counsel.

In <u>**United States v. Glover**</u>, 97 F.3d 1345 (10th Cir. 1996), the Court noted that whether counsel's failure to obtain scientific testing was prejudicial depended on the results of that testing.

Therefore, testing needed to occur to dispose of the ineffectiveness claim.

32

The **Glover** principle applies in Petitioner's case.

## V. <u>Relevance to Claims of False or Misleading Evidence</u>

Petitioner has alleged (see Claim for Relief 33 in the Rule 40 Petition) that the crime lab director provided false or misleading evidence in testifying about what she was "unable" to do, had "insufficient" sample to perform, or obtained only "inconclusive" results regarding.

Considering the capabilities of DNA testing in the middle 1990s, legitimate questions exist regarding:

- Whether the laboratory made efforts to conduct comprehensive and meaningful DNA testing in the case;

and/or

- Whether the lab director's testimony represents a full and accurate account of the DNA results.

If the laboratory attempted less than the lab director claimed or if it failed to disclose all the results or if it simply botched the testing process, the lab director was in any instance providing false or misleading testimony in creating the impression that

33

the lack of evidence could be attributed to the task being beyond the reasonable capabilities of the lab.

Testing is appropriate in connection with claims of false or misleading evidence. **United States v. Burnside**, 824 F.Supp. 1215, 1260 (N.D. Ill, 1993). See also **Freeman v. Georgia**, 599 F.2d 65, 71-72 (5th Cir. 1979); **United States v. Shaffer**, 789 F.2d 682, 690 (9th Cir. 1986).

The federal constitution's Fourteenth Amendment is violated just as much when misleading evidence is part of the case, **Alcorta v. Texas**, 355 U.S.(1957) 28(constitutional violation for victim's lover to create impression he was only casual acquaintance), as when blatantly false evidence is used. **E.g.**, **Pyle v. Kansas**, 317 U.S. 213 (1942).

In accordance with these principles, relief has been granted when the jury was misled regarding the significance of scientific evidence. **Foster v. Lockhart**, 811 F. Supp. 1363, 1371 (W.D. Ark. 1992).

34

A convicted person, such as Petitioner, can and should have access to evidence to prove his false evidence claims.   See **Burnside**.

### CONCLUSION

DNA testing is critical to determining whether a miscarriage of justice has occurred.

There already is considerable reason to suspect James Burkhart in this case.

Testing could provide important support for Petitioner's long-maintained claim of innocence.

Good cause has been shown why full discovery is necessary to fully develop the facts of claim.

Based on the foregoing, this Honorable Court should grant this Motion.

DATED: Honolulu, Hawaii,_____4/19/06_____, 2006.


_____
KEITH SHIGETOMI
ATTORNEY AT LAW