DEPARTMENT OF THE PROSECUTING ATTORNEY  207

BENJAMIN M. ACOB  4471
Prosecuting Attorney
PETER A. HANANO  6839
First Deputy Prosecuting Attorney
County of Maui
Wailuku, Maui, Hawaii  96793
Tel. No. 270-7630
Fax. No. 270-7927

Attorneys for Respondents

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIV. NO. 04-00743 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | RESPONSIVE BRIEF |
| vs. | ) | |
| | ) | |
| IWALANI WHITE, Acting | ) | |
| Director, STATE OF HAWAI'I, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| | ) | |
| Respondents. | ) | |

RESPONSIVE BRIEF

CERTIFICATE OF SERVICE

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.............................................................. i

TABLE OF AUTHORITIES......................................................... iii

I. STATEMENT OF FACTS..................................................... 1

II. STANDARD OF REVIEW................................................... 20

III. ARGUMENT................................................................... 21

   A. ALL OF PETITIONER'S PROCEDURALLY
      DEFAULTED CLAIMS MUST BE DISMISSED
      SINCE PETITIONER CANNOT MEET HIS BURDEN
      OF PROVING THAT HE IS ACTUALLY INNOCENT............... 21

     1. Cause And Prejudice, Fundamental Miscarriage Of
        Justice........................................................................ 26

   B. EVEN ASSUMING *ARGUENDO*, THAT PETITIONER
      MET HIS BURDEN OF PROVING ACTUAL
      INNOCENCE, ALL OF PETITIONER'S CLAIMS FAIL
      ON THE MERITS.............................................................. 35

     1. Ground One................................................................ 35

     2. Ground Two................................................................ 40

     3. Ground Three.............................................................. 46

        a. Christian-Kimmey Tape........................................... 48

        b. 911 Tape.............................................................. 50

# TABLE OF CONTENTS

Page

    c. Additional Forensic Testing.................................................... 52

    d. Other Issues........................................................................... 54

  5. Ground Six................................................................................ 58

  6. Ground Seven............................................................................ 59

  7. Ground Eight............................................................................. 65

    a. Trial Counsel's Advice Regarding Petitioner's
       Right To Testify.................................................................... 67

    b. Trial Counsel's Closing Argument....................................... 68

IV. CONCLUSION................................................................................ 75

## TABLE OF AUTHORITIES CITED

Page

### CASES

Alcorta v. Texas, 355 U.S. 28 (1957)................................................................. 49

Briones v. State, 74 Haw. 442, 848 P.2d 966 (Haw. 1993)........................... 64

Brown v. Dixon, 891 F.2d 490, 495 (4th Cir.1989), cert. denied,
495 U.S. 953 (1990).................................................................................... 69, 70

Chambers v. Mississippi, 410 U.S. 284 (1973)............................................. passim

Coleman v. Thompson, 501 U.S. 722, 750 (1991)........................................ 22, 26

Edwards v. Carpenter, 529 U.S. 446, 451 (2000)........................................ 26

Evitts v. Lucey, 469 U.S. 387 (1985)............................................................. 59, 64

Fairchild v. Norris, 51 F.3d 129, 130-31 (8th Cir. 1995).............................. 27

Ford v. Georgia, 498 U.S. 411, 424 (1991).................................................... 22

Foster v. California, 394 U.S. 440 (1969)....................................................... 55

Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989)............................................ 22

Hendricks v. Calderon, 70 F.3d 1032, 1041 (9th Cir.1995), cert.
denied, 517 U.S. 1111 (1996)..................................................................... 68

House v. Bell, ___ U.S.___, 126 S. Ct. 2064 (2006)..................................... 27

Kimmelman v. Morrison, 477 U.S. 365 (1986)............................................. 49

Lorentsen v. Hood, 223 F.3d 950, 954 (9th Cir. 2000)................................. 28

## TABLE OF AUTHORITIES CITED

Page

### CASES (continued)

Manson v. Brathwaite, 432 U.S. 98 (1977)..................................................... 55, 56, 58

Matias v. Oshiro, 683 F.2d 318, 319-21 (9th Cir. 1982)................................ 23

Miller v. Pate, 386 U.S. 1 (1967)....................................................................... 49

Matthews v. United States, 485 U.S. 58, 65 (1988)........................................ 69

Murray v. Carrier, 477 U.S. 478, 488  (1986)................................................. 26

O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999).......................................... 22

Rock v. Arkansas, 483 U.S. 44 (1987)............................................................... 35, 36, 37

Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992)............................................ 27

Schlup v. Delo, 513 U.S. 298, 327 (1995)........................................................ 27, 28, 30

State v. Christian, 88 Hawai`i 407, 422, 967 P.2d 239, 254 (1998)............. 37, 42, 43

State v. Lira, 70 Haw. 23, 29, 759 P.2d 869, 873 (1988)............................... 69

Strickland v. Washington, 466 U.S. 668 (1984)............................................. passim

United States v. Demma, 523 F.2d 981, 986 (9th Cir. 1975)........................ 69

United States v. Frady, 456 U.S. 152, 168 (1982)........................................... 26, 27

Williams v. Taylor, 529 U.S. 362, 412-13 (2000)........................................... 21

United States v. Wade, 388 U.S. 218 (1967).................................................... 55, 56

## TABLE OF AUTHORITIES CITED

Page

### UNITED STATES CODE

28 U.S.C. Section 2254(b)(2)............................................................................    40

28 U.S.C. Section 2254(d)................................................................................    20

28 U.S.C. Section 2254(e)(1)..........................................................................    21


### HAWAII RULES OF PENAL PROCEDURE

Rule 40(a)(3)....................................................................................................    19, 21, 22,

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIV. NO. 04-00743 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | RESPONSIVE BRIEF |
| vs. | ) | |
| | ) | |
| IWALANI WHITE, Acting | ) | |
| Director, STATE OF HAWAI'I, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RESPONSIVE BRIEF

I.    STATEMENT OF FACTS.

On February 24, 1997, the jury trial commenced before the Honorable E.

John McConnell, in the Second Circuit Court, State of Hawai`i.  At trial, Petitioner

was represented by both Anthony Ranken and Kevin Ranken.  The prosecution

was represented by Deputy Prosecuting Attorney, Davelynn M. Tengan.  Prior to

the actual evidentiary portion of the jury trial, the trial court questioned Petitioner

regarding Petitioner's right to testify.  (Vol. 3, Exh. "H", at 5-6).[1]

---

[1] All citations to the record herein refer to the Exhibits attached to
Respondents' Answer filed on September 30, 2005, as well as the court records
and files contained in the above-entitled matter.

On February 26, 1997, the evidentiary portion of the trial commenced.  As part of its case- in-chief, the prosecution called Serena Seidel ("Seidel") as a witness.  Seidel testified that she lived on Kulanihakoi Street, Kihei, Maui, in July, 1995.  (Vol. 3, Exh."K", at 45-46, 62).  Vilmar Cabaccang ("Cabaccang"), her boyfriend, pretty much stayed at her place every night, although he did not live there with her.  (Id., at 58).  Whenever Cabaccang came to the house, he would put his car keys on a glass table in front of the lanai door.  (Id., at 81).  Cabaccang's car was a Honda Civic, golden in color.  (Id., at 54).

Seidel also testified that when Cabaccang went to bed on the night of July 13, 1995, he wore his boxer shorts and did not wear a shirt or socks.  (Id., at 46, 57).  At some point after Cabaccang came to bed, Seidel heard a sound from outside which she believed came from Cabaccang's car, so she looked out the window and saw a person wearing a baseball cap sitting in the driver's side of the car.  (Id., at 59-60).  She told Cabaccang, "Babes, someone is sitting in your car." (Id., at 60).  She then ran out the unlocked lanai door to chase the person in Cabaccang's car.  (Id., at 61, 81).

Cabaccang followed Seidel, and as she came to the back of the car, she saw that the driver's side was open and a man came out of the car and ran towards South Kihei Road.  (Id., at 62-63).  Cabaccang was now ahead of her, running after the man.  (Id., at 61-62).  Cabaccang, wearing only his boxer shorts and

-2-

having nothing in his hand, did not stop at his car. (Id., at 64-65). Seidel testified that she followed Cabaccang and the man, who wore a flannel shirt, jeans, and covered shoes. (Id., at 63). She saw that the man was taller than her and Cabaccang, and wore a baseball cap. (Id., at 73). As Seidel ran down the road, she was screamed, "Help. Somebody help. Call 911. Help." (Id., at 64). She stopped at Tesha Santana's house, knocked at the door to get help, but no one answered. (Id., at 65). She then ran towards Cabaccang and the man, who were struggling at the end of the sidewalk from Tesha's house, near the fire hydrant. (Id., at 66-67). Cabaccang told her, "Babe, the guy has a knife. He wants to kill me." (Id., at 67). She rushed to help Cabaccang, and they ended up rolling on the grass area of ground. (Id., at 69). Then the man was "under Vilmar" and Seidel. (Id.). Seidel and Cabaccang were trying to get the knife out of the man's hand, and telling the man to drop the knife. (Id.) The man "wouldn't let go of the knife." (Id.). She saw the man as he was holding the knife. (Id.). As she and Cabaccang kept telling him to drop the knife, the man pleaded, "Please don't turn me in. I didn't know it was you guys car." (Id., at 70). Seidel testified that a little after the man finally dropped the knife, she realized that Cabaccang was stabbed. (Id., at 71). The man left. (Id., at 87). At the scene at the scene where she and Cabaccang struggled with the man, Seidel saw a knife, a screwdriver, and Cabaccang's car keys; the knife and the screwdriver did not belong to Cabaccang.

-3-

(Id., at 73-74). Seidel also testified that the man she and Cabaccang struggled with wore gloves, and she noticed the gloves when she and Cabaccang were trying to get the knife out of the man's hand. (Id., at 82).

Seidel further testified that in one of two separate photographic line-ups shown to her by Maui County Police Detective Antonio Funes ("Detective Funes"), she pointed out picture number 3 in State's Exhibit 39 as the face of the person who held the knife and fought with her and Cabaccang, and she had no difficulty identifying him. (Id., at 77-79). Seidel made an in-court identification of Petitioner as the person who held the knife and fought her and Cabaccang. (Id., at 85-86). Seidel testified that only Petitioner was there at the time with her and Cabaccang, and that there was no one else. (Id., at 116-117).

Detective Antonio Funes ("Det. Funes") testified that he showed two separate photographic line-ups to Seidel; the first one, State's Exhibit 56, with the picture of James Burkhart, was on July 18, 1995. (Vol. 4, Exh. "N", at 33-34, 61). Seidel did not pick anybody from this line-up. (Id., at 34). The second one, State's Exhibit 39, was on August 22, 1995. Photograph number 3 was a picture of Petitioner. (Id., at 34-35). When Seidel looked at this line-up, Seidel shook and cried, picked number 3, and said, "This is him." (Id., at 35-36).

Phillip Schmidt ("Schmidt") testified that he lived on Kulanihakoi Street, Kihei, at Haleakala Gardens. (Vol. 3, Exh. "L", at 11-12). On July 14, 1995, at

-4-

about 3:00 a.m., he was awakened by yelling and screaming. (Id., at 12-13). He got out and walked straight to the street. (Id., at 13-14). He saw a young man briskly walking down towards Kihei Road, and there was street light directly over the head of the young man. (Id., at 15-16, 53). The young man turned and looked directly at him. (Id., at 16). To Schmidt's left, he saw Cabaccang, whom he did not know, lying on the ground and trying to get up with blood and several stab wounds. (Id., at 16-17). Schmidt testified, "I immediately asked [Cabaccang] if that was the person that did this to you, pointing down the sidewalk where the person was walking away, and he [Cabaccang] told me yes it was." (Id., at 17). He also asked Cabaccang whether the person who did this to him "was a local guy or a haole guy," and Cabaccang said, "Haole guy." (Id., at 29-30).

Schmidt had a picture in his mind of the man he saw walking away. (Id., at 17). He made an in-court identification of Petitioner as the only man he saw walking down the street. (Id., at 40-41). Schmidt also testified that when he was shown the photographic line-up, State's Exhibit 39, by Detective Funes, he was frightened when he saw picture number 3, and the hair at the back of his neck stood up and it was "a frightening feeling." (Id., at 42-43). He recognized it as the face of the man he saw walking down the street. (Id., at 43). Schmidt also testified that the man he saw walking down the street was not in State's Exhibit 56, another photographic line-up. (Id., at 48). (Note: State's Exhibit 56 contained the

picture of Burkhart. (<u>See</u> testimony of Detective Funes, Vol. 4, Exh. "N", at 33-34).

Detective Timothy Gapero of the Maui Police Department testified that on July 14, 1995, he arrived at the scene of the crime at about 4:33 to videotape it. (Vol. 3, Exh. "L", at 107-108). Among the items he saw were a double-bladed knife and a Phillips screwdriver. (<u>Id.</u>, at 109-110). At the scene, Officer Waldo Fujie also saw a baseball cap. (Vol. 3, Exh. "J", at 28-29).

Ryan Catugal ("Catugal") testified that he worked at one time with Petitioner at Pukalani Country Club. (Vol. 3, Exh. "N", at 41-42). Before the stabbing of Cabaccang in July, 1995, Petitioner showed him a knife that was double-bladed with a black handle. (<u>Id.</u>, at 42, 44). He recognized State's Exhibit 5 "[b]ecause of the handle and the double blade." It looked exactly like the one Petitioner showed him. (<u>Id.</u>, at 44).

Tammy Dooley ("Dooley") testified that she knew Petitioner, and that she lived with Petitioner and Mike Haskel for three months. (Vol. 3, Exh. "K", at 3-4). She had seen Petitioner carry Phillips screwdrivers with him. (<u>Id.</u>, at 14). She also testified that Mike Haskel used to wear a Michigan cap, and she recognized State's Exhibit 8 because Mike Haskel "used to wear it." (<u>Id.</u>, at 5). However, Mike Haskel was not on Maui in July 1995, because he left Maui to live with his mother on the mainland. (<u>Id.</u>, at 6).

Lisa Kimmey ("Kimmey") testified that Petitioner was her former boyfriend. (Vol. 4, Exh. "N", at 82). According to Kimmey, Petitioner had a Michigan cap before Cabaccang was killed. (Vol. 4, Exh. "O", at 10). State's Exhibits 32, 33, 34, and 35 were photographs taken at Kimmey's house showing Petitioner wearing his Michigan cap. (Id., at 10). She did not see Petitioner wearing that cap after Cabaccang was killed. (Id., at 11).

Kimmey further testified that three days after Cabaccang was killed, Petitioner told her that he stabbed Cabaccang. (Id.). Petitioner told her how Cabaccang was able to catch up with him; that Petitioner dropped the knife and went to pick it up; that Cabaccang then tackled him down to the ground; and that Petitioner told her that Cabaccang wore only boxer shorts that night, with no shirt, shoes or slippers. (Id., at 12-13). Kimmey also testified that when Petitioner talked to her about the knife, he never told her that there was any other person who stabbed Cabaccang. (Vol. 4, Exh. "O", at 43).

Luana Kaholukula testified that on July 17, 1995, while was at the Kalepolepo Park, about three blocks where Cabaccang was killed, she saw a flannel jacket on the side of the bathroom of the park. (Vol. 3, Exh. "L", at 95-98). The flannel fitted the description described in the newspaper as the one used by the person involved in Cabaccang's killing. The police were called, and the flannel was not removed until the police arrived. (Id., at 97-98). Police Officer

-7-

Loren Natividad testified that he recovered the black flannel jacket, State's Exhibit 10, at Kalepolepo Park. (Id., at 88-89, 90). Within the pocket of the jacket was a pair of gloves, State's Exhibit 11. (Id., at 89-90).

Ruth Duponte, manager of Pukalani Country Club, testified that in July and August, 1995, Petitioner was working there as a "dishwasher, salad bar." (Vol. 3, Exh. "L", at 100). The club had gloves like State's Exhibit 11, which the girls used in making fresh salad. The gloves were kept in an unlocked area, accessible to Petitioner. (Id., at 102).

Dr. Anthony Manoukian, who was qualified as an expert in forensic pathology, clinical pathology, and anatomical pathology, testified that he performed Cabaccang's autopsy on July 17, 1995. (Vol. 4, Exh. "O", at 53-56, 62). Asked whether Cabaccang's double stab wounds were consistent with having been caused by a weapon, such as State's Exhibit 5, Dr. Manoukian testified: "Absolutely." (Id., at 93). As a result of his examination of Cabaccang, it was his opinion with a reasonable medical certainty that Cabaccang's cause of death was due to multiple stab wounds caused by a double pronged instrument. (Id., at 96-97).

On March 5, 1997, the prosecution rested its case. (Vol. 4, Exh. "P", at 24). Following that, the defense attempted to call James Burkhart as its first witness. (Id., at 26). Outside the presence of the jury, Burkhart, who was represented by

counsel, told the trial court that he would plead the Fifth Amendment and refuse to testify. (Id., at 27-28). The trial court found Burkhart "unavailable" under Hawai`i Rules of Evidence Rule 804. (Id., at 29). Burkhart was "presented to the jury for the purpose that they may gauge his stature and appearance." (Id., at 32). After that, Petitioner sought to introduce two witnesses who would testify that Burkhart told them that Burkhart killed Cabaccang. (Vol. 4, Exh. "Q", at 3-4). The State responded that it had two rebuttal witnesses who would testify that Burkhart was in Kula on the night of the murder. (Id., at 13). The trial court denied Petitioner's request to have his witnesses testify about Burkhart's alleged inculpatory statements on the ground that Petitioner failed to demonstrate the trustworthiness of those alleged statements. (Id., at 19). As part of their defense, Petitioner presented other witnesses. (Vol. 4, Exhs. "P", "Q").

On Thursday, March 6, 1997, the defense advised the trial court that it would present Lori Smith, Petitioner's mother, as its final witness before resting its case. The trial court then held the required[2] colloquy with Petitioner, who informed the trial court that he would not testify:

> THE COURT: That being the case, Mr. Christian, can I ask you to state your name? There's questions I have to ask you.

---

[2] Required pursuant to Tachibana v. State, 79 Hawai`i 226, 231, 900 P.2d 1293, 1298 (1995) (the decision to testify is ultimately committed to a defendant's own discretion).

THE DEFENDANT:  Taryn Christian.

THE COURT:  As I discussed with you before the start of the trial, you do have the constitutional right to testify in your own defense.  You understand?

THE DEFENDANT:  Yes.

THE COURT:  And although you should consult with Mr. Ranken, your lawyer, regarding your decision to testify, it is your decision and no  one can prevent you from testifying if you chose to do so that (sic).  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  And if you decide to testify, the prosecutor will be allowed to  cross-examine you.  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  You also have the constitutional right not to testify and to remain silent.  You understand?

THE DEFENDANT:  I understand.

THE COURT:  And you understand that if you choose not to testify, that the jury will be instructed that it cannot hold your silence against you in deciding your case.

THE DEFENDANT:  I understand.

THE COURT:  It's the understanding of the court that you do not intend to testify in this case; is that correct?

THE DEFENDANT:  That's correct.

THE COURT:  And that's your decision?

THE DEFENDANT:  Yes.

(Vol. 4, Exh. "R", at 3-5).  When Smith failed to show up, the defense rested on March 6, 1997.  The State presented brief rebuttal testimony.  (Id., at 8).  Trial was then continued to Monday, March 10, 1997, for closing arguments.

On March 10, 1997, moments before the prosecutor commenced her closing argument, the following occurred:

> THE DEFENDANT:  Your Honor, I wish to exercise my right to testify.
>
> THE COURT:  Wait a minute.  Wait a minute.
>
> THE DEFENDANT:  -- in front of the jury.
>
> THE COURT:  Wait a minute.  Excuse the jury, please.
>
> Do you need a recess, Mr. Ranken?
>
> MR. RANKEN:  I guess we'd like to meet with your Honor without the jury.
>
> THE DEFENDANT:  We're in possession of a tape that shows that Serena Seidel lied on the stand.  That witnesses have been in the presence --
>
> CLERK:  All rise.  Court will stand in recess.
>
> (The following was held in chambers)
>
> THE COURT:  Let the record reflect that we're convened in chambers outside the hearing of the jury Anthony and Kevin Ranken are present as well as the defendant.  Ms. Tengan and Mr. Jenkins are here for the State.
>
> Mr. Ranken, there's been some outburst before the recess was taken.  Anything further for the record?

MR. RANKEN: I have nothing to add. Apparently my client wants a chance to address the Court or the jury.

**I've informed him that we're beyond that stage of the trial and advised him not to engage in any further outburst in front of the jury because I believe it will only hurt his cause and not help him.**

I have nothing further to say. I don't know if my client wishes to bring anything up directly to the Court, if the Court permits it.

THE COURT: Mr. Christian, is there anything you wish to say?

THE DEFENDANT: Yes, there's a tape of a witness that was in the presence of Hina and Serena on more than one occasion and shows that Serena's committed perjury in this court.

MR. RANKEN: Let me just state on this record there's a tape which was delivered to me this morning. It's existence -- alleged existence was made known to me Wednesday or Thursday of the first week of trial. I said I can't do anything without a witness. I need more than a tape. I need the name of a witness. It has never been provided to me.

I believe that I was told that it was impossible for Lori Smith as well as Patricia Mullins to track down this witness, and they were trying -- and as of the end of the trial, I still only had a first name, no way to reach the person, and the tape had not been presented to me.

I've told Mr. Christian if he feels that counsel has been ineffective, he has remedy after trial. I'll also tell him now that there's a possibility -- if the court finds there's newly discovered evidence which couldn't have been found before trial, a new trial is possible on that grounds. But I'm not -- obviously I have not even heard the tape. I don't know what we've got if anything.

THE COURT: Anything else?

THE DEFENDANT:  No, that is all.

(Vol. 4, Exh. "T", at 4-6).  After recalling the jury back into the courtroom, the

trial court instructed the jury "to disregard any statements made this morning",

then proceeding with closing arguments.  (Id., at 8).

During his closing argument, Petitioner's trial counsel presented the

following arguments and theories to the jury:

1.  Kimmey was trying to "trap" Petitioner in the taped telephone call.  (Vol. 4, Exh. "T", at 39-40);

2.  That Petitioner was at the murder scene and fought with Cabaccang (Id., at 46), but someone else killed Cabaccang. (Id., at 47-55);

3.  That the following exchange took place between Kimmey and Petitioner in the taped telephone conversation:

    Lisa:  So you think it's okay?  So you think that I should feel more sorry for you because you're the one who stabbed him and not me?

    Taryn:  I'm not asking that.  I wasn't the one who stabbed him, and I know that for a fact;

4.  Petitioner's trial counsel also played a portion of the tape for the jury and told them that they will have headphones in the jury room so that they could "try to hear better."  (Id., at 54-55);

5.  If Petitioner stabbed Cabaccang, it was in self-defense.  (Id., at 55-80);

6.  If Petitioner stabbed Cabaccang, it was reckless Manslaughter. (Id., at 80-84, 87); and

> 7.  If Petitioner stabbed Cabaccang, it was extreme emotional disturbance Manslaughter. (Id., at 84-86, 87).

The jury found Petitioner guilty as charged. (Id., at 137-139).

On March 20, 1997, Petitioner later filed a Motion for New Trial or in the Alternative for Entry of Judgment of Lesser conviction on Count One. (Vol. 2, Exh. "A", at 614-623). The trial court orally denied the motion. (Vol. 4, Exh. "U", at 19).

On April 18, 1997, trial counsel filed a Motion for Withdrawal and Substitution of Counsel. (Vol. 2, Exh. "A", at 636). As part of the motion, trial counsel attached an Affidavit of Taryn Christian, which was apparently given to trial counsel. (Id., at 639). In the affidavit, Petitioner made reference to potential claims of ineffective assistance of counsel. On May 30, 1997, the trial court granted the motion to withdraw and appointed Pamela O'leary Tower, Esq. to represent Petitioner on appeal. (Id., at 712).

On June 24, 1997, Petitioner filed a Notice of Appeal. (Vol. 2, Exh. "A", at 719-722). In his Opening Brief filed on November 24, 1997, Petitioner raised the following issues on direct appeal:

> 1.  The trial court erred in denying Defendant his constitutional and statutory right to testify;
>
> 2.  The trial court erred in denying Defendant's motion for new trial wherein he argued that the trial court should have allowed him to testify;

3.    The trial court erred in denying Defendant's request to admit evidence another person confessed to committing the crime with which Defendant was charged, therefore, denying him his constitutional right to a fair trial;

    a. The trial court applied the wrong standard for reviewing Defendant's proffered evidence;

    b. Even if the trial court applied the correct standard for reviewing Defendant's proffered evidence, the court erred in finding that the evidence was not sufficiently trustworthy;

4.    Defense counsel provided Defendant with ineffective assistance by advising him it was too late for him to testify.

(Vol. 5, Exh. "V", at i, 15-30).

On February 18, 1998, the State filed its Answering Brief. (Vol. 5, Exh. "W"). On March 9, 1998, the Petitioner filed the Defendant-Appellant's Reply Brief. (Vol. 5, Exh. "X").

On November 10, 1998, the Hawai`i Supreme Court issued its published decision and found that Petitioner's points on appeal were "without merit." (Vol. 5, Exh. "Y", at 2). The Hawai`i Supreme Court affirmed the circuit court's judgment, conviction, and sentence with respect to Count One (Murder in the Second Degree) and Count Three (Attempted Theft in the Third Degree), and reversed Petitioner's conviction and sentence on Count Two (Use of Deadly or Dangerous Weapon in the Commission of a Crime), based on State v. Jumila, 87 Hawai`i 1, 950 P.2d 1201 (1998). On remand, Count Two (Use of Deadly or

Dangerous Weapon in the Commission of a Crime) was dismissed with prejudice. (Id., at 2-3).

On January 31, 2000, Petitioner filed a *pro se* Petition to Vacate, Set Aside, or Correct Judgment or to Release Prisoner from Custody pursuant to Hawai`i Rules of Penal Procedure ("HRPP") Rule 40. (Vol. 6, Exh. "Z", at 1-37). Petitioner raised 57 grounds for relief. (Id.).

On March 15, 2000, the State filed its State's Response to Rule 40 Petition for Post-Conviction Relief. (Vol. 6, Exh. "Z", at 46-300).

On April 10, 2000, Petitioner filed an Addendum to Rule 40 Petition for Post-Conviction Relief, and raised another six grounds for relief, bringing the number of claimed grounds for relief to 63. (Id., at 301-336). The following day, on April 11, 2000, Petitioner filed another Addendum to Rule 40 Petition for Post-Conviction Relief, raising an additional ground for relief, bringing the number of claimed grounds for relief to 64. (Id., at 337-338).

On December 18, 2000, Petitioner filed another Addendum to Rule 40 Petition for Post-Conviction Relief, and raised two more grounds for relief, bringing the number of claimed grounds for relief to 66. (Vol. 7, Exh. "Z", at 354-552). Petitioner also filed various exhibits to the Addendum. (Id., at 553-788). On February 20, 2001, the State filed its State's Response to Petitioner's Addendum to Rule 40 Petition. (Vol. 8, Exh. "Z", at 793-1085).

On March 13, 2001, Petitioner filed a Supplement to Addendum to Rule 40 Petition, and raised one more ground for relief, bringing the number of claimed grounds for relief to 67. (Vol. 9, Exh. "Z", at 1094-1193). On March 13, 2001, Petitioner filed Supplemental Exhibits to Addendum to Rule 40 Petition. (Vol. 9, Exh. "Z", at 1194-1499).

On April 23, 2002, Petitioner filed a Motion to Produce Evidence for Inspection and Testing ("Motion to Produce") and supporting documents. (Vol. 9, Exh. "Z", at 1503-1533).

On May 2, 2002, the trial court issued its Findings of Fact, Conclusions of Law, and Order Denying Petition for Post-Conviction Relief. (Id., at 1535-1546).

On May 13, 2002, Petitioner filed a Motion for Reconsideration of Findings of Fact, Conclusions of Law, and Order Denying Petition for Post-Conviction Relief ("Motion for Reconsideration") and supporting documents. (Id., at 1553-1567).

Hearings were held on the Motion to Produce and the Motion for Reconsideration on May 30, 2002 and July 17, 2002. (Vol. 10, Exh. "AA", at 1-67; Vol. 10, Exh. "BB", at 1-12). The trial court orally denied both motions on July 17, 2002. (Vol. 10, Exh. "BB", at 11).

On July 1, 2002, Petitioner, through his attorney, Keith S. Shigetomi, filed his Notice of Appeal. (Vol. 9, Exh. "Z", at 1596-1609).

On March 4, 2003, the State received Petitioner's Amended Opening Brief. (Vol. 10, Exh. "CC").  On May 2, 2003, the State filed its Answering Brief. (Vol. 10, Exh. "DD").  On June 9, 2003, the State received Petitioner-Appellant's Reply Brief. (Vol. 10, Exh. "EE").

On November 24, 2004, the Hawai`i Supreme Court issued a Summary Disposition Order affirming the lower court's denial of Petitioner's HRPP Rule 40 petition for post-conviction relief as follows:

> "Upon carefully reviewing the record and the briefs submitted and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Christian's contentions as follows:
>
> (1) Inasmuch as <u>Massaro v. United States</u>, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), upon which Christian relies, is not binding on this court, we hold that Christian's Rule 40 ineffective assistance of counsel claims were waived because he did not raise them in his direct appeal. See HRPP Rule 40(a)(3) (2000). Moreover, even if these contentions were not waived, Christian failed to demonstrate that his trial counsel's decision against enhancing the taped conversation between Christian and his former girlfriend and playing the 911 tape for the jury resulted in the withdrawal or substantial impairment of a potentially meritorious defense. See <u>State v. Fukusaku</u>, 85 Hawai`i 462, 480, 946 P.2d 32, 50 (1997).
>
> (2) Christian's claims that further forensic analysis could lead to an ineffective assistance of trial counsel claim and his list of potential issues that could possibly substantiate a claim of ineffective assistance of trial counsel fail to demonstrate any specific errors or omissions reflecting counsel's lack of skill, judgment or diligence. <u>Id</u>.
>
> (3) Christian maintains that appellate counsel was ineffective for failing to allege in his direct appeal that the DNA analyst's

testimony was inconsistent and that the police used unreliable eyewitness identification evidence during its investigation. Because these contentions were not raised in his Rule 40 petition, they are deemed waived. State v. Moses, 102 Hawai`i 449, 456, 77 P.3d 940, 947 (2003) ("if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[ ]").  Even if these contentions were not waived, Christian fails to demonstrate that appellate counsel's failure to raise the aforementioned contentions resulted in the withdrawal or substantial impairment of a potentially meritorious defense, or that appellate counsel's performance fell below that of a reasonably competent, informed and diligent attorney in criminal cases.  See Briones v. State, 74 Haw. 442, 465-67, 848 P.2d 966, 977-78 (1993).  Accordingly, we hold that Christian failed to state a colorable claim of ineffective assistance of appellate counsel.

    (4) Finally, Christian's remaining contentions regarding "actual innocence," the testing of physical evidence, alleged improper identification evidence used by police, and the prosecution's alleged use of false and/or misleading evidence pertain to matters that occurred during trial and, therefore, should have been raised in the direct appeal.  Thus, the validity of these claims turns on whether Christian had effective assistance of appellate counsel on his direct appeal.  As indicated above, Christian failed to establish a colorable claim of ineffective assistance of appellate counsel.  Accordingly, Christian fails to rebut the presumption that his remaining claims were knowingly and understandingly waived.  See HRPP Rule 40(a)(3)."

(Vol. 10, Exh. "FF") (footnotes omitted).

    On December 22, 2004, Petitioner filed a Petition Under 28 U.S.C. § 2254

For Writ Of Habeas Corpus By A Person In State Custody ("Petition") in the

United States District Court ("District Court") For the District of Hawaii.  On

May 25, 2005, the District Court issued an Order to Show Cause directing

Respondents Richard Bissen and the State of Hawai`i Department of Public Safety ("Respondents") file an answer to the petition on or before July 25, 2005. On July 12, 2005, the District Court granted Respondent's Ex Parte Application For Enlargement Of Time For Respondents To File Answer To Petition For Writ Of Habeas Corpus, rendering the Respondent's Answer due on September 23, 2005. On September 21, 2005, the District Court granted Respondent's Second Ex Parte Application For Enlargement Of Time For Respondents To File Answer To Petition For Writ Of Habeas Corpus, thus, rendering the Respondent's Answer due on September 30, 2005. Respondents filed their Answer on September 30, 2005.

## II. STANDARD OF REVIEW.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id., at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id., at 411.

Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

III. ARGUMENT.

A.    ALL OF PETITIONER'S PROCEDURALLY DEFAULTED CLAIMS MUST BE DISMISSED SINCE PETITIONER CANNOT MEET HIS BURDEN OF PROVING THAT HE IS ACTUALLY INNOCENT.

A claim that was not, and can no longer be, fairly presented in state court is procedurally defaulted. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). Likewise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule. Coleman v. Thompson, 501 U.S. 722, 750 (1991). A state procedural rule constitutes an adequate bar to federal court review if it was "firmly established and regularly followed" at the time it was applied by the state court, Ford v. Georgia, 498 U.S. 411, 424 (1991). If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

In this case, most of Petitioner's eight grounds are procedurally defaulted and are therefore precluded from federal habeas relief. However, Ground One has not been procedurally defaulted since that ground was fairly presented in Petitioner's Opening Brief on direct appeal to the Hawai`i Supreme Court. (Vol. 5, Exh. "V", at 14-21). Likewise, Petitioner's Fourteenth Amendment claim in Ground Two is also not procedurally defaulted since Petitioner also fairly

-22-

presented this claim in his Opening Brief on direct appeal. (Id., at 24-25).  On the other hand, however, all of Petitioner's remaining grounds are procedurally defaulted.

As stated in Respondents' Answer, Petitioner's claims in Grounds Two (Fifth and Sixth Amendment), Three (trial counsel's alleged impeding of Petitioner's right to testify), Seven (ineffective assistance of appellate counsel), and Eight (ineffective assistance of trial counsel), and are unexhausted since these claims were not fairly presented to the Hawai`i Supreme Court.  Because these unexhausted claims can no longer be fairly presented in state court pursuant to Hawaii Rules of Penal Procedure ("HRPP") Rule 40(a)(3), which is an independent and adequate state procedural rule that has been firmly established and regularly followed, these unexhausted claims are precluded from federal habeas relief.  See Matias v. Oshiro, 683 F.2d 318, 319-21 (9th Cir. 1982) (district court properly found that HRPP Rule 40 precluded the availability of any state proceeding to raise the new ineffective assistance claim).

Second, Grounds Three, Four, Five, and Six, are also precluded from federal habeas relief because those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, namely HRPP Rule 40(a)(3).  On November 24, 2004, the Hawai`i Supreme Court issued its Summary Disposition Order ("SDO") denying Petitioner's HRPP Rule 40 petition for post-conviction

-23-

relief. (Vol. 10, Exh. "FF", at 1-4).  In the SDO, the Hawai`i Supreme Court

recognized that Petitioner raised sixty-seven different grounds for which were

categorized into three main areas: (1) ineffective assistance of trial counsel; (2)

ineffective assistance of appellate counsel; and (3) improper use of evidence.

After carefully reviewing the record and the briefs submitted and having given due

consideration to the arguments advanced and the issues raised by the parties, the

Hawai`i Supreme Court resolved Petitioner's contentions as follows:

> (1) Inasmuch as <u>Massaro v. United States</u>, 538 U.S. 500, 123
> S.Ct. 1690, 155 L.Ed.2d 714 (2003), upon which Christian relies, is
> not binding on this court, ***we hold that Christian's Rule 40
> ineffective assistance of counsel claims were waived because he did
> not raise them in his direct appeal***.  **See HRPP Rule 40(a)(3)
> (2000)**.  Moreover, even if these contentions were not waived,
> Christian failed to demonstrate that his trial counsel's decision against
> enhancing the taped conversation between Christian and his former
> girlfriend and playing the 911 tape for the jury resulted in the
> withdrawal or substantial impairment of a potentially meritorious
> defense.  See <u>State v. Fukusaku</u>, 85 Hawai`i 462, 480, 946 P.2d 32,
> 50 (1997).
>
> (2) Christian's claims that further forensic analysis could lead
> to an ineffective assistance of trial counsel claim and his list of
> potential issues that could possibly substantiate a claim of ineffective
> assistance of trial counsel fail to demonstrate any specific errors or
> omissions reflecting counsel's lack of skill, judgment or diligence.  <u>Id</u>.
>
> (3) Christian maintains that appellate counsel was ineffective
> for failing to allege in his direct appeal that the DNA analyst's
> testimony was inconsistent and that the police used unreliable
> eyewitness identification evidence during its investigation.  Because
> these contentions were not raised in his Rule 40 petition, they are
> deemed waived.  <u>State v. Moses</u>, 102 Hawai'i 449, 456, 77 P.3d 940,

947 (2003) ("if a party does not raise an argument at trial, that
argument will be deemed to have been waived on appeal[ ]").  Even if
these contentions were not waived, Christian fails to demonstrate that
appellate counsel's failure to raise the aforementioned contentions
resulted in the withdrawal or substantial impairment of a potentially
meritorious defense, or that appellate counsel's performance fell
below that of a reasonably competent, informed and diligent attorney
in criminal cases.  See Briones v. State, 74 Haw. 442, 465-67, 848
P.2d 966, 977-78 (1993).  Accordingly, we hold that Christian failed
to state a colorable claim of ineffective assistance of appellate
counsel.

    (4) Finally, ***Christian's remaining contentions regarding
"actual innocence," the testing of physical evidence, alleged
improper identification evidence used by police, and the
prosecution's alleged use of false and/or misleading evidence
pertain to matters that occurred during trial and, therefore, should
have been raised in the direct appeal***.  Thus, the validity of these
claims turns on whether Christian had effective assistance of
appellate counsel on his direct appeal.  As indicated above, Christian
failed to establish a colorable claim of ineffective assistance of
appellate counsel.  Accordingly, Christian fails to rebut the
presumption that his remaining claims were knowingly and
understandingly waived.  **See HRPP Rule 40(a)(3).**

(Vol. 10, Exh. "FF", at 1-4) (emphasis added).  Based upon the above, it is clear

that all of Petitioner's ineffective assistance of trial counsel issues were found to

be waived pursuant to HRPP Rule 40(a)(3).  Likewise, all of remaining

contentions regarding "actual innocence," the testing of physical evidence, alleged

improper identification evidence used by police, and the prosecution's alleged use

of false and/or misleading evidence were also found to be waived  pursuant to

HRPP Rule 40(a)(3).  Accordingly, Grounds Four, Five, and Six, are procedurally

defaulted, and are therefore precluded from federal habeas relief.

>    1.    Cause And Prejudice, Fundamental Miscarriage Of Justice.

Petitioners are barred from raising procedurally defaulted claims in federal

court unless they demonstrate:  (1) "cause" for failing to properly present the claim

to the state court; and (2) "actual prejudice" resulting from such failure; or (3) "a

fundamental miscarriage of justice." Edwards v. Carpenter, 529 U.S. 446, 451

(2000); Coleman v. Thompson, 501 U.S. 722, 732 (1991).

In procedural default cases, the cause standard requires the petitioner to

show that "some objective factor external to the defense impeded counsel's

efforts" to raise the claim in state court.  Murray v. Carrier, 477 U.S. 478, 488

(1986).  Objective factors that constitute cause include "interference by officials"

that makes compliance with the State's procedural rule impracticable, and "a

showing that the factual or legal basis for a claim was not reasonably available to

counsel." Id.

Once the petitioner has established cause, he must show "actual prejudice"

resulting from the errors of which he complains.  United States v. Frady, 456 U.S.

152, 168 (1982).  To establish prejudice resulting from a procedural default, a

habeas petitioner bears "the burden of showing not merely that the errors at his

trial constituted a possibility of prejudice, but that they worked to his actual and

substantial disadvantage, infecting his entire trial with errors of constitutional dimension." United States v. Frady, 456 U.S. 152, 170 (1982).

Lastly, the miscarriage of justice exception allows a federal court to hear the merits of the procedurally defaulted claims if the failure to hear the claims would constitute a "miscarriage of justice." See Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992) (citations omitted). In the federal habeas corpus context, the "miscarriage of justice" exception is limited to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995). A petitioner demonstrates a miscarriage of justice if he shows that the constitutional error complained of probably resulted in the conviction of an innocent person. Schlup v. Delo; accord House v. Bell, ___ U.S.___, 126 S. Ct. 2064 (2006). It is known as a "gateway innocence claim" because it is the gateway through which a petitioner must pass in order to have otherwise barred constitutional claims considered. It is not sufficient to merely show that a reasonable doubt exists in the light of the new evidence. Rather, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 326; see also Fairchild v. Norris, 51 F.3d 129, 130-31 (8th Cir. 1995) (standard not satisfied where "at least one juror, acting reasonably and properly instructed," would have convicted

the petitioner). "Petitioner bears the burden of proof on this issue by a preponderance of the evidence, and he must show not just that the evidence against him was weak, but that it was so weak that 'no reasonable juror' would have convicted him." Lorentsen v. Hood, 223 F.3d 950, 954 (9th Cir. 2000).

In Ground Four, Petitioner alleges that "the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitution entitle Mr. Christian to relief based upon actual innocence and entitle him to a hearing and to forensic testing to support his pronouncement of innocence". (Petition, at 26). In support of this Ground, Petitioner primarily relies upon Schlup v. Delo, 513 U.S. 298 (1995).

In this case, Petitioner fails to demonstrate that a constitutional violation has probably resulted in the conviction of one who is actually innocent. Petitioner argues that:  1) "Forensic testing *may* resolve important innocence issues," (Petition, at 27) (emphasis added); and 2) "Mr. Christian is entitled to proceed with claims of innocence in federal court because testing and other evidence *can* show that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" (Petition, at 29) (emphasis added).  More specifically, Petitioner bases his claims on the issues of DNA testing of blood at the murder scene and bite mark analysis of the bite on Seidel.

At the outset, the Petitioner has not provided any new reliable evidence that would create a colorable claim of actual innocence.  In fact, Petitioner has not

produced any exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial. For instance, the only evidence of the alleged existence of a "third man" at the murder scene, is Petitioner's unsubstantiated self-serving proffered testimony . Apparently, Petitioner *hopes* that DNA testing would possibly show the presence of someone's DNA at the crime scene. However, even assuming *arguendo* this to be true, the jury would still have to decide whether to believe Petitioner's claim that he did not kill Cabaccang, because the presence of someone else's blood at the murder scene does not automatically deem Petitioner innocent. Likewise, Petitioner's reliance on the possibility that bite mark analysis could show "actual innocence" is also specious. The bite mark was a barely photographable bruise on the date of the offense. (Vol. 6, Exh. "Z", at 274-275). According to Detective Gapero, although the bruise appeared to be a bite mark, there were no indentations or impressions that would have allowed police to take some sort cast. (Vol. 3, Exh. "M", at 23-24). Because it was a bruise and not an actual a "bite mark", a bite mark analysis could not determine whether the bruise came from the Petitioner. Accordingly, Petitioner again offers no new reliable evidence pertaining to the bite mark that would create a colorable claim of actual innocence.

Finally, in light of all the other evidence, as discussed below, Petitioner cannot show that it is more likely than not that no reasonable juror would have

convicted him.  Unlike in Schlup, the overwhelming physical, testimonial, and forensic evidence in this case clearly implicated Petitioner in Cabaccang's murder.

First, according to the trial testimony, the assailant wore a baseball cap at the time of the stabbing.  (Vol. 3, Exh. "K", at 73).  Police recovered a "Michigan" baseball cap at the murder scene (State's Exhibit 8).  According to Schmidt, the individual that Schmidt observed walking away from the murder scene, which Cabaccang identified as the assailant, appeared to have been wearing some type of hat on his head.  (Vol. 3, Exh. "L", at 18).  When police searched Petitioner's vehicle and residence on August 17, 1995, police did not find a Michigan baseball cap.  (Vol. 3, Exh. "M", at 31, 68; Vol. 4, Exh. "N", 43).  Petitioner's co-worker Catugal, testified that he always observed Petitioner to be wearing hats.  (Vol. 3, Exh. "M", at 45).  At trial, the State admitted photographs which depicted Petitioner wearing a "Michigan" baseball cap.  (State's Exhibits 32, 33, 34, 35).  (Vol. 4, Exh. "N", at 43; Vol. 4, Exh. "O", at 40).  Kimmey testified that prior to Cabaccang's murder, she saw Petitioner wearing a Michigan baseball cap, however, after the murder she did not see Petitioner with the cap.  (Vol. 4, Exh. "O", at 10-11).

Second, Cabaccang's killer wore a flannel type shirt and plastic gloves at the time of the stabbing.  (Vol. 3, Exh. "K", at 63, 82).  According to Schmidt, the individual that Schmidt observed walking away from the murder scene, which

Cabaccang identified as the assailant, wore a long sleeve plaid shirt. (Vol. 3, Exh. "L", at 19-20). About three days after Cabaccang's murder, police recovered a black flannel jacket (State's Exhibit 10) containing a pair of plastic gloves (State's Exhibit 11) within one of the pockets, about three blocks from the crime scene. Vol. 3, Exh. "L", at 88-90). Kimmey testified that she observed Petitioner to have "other flannels" at his house. (Vol. 4, Exh. "O", at 41). According to Petitioner's former employer, the restaurant used identical plastic type gloves in their food preparation. (Vol. 3, Exh. "L", at 100). These gloves were kept in an unlocked area, accessible to Petitioner. (Id., at 102). When police searched Petitioner's residence on August 17, 1995, police recovered an open box of plastic gloves from under the sink area. (Vol. 3, Exh. "M", at 64).

Third, the killer used a double bladed knife to inflict multiple fatal wounds to Cabaccang. The testimony of Dr. Manoukian established that Cabaccang's multiple "double stab wounds" were consistent with having been caused by the double bladed knife recovered from the murder scene (State's Exhibit 5). (Vol. 4, Exh. "O", at 93). It was Dr. Manoukian's opinion to a reasonable medical certainty that Cabaccang's cause of death was due to multiple stab wounds caused by a double pronged instrument. (Vol. 4, Exh. "O", at 96-97). Seidel recognized State's Exhibit 5 as the knife that she and Cabaccang were trying to get out of the assailant's hands. (Vol. 3, Exh. "K", at 83). Petitioner's former co-worker,

Catugal, testified that after work one day, before Cabaccang's murder, Petitioner showed him a black handled double bladed knife which Petitioner retrieved from under Petitioner's car seat. (Vol. 3, Exh. "M", at 42-44). At trial, Catugal recognized State's Exhibit 5 as looking exactly like the one Petitioner showed him after work. (Vol. 3, Exh. "M", at 44). When police searched Petitioner's vehicle and residence on August 17, 1995, police did not find a black handled double bladed knife. (Vol. 3, Exh. "M", at 31, 67; Vol. 4, Exh. "N", at 43). Although somewhat unsure of the exact dates, Megan Kenny testified that on the evening of July 13, 2005, she saw a double bladed knife in Petitioner's room. (Vol. 4, Exh. "Q", at 45-46). When shown State's Exhibit 5 at trial, Lisa Kimmey testified that she first saw Petitioner with an identical knife when Petitioner bought the knife from "Uncle Jesse's in Wailuku." (Vol. 4, Exh. "O", at 8). Kimmey further testified that prior to Cabaccang's murder, she saw Petitioner with the knife, but after the murder, she did not see Petitioner with the knife. (Vol. 4, Exh. "O", at 8). As part of the murder investigation, Detective Brian Kaya discovered that Uncle Jesse's sold double bladed knives. (Vol. 3, Exh. "M", at 79).

Fourth, Cabaccang's killer wore covered shoes and carried a phillips screwdriver during the time of the stabbing. (Vol. 3, Exh. "K", at 63, 73-74). According to Schmidt, the individual that Schmidt observed walking away from the murder scene, which Cabaccang identified as the assailant, wore dark high top

shoes. (Vol. 3, Exh. "L", at 45). Kimmey testified that prior to Cabaccang's murder, Petitioner wore high top black Nike boots, but after the murder, she did not see Petitioner wear those boots. (Vol. 4, Exh. "O", at 1). Duponte testified that sometime after July 14, 1995, Petitioner came to work with an injury which, according to Petitioner, prevented him from wearing his shoes to work. (Vol. 3, Exh. "L", at 103). When police searched Petitioner's vehicle and residence on August 17, 1995, police did not find any black Nike boots. (Vol. 3, Exh. "M", at 30, 67; Vol. 4, Exh. "N", at 43). Dooley testified that she had observed Petitioner carry Phillips screwdrivers with him. (Vol. 3, Exh. "K", at 14).

Fifth, within a few days after the murder, witnesses observed injuries on Petitioner's stomach and hands. Kimmey testified that she noticed cuts on Petitioner's fingers, as well as a scratch on his stomach. (Vol. 4, Exh. "O", at 31-32, 41). According to Kimmey, Petitioner told her that the cuts on his fingers were from grabbing the knife after Cabaccang had grabbed the knife by the handle. (Vol. 4, Exh. "O", at 43). Jennifer German testified that in late July 1995, she was at the beach with Petitioner and observed a scratch on Petitioner's stomach area which was about four inches in length. (Vol. 4, Exh. "Q", at 21).

Six, all of the evidence points to only *one* assailant. According to Seidel, there was only one man at the scene during the fatal stabbing. (Vol. 3, Exh. "K", at 73, 116-117). According to Kimmey, Petitioner never mentioned that another

-33-

person stabbed Cabaccang. (Vol. 4, Exh. "O", at 43). In fact, three days after the murder, Petitioner admitted to Kimmey that he had stabbed Cabaccang. (Id., at 43). Two eye witnesses, Seidel and Schmidt, directly observed Cabaccang's assailant on the night of the murder. Both identified Petitioner as the attacker in separate photo lineups and during the trial. Neither of them identified Burkhart as the killer.

Seven, Petitioner's tape recorded statements made to Kimmey a little over a month after Cabaccang's murder were extremely incriminating. For example, Petitioner made the following statements, in pertinent part, during in the conversation with Kimmey:

> Lisa: Why did you go down there and do that?
>
> Taryn: I don't know. You think I don't regret it? Shit.

(Vol. 6, Exh. "Z", at 249).

> Lisa: You had the knife. It's your knife, Taryn, it's your hat, it's your jacket, everything
>
> Taryn: I know, but he was the one who pulled the knife.

(Vol. 6, Exh. "Z", at 252).

> Lisa: Well, do you think the cops found any of your clothes?
>
> Taryn: No.
>
> Lisa: No?

Taryn: I know they found that hat because they described it.

(Vol. 6, Exh. "Z", at 256).

Lisa: But I didn't do anything, it's you who did the thing. Taryn, isn't it in your conscience that you killed someone?

Taryn: Of course. Every day.

(Vol. 6, Exh. "Z", at 258). Clearly, Petitioner's statements in the context in which they were made, were highly incriminating because they not only establish that Petitioner was at the murder scene, but also demonstrates Petitioner's consciousness of guilt. Thus, Petitioner's "non-denials" were tantamount to an express confession of guilt.

In conclusion, because Petitioner has failed to demonstrate that his is "actually innocent", Petitioner cannot pass though the "gateway" to have his otherwise barred constitutional claims considered on the merits.

B.    EVEN ASSUMING *ARGUENDO*, THAT PETITIONER MET HIS BURDEN OF PROVING ACTUAL INNOCENCE, ALL OF PETITIONER'S CLAIMS FAIL ON THE MERITS.

1. Ground One.

In Ground One, Petitioner alleges violations of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because Petitioner was "arbitrarily deprived of his right to testify." (Petition, at 7). In support of this Ground, Petitioner cites Rock v. Arkansas, 483 U.S. 44 (1987). However,

Petitioner fails to specifically demonstrate how the Hawai`i Supreme Court's adjudication on the merits resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. In fact, Petitioner neither describes the particular facts of <u>Rock</u>, nor articulates the governing legal principle from that case.

In <u>Rock</u>, the question before the Court was whether a criminal defendant's right to testify may be restricted by a *per se* state rule that excluded the defendant's post-hypnosis testimony. <u>Rock</u>, at 54. There, the Court recognized that the right to present relevant testimony is not without limitation, and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." <u>Id</u>., at 55-56. Restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. <u>Id</u>. In applying its evidentiary rules, a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify. <u>Id</u>. Numerous state procedural and evidentiary rules control the presentation of evidence and do not offend the defendant's right to testify. <u>Id</u>., at n.11.

In this case, the Hawai`i Supreme Court's affirming the trial court's refusal to reopen the evidentiary portion of the trial was consistent with the governing

legal principles in Rock. In rendering its decision, the Hawai`i Supreme Court, stated:

> Obviously, in this jurisdiction, as the Ephraim court recognized was the case in Alabama, "the trial court has discretion in scheduling and in determining courtroom procedure." 627 So.2d at 1105. See HRE Rule 611(a) (1993) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."). Moreover, we agree with the Mayfield court both that, "on every occasion where a defendant recants his election to remain silent," the trial judge need not "blindly adhere to the whims of a fickle defendant" or comply with an "assertion of the right to testify [that] is merely an attempt at some subterfuge" and that prejudicial delay or "disruption to the orderly processes of the trial" may legitimately entitle the trial judge to preclude the "recantation," however "sincere" the defendant's waiver of the right to testify may be.

(Vol. 5, Exh. "V", at 25); State v. Christian, 88 Hawai`i 407, 422, 967 P.2d 239, 254 (1998). Clearly, the Hawai`i Supreme Court recognized that the Petitioner's right to testify must be balanced against the trial court's legitimate interest in promoting both fairness and order in the trial. In this case, Petitioner not only knowingly and voluntarily waived his right to testify on March 6, 1997, but also attempted to disrupt the orderly court proceedings by improperly tainting the jury with incompetent and inadmissible hearsay evidence.

First, the manner in which Petitioner reasserted his desire to testify is highly suspect. Petitioner waited literally seconds before the State was to commence its

closing arguments, before making his statement in front of the jury. Moreover,

Petitioner did not just simply assert his right to testify, but instead, clearly and

deliberately attempted to inject inadmissible and prejudicial material before the

jury. Most importantly, Petitioner intentionally disregarded the trial court's

instruction to wait until the jury had left the courtroom before he blurted out

"we're in possession of a tape that shows that Serena Seidel lied on the stand . . .

that witnesses have been in the presence --." (Vol. 4, Exh. "T", at 4). Interestingly,

the focus was not on Petitioner's right to testify, but rather the subject matter of

this mysterious tape.

Second, the timing of Petitioner's request to testify is also suspect. If

Petitioner truly wanted to testify because Seidel allegedly "committed perjury in

this court" (Vol. 4, Exh. "T", at 5), Petitioner could have requested to do so

earlier. Petitioner apparently possessed the purported tape at least by "the first

week of trial." (Id.). Any alleged perjury by Seidel would have been detected by

Petitioner when Seidel concluded her testimony on February 26, 1997.

Third, the trial court properly and carefully considered the entire

circumstances in determining whether or not the case would be reopened. The

trial court could have simply admonished Petitioner to refrain from further

outbursts and then resumed with closing statements. Instead, the trial court

allowed trial counsel to confer with the Petitioner, and then held a hearing in

chambers. At that time, the trial court attempted to ascertain the reasons for the Petitioner's change in desire to testify. Also during that time, the trial court learned that the tape Petitioner was referring to had been in Petitioner's possession from the beginning of the trial; had apparently been discussed with defense counsel; had not been provided to defense counsel until that very morning just prior to closing arguments; and had not been heard by defense counsel. (Vol. 4, Exh. "T", at 5-6). In the end, after having been asked by the trial court, if there was anything else, Petitioner informed the trial court: "No, that is all." (Id., at 6). Petitioner did not ask the trial court to testify at this late stage. Nor did Petitioner re-assert his right to testify. Indeed, from Petitioner's answer it appeared that Petitioner had accomplished his objective of interjecting prejudicial material in the presence of the jury.

Finally, Petitioner apparently understood his rights and the court process. On numerous occasions, during the pendency of the case, Petitioner was able to address the trial court, demonstrating that he knew he had the ability to personally speak to the judge and raise his concerns. For example, during the trial on March 4, 1997, Petitioner apparently informed Mr. Ranken that Petitioner wished to address the court and proceeded against his counsel's advice, to do so. (Vol. 4, Exh. "N", at 3-5). At that time, Petitioner requested that his "court appointed attorney step down because of his ineffectiveness of counsel" and that "we need a

judicial determination before we can proceed with this action before the court."

Curiously, however, Petitioner waited until the jury was in the courtroom, and

seconds before the prosecution's closing argument was to commence, before

expressing his change in desire to testify.

Based upon all of the above considerations, the trial court did not arbitrarily

and disproportionately restrict Petitioner's right to testify.  Accordingly, the

Hawai`i Supreme Court's adjudication on the merits of this claim was not was

contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States, and therefore

Petitioner is not entitled to habeas relief.

### 2. Ground Two.

In Ground Two, Petitioner alleges violations of the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution because of the trial

court's refusal to admit the confessions of James "Hina" Burkhart into evidence.[3]

(Petition, at 14).  In support of this Ground, Petitioner cites Chambers v.

Mississippi, 410 U.S. 284 (1973).  Again, Petitioner fails to specifically

demonstrate how the Hawai'i Supreme Court's adjudication on the merits resulted

---

[3] Although some of the claims in this ground are unexhausted and
procedurally barred, Respondents, alternatively, without conceding, addresses this
claim on the merits.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of
habeas corpus may be denied on the merits, notwithstanding the failure of the
applicant to exhaust the remedies available in the courts of the state.").

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, namely Chambers.  Although unclear, Petitioner apparently alleges that the Hawai`i Supreme Court *unreasonably applied* the governing legal principles in Chambers to the facts of Petitioner's case. Specifically, Petitioner claims that it was unconscionable and a violation of Petitioner's federal constitutional rights for the prosecution to be allowed to attempt to exonerate its initial suspect and for the defense to be prohibited from rebutting that testimony. (Petition, at 16).  Petitioner is wrong.

In Chambers, the alleged "real perpetrator", Gable McDonald, testified among other things, about his (McDonald) absence from the crime scene during the critical period.  Chambers, at 291.  Following that, Chambers attempted to introduce testimony of three witness to whom McDonald had confessed.  Id, at 292.  After the state objected on the basis of hearsay, the trial court sustained the objection.  Id.  On certiorari review, the United States Supreme Court concluded that the "[e]xclusion of this critical evidence", among other things, denied Chambers a trial in accord with traditional and fundamental standards of due process.  Id., at 302.

In this case, the Hawai`i Supreme Court's decision on this issue was not an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.  First, the Hawai`i Supreme Court properly

identified the governing legal principles as set forth in Chambers. (Vol. 5, Exh. "V", at 39). Following that, the Christian court painstakingly analyzed and distinguished the facts in Chambers, from the facts in Petitioner's case. In doing so, the Christian court opined that "it is apparent that the corroborating circumstances of the type noted by the Chambers court are not present in the instant case. " (Vol. 5, Exh. "V", at 43; Christian, at 430, P.2d 262). Specifically, the Christian court stated:

1.    First, no eyewitness linked Burkhart to the stabbing of Cabaccang. On the contrary, the two individuals who had an opportunity to observe Cabaccang's assailant failed to identity Burkhart in a photo lineup, and instead, both identified Christian as the attacker.

2.    Moreover, the prosecution offered two witnesses who placed Burkhart at another location at the time of the stabbing. Second, neither of the two confessions allegedly made by Burkhart were sworn, as was McDonald's confession to Chambers's attorneys.

3.    Finally, while there is evidence that Burkhart owned an unusual "butterfly" knife, Christian himself conceded that the split blade knife found at the crime scene was not a "butterfly" knife. The only arguably corroborating evidence offered by Christian did not link Burkhart to the crime, but rather, in a rather tenuous manner, to the neighborhood in which the crime took place, by indicating that Burkhart had failed to appear at the nearby home of his friends, who had been expecting his visit that evening.

(Vol. 5, Exh. "V", at 43-44; Christian, at 430-31, P.2d 262-63).  Therefore, the Hawai`i Supreme Court reasonably applied the governing legal principles in Chambers to the facts of Petitioner's case.

Second, Petitioner's own exhibits attached to his HRPP Rule 40 petition provide further support that the Burkhart confessions were not supported by "corroborating circumstances clearly indicating the trustworthiness of the statement".  Specifically, in one of Petitioner's exhibits (Vol. 7, Exh. "Z", at 637), which is apparently a partial transcript of an interview of Tesha Santana, Santana states the following:

1.    Burkhart was supposed to go to Santana's house one week prior to the day of the murder; (Id., at 637).

2.    Burkhart did not show up on the day of the murder; (Id., at 637).

3.    Santana did not have any information that Hina "was seeing Serina;" (Id., at 639).

4.    It was the police who initially brought up Burkhart's name, not Santana; (Id., at 640).

5.    Burkhart never admitted to Santana "that he did it;" (Id., at 642).

6.    Burkhart personally denied stabbing Cabaccang; (Id., at 650).

7.    Burkhart also told Santana that he was staying at his cousin's house; (Id., at 651).

8.     Santana heard Cabaccang say "Why" blank "keys", but did not
       hear "why did you give him the keys," (Id., at 661-62).

Plainly, the above statements by Santana not only corroborates the State's two

rebuttal witnesses that would have testified that Burkhart was staying in Kula at

the time of the murder, but also directly contradicts the trustworthiness of the

alleged Burkhart confessions.

Furthermore, Burkhart's alleged confession to Patricia Mullins ("Mullins")

is highly suspect.  Apparently, Mullins was working as a defense investigator in

connection with Petitioner's mother, Lori Smith.  In an exhibit submitted as part of

his HRPP Rule 40 petition, Mullins apparently conducted a taped interview with

someone purported to be "James Shim" ("Shim").  (Vol. 7, Exh. "Z", at 688-704).

According to the transcript of that interview, Mullins explained to Shim that

Mullins was "[o]ne of the investigators ...," and that she had "read reports after

reports ..."  (Id., at 698).  At one point, Mullins even invited Shim to "[c]ome

watch me on the stand."  (Id., at 695).  Based upon the transcript, it is apparent that

Mullins also had information that Burkhart told Shim that he (Burkhart) did not

commit the murder.  (Id., at 691).  Shim acknowledged this to be true.  (Id., at

696).

Additionally, in another defense exhibit that was attached to the instant

Petition, which apparently was a statement Mullins gave to the police, Mullins

told police that "[e]verybody knew he [Burkhart] was fooling around with the girlfriend [Seidel]." (See Exhibit #10-A of App. "D" of the Petition). When asked to provide names of people, Mullins gave police two names, Loreal Tavares and Anella Wong. As part of the investigation, police questioned Wong about what Mullins told police. In response, Wong stated, "[I] didn't know what Trish [Mullins] was talking about as I haven't seen or talked to her for a long while, since she in MCCC." (Vol. 7, Exh. "Z", at 606).

Finally, Petitioner cites no reliable evidence indicating that Burkhart was even at the murder scene. In fact, unlike the overwhelming physical evidence against Petitioner, there is no physical evidence linking Burkhart to the crime scene. In fact, the State had two rebuttal witnesses, Harry Auweloa and Helen Beatty, who would have testified that Burkhart was staying at their residence in Kula from July 9, 1995, to July 22, 1995. (Vol. 4, Exh. "Q", at 13; Vol. 9, Exh "Z", at 1276-1278). Both would have testified that Burkhart did not leave the residence during that period. (Id.). However, because the Burkhart confessions weren't allowed into evidence, the jury never heard the testimony of these two rebuttal witnesses.

Based upon all of the above considerations, the trial court did violate the Petitioner's constitutional right to due process. The facts in Chambers are distinguishable from the facts of this case. The Hawai'i Supreme Court not only

identified the correct governing legal principles of Chambers, but also reasonably

applied those principles to the facts of Petitioner's case. Accordingly, the Hawai`i

Supreme Court's adjudication on the merits of this claim was not was contrary to,

or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States, and therefore Petitioner is

not entitled to habeas relief.

### 3. Ground Three.

In Ground Three, Petitioner alleges a violation of the Six Amendment's right

to counsel pursuant to Strickland v. Washington, 466 U.S. 668 (1984). (Petition,

at 18). In particular, Petitioner alleges ineffective assistance of trial counsel based

on the following: 1) trial counsel's failure to employ expert analysis of both the

"Christian-Kimmey" tape and the "911" recordings.

Additionally, Petitioner argues that further "forensic testing could have an

impact on a proper assessment of Christian's ineffective assistance claims".

(Petition, at 22). Finally, Petitioner lists in conclusory fashion, eleven "Other

Issues Warranting Full Consideration", which appear to be additional ineffective

assistance claims. In spite of all of this, however, Petitioner again fails to specify

how the Hawai'i Supreme Court's denial of this Ground resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States.

Nevertheless, Petitioner's allegations are without merit.

In Strickland, the United States Supreme Court articulated the two part federal standard in determining whether a claim that counsel's assistance was so defective required the reversal of the conviction or death sentence. Id., at 687. In its decision, the Strickland court stated the following:

> "[a] defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

> * * *

> "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."

> * * *

> "At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

\* \* \*

> "[c]ounsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments."

Strickland, at 677, 690-91. Furthermore, "[a]ny deficiencies in counsel's

performance must be prejudicial to the defense in order to constitute ineffective

assistance under the Constitution." Id., at 692. Even if a defendant shows that

particular errors of counsel were unreasonable, the defendant must show that they

actually had an adverse effect on the defense. Id., at 693. In other words, "the

defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Id.,

at 694. A reasonable probability is a probability sufficient to undermine

confidence in the outcome. Id.

### a. Christian-Kimmey Tape.

Petitioner complains that his trial counsel was ineffective because trial

counsel did not have the taped conversation between Petitioner and Kimmey

enhanced or had the volume adjusted properly for the jury. Petitioner's complaint

is frivolous.

First, trial counsel argued in closing arguments that Kimmey tried to "trap" Christian in the taped telephone call. (Vol. 4, Exh "T", at 39-40). Second, trial counsel argued that Kimmey and Petitioner had the following exchange:

> Lisa: So you think it's okay? So you think that I should feel more sorry for you because you're the one who stabbed him and not me?

> Taryn: I'm not asking that. I wasn't the one who stabbed him, and I know that for a fact;

(Id., at 54-55). Third, trial counsel told the jury that they will have headphones in the jury room so they could "try to hear (the tape) better." (Id.). Finally, the jury was not provided a copy of the transcript, but instead heard the tape and had the opportunity to review the tape in the jury room.

Therefore, the jury had the opportunity to listen carefully to the tape, including with headphones. Furthermore, the cases cited by Petitioner[4] do not apply because trial counsel addressed this issue clearly before the jury. Accordingly, Petitioner not only fails to demonstrate that trial counsel's failure to have the "Christian-Kimmey tape" enhanced was outside the wide range of professionally competent assistance, but also that there was a reasonable probability that such failure would have changed the result of the proceeding.

---

[4] Kimmelman v. Morrison, 477 U.S. 365 (1986); Miller v. Pate, 386 U.S. 1 (1967); and Alcorta v. Texas, 355 U.S. 28 (1957).

b. <u>911 Tape</u>.

Christian next complains that trial counsel was ineffective because trial counsel did not have the 911 tape recording enhanced. Again, Petitioner's complaint is frivolous since the issue was actually considered, and rejected, by previous trial counsel Dennis Jung ("Mr. Jung").

In a hearing on November 20, 1996, Mr. Jung represented to the trial court the following in pertinent part:

MR. JUNG:

* * *

As far as the 911 recording is concerned, I have agreed to preliminary investigation on that regard and Lori Smith actually did do some analysis on the 911 tape and that the results of that analysis turned out negative. Since then I have been asked by the family -

THE COURT: Negative on what respect? Negative as to what?

MR. JUNG: The tape was turned over to an independent expert examiner to detect the presence of voices on the tape other than the known voices to the 911 operator. That came up negative.

(Vol. 3, Exh. "D", at 11-12). In addition, Mr. Jung told the trial court that he had "no factual basis upon which to believe there is exculpatory evidence contained in the 911 recording to request funds to conduct further testing. (<u>Id</u>., at 12). Moreover, Mr. Jung stated that in order to conduct the requested analysis on the 911 tape, Mr. Jung needed more funds. (<u>Id</u>.).

Petitioner, in hindsight, is second-guessing the decision of Mr. Jung, who determined that he (Mr. Jung) had no basis to believe that exculpatory evidence existed on the 911 tape to warrant the need to request funds for further testing. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Strickland, at 669.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id., at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id., at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.

Indeed, the record affirmatively shows that Mr. Jung specifically determined it would not be in Petitioner's best interest to conduct further testing. Mr. Jung recognized that he had no reasonable basis to request funds from the trial court to conduct further testing. In addition, Petitioner fails to show, other than some conjecture from the audio engineer, that the 911 tape contained a statement by

Cabaccang that "James Burkhart just walked off." In fact, Petitioner argues in his Petition, that "[a] male voice _assumed_ to be Vilmar says the word 'Burkhart'". (Petition, at 21) (emphasis added). All of this is pure speculation and conjecture. Again, Petitioner not only fails to demonstrate that trial counsel's failure to _further_ enhance the 911 tape recording was outside the wide range of professionally competent assistance, but also that there was a reasonable probability that such failure would have changed the result of the proceeding.

### c. Additional Forensic Testing.

Christian also argues that forensic testing _could_ have an impact on a proper assessment of Christian's ineffective assistance claims. Specifically, Petitioner complains that trial counsel was ineffective because he failed to: 1) have DNA testing done; and 2) conduct an examination of the photograph, or the negative, of the bite mark on Seidel's body. (Petition, at 22). Petitioner's claims are both speculative and lack merit.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Strickland, at 691. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. Id. In particular, what investigation decisions are reasonable depends critically on such information. Id. For example, when the facts that support a certain potential line

of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. Id. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. Id.

In this case, Mr. Jung, as a matter of trial strategy, decided not to pursue DNA testing. In fact, Mr. Jung told the trial court that spending money to have DNA tests conducted was, in his opinion, not good strategy. (Vol. 3, Exh. "D", at 11). In addition, Mr. Jung informed the trial court the he had the following concerns:

> "I can represent to the court that things have gone on in this case that I find out about after the fact. I believe that some of the things that have gone on recently have been extremely detrimental to the defense of this case, and I am concerned I have not been a part of it."

(Vol. 3, Exh. "D", at 13).

Second, as previously discussed, the bite mark was a barely photographable bruise on the date of the offense and thus not subject to further analysis or testing.

Therefore, Petitioner fails to demonstrate how in this case, either failing to conduct DNA testing or bite mark analysis was outside the wide range of

professionally competent assistance, and that such omission resulted in actual
prejudice to Petitioner.

### d. Other Issues.

Finally, Petitioner simply lists eleven "Other Issues Warranting Full
Consideration", which appear to be additional issues that could lead to other
ineffective assistance claims. Because Petitioner does not provide any specific
legal argument or detailed factual basis for each of these claims, Petitioner has
again failed to demonstrate his burden of showing that there is a reasonable
probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different.

To conclude, Petitioner has not adequately demonstrated that his trial
counsel's entire performance was outside the wide range of professionally
competent assistance. Here, Petitioner numerous attorneys had repeatedly
requested court authorized funds for investigative services. Indeed, Petitioner had
multiple investigators working on his case. Petitioner has also failed to show that
there is a reasonable probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. Accordingly, the Hawai'i
Supreme Court's refusal to address this claim on the merits, or its alternative denial
on the merits, was not contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States. Thus, Petitioner in not entitled to habeas relief.

In Ground Five, Petitioner alleges a violation of the Fourteenth Amendment's right to due process clause due to the prosecution's alleged use of "improper identification" evidence. (Petition, at 29). In support of this Ground, Petitioner alludes to Foster v. California, 394 U.S. 440 (1969), United States v. Wade, 388 U.S. 218 (1967), Manson v. Brathwaite, 432 U.S. 98 (1977). However, Petitioner again fails to specify how the Hawai'i Supreme Court's denial of this Ground resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. In fact, Petitioner neither describes the particular facts of Foster, Wade, or Brathwaite, nor articulates in detail, the governing legal principles of those cases.

In Foster v. California, the police put Foster in a lineup with other people who were clearly shorter then him. The sole complaining witness could not identify Foster, so the police set up a one-on-one confrontation, in which the complaining witness made a tentative identification. The police then held a second lineup in which Foster was the only repeat subject from the first lineup. This is not at all similar to the instant case.

Likewise, United States v. Wade, is also different.  In Wade, the defendant was placed in a lineup and each subject in the lineup was made to say what the suspect told the complaining witness, without the assistance of counsel.  This is also different from the instant case.  Finally, in Manson, the United States Supreme Court held that a photograph identification by a trained law enforcement officer was, under the totality of the circumstances," sufficient.  There, the Court stated the following:

> We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre and post Stovall [v. Denno, 388 U.S. 293 (1967),] confrontations. The factors to be considered are set out in [Neil v. ]Biggers, 409 U.S.[ 188,] 199-200 [(1972)].  These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

Manson v. Brathwaite, at 114 (footnotes added).

In this case, the totality of the circumstances show that the photographic identification (as presented with pictures of other individuals) was reliable.  First, both Seidel and Schmidt not only had a good opportunity to view Cabaccang's killer, but also demonstrated a high degree of certainty in selecting Petitioner from the photo-lineup.  In fact, Seidel not only fought with the killer, but repeatedly told the killer to "drop the knife".  (Vol. 3, Exh. "K", at 69).  When shown the photo

line-up by Detective Funes on August 22, 1995, a little over a month after the murder, Seidel shook and cried, picked number three, and said "this is him." (Vol. 4, Exh. "N", at 35-36). Similarly, Schmidt had the opportunity to view Petitioner as Petitioner walked away from the murder scene. According to Schmidt, he had a "picture in his mind of the man he saw walking away". (Vol. 3, Exh. "L", at 17). When shown the photographic line-up, State's Exhibit 39, by Detective Funes, he was frightened when he saw picture number 3, and the hair at the back of his neck stood up and it was "a frightening feeling." (Id., at 42-43).

Second, Petitioner does not show how the photograph was impermissibly or unnecessarily suggestive. All he alleges that his picture allegedly made it seem as if he had long hair. Yet, despite this claim, he was clearly identified by eyewitnesses. In fact, at trial, Schmidt testified that he chose "number 3" in the photo lineup (State's Exhibit 39) because of Schmidt's "recognition of the face", and not because of "[t]he brightness or the lightness or the dark or anything". (Vol. 3, Exh. "L", at 43). Clearly, Schmidt chose Petitioner's photo due to Schmidt's recognition of Petitioner's face and not because of the alleged improper shading.

Accordingly, weighing this against the allegation that the photograph was suggestive because of the alleged shading, one cannot reach the conclusion that the photographic lineup procedure warrants federal habeas relief. It cannot be said

that there was "a very substantial likelihood of irreparable misidentification."

Manson, 432 U.S. at 116 (citation omitted). Therefore, the Hawai`i Supreme

Court's refusal to address this claim on the merits, or its alternative denial on the

merits, was not contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States.

Thus, Petitioner in not entitled to habeas relief in this instance.

### 4. Ground Six.

In Ground Six, Petitioner alleges a violation of the Fourteenth Amendment's

right to due process clause due to the alleged use of "false and/or misleading

evidence." (Petition, at 30). In particular, Petitioner alleges the following: "the

use of inaccurate versions of critical tape recordings, the use of a lineup

photograph with a tendency to deceive, and the presentation of apparently

inaccurate DNA evidence resulted in Christian receiving an unfair trial".

However, again, Petitioner fails to specify how the Hawai`i Supreme Court's

denial of this Ground resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States. Nevertheless, Petitioner's allegations are

without merit.

First, as previously discussed, *supra*, the tape recordings were not

inaccurate. Second, again as previously discussed, *supra*, the photographic lineup

was neither impermissibly suggestive, nor unreliable. Third, as discussed *infra*, the testimony of the DNA expert was not inaccurate.

Accordingly, the Hawai`i Supreme Court's refusal to address this claim on the merits, or its alternative denial on the merits, was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.    Thus, Petitioner in not entitled to habeas relief.

    5.  Ground Seven.

In Ground Seven, Petitioner alleges a violation of his Sixth Amendment right to effective assistance of counsel due to appellate counsel's alleged failure to raise meritorious issues on direct appeal.  In support of this Ground, Petitioner alludes to Evitts v. Lucey, 469 U.S. 387 (1985).  However, Petitioner again fails to specify how the Hawai'i Supreme Court's denial of this Ground resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. In fact, Petitioner neither describes the particular facts of Evitts, nor articulates in detail, the governing legal principles of that case.  Specifically, Petitioner entire argument in this Ground is as follows:

> *"Adequate study of the DNA issues would have informed appellate counsel that the DNA analyst's testimony was almost certain to be inaccurate.*

> *Examining the records also would have revealed the problems with the suggestive eyewitness identification issue.*
>
> *Appellate counsel was ineffective for failing to present all the ineffectiveness contentions that are raised in this current § 2254 Petition and in the Rule 40 Petition.*
>
> *Failure to adequately pursue a direct appeal was in contravention of Mr. Christian's basis constitutional rights as identified by the United States Supreme Court. See Evitts v. Lucey, 469 U.S. 387 (1985)."*

(Petition, at 33) (emphasis added).  Petitioner's arguments on this issue were previously raised in a similar fashion in his Opening Brief on Rule 40 appeal. (Vol. 10, Exh. "CC", at 32).  Plainly, Petitioner has failed to demonstrate how the Hawai`i Supreme Court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

Moreover, Petitioner fails to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). Judicial scrutiny of counsel's performance must be highly deferential. Strickland v. Washington, 466 U.S. 668, 689 (1984).  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Id.

(citation omitted).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Id. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. (citation omitted).  There are countless ways to provide effective assistance in any given case. Id. Even the best criminal defense attorneys would not defend a particular client in the same way. Id. (citation omitted).

A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. Strickland, at 690.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. Id. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance

-61-

and made all significant decisions in the exercise of reasonable professional judgment. Id. (emphasis added).

In this case, as stated above, Petitioner alleges ineffective assistance of appellate counsel because "adequate study of the DNA issues would have informed appellate counsel that the DNA analyst's testimony was almost certain to be inaccurate" and "examining the records also would have revealed the problems with the suggestive eyewitness identification issue". Petitioner fails to rebut the strong presumption that appellate counsel provided effective assistance of counsel. Nevertheless, Petitioner's allegations are without merit.

First, the DNA testimony at trial was not inaccurate. Apparently, Petitioner's claim relates to the trial testimony of the DNA expert relating to the testing of the knife. (State's Exhibit 5). According to that testimony, four out of the eight sites were "presumptive" for blood. (Vol. 4, Exh. "N", at 24-25). After conducting an "origin" test, Furuya was able to conclude that those two cites were blood. (Id.). When asked by Mr. Rankin, "[w]ere you unable to determine who those blood spots may have come from?", Furuya's response was, "there was insufficient for further testing", as there was "[a] very small amount". (Id.). At the evidentiary hearing on May 30, 2002, the following occurred in pertinent part:

* * *

[Mr. Barrett]: Would it be a correct statement if there is enough sample to determine that it is blood, there's enough sample to test for DNA?

[Furuya]: For positive for blood?

[Mr. Barrett]: Yes.

[Furuya]: Possibly, yes.

[Mr. Barrett]: You would not argue with that statement.

[Furuya]: I guess we would at least attempt to try to do DNA extraction.

       * * *

[Mr. Barrett]: And on the samples in this particular case do you see any reason why DNA results couldn't be obtained from say a swab of some sidewalk, or other items such as that?

[Furuya]: My description of the report says reddish blood-like stains are visible, so it would indicate to me that possibly DNA testing would be successful.

(Vol. 10, Exh. "AA", at 10) (emphasis added). Based upon the above, it is clear

that Furuya's testimony was not inaccurate. At trial, Furuya was asked specific

questions about her analysis on specific items of evidence that were submitted as

trial exhibits. On the other hand, on May 30, 2002, Furuya was asked hypothetical

questions about DNA testing. In fact, as demonstrated above, Furuya's answers

were that DNA testing is "possible" and would "possibly" be successful.

Nevertheless, Furuya's trial testimony was that "there was insufficient for further

testing".  Furthermore, appellate counsel could not have raised this issue on direct appeal since the evidentiary hearing occurred after the Opening Brief was filed.

Second, Petitioner again fails to show how omission of the alleged "suggestive eyewitness identification issue amounts to ineffective assistance of appellate counsel.  As stated supra, Petitioner fails to establish, under the totality of the circumstances, that the photographic identification was unreliable.  See Argument on Merits, Ground Five.

Finally, Petitioner's "catch all" claim that appellate counsel was ineffective "for failing to present all the ineffectiveness contentions that are raised in this current § 2254 Petition and in the Rule 40 Petition" is unreasonable.  Petitioner essentially argues that appellate counsel should have raised the nearly over seventy grounds he raised in his pro se HRPP Rule 40 Petition. As the Hawai`i Supreme Court has stated, "every appealable issue is not required to be asserted. . Briones v. State, 74 Haw. 442, 466, 848 P.2d 966, 977-78 (Haw. 1993).  The page limitation on the appellate briefs and the dictates of effective appellate advocacy compel appellate counsel to advance a limited number of key issues.  Id.  An appellate attorney need not advance every argument, regardless of merit, urged by an appellant.  See Evitts, at 835.  (citation omitted).

Here, it appears that Petitioner is well versed in the law.  In fact, throughout Petitioner's entire court proceedings, Petitioner has filed numerous pro se court

documents including, but not limited to, numerous affidavits, motions, and even a comprehensive HRPP Rule 40 petition. Moreover, Petitioner was apparently aware of his trial counsel's alleged failure to conduct: 1) independent DNA testing; 2) a bite mark analysis; and 3) a forensic analysis of the 911 tape. (Petition, at 25). If Petitioner strongly believed that certain issues should have been raised on direct appeal, Petitioner should have informed his appellate counsel of such. Indeed, appellate counsel gave Petitioner an "opportunity to participate in his appeal" and invited any suggestions or revisions Petitioner might have had before the Opening Brief was filed. (Vol. 9, Exh. "Z", at 1494).

To conclude, because Petitioner has failed to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different", Petitioner's right to effective assistance of appellate counsel was not violated. Therefore, the Hawai'i Supreme Court's refusal to address this claim on the merits, or its alternative denial on the merits, was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Thus, Petitioner in not entitled to habeas relief.

### 6. Ground Eight.

In Ground Eight, Petitioner alleges a violation of the Six Amendment's right to counsel pursuant to Strickland v. Washington, 466 U.S. 668 (1984). (Petition,

at 18). In particular, Petitioner alleges ineffective assistance of trial counsel based on the following: 1) trial counsel's poor advice regarding Petitioner's right to testify; 2) trial counsel's defective closing argument. Petitioner's allegations are without merit.

As previously discussed, a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. Strickland, at 690. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id., at 690. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Id. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. Id., at 691.

Moreover, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Id., at 691. Even if a defendant shows that particular

errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense. Id., at 693. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Id., at 693. (citation omitted). The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id., at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id., at 694.

>    a.   Trial Counsel's Advice Regarding Petitioner's Right To Testify.

Petitioner alleges that when "[M]r. Ranken had refused to accept Petitioner's decision to testify and would not call him to the stand, counsel had acted unethically to prevent his client from exercising his fundamental right to testify". (Petition, at 44). In this instance Petitioner fails to demonstrate not only that this alleged improper advice was professionally unreasonable under the Strickland standard, but also that he suffered actual prejudice as a result of it.

First, although not specifically articulated in Ground 8 of the Petition, the alleged professionally unreasonable advice was apparently the following:

>    "I've informed him that we're beyond that stage of the trial and advised him not to engage in any further outburst in front of the jury because I believe it will only hurt his cause and not help him."

(Vol. 4, Exh. "T", at 5). Clearly, the above advice was not outside the wide range of professionally competent assistance. On two separate occasions during the trial, the trial court apprised Petitioner that the decision to testify was his personal decision, regardless of any recommendation by his attorney. Nevertheless, Petitioner rejected trial counsel's advice that "we're beyond that stage of the trial" and vehemently, in front of the jury, blurted out, "I wish to exercise my right to testify". (Vol. 4, Exh. "T", at 4). Additionally, one cannot imagine how trial counsel's advice "not to engage in any further outburst in front of the jury" could remotely be professionally unreasonable.

Second, Petitioner has failed to demonstrate actual prejudice. Even assuming arguendo that the advice was erroneous, as stated above, Petitioner did not follow it. Instead, Petitioner attempted to retract his prior waivers in spite of his trial counsel's advice, and was afforded a full opportunity to be heard with respect to his reasons for wishing to do so. Thus, Petitioner cannot show that but for counsel's unprofessional errors, the result of the proceeding would have been different.

### b. Trial Counsel's Closing Argument.

A lawyer is not required by the Sixth Amendment to present a single, coherent defense theory. Hendricks v. Calderon, 70 F.3d 1032, 1041 (9th Cir.1995), cert. denied, 517 U.S. 1111 (1996). It is well established that a

defendant in a criminal prosecution may assert inconsistent defenses. <u>United States v. Demma</u>, 523 F.2d 981, 986 (9th Cir. 1975). The rule in favor of inconsistent defenses reflects the belief of modern criminal jurisprudence that a criminal defendant should be accorded every reasonable protection in defending himself against governmental prosecution. <u>Id</u>. As recognized in <u>Matthews v. United States</u>, 485 U.S. 58, 65 (1988), federal appellate cases also permit the raising of inconsistent defenses. (citations omitted). "And state cases support the proposition that a homicide defendant may be entitled to an instruction on both accident and self-defense, two inconsistent affirmative defenses." <u>Id</u>. See <u>State v. Lira</u>, 70 Haw. 23, 29, 759 P.2d 869, 873 (1988) (a defendant has the right to argue inconsistent defenses and is entitled to have the jury instructed on ostensibly inconsistent theories of defense if there is evidence supporting the theories). Counsel for a criminal defendant may, in the exercise of her professional judgment, present inconsistent defense theories without running the risk that such tactics will later be deemed ineffective assistance of counsel. <u>Brown v. Dixon</u>, 891 F.2d 490, 495 (4th Cir.1989), <u>cert. denied</u>, 495 U.S. 953 (1990).

In this case, Petitioner fails to demonstrate that trial counsel's presentment of inconsistent theories in closing argument was the result of anything but reasonable professional judgment. In fact, before the trial even started, trial counsel outlined his proposed trial strategy in a letter to Petitioner dated

February 23, 1997. (Vol. 9, Exh. "Z", at 1295-96). In that letter, trial counsel not only suggested a proposed defense strategy to Petitioner, but also expressed his genuine concerns about adopting a "third -man" defense in light of the "overwhelming body of evidence" that the prosecution was prepared to present at trial. (Id., at 1295). In recognition of this, trial counsel advised Petitioner that it would be in Petitioner's best interests to concede the identification issue, and instead, pursue a self-defense theory. (Id.). Trial counsel acknowledged that one of the advantages of conceding issues that the defense "had no reasonable hope of successfully contesting, would be to retain more credibility with the jury. (Id.)

However, despite all of this reasonable professional advice, Petitioner rejected trial counsel's recommendations and instead, still chose to contest identification and "argue any an all theories of the case that are reasonably likely to lead to an acquittal or to a verdict on a lesser charge." (Id., at 1296). As a matter of fact, the Petitioner's opening statement, presentation of evidence during the trial, and Petitioner's closing argument, were all very consistent with Petitioner's ill-advised but strategic decision to "argue any an all theories of the case".

First, trial counsel's opening statement was consistent with what was memorialized in the February 23, 1997, letter to Petitioner. During opening statements, trial counsel did not commit to any particular theory of the case.

-70-

Consistent with this, trial counsel did not concede "identification" but mentioned the existence of a "third man", and the fact that "the knife found at the scene could not have belonged to Petitioner because Petitioner's "knife was still up in his house in Kula after this incident". (Vol. 3, Exh. "I", at 15-16, 19). In addition, trial counsel also argued that, "Taryn Christian never had any such intent to kill anyone". (Id., at 19-20). Finally, trial counsel also told the jury that "when we piece together the puzzle for you in final argument after all the evidence is in, we will show you that Taryn Christian is not guilty of murder." (Id., at 19-20).

Second, the actual evidence the defense presented at trial was also consistent with what was memorialized in the February 23, 1997 letter to Petitioner. At trial, in order to establish a potential self-defense theory through other witnesses, the defense elicited testimony from various witnesses of the presence of another knife. Specifically, Schmidt testified that he recalled Cabaccang holding a knife that was about four to five inches long. (Vol. 3, Exh. "L", at at 58); Robert Perry, Jr. testified that he also noticed two knives, one of which was by Cabaccang's hand. (Vol. 4, Exh. "P", at 37). Robert Perry, Sr. testified that he also noticed two knives, one of which was seven to eight inches long next to Cabaccang's hand. (Vol. 4, Exh. "P", at 54). Consistent with this self-defense theory, another defense witness, Jennifer German, testified that in late July of 1995, she was at the beach along with Petitioner and observed an

approximately four inch scratch on Petitioner's stomach area. (Vol. 4, Exh. "Q", at 20-21). Additionally, in order to refute the identification issue (ie. that Petitioner was not the one who stabbed Cabaccang), the defense elicited testimony from Megan Kenny who essentially testified that she saw Petitioner's double bladed knife in Petitioner's room after the night of the murder. (Vol. 4, Exh. "Q", at 45-47).

Third, trial counsel's closing argument was also consistent with what was memorialized in the letter to Petitioner, dated February 23, 1997. As stated in the letter, trial counsel recognized the extreme difficulty in arguing inconsistent theories to the jury in closing argument. Nevertheless, trial counsel exercised reasonable professional judgement and apparently, adopted a strategy wherein trial counsel would attempt to create reasonable doubt through the use of conflicting defense theories. In arguing for an outright acquittal, trial counsel argued reasonable doubt as to identification, self-defense, and state of mind. Specifically, trial counsel's closing argument included the following:

1.   "First question is: is there a reasonable doubt as to who inflicted the wounds?" (Vol. 4, Exh. "T", at 43);

2.   "[i]f you answer no, you don't have a reasonable doubt on that point of the identity, then you move on to the next stage. And that's to consider whether the defense of self-defense applies in this case. (Id.);

3.  "If you find beyond a reasonable doubt that the prosecution has proven this was not self-defense, then you go on to the next question. And that is you need to look at Mr. Christian's state of mind at the time of this incident. In order to prove the murder charge, the prosecutor would have to convince you that it was intentional or knowing beyond a reasonable doubt." (Id., at 44-45);

Likewise, in arguing for a lesser offense, trial counsel urged the jury to consider either a reckless state of mind, or that Petitioner acted under the "influence of extreme emotional disturbance. (Id., at 45).

Based upon the above, it is clear that trial counsel recognized and discussed with Petitioner, the potential credibility issues associated with arguing inconsistent defenses. Furthermore, trial counsel not only recognized that the third- man defense had "almost no support in the evidence" and was inconsistent with the "overwhelming body of evidence", but also knew that the third-man defense would make a manslaughter verdict less likely. Nevertheless, Petitioner, to his detriment, rejected trial counsel's sound professional legal advice. Instead, as a matter of strategy, Petitioner chose not to commit to any particular theory of the case, and chose to pursue and argue "any and all theories of the case". Therefore, trial counsel's actions in this claim were quite properly, based upon on informed strategic choices made by the Petitioner, and thus, was the result of reasonable professional judgment.

-73-

Finally, neither Petitioner's appellate counsel on direct appeal, nor Petitioner's Rule 40 appellate counsel (who is actually current counsel now) believed that arguing inconsistent theories in closing argument warranted an ineffective assistance claim on either appeal.  Apparently, both appellate counsels determined that trial counsel exercised "reasonable professional judgement" in adopting alternative theories in closing argument.  Therefore, the identified acts or omissions in this claim, were not outside the wide range of professionally competent assistance, and thus, does not constitute ineffective assistance of counsel.

To conclude, in this Ground, Petitioner has not adequately demonstrated that his trial counsel's entire performance was outside the wide range of professionally competent assistance.  Furthermore, Petitioner has also failed to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Accordingly, the Petitioner has failed to demonstrate how the Hawai`i Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Thus, Petitioner in not entitled to habeas relief in this regard.

IV. CONCLUSION.

Based upon the foregoing, in addition to the reasons stated in Respondent's

Answer filed on September 30, 2005, Respondent respectfully requests that this

Honorable Court deny and dismiss the Petition.

DATED:  Wailuku, Hawai`i, March 1, 2007.

Respectfully submitted,

DEPARTMENT OF THE PROSECUTING ATTORNEY
BENJAMIN M. ACOB, PROSECUTING ATTORNEY

By_____

PETER A. HANANO
 First Deputy Prosecuting Attorney
County of Maui
Attorney for Respondents