# APPENDIX "C"

IN THE SUPREME COURT OF THE STATE OF HAWAI`I

---o0o---

STATE OF HAWAI`I, Plaintiff-Appellee, v. TARYN CHRISTIAN,
Defendant-Appellant

NO. 20804

APPEAL FROM THE SECOND CIRCUIT COURT

(CR. NO. 95-0389(1))

NOVEMBER 10, 1998

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, AND RAMIL, JJ.

OPINION OF THE COURT BY LEVINSON, J.

The defendant-appellant Taryn Christian appeals from

the second circuit court's judgment and sentence after conviction

of one count of murder in the second degree in violation of

Hawai`i Revised Statutes (HRS) § 707-701.5 (1993) (Count I),[1] one

count of use of a deadly or dangerous weapon in the commission of

a crime in violation of HRS § 134-51(b) (1993) (Count II),[2] and

---

[1]  HRS § 707-701.5 provides in relevant part that "a person commits the
offense of murder in the second degree if the person intentionally or
knowingly causes the death of another person."

[2]  HRS § 134-51(b) provides that "[w]hoever knowingly possesses or
intentionally uses or threatens to use a deadly or dangerous weapon while
                                                        (continued...)

one count of attempted theft in the third degree in violation of
HRS §§ 705-500 (1993) and 708-832(1)(a) (1993) (Count III).[3]  On
appeal, Christian argues:  (1) that the trial court reversibly
erred in (a) denying him his right to testify, (b) denying his
motion for a new trial, wherein he argued that he should have
been permitted to testify, and (c) excluding evidence that a
third party had confessed to the murder; and (2) that he was
denied the effective assistance of counsel.

Christian's points on appeal are without merit.
Accordingly, we affirm the judgment, conviction, and sentence in
Count I (second degree murder) and Count III (attempted third

---

[3]    HRS § 705-500 provides:

**Criminal attempt.**  (1) A person is guilty of an attempt to commit
a crime if the person:
> (a)    Intentionally engages in conduct which would constitute the
> crime if the attendant circumstances were as the person
> believes them to be; or
> (b)    Intentionally engages in conduct which, under the
> circumstances as the person believes them to be, constitutes
> a substantial step in a course of conduct intended to
> culminate in the person's commission of the crime.
(2)    When causing a particular result is an element of the crime,
a person is guilty of an attempt to commit the crime if, acting with the
state of mind required to establish liability with respect to the
attendant circumstances specified in the definition of the crime, the
person intentionally engages in conduct which is a substantial step in a
course of conduct intended or known to cause such a result.
(3)    Conduct shall not be considered a substantial step under
this section unless it is strongly corroborative of the defendant's
criminal intent.

HRS § 708-832(1)(a) provides in relevant part that "[a] person commits
the offense of theft in the third degree if the person commits theft . . .
[o]f property or services the value of which exceeds $100[.]"  The applicable
definition of "theft" is supplied by HRS § 708-830(1) (1993), which provides
in relevant part that "[a] person commits theft if the person . . . [o]btains,
or exerts control over, the property of another with intent to deprive the
other of the property."

- 2 -

766

degree theft).   However, because Christian's conviction of Count
II (use of a deadly or dangerous weapon in the commission of a
crime) and simultaneous conviction of Count I is barred under the
rationale of this court's opinion in State v. Jumila, 87 Hawai`i
1, 950 P.2d 1201 (1998), we reverse his conviction of and
sentence in connection with Count II.

## I.   BACKGROUND

During the early morning hours of July 14, 1995, Vilmar
Cabaccang and his girlfriend, Serena Seidel, were aroused from
bed by noise from the outside.   When Seidel looked out the
window, she saw someone sitting in Cabaccang's car.   Cabaccang
and Seidel ran outside.   The occupant of the car fled on foot,
Cabaccang and Seidel in hot pursuit.   Seidel reported that, as
she ran, she called for help.   She observed that the man whom she
and Cabaccang were chasing was wearing jeans, a baseball cap, a
flannel shirt, and covered shoes.   Seidel stopped at the
residence of a friend, Tesha Santana, and banged on the door for
help.   When no one answered, she continued running after
Cabaccang and the unknown man.

By the time Seidel caught up to them, Cabaccang and his
quarry were struggling.   Cabaccang warned, "Babe, the guy has a
knife.   He wants to kill me."   Seidel attempted to assist.   She
punched the man in the head, whereupon he bit her on the wrist.
As she struggled with the man, Seidel observed that he was
wearing "the kind of gloves that you use when you dye people's

- 3 -

hair." At some point, the man dropped the knife, and Seidel became aware that there was blood "all over" and that Cabaccang had been stabbed. The attacker walked away, stating that he was "going to call 911."

Phillip Schmidt, who lived nearby, was aroused from his bed at about 3:00 a.m. by the sound of shouting and screaming. Coming outside to investigate, he observed a young man walking toward Kīhei Road. The area was well lit by street lights and a full moon, and Schmidt reported that he obtained a good look at the man's face. A short distance away, Schmidt observed Cabaccang lying on the ground and attempting to stand up. Observing several stab wounds, Schmidt pointed at the man who was walking away and asked Cabaccang if he was the person who had inflicted the injuries. Cabaccang responded in the affirmative. Schmidt, a recreational therapist with a background in first aid, proceeded to care for Cabaccang until ambulance personnel took him from the scene. Cabaccang eventually died from his wounds. Schmidt reported that the man whom he had observed walking away from the scene was wearing a long-sleeved plaid shirt, "trooper-type" pants, and high top tennis shoes.

Maui Police Department (MPD) Detective Timothy Gapero arrived at the scene of the stabbing at about 4:30 a.m. Detective Gapero videotaped the area and recovered a double-bladed knife, a Phillips head screwdriver, Cabaccang's car keys, and a blood-soaked baseball cap.

768

Because Seidel's friend, Santana, advised that an acquaintance of hers, Hina Burkhart, was supposed to have met her at her home that evening but had failed to appear as planned and that Santana suspected that Burkhart might have been responsible for the stabbing, the police initially regarded Burkhart as a suspect in the case. However, both Seidel and Schmidt failed to identify Burkhart's photo as depicting the man whom they had observed, and the investigation uncovered two witnesses who placed Burkhart in another location at the time of the stabbing. Accordingly, Burkhart was ruled out as a suspect.

Approximately three days after the attack on Cabaccang, Christian told his former girlfriend, Lisa Kimmey, that he had committed the homicide. A few days later, Kimmey reported the matter to the police. Kimmey's mother provided the police with photographs of Christian wearing a baseball cap identical to the blood-soaked cap found at the scene of the stabbing. Kimmey also testified that, before the stabbing, she had observed Christian in possession of a double-bladed knife like the one used to kill Cabaccang. A search of Christian's home yielded a box of the same type of plastic gloves as Seidel had observed on the attacker's hands, and Seidel and Schmidt both identified Christian's photograph as being that of the man whom they had observed at the crime scene. Subsequently, Christian was charged in this matter.

At trial, Christian's theory of defense was that he had been mistakenly identified; accordingly, he attempted to

- 5 -

introduce testimony that Hina Burkhart had confessed to the murder on two separate occasions. When called as a witness, however, Burkhart advised the trial court that he would exercise his fifth amendment privilege against self-incrimination with respect to any questions that might be put to him in the matter. The trial court therefore declared Burkhart to be "unavailable" within the meaning of Hawai`i Rules of Evidence (HRE) Rule 804 (1993)[4] and conducted a hearing pursuant to HRE Rule 103 (1993)[5] to determine whether there was sufficient corroboration of Burkhart's out-of-court declarations to permit Christian to introduce them into evidence.[6] The transcript of the hearing is excerpted below:

> THE COURT: ....
> We're met in chambers for the purposes of determining whether there is sufficient corrobatory [sic] evidence to support the statements of three witnesses.
> MR. RANKEN: Two witnesses.
> THE COURT: Two witnesses, I'm sorry, which Mr. Ranken wants to offer. These are statements by witnesses which are offered pursuant to [HRE] Rule 804(b)(3) as statements against . . . penal interest by Mr. Burkhart, namely that he was responsible for the crime which is the

---

[4]    HRE Rule 804(a)(1) provides that a witness/declarant is "unavailable" if he or she "[i]s exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement."

[5]    HRE Rule 103(c) provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."

[6]    HRE Rule 804(b)(3), relating to "[s]tatement[s] against interest," provides in relevant part that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

subject of this case.

Before such statements can come in under the rule, the Court is required to make a preliminary finding that there has been sufficient corroboration. In the words of the rule, "a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

THE COURT: First, Mr. Ranken, you need to make clear what your offer of proof is, who the witnesses are, what the offer of proof is, and point out or offer evidence as to what corroborating circumstances clearly indicate the trustworthiness of those statements.

MR. RANKEN: Thank you, your Honor. Mr. William Auld --

THE COURT: How do you spell that?

MR. RANKEN: A-u-l-d. Our two witnesses are William Auld and Patricia Mullins, M-u-l-l-i-n-s.

These are the two witnesses that heard incriminating statements by the witnesses.

Mr. Auld will testify that he shared a jail cell in November or December of 1995 with James Hina Burkhart. That Mr. Burkhart told him that he was the one who stabbed Vilmar Cabaccang and it felt good to feel the blood running down his hands and arms. Further, that Mr. Auld believed Mr. Burkhart was telling the truth.

THE COURT: Hold on. Okay, go ahead.

[MR. RANKEN:] Ms. Patricia Mullins, who is also standing by ready to testify, would say that she knows James Burkhart. She used to hang around with him quite a bit.

THE COURT: What was the relationship between them?

MR. RANKEN: They were friends. And she also has known the decedent in this case, Vilmar Cabaccang, for a long time and she did hang out, associate with Darryl and Danny Macadangdang, friends of Vilmar's.

She will testify that she had seen --

THE COURT: Hold on. Okay, go ahead.

MR. RANKEN: -- that in the past, considerably before this offense occurred, she had seen Hina, that's James Burkhart, arguing with someone, and that he pulled out a butterfly knife. She will say --

THE COURT: Well, okay.

MR RANKEN: She will say that Hina, a couple of days after Vilmar was killed --

THE COURT: Is there any time frame when Hina supposedly pulled this butterfly knife?

MR. RANKEN: No. She just remembers that was years ago. And, for the record, there's not a butterfly knife involved in this case.

THE COURT: That split blade knife that's in evidence is not

considered a butterfly knife? I'm not familiar with the terminology.

MR. RANKEN: No, it's not.

MS. TENGAN: It is not considered a butterfly knife.

MR. RANKEN: She will say she saw Hina a couple days after Vilmar was killed in Kihei, and also about four days after Vilmar was killed and on that second occasion --

THE COURT: Give me the two days. Couple of days after --

MR. RANKEN: Vilmar was killed. Driving in Kihei -- riding, riding in a truck.

THE COURT: That's not when she had a conversation with him.

MR RANKEN: No. Shortly after that, a couple of days later, she will say she had a conversation with him. She had heard that he was a suspect or that the picture, composite matched him, and she therefore talked to him about it when she saw him in Kihei about four days after the stabbing, and she told him what he did was fucked up.

THE COURT: Okay, Okay.

MR. RANKEN: He responded, "[W]ell, Trish, you know me, I got to do what I got to do." She said, "[Y]ou didn't have to kill him." He said, "[T]hat fucker is stupid for coming after me." She said, "[Y]ou're stupid. You'll get busted. The girlfriend" -- meaning Vilmar's girlfriend as she intended -- she said, "Vilmar's girlfriend was there, will talk." Hina responded --

THE COURT: Okay, hold on. Okay.

MR. RANKEN: Hina responded, "[N]o, I got that bitch wrapped around my finger so good, I'm going to get away with it." Hina further stated that he got what he wanted and used -- said he got happy, which from prior conversations she interpreted as meaning that in some way he got drugs out of what he did.

Finally, that she believed he was telling the truth and later she ran across Hina in jail at a meeting when they were both serving -- when they were both in jail at Maui Community Correctional Center.

He caught --

THE COURT: She was in jail too?

MR. RANKEN: She was in jail. In December she went to jail, December of 1995.

He told her, "[Y]ou better keep your mouth shut." She asked him what he meant. He said, "[Y]ou better not rat on me."

MR. RANKEN: That's my complete offer of proof. Let me now list the corroborating circumstances under 804(b)(3).

THE COURT: Wait a minute.

Okay, at the jail he responded -- he volunteered, that's your offer, to her that she better not rat on him.

MR RANKEN: Yes.

- 8 -

THE COURT: Okay, go ahead.

MR. RANKEN: Corroborating circumstances. Tesha Santana, the neighbor, did know Hina Burkhart well. Was friends with him, and told Serena Seidel that Hina was to come to Tesha's house that . . . night or evening of the stabbing.

There were -- Vilmar's keys were found at the scene and there is no logical explanation for the presence of those keys at the scene, other than the involvement of someone besides Taryn Christian, who would not have access to them and did not know Vilmar or Serena.

The car was apparently unlocked, which means it may have been accessed using keys. The officer testified already that there was no forced entry. No evidence of forced entry.

Boisey Pimentel, Robert Boisey Pimentel, will testify that Hina had a knife that could have been the same one used that was found at the scene, the double bladed knife.

THE COURT: Car unlocked, Pimentel will say Hina had a knife that could have been the one.

MR. RANKEN: Yeah, sounds similar in description to the one used. Although he remembers it was an unusual knife, he does not remember specifically that it had a split blade. The size is approximately the same.

And Serena, it was testified by several witnesses that she behaved strangely at the scene. That she avoided contact with police. Although Serena said in her testimony that she yelled for someone to call 911 or yelled, help, several witnesses and the 911 tape show that she only yelled the word, Tesha, repeatedly. Never called for help or 911, and we'll present still another witness as to that this afternoon, that's Judith Laury, indicating that perhaps Serena did not so much want the police there, but wanted someone there who was a friend with James Burkhart, indicating that James Burkhart may have been at the scene.

And Jennifer Santana will testify -- she is also -- she is Tesha's mother, lives there. She will testify that at the time Burkhart had longish hair in back and that she got two calls within a couple of weeks after the stabbing that Tesha had better keep her mouth shut. Tesha, of course, had made comments indicating perhaps Hina was involved.

Finally, the last item of corroboration is, I would submit that the statements of Patricia Mullins and William Auld corroborate each other.

After considering Christian's offer of proof and the

corroboration offered, the trial court ruled that the

trustworthiness of the statements had not been clearly

773

demonstrated and that, therefore, the necessary prerequisites of admissibility had not been met.

Before jury selection began, the trial court, by way of a "Tachibana colloquy," see infra section III.A.1, advised Christian of his right to testify in his own behalf. Later, in conjunction with the defense resting its case-in-chief, a further colloquy transpired as follows:

> THE COURT: ... [C]an I ask you to state your name? There's questions I have to ask you.
> THE DEFENDANT: Taryn Christian.
> THE COURT: As I have discussed with you before the start of the trial, you do have the constitutional right to testify in your own defense. You understand?
> THE DEFENDANT: Yes.
> THE COURT: And although you should consult with Mr. Ranken, your lawyer, regarding your decision to testify, it is your decision and no one can prevent you from testifying if you choose to do so .... Do you understand?
> THE DEFENDANT: Yes.
> THE COURT: And if you decide to testify, the prosecutor will be allowed to cross-examine you. You understand that?
> THE DEFENDANT: Yes.
> THE COURT: You also have the constitutional right not to testify and to remain silent. You understand?
> THE DEFENDANT: I understand.
> THE COURT: And you understand that if you choose not to testify, that the jury will be instructed that it can not hold your silence against you in deciding your case.
> THE DEFENDANT: I understand.
> THE COURT: It's the understanding of the Court that you do not intend to testify in this case; is that correct?
> THE DEFENDANT: That's correct.
> THE COURT: And that's your decision?
> THE DEFENDANT: Yes.

Subsequently, the prosecution presented two rebuttal witnesses, and the trial court recessed the proceedings in

774

anticipation of closing arguments commencing on the morning of the next day of trial.

However, when the trial court reconvened the proceedings, and as the prosecution was preparing to begin its closing argument, the following exchange occurred:

THE DEFENDANT: Your Honor, I wish to exercise my right to testify --

THE COURT: Wait a minute. Wait a minute.

THE DEFENDANT: -- in front of the jury.

THE COURT: Wait a minute. Excuse the jury, please. Do you need a recess, Mr. Ranken?

MR RANKEN: I guess we'd like to meet with your Honor without the jury.

THE DEFENDANT: We're in possession of a tape that shows Serena Seidel lied on the stand. That witnesses have been in the presence --

THE CLERK: All rise. Court will stand in recess.

(At which time a recess was taken.)

(The following was held in chambers.)

THE COURT: Let the record reflect that we're convened in chambers outside of the hearing of the jury. Anthony and Kevin Ranken are present[,] as well as the defendant. Ms. Tengan and Mr. Jenkins are here for the state.

Mr. Ranken, there's been some outburst before the recess was taken. Anything further for the record?

MR. RANKEN: I have nothing to add. Apparently my client wants a chance to address the Court or the jury.

I've informed him that we're beyond that stage of the trial and advised him not to engage in any further outburst in front of the jury because I . . . believe it will only hurt his cause and not help him.

I have nothing further to say. I don't know if my client wishes to bring anything up directly to the Court, if the Court permits it.

THE COURT: Mr. Christian, is there anything you wish to say?

THE DEFENDANT: Yes, there's a tape of a witness that was in the presence of Hina and Serena on more than one occasion and shows that Serena's committed perjury in this court.

MR RANKEN: Let me just state on this record there's a tape which was delivered to me this morning. Its existence -- alleged existence was made known to me Wednesday or Thursday of the first week of trial. I said I can't do anything without a witness. I need more than a tape. I

- 11 -

need the name of a witness. It has never been provided to me.

I believe that I was told that it was impossible for Lori Smith as well as Patricia Mullins to track down this witness, and they were trying -- and as of the end of the trial, I still had only a first name, no way to reach the person, and the tape had not been presented to me.

I've told Mr. Christian if he feels that counsel has been ineffective, he has a remedy after trial. I'll also tell him now that there's a possibility -- if the Court finds there's newly discovered evidence which couldn't have been found before trial, a new trial is possible on that grounds. But I'm not -- obviously I have not even heard the tape. I don't know what we've got if anything.

THE COURT: Anything else?

THE DEFENDANT: No, that is all.

MS. TENGAN: And for --

THE COURT: Any response from the state?

MS. TENGAN: Yes, the state will object to any reopening of the trial. The defendant received a colloquy with the Court wherein he acknowledged his right to testify or not testify. He was rational, coherent and understanding at the time of the colloquy.

When the defense's case was on, the defendant apparently elected not to testify because he did not testify. Other defense witnesses were provided, and the case was closed.

The state has never received any discovery from the defense indicating the alleged existence of any tape that the defendant has referred to, and would certainly object to any reopening at this time to present any such witness or evidence.

Mr. Ranken has indicated he doesn't even know anything about this tape other than there is some sort of a tape and a person whose name he does not know saying he does not know what.

At any rate, he was aware of this during the first week of trial. Nothing was made available to the state at that point in time. The state has concealed nothing, has put all of its evidence forward. The defendant has put its [sic] case forward. The case is closed, and the state would just elect to proceed forward and ask the Court to do the same.

THE COURT: Yes, the Court will not reopen the case. We will proceed with final arguments.

I will caution the defendant that if he makes any further outbursts in front of the jury -- first, not only is his counsel correct[;] it only hurts his case. Secondly, if he continues that, the Court will have no choice but to exclude him from the courtroom. Something that I would be very reluctant to do, but I will ask that there be no further outbursts of that nature.

(Emphases added.)

The jury eventually found Christian guilty of all of the offenses charged against him.

On March 20, 1997, Christian filed a motion for new trial or, in the alternative, for entry of a "judgment of lesser conviction" as to the murder count, urging that (1) he wished to adduce newly discovered evidence that would exonerate him, (2) there was insufficient evidence to support his conviction of murder, and (3) the trial court had erroneously excluded evidence of Burkhart's confessions to the crime. In a supplemental memorandum, Christian also argued that (1) a request for new counsel made during the trial had been improperly denied and (2) the court had erroneously refused him the right to testify in his own behalf.

During the hearing on Christian's motion, conducted on May 29, 1997, the prosecution contended that the motion should be denied because Christian's only proffer in support of his request to testify was the existence of an inadmissible tape. Christian's counsel retorted as follows:

> MR. RANKEN: . . . I must <u>disagree</u> with Miss Tengan's argument
> that Taryn's comment about the tape was an offer of proof as to everything
> he would have testified about. He --
> THE COURT: Well, <u>do you want to make any further evidentiary
> showing at this time</u>?
> . . . .
> MR. RANKEN: . . . <u>I want to</u> offer -- make an offer of proof that
> the defendant would have testified as to the events that occurred. He
> would have stated his version of what happened, which would have been
> substantially different from the prosecution's witnesses and would have
> supported a finding of not guilty on the charges of murder, anyway, and

manslaughter.

Also, I want to point out that once he takes the stand he's wide open for cross-examination on any subject, so even if the Court felt his offer of the tape was an offer of proof for his testimony and it was inadmissible, Miss Tengan could have cross-examined him as to anything.

So I think that that's improper.

THE COURT: Well, the more fundamental point, though, you know, is the whole colloquy on Tachibana that was conducted, and he indicated he did not want to testify and waited until literally . . . the beginning of final argument and makes this statement.

MR. RANKEN: That's why --

THE COURT: I don't think the Court should permit that.[7]

MR. RANKEN: Okay. That's why I cited the Jones[8] case, your Honor, because although Miss Tengan is correct in her description of that case, the Court also did say -- and it may be considered dictum, but the Court said that the defendant was free to change his mind about that decision at any time before the end of the trial, and that's I think the importance of that, that that right is protected to that degree.

(Emphases added.)

The circuit court orally denied Christian's motion. This timely appeal followed.

## II.   STANDARDS OF REVIEW

A.   Trial Court's Refusal To Reopen Evidence In Order To Allow Defendant To Testify In His Own Behalf

As a general matter, "permitting or disallowing a party to reopen its case for the purpose of submitting additional evidence is a matter within the discretion of the trial court" and is subject to review for abuse of discretion. Territory v. Rutherford, 41 Haw. 554, 558 (1957). "The

---

[7]      As our analysis below indicates, the circuit court reached the right result, albeit for the wrong reason. See Lee v. Heftel, 81 Hawai`i 1, 5 n.2, 911 P.2d 721, 725 n.2 (1996); State v. Propios, 76 Hawai`i 474, 486, 879 P.2d 1057, 1069 (1994); State v. Pinero, 75 Haw. 282, 290, 859 P.2d 1369, 1373 (1993).

[8]      See Jones v. State, 79 Hawai`i 330, 902 P.2d 965 (1995), discussed infra in section III.A.1.

- 14 -

> trial court abuses its discretion when it clearly exceeds the bounds of
> reason or disregards rules or principles of law or practice to the substantial
> detriment of a party litigant." State v. Furutani, 76 Hawai`i 172, 179, 873
> P.2d 51, 58 (1994) (citations and internal quotation marks omitted).

State v. Kwak, 80 Hawai`i 297, 304-05, 909 P.2d 1112, 1119-20

(1995) (footnote omitted).

     B.    Denial Of A Motion For New Trial

     "'As a general rule, the granting or denial of a motion

for new trial is within the sound discretion of the trial court

and will not be disturbed absent a clear abuse of discretion.'"

State v. Samonte, 83 Hawai`i 507, 527, 928 P.2d 1, 21 (1996)

(quoting Furutani, 76 Hawai`i at 178-79, 873 P.2d at 57-58

(citations omitted)); see also State v. Gabalis, 83 Hawai`i 40,

45, 924 P.2d 534, 539 (1996); State v. Jackson, 81 Hawai`i 39,

48, 912 P.2d 71, 80 (1996).

     C.    Admission Of Evidence Under Hawai`i Rules Of Evidence
          (HRE) Rule 804(b)(3)

> [D]ifferent standards of review must be applied to trial
> court decisions regarding the admissibility of evidence, depending
> on the requirements of the particular rule of evidence at issue.
> When application of a particular evidentiary rule can yield only
> one correct result, the proper standard for appellate review is the
> right/wrong standard.
> Kealoha v. County of Hawaii, 74 Haw. 308, 319, 844 P.2d 670, 676,
> reconsideration denied, 74 Haw. 650, 847 P.2d 263 (1993). . . .
> "Evidentiary decisions . . . [that] require a 'judgment call' on the part of the
> trial court[] are reviewed for an abuse of discretion." Walsh v. Chan, 80
> Hawai`i 212, 215, 908 P.2d 1198, 1201 (1995) (citing Sato v. Tawata, 79
> Hawai`i 14, 19, 897 P.2d 941, 946 (1995)). . . .

Tabieros v. Clark Equip. Co., 85 Hawai`i 336, 350-51, 944 P.2d

1279, 1283-84 (1997) (quoting State v. Arceo, 84 Hawai`i 1, 11,

928 P.2d 843, 853 (1996)) (some ellipsis points added and some in original).

> This court has recognized that, ordinarily,

> [t]he requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result. HRE Rule 802 (1993) provides in pertinent part that "[h]earsay is not admissible except as provided by these rules[.]" HRE Rules 803 and 804(b) (1993) enumerate exceptions that "are not excluded by the hearsay rule[.]". With respect to the exceptions, the only question for the trial court is "whether the specific requirements of the rule were met, [so] there can be no discretion." Kealoha, 74 Haw. at 319, 844 P.2d at 675. Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can [generally] be only one correct result, and "the appropriate standard for appellate review is the right/wrong standard." Id.

State v. Moore, 82 Hawai`i 202, 217, 921 P.2d 122, 137 (1996) (some brackets added and some in original).

Nevertheless, insofar as HRE Rule 804(b)(3) exempts out-of-court "statement[s] tending to expose the declarant to criminal liability and offered to exculpate the accused" (emphasis added) from the general proscription regarding the admissibility of hearsay, see infra section III.B, the rule is different because proof of "corroborating circumstances clearly indicat[ing] . . . trustworthiness" is expressly required as a precondition to the admissibility of such statements, but is not required with respect to the other classes of statements against interest enumerated in subsection (b)(3). Cf. United States v. Salvador, 820 F.2d 558, 561 (2d Cir. 1987) (similarly construing the equivalent federal rule). By its very nature, the assessment as to whether "corroborating circumstances" rise to the level of "clearly indicat[ing] the trustworthiness of the statement," so

- 16 -

as to render it admissible into evidence as a statement against penal interest, requires the trial court to make a "judgment call" through the exercise of its discretion.  Accordingly, inasmuch as the trial court is required to make a "judgment call" in determining whether to admit evidence under HRE Rule 804(b)(3), its ruling should not be reversed unless there has been an abuse of discretion.  Id.  See also United States v. Mackey, 117 F.3d 24, 29 (1st Cir. 1997) ("[T]he district court has 'a substantial degree of discretion in making this important finding on trustworthiness.'  . . . [W]e think it impossible to say that the district court abused its discretion in concluding that the circumstances did not 'clearly indicate the trustworthiness of the statement.'") (citing United States v. Barrett, 539 F.2d 244, 253 (1st Cir. 1976)); United States v. Poland, 659 F.2d 884, 895 (9th Cir. 1981) ("Whether to admit a statement against penal interest is in the discretion of the trial judge.  'The standard for appellate review of a decision to exclude a hearsay statement under Rule 804(b)(3) is whether the trial court abused its discretion.'") (quoting United States v. Satterfield, 572 F.2d 687, 690 (9th Cir.), cert. denied, 439 U.S. 840 (1978)); People v. Greenberger, 68 Cal. Rptr. 2d 61, 81 (Cal. Ct. App. 1997) ("Determination of whether a statement is trustworthy is entrusted to the sound discretion of the trial court.  In reviewing the trial court's rulings we apply the abuse-of-discretion standard."); State v. Lopez, 681 A.2d 950, 957 (Conn. 1996) ("The determination of whether such a statement

- 17 -

is sufficiently trustworthy to be admitted into evidence at trial

lies within the sound discretion of the trial court."); <u>Ross v.</u>

<u>State</u>, 482 A.2d 727, 741 (Del. 1984) ("[W]hether there is

sufficient corroborative evidence to admit a hearsay statement

against interest is a matter to be committed to the sound

discretion of the trial court and reversible only upon a showing

of abuse of discretion, or that the ruling was clearly

erroneous."  (Citations omitted.)); <u>State v. Patterson</u>, 673

N.E.2d 1001, 1006 (Ohio Ct. App. 1996) ("[T]he trial court has

broad discretion in determining whether such corroborating

circumstances exist.").

D.    <u>Ineffective Assistance Of Counsel</u>

This court has long held that when an ineffective assistance of
counsel claim is raised, the question is: "When viewed as a whole, was
the assistance provided to the defendant within the range of competence
demanded of attorneys in criminal cases?" <u>State v. Edwards</u>, 81 Hawai`i
293, 300, 916 P.2d 703, 710 (1996).  This court has also held that

the defendant has the burden of establishing ineffective assistance
of counsel and must meet the following two-part test: 1) that there
were specific errors or omissions reflecting counsel's lack of skill,
judgment, or diligence; and 2) that such errors or omissions
resulted in either the withdrawal or substantial impairment of a
potentially meritorious defense.

<u>Id.</u> (quoting <u>State v. Silva</u>, 75 Haw. 419, 439-40, 864 P.2d 583, 593
(1993)). "Determining whether a defense is 'potentially meritorious'
requires an evaluation of the possible, rather than the probable, effect of
the defense on the decision maker . . . . Accordingly, no showing of
'actual' prejudice is required to prove ineffective assistance of counsel."
<u>Dan v. State</u>, 76 Hawai`i 423, 427, 879 P.2d 528, 532 (1994).

<u>State v. Fukusaku</u>, 85 Hawai`i 462, 479-80, 946 P.2d 32, 49-50

(1997).  <u>See</u> <u>also</u> <u>State v. Richie</u>, 88 Hawai`i 19, 39, 960 P.2d

1227, 1247 (1998).

- 18 -

## III.  DISCUSSION

A.  Based On The Record On Appeal, The Trial Court Did Not Commit An Abuse Of Discretion When It Disallowed Christian's Proffered Withdrawal Of His Prior Knowing And Voluntary Waiver Of His Constitutional Right To Testify In His Own Behalf.

### 1.  General principles

[A d]efendant's right to testify in his [or her] own defense is guaranteed by the constitutions of the United States and Hawai`i and by a Hawai`i statute.

The right to testify in one's own behalf arises independently from three separate amendments to the United States Constitution. It is one of the rights guaranteed by the due process clause of the fourteenth amendment as essential to due process of law in a fair adversary process . . . .

The right to testify is also guaranteed to state defendants by the compulsory process clause of the sixth amendment as applied through the fourteenth amendment . . . .

Lastly, the opportunity to testify is also a necessary corollary to the [f]ifth [a]mendment's guarantee against compelled testimony, since every criminal defendant is privileged to testify in his [or her] own defense, or to refuse to do so.

Because the texts of sections 5, 14, and 10 of article I of the Hawai`i Constitution parallel the fourteenth, fifth, and sixth amendments to the United States Constitution, . . . the right to testify is also guaranteed by these parallel provisions of the Hawai`i Constitution. . . .

[T]here is [also a] statutory protection for the right to testify.  HRS § 801-2 ([1993]) states:

In the trial of any person on the charge of any offense, he [or she] shall have a right . . . to be heard in his [or her] defense.

State v. Silva, 78 Hawai`i 115, 122-23, 890 P.2d 702, 709-10 (App. 1995) (citations, quotations marks, footnote, and emphasis omitted).

. . . .

"The decision to testify is ultimately committed to a defendant's own discretion[.]"  Silva, 78 Hawai`i at 124, 890 P.2d at 711.  Thus, "a defendant's personal constitutional right to testify truthfully in his [or her] own behalf may not be waived by counsel as a matter of trial strategy," [United States v.] Moody, 977 F.2d [1425,] 1431 [(11th Cir. 1992)]

- 19 -

(quoting <u>United States v. Curtis</u>, 742 F.2d 1070, 1076 (7th Cir. 1984), <u>cert.</u>
<u>denied</u>, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986)), but "'may
be relinquished only by the defendant.'" <u>Silva</u>, 78 Hawai`i at 123, 890
P.2d at 710 (quoting <u>United States v. Joelson</u>, 7 F.3d 174, 177 (9th Cir.),
<u>cert. denied</u>, [510] U.S. [1019], 114 S.Ct. 620, 126 L.Ed.2d 584 (1993)).

<u>Tachibana v. State</u>, 79 Hawai`i 226, 231-32, 900 P.2d 1293, 1298-99 (1995) (some citations omitted) (some brackets and ellipsis points added and some in original).

Accordingly, this court held in <u>Tachibana</u> "that[,] in order to protect the right to testify under the Hawai`i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." <u>Id.</u> at 236, 900 P.2d at 1303 (footnotes omitted). In this connection, we noted that "the ideal time to conduct the ["<u>Tachibana</u> colloquy"] is immediately prior to the close of the defendant's case" and that, "[t]herefore, whenever possible, the trial court should conduct the colloquy at that time." <u>Id.</u> at 237, 900 P.2d at 1304 (footnote omitted).

> Furthermore, although the ultimate colloquy should be conducted after all evidence other than the defendant's testimony has been received, it would behoove the trial court, prior to the start of trial, to (1) inform the defendant of his or her personal right to testify or not to testify and (2) alert the defendant that, if he or she has not testified by the end of the trial, the court will briefly question him or her to ensure that the decision not to testify is the defendant's own decision. Such an early warning . . . reduce[s] the possibility that the trial court's colloquy could have any inadvertent effect on either the defendant's right not to testify or the attorney-client relationship.

<u>Id.</u> at 237 n.9, 900 P.2d at 1304 n.9. Finally, in conducting the "<u>Tachibana</u> colloquy," we cautioned that

- 20 -

"the trial court must be careful not to influence the defendant's decision whether or not to testify and should limit the colloquy to advising the defendant that he [or she] has a right to testify, that[,] if he [or she] wants to testify . . . [,] no one can prevent him [or her] from doing so, [and] that, if he [or she] testifies[,] the prosecution will be allowed to cross-examine him [or her]. In connection with the privilege against self-incrimination, the defendant should also be advised that he [or she] has a right not to testify and that[,] if he [or she] does not testify[,] then the jury can be instructed about that right.

Id. at 236 n.7, 900 P.2d at 1303 n.7 (quoting State v. Neuman, 371 S.E.2d 77, 82 (W. Va. 1988) (quoting People v. Curtis, 681 P.2d 504, 514 (Colo. 1984)) (some brackets added and some in original).

The record in this matter amply demonstrates that the trial judge assiduously followed the procedures mandated in Tachibana and that Christian's waiver of his constitutional right to testify in his own defense was both knowing and voluntary. See State v. Merino, 81 Hawai`i 198, 221, 915 P.2d 672, 695 (1996) ("'To determine whether a waiver' of [a] 'fundamental right' . . . was 'voluntarily and intelligently undertaken, this court will look to the totality of [the] facts and circumstances of each particular case.'" (Quoting State v. Vares, 71 Haw. 617, 915 P.2d 695 (1990).) (Some brackets added and some in original.)) Indeed, Christian does not argue to the contrary.

The present appeal, however, poses the question whether, and under what circumstances, a defendant who has knowingly and voluntarily waived his or her right to testify as a result of "Tachibana colloquies," conducted both at the commencement of the trial as a preliminary matter and immediately

- 21 -

prior to the close of the defense's case, may subsequently

withdraw or revoke that waiver (i.e., may, in effect, change his

or her mind) and regain the right to testify in his or her

own behalf.   While this court has never addressed the precise issue,

in Jones v. State, 79 Hawai`i 330, 902 P.2d 965 (1995), we

implied -- in resolving the defendant's claim "that his trial

counsel had failed to advise him that the decision whether or not

to testify was his decision to make and that, despite having

signed [a] written waiver, he was free to change his mind at any

time before the end of trial," -- that a defendant who has waived

his or her right to testify might later withdraw or revoke that

waiver.   Id. at 335, 902 P.2d at 970 (emphasis added).

          Other jurisdictions have recognized such a prerogative.

For example, in Ephraim v. State, 627 So.2d 1102 (Ala. Crim. App.

1993), the Alabama Court of Criminal Appeals resolved

circumstances similar in many respects to those of the matter

before us in the following fashion:

> [P]rior to the presentation of the defense's case, the court asked the
> appellant whether he wished to take the stand and to testify in his own
> behalf.  At this time the appellant stated that he did not wish to testify. . . .
> [D]efense counsel[ ] and the prosecutor were present at a charge
> conference when the trial court was notified that the appellant had changed
> his mind and wished to testify.  He told the court that he wanted to tell his
> side of the story.  At this time, closing arguments of counsel had not been
> made and nothing had occurred in the presence of the jury after the
> defense rested its case.  The court refused to allow the appellant to testify,
> stating that the appellant had had his chance to testify, that he had waived
> that right and that the court was not now going to allow the appellant to
> disrupt the proceedings.
>      . . . .
>      . . . We realize that the trial court has discretion in scheduling and

in determining courtroom procedure; however, when the exercise of that discretion results in the denial of a basic constitutional right, we must find that that discretion has been abused. . . . The appellant in this case was denied the most basic of constitutional rights, the right to be heard and to present his own defense.

In situations where closing arguments had been made before the defendant reasserted his right to testify, a court's reluctance to reopen the case would perhaps be more excusable. We do not have that situation here. In this case nothing had been presented to the jury when the appellant asked to take the stand. No closing arguments had been made and the only action that had been taken was a charge conference, which occurred off the record and outside the presence of the jury. We are compelled to reverse the trial court's judgment. The appellant was denied his constitutional right to a fair trial.

Id. at 1103, 1105 (citation omitted) (emphases added). See also United States v. Walker, 772 F.2d 1172, 1176 (5th Cir. 1985) (reversing defendant's conviction and remanding for new trial where trial court, at commencement of next day of trial after prosecution had presented rebuttal witnesses and rested its case, and prior to the parties' closing arguments and trial court's charge to the jury, denied defendant's motion to reopen evidence "'solely for the purpose' of allowing [the defendant] to testify" after defendant had originally declined to testify at close of his case because he was not "emotionally . . . or . . . documentarily prepared"); Mayfield v. State, 468 A.2d 400, 402, 408-10 (Md. Ct. Spec. App. 1983) (reversing defendant's conviction and remanding for new trial where trial court, on morning after defense rested, refused to permit defendant to reopen his case for limited purpose of testifying in own behalf and ruling, inter alia, that "[t]he State argues that no error occurred below because appellant waived his right to testify.  We

- 23 -

believe a close examination of the chronology of events reveals that <u>any waiver was rescinded</u>. . . . Our reversal of [defendant's] conviction is based on the trial court's abuse of its discretion in failing to permit [defendant] to reopen his case in order to testify in his own behalf. . . . In this case, we find a defendant asserting his right to testify after both sides had rested. . . . [Defendant] was a willing, available witness with <u>testimony relevant to the central issue of his guilt or innocence</u>. [Defendant] can justifiably explain his delay in asserting his desire to testify. . . . We do not mean to say that[,] on every occasion where a defendant recants his election to remain silent[,] the trial judge must blindly adhere to the whims of a fickle defendant. There may be cases where (after waiver) the assertion of the right to testify is merely an attempt at some subterfuge. On the other hand, situations may arise where, although the recantation is sincere, the length of delay causes undue prejudice to the State or disruption to the orderly process of the trial. There, the court must consider the effects on both the defendant and the State to the end that justice may be served. In the instant case, justice would have been served by permitting the [defendant] to reopen his case." (Emphases added.)); <u>People v. Burke</u>, 574 N.Y.S.2d 859, 860 (N.Y. App. Div. 1991) ("After the close of the People's case . . . , defense counsel, who had advised defendant not to take the stand, attempted to ascertain whether defendant wanted to testify. Defendant vacillated with rambling responses, first indicating

- 24 -

his desire to testify and subsequently appearing to acquiesce to his counsel's recommendation that he decline.  After the defense rested and during the charge conference, defendant clearly and unambiguously sought to testify whereupon counsel moved to reopen for that purpose.  [The] County Court denied the application. . . .  [W]e find that there must be a reversal and a new trial ordered. . . . Under the circumstances of this case, . . . it was an abuse of discretion as a matter of law for [the] County Court to deny defendant's motion to reopen the defense and to permit his testimony. . . .  The circumstances here are distinguishable from . . . the refusal to reopen the defense to permit the defendant to testify occur[ring] after summations ha[ve] been completed.  Here, the denial was a abuse of discretion requiring that a new trial be ordered."  (Citations omitted.)  (Emphasis added.)).

     Obviously, in this jurisdiction, as the Ephraim court recognized was the case in Alabama, "the trial court has discretion in scheduling and in determining courtroom procedure." 627 So.2d at 1105.  See HRE Rule 611(a) (1993) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.").  Moreover, we agree with the Mayfield court both that, "on every occasion where a defendant recants his

- 25 -

election to remain silent," the trial judge need not "blindly adhere to the whims of a fickle defendant" or comply with an "assertion of the right to testify [that] is merely an attempt at some subterfuge" and that prejudicial delay or "disruption to the orderly processes of the trial" may legitimately entitle the trial judge to preclude the "recantation," however "sincere" the defendant's waiver of the right to testify may be.

Nevertheless, we also agree with the Ephraim, Walker, Mayfield, and Burke courts that there are circumstances under which it would be an abuse of the trial court's discretion to refuse to permit a criminal defendant to change his or her mind and withdraw or revoke a Tachibana waiver of the right to testify. Our task thus becomes to posit an analytical framework by which the trial courts may be guided in ruling on future attempts to withdraw or revoke such waivers.

In this connection, we believe that the wisest course is to borrow, by analogy, from the approach that this court has developed over time regarding the allowance or disallowance of withdrawals of guilty and no contest pleas that have been entered pursuant to Hawai`i Rules of Penal Procedure (HRPP) Rule 11, which, by their very nature, entail the global waiver of the full panoply of a defendant's fundamental trial-related rights -- including the right to testify in one's own defense that is at issue in the present matter. After all, a guilty or no contest plea, if accepted, is "'in itself . . . a conviction and a simultaneous waiver of . . . important constitutional guarantees

790

-- [(1)] the privilege against self-incrimination, [(2)] a trial by jury, and [(3)] the confrontation of one's accusers.'" Carvalho v. Olim, 55 Haw. 336, 343, 519 P.2d 892, 897 (1974) (quoting Wong v. Among, 52 Haw. 420, 425, 477 P.2d 630, 634 (1970)). To the foregoing basic list of waived fundamental trial rights subsumed within an accepted plea of guilty or no contest, we would add the following: (4) the right to have guilt proved beyond a reasonable doubt; see Tachibana, 79 Hawai`i at 236, 900 P.2d at 1303 (citing Conner v. State, 9 Haw. App. 122, 126, 826 P.2d 440, 442-43 (1992)); (5) the right to a unanimous jury verdict; see State v. Arceo, 84 Hawai`i 1, 27, 928 P.2d 843, 872 (1996) (citing article I, sections 5 and 14 of the Hawai`i Constitution and State v. Iosefa, 77 Hawai`i 177, 185, 880 P.2d 1224, 1232 (App.), cert. dismissed, 77 Hawai`i 373, 884 P.2d 1149 (1994)); (6) the right to have compulsory process for obtaining witnesses in the accused's favor; see State v. Savitz, 67 Haw. 59, 60-61, 677 P.2d 465, 466-67 (1984) (citing the sixth amendment to the United States Constitution, as applied to the states through the fourteenth amendment, and article I, section 14 of the Hawai`i Constitution); and (7) the right to included offense instructions; see Tachibana, 79 Hawai`i at 236, 900 P.2d at 1303 (citing State v. Kupau, 76 Hawai`i 387, 395-96 & n.13, 879 P.2d 492, 500-01 & n.13 (1994)).

In Merino, supra, this court recently distilled twenty years of case law addressing the proper means of resolving efforts by criminal defendants to withdraw guilty and no contest

- 27 -

791

pleas, *inter alia*, in the following fashion:

> In [State v.] Jim, [58 Haw. 574, 574 P.2d 521 (1978)], which we recently described as the "leading case in this jurisdiction regarding withdrawal of a defendant's guilty or no contest plea," see [State v.] Gomes, 79 Hawai'i [32,] 36, 897 P.2d [959,] 963 [(1995)], this court offered the following structural overview [hereinafter, "the Jim overview"] of Hawai'i Rules of Criminal Procedure Rule 32(d), which was the predecessor of -- and identical to -- HRPP 32(d):[9]

>> A defendant does not have an absolute right to withdraw his [or her] guilty plea, and a motion for withdrawal of a guilty plea under the . . . rule must therefore be determined under either of two established principles. Where the request is made after sentence has been imposed, the "manifest injustice" standard is to be applied. But where the motion is presented to the trial court before the imposition of sentence, a more liberal approach is to be taken, and the motion should be granted if the defendant has presented a fair and just reason for his request and the [prosecution] has not relied upon the guilty plea to its substantial prejudice.

> Jim, 58 Haw. at 575-76, 574 P.2d at 522-23 (citations and footnote omitted); see also [State v.] Adams, 76 Hawai'i [408,] 411, 879 P.2d [513,] 516 [(1994)]; [State v.] Smith, 61 Haw. [522,] 523, 606 P.2d [86,] 88 [(1980)]. Notwithstanding that actual "guilt or innocence is not the issue on a motion to withdraw a guilty [or no contest] plea," Jim, 58 Haw. at 576, 574 P.2d at 523, "the trial court may hold an evidentiary hearing to determine the plausibility and legitimacy of a defendant's reasons for requesting withdrawal of his or her plea." Gomes, 79 Hawai'i at 36, 897 P.2d at 963 (citing Jim, 58 Haw. at 579, 574 P.2d at 524), and "[t]he defendant has the burden of establishing plausible and legitimate reasons for the withdrawal." [State v.] Costa, 64 Haw. [564,] 565, 644 P.2d [1329,] 1331 [(1982)].

> Because [the defendant] filed his . . . motion [to withdraw no contest plea] in the present case before the circuit court imposed sentence, pursuant to the Jim overview and the two-pronged "liberal approach," we review for abuse of discretion . . . [the trial judge's] denial of the motion

---

9   HRPP 32(d) (1995) provides:

**Withdrawal of Plea of Guilty.**  A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence shall set aside the judgment of conviction and permit the defendant to withdraw his plea.

- 28 -

and inquire (1) whether [the defendant] presented "fair and just reasons" for his request, and, if and only if he has, (2) whether the prosecution relied upon the no contest plea to its substantial detriment. The second prong of the "liberal approach" is conditioned upon satisfaction of the first because "the absence of substantial prejudice [does] not support or resurrect a defendant's pre-sentence motion to withdraw a guilty or no contest plea where no fair and just reason for withdrawal has been presented." Gomes, 79 Hawai`i at 40, 897 P.2d at 967.

State v. Merino, 81 Hawai`i 198, 223, 915 P.2d 672, 697 (1996) (some brackets and ellipsis points added and some in original) (footnotes omitted).

Four weeks after deciding Merino, this court amplified its "waiver withdrawal" analysis in State v. Nguyen, 81 Hawai`i 279, 286, 916 P.2d 689, 696 (1996), a case in which the defendant -- based upon the subsequent enactment of federal statutory law that subjected him to involuntary deportation hearings -- had moved, unsuccessfully, to withdraw his entry of a no contest plea several years after the trial court had imposed sentence, thereby implicating the "manifest injustice" standard. Affirming the circuit court's denial of the defendant's post-conviction motion, we ruled as follows:

While [the defendant's] predicament might justifiably evoke sympathy, under Hawai`i law [the defendant] was entitled to withdraw his plea of "no contest" after imposition of sentence only upon a showing of manifest injustice. State v. Cornelio, 68 Haw. 644, 646, 727 P.2d 1125, 1126-27 (1986). Manifest injustice occurs when a defendant makes a plea involuntarily or without knowledge of the direct consequences of the plea. Cf. Reponte[ v. State], 57 Haw. [354,]362, 556 P.2d [577,] 583 [(1976)] ( a plea of guilty is not constitutionally acceptable unless made voluntarily and with a full understanding of the consequences); State v. James, . . . 500 N.W.2d 345, 348 (Wis. Ct. App. 1993) (a "manifest injustice" occurs when a defendant makes a plea involuntarily, or without knowledge of the charge, the consequences of the plea or that the sentence or that the

- 29 -

793

sentence actually imposed could be imposed), review denied, 505 N.W.2d
138 (Wis. 1993); Commonwealth v. Holbrook, 427 Pa. Super. 387, 629
A.2d 154, 158 (1993) (To establish manifest injustice, [the defendant]
must show that his plea was involuntary or was given without knowledge
of the charge"), appeal denied, 536 Pa. 620, 637 A.2d 280 (1993). There
is no manifest injustice when a trial court has made an affirmative
showing through an on-the-record colloquy between the court and the
defendant which shows that the defendant had a full understanding of what
his or her plea connoted and its direct consequences. Cornelio, 68 Haw. at
646-47, 727 P.2d at 1127. The on-the-record colloquy . . . between the
circuit court and [the defendant] shows that the circuit court determined
that [the defendant] made his plea voluntarily[] and that [the defendant]
had a full understanding of what his "no contest" plea connoted and its
direct consequences. See supra at 282-285, 916 P.2d at 692-695. Thus,
the on-the-record colloquy supports the circuit court's finding that [the
defendant] failed to demonstrate manifest injustice that would warrant
granting the withdrawal of his "no contest" plea.

Nguyen, 81 Hawai`i at 292, 916 P.2d at 702 (some brackets added
and some in original) (emphasis added).

     Accordingly, the involuntary entry of a guilty or no
contest plea, or such a plea entered without a full understanding
of its consequences, constitutes the sort of "manifest injustice"
under the "Jim overview" that entitles a defendant to withdraw
his or her plea after sentence has been imposed.[10]

     The Nguyen analysis does not, however, exhaust the
entire universe of relevant "manifest injustices." Indeed, this
court has declared that, "where a defendant is denied due process
. . . . , 'there is "manifest injustice" as a matter of law,' and
the defendant 'is entitled to withdraw his guilty [or no contest]
plea.'" Adams, 76 Hawai`i at 414, 879 P.2d at 519 (quoting

---

[10]     A fortiori, the involuntary or "ignorant" entry of a guilty or no
contest plea before the imposition of sentence would present "a fair and just
reason" for its requested withdrawal.

- 30 -

United States v. Crusco, 536 F.2d 21, 26-27 (3d Cir. 1976)).  In
Adams, the defendant's right to due process was infringed
substantively "because the prosecution violate[d] a plea
agreement."  Id.  But, as a procedural matter, "[t]he basic
elements of due process of law require notice and an opportunity
to be heard at a meaningful time and in a meaningful manner."
Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87
Hawai`i 217, 243, 953 P.2d 1315, 1341 (1998) (citations omitted).
See also State v. Tuipuapua, 83 Hawai`i 141, 147, 925 P.2d 311,
317 (1996) ("due process requires the government to afford notice
and meaningful opportunity to be heard"); State v. Vinge, 81
Hawai`i 309, 321, 916 P.2d 1210, 1222 (1996) ("due process
requires . . . reasonable notice . . . and . . . the opportunity
to be heard"); State v. Schroeder, 76 Hawai`i 517, 531, 860 P.2d
192, 206 (1994) ("'due process requires that a defendant . . .
'be given reasonable notice and afforded the opportunity to be
heard'") (quoting State v. Freitas, 61 Haw. 262, 277, 602 P.2d
930, 933 (1979)).

        In our view, the Rubicon most logically demarcating the
line between the application of the "manifest injustice" standard
and the "more liberal approach" to the attempted withdrawal of a
criminal defendant's prior waiver of the constitutional right to
testify in his or her own behalf is the actual commencement of
the post-evidentiary phase of the trial, i.e., the parties'

795

closing arguments to the trier of fact.[11]  It is, after all, at this point in the proceedings that the defendant has taken the "decisive, irrevocable step" of placing his or her fate regarding the charged offenses in the jury's hands, based on the evidence presented.[12]  See Ephraim, 627 So.2d at 1103, 1105 (noting, inter alia, that, prior to closing arguments, "nothing ha[s] occurred in the presence of the jury after the defense [has] rested its case," in contrast to "situations where closing arguments ha[ve] been made before the defendant reassert[s] his right to testify"); Burke, 574 N.Y.S.2d at 860 ("[T]he statutory framework is not so rigid that the . . . power of the trial court to alter the order of proof in its discretion and in furtherance of justice cannot be exercised at least until the case is submitted to the jury."  (Citations and internal quotation marks omitted.)).  We therefore hold that the trial court must pass on a defendant's attempted withdrawal of the prior waiver of his or her right to testify, tendered before the commencement of closing arguments, pursuant to the "liberal approach," whereas such an attempted withdrawal tendered thereafter is subject to the

---

[11]    Our view in this regard presupposes, of course, that the parties' closing arguments precede the trial court's charge to the jury, as is the case in this jurisdiction.  See HRPP Rule 30(e) (1995) ("The court shall instruct the jury after the arguments are completed. . . .").

[12]    The Rubicon is a fifteen-mile-long river in northern Italy flowing east into the Adriatic Sea.  "[B]y crossing this ancient boundary between Cisalpin Gaul and Italy to march against Pompey in 49 B.C., Julius Caesar committed himself to conquer or perish."  Webster's Encyclopedic Unabridged Dictionary of the English Language 1250 (1989).  Thus, to "cross or pass the Rubicon" is "to take a decisive or irrevocable step[.]"  Id.

"manifest injustice" standard.

2.   <u>Application of general principles to the present case</u>

a.   <u>first attempt to withdraw prior waiver: **before** commencement of closing arguments</u>

In accordance with the foregoing general principles, and because Christian first attempted to withdraw his prior waiver of his constitutional right to testify in his own behalf <u>before</u> the commencement of closing arguments by declaring in open court that he "wish[ed] to exercise [his] right to testify . . . in front of the jury," we review the trial court's disallowance, "pursuant to . . . the two-pronged 'liberal approach,' . . . for abuse of discretion . . . and inquire (1) whether [Christian] presented 'fair and just reasons' for his request, and, if and only if he has, (2) whether the prosecution relied upon [Christian's prior waiver] to its substantial detriment." <u>Merino</u>, 81 Hawai`i at 223, 915 P.2d at 697 (footnote omitted).

In effecting our review, we are cognizant both that the trial court was entitled -- as it in fact did, <u>in</u> <u>camera</u>, in response to Christian's "outburst," <u>see</u> <u>supra</u> section I -- to "hold an evidentiary hearing to determine the plausibility and legitimacy of [Christian's] reasons for requesting withdrawal" of his prior waiver and that Christian had "the burden of establishing plausible and legitimate reasons for the withdrawal." <u>Id.</u> (citations and internal quotation marks omitted). In this connection, we agree with the United States

- 33 -

Court of Appeals for the Fifth Circuit in <u>Walker</u> that, "[i]n exercising its discretion, the [trial] court [was required to] consider . . . the character of the [proffered] testimony," bearing in mind that "[t]he evidence proffered should be relevant, <u>admissible</u>, technically adequate, and helpful to the jury in ascertaining [Christian's] guilt or innocence . . . ." <u>Walker</u>, 772 F.2d at 1177 (quoting <u>United States v. Thetford</u>, 676 F.2d 170, 182 (5th Cir. 1982), <u>cert. denied</u>, 459 U.S. 1148 (1983) (quoting <u>United States v. Larson</u>, 576 F.2d 759, 778 (8th Cir. 1979)) (emphasis added).

The record reflects that the trial court accorded both Christian and his counsel a full, fair, and complete opportunity, in chambers, to establish plausible and legitimate reasons for Christian's requested withdrawal of his prior waiver of his right to testify.  At that time, Christian's sole offer of proof in support and explanation of his newly expressed desire to testify was that "there's a tape of a witness that was in the presence of Hina [Burkhart] and Serena [Seidel] on more than one occasion [that] shows that Serena's committed perjury in . . . court."[13] Christian's counsel then, in substance, advised the trial court that (1) he had no knowledge of the tape's contents or the source of the out-of-court declarations allegedly contained therein, (2) he lacked any foundational basis for establishing the tape's

---

[13]    We emphasize that, in response to the trial court's query as to whether he wished to offer "anything else" in support of his request, Christian advised the court, "No, that is all."

relevance, and (3) being unable to identify or produce the declarant, the tape constituted inadmissible hearsay.  In other words, as the deputy prosecuting attorney aptly characterized the situation, defense counsel had "indicated [that] he doesn't . . . know anything about [the] tape other than [that] there is some sort of a tape and a person whose name he does not know saying he does not know what."

Under the foregoing circumstances, it is apparent, as a matter of law, that Christian failed to make an even colorably sufficient showing that the tape, which was the only evidentiary basis offered at the time in support of his request to reopen the defense's case in order that he might testify, was "relevant, admissible, technically adequate, and helpful to the jury in ascertaining [his] guilt or innocence."  See Walker, 772 F.2d at 182.  That being the case, it is equally apparent, as a matter of law, that Christian fell far short of meeting his "burden of establishing plausible and legitimate reasons for the withdrawal" of his prior waiver.  See Merino, 81 Hawai`i at 223, 915 P.2d at 697.  Accordingly, we hold that Christian failed to present "'fair and just reasons' for his request," see id.,[14] and that the trial court therefore committed no abuse of discretion in ruling that it would "not reopen the case."

_____

[14]    Having so held, we need not reach the question whether the prosecution relied to its substantial detriment upon Christian's prior waiver of his right to testify.  See Merino, 81 Hawai`i at 223, 915 P.2d at 697.

b.    <u>second attempt to withdraw prior waiver:</u>
      <b>post-verdict</b> <u>motion for new trial</u>

In support of Christian's post-verdict motion for a new
trial, defense counsel -- for the first time -- made an offer of
proof that, if he had been permitted to testify when he had
initially asked to do so, Christian "would have testified as to
the events that occurred [and] would have stated his version of
what happened, which would have been substantially different from
[the version of] the prosecution's witnesses and would have
supported a [verdict] of not guilty on the charges of murder,
anyway, and manslaughter."  That is to say, not until the hearing
on his post-verdict motion for a new trial did Christian apprise
the trial court that he wanted to "tell his side of the story."
<u>See</u> <u>supra</u> section I.

On the present record, it is likely that, pursuant to
the "liberal approach," had Christian made the foregoing proffer
when, <u>before</u> the commencement of closing arguments, he had first
sought to "exercise [his] right to testify . . . in front of the
jury," thereby withdrawing his prior waiver of that right, it
would have been an abuse of discretion for the circuit court to
have refused to "reopen the case" in order to allow Christian's
testimony.  <u>See</u> <u>Ephraim</u>, 627 So.2d at 1103, 1105; <u>Walker</u>, 772
F.2d at 1176; <u>Mayfield</u>, 468 A.2d at 402, 408-10; <u>Burke</u>, 574
N.Y.S.2d at 860.  However, because Christian's belated offer of
proof was not made until <u>after</u> the jury had returned its verdict
(and, <u>a fortiori</u>, after the commencement of closing arguments),

- 36 -

800

his attempt to withdraw his prior waiver was subject to the "manifest injustice" standard. See supra section III.A.1.[15]

As we have already noted, by virtue of the trial court's scrupulous adherence to the dictates of our decision in Tachibana, there is no question that Christian's waiver, prior to the commencement of the parties' closing arguments, of his constitutional right to testify in his own defense was both knowing and voluntary. Cf. Nguyen, 81 Hawai`i at 292, 916 P.2d at 702. Moreover, Christian has not suggested -- and our review of the record does not reveal -- that his post-verdict request to withdraw his waiver was justified by any substantive denial of due process during the proceedings against him. Cf. Adams, 76 Hawai`i at 414, 879 P.2d at 519. Finally, the record establishes beyond doubt, with respect to both of his attempts at withdrawal of his waiver, that Christian was accorded a full, timely, and meaningful opportunity to be heard. Cf. Korean Buddhist Dae Won Sa Temple, 87 Hawai`i at 243, 953 P.2d at 1341; Tuipuapua, 83 Hawai`i at 147, 925 P.2d at 317; Vinge, 81 Hawai`i at 321, 916 P.2d at 1222; Schroeder, 76 Hawai`i at 531, 880 P.2d at 206.

We therefore hold that the trial court's denial of Christian's post-verdict motion for a new trial -- based on Christian's claim that his attempt to withdraw, prior to the

---

[15]    Were such not the case, defendants such as Christian would have every incentive to seek "a second bite at the apple" by waiving their constitutional right to testify in their own behalf, remaining silent during the evidentiary phase of their trials, hoping for the best, and seeking to retry their cases in the event of an undesirable outcome by claiming a resurrected desire to enlighten the trier of fact with their version of the material events.

801

commencement of closing arguments, his earlier knowing and
voluntary waiver of his constitutional right to testify in his
own behalf should have been allowed -- was not "manifestly
unjust" and, for that reason,[16] did not constitute an abuse of
the trial court's discretion.

B.    Because Corroborating Circumstances Did Not Clearly
      Indicate The Trustworthiness Of Burkhart's Alleged
      Confessions, The Circuit Court Did Not Commit An Abuse
      Of Discretion In Excluding Hearsay Testimony Regarding
      Them.

Christian contends that the trial court erroneously
excluded hearsay testimony regarding Burkhart's alleged
admissions that he, Burkhart, in fact killed Vilmar Cabaccang.
In this connection, Christian asserts that:  the trial court (1)
failed to apply the "legitimate tendency" test, as set forth in
State v. Rabellizsa, 79 Hawai`i 347, 903 P.2d 43 (1995), in order
to determine the admissibility of testimony that Burkhart had
confessed to Cabaccang's murder; and (2) even if it applied the
correct standard, the trial court misapplied HRE Rule 804(b)(3)
because Burkhart's purported confessions were "so palpably
against Burkhart's interest that there [was] a circumstantial
guarantee of their trustworthiness, regardless of whether there
[was] corroborating evidence."

We note, as a preliminary matter, that Rabellizsa is
inapposite to the present case.  The "legitimate tendency" test
pertains to the assessment of the relevance of evidence offered

---

[16]    See supra note 7.

to establish a third party's motive to commit the offense with which the defendant is charged.  It is therefore not germane to the trial court's exclusion, on <u>hearsay</u> grounds, of the proffered testimony relating to Burkhart's alleged confessions, the propriety of which must be ascertained in accordance with HRE Rule 804.

HRE Rule 804(b) provides in relevant part:

> Hearsay exceptions.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
> . . . .
> (3)    Statement against interest.  A statement which    . . . at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.  <u>A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement[.]</u>

(Emphasis added.)[17]

Christian correctly points out that the seminal decision governing the admissibility of a third party confession that exculpates a defendant is <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973),[18] in which the United States Supreme Court held that a state trial court's exclusion, pursuant to local evidentiary rules, of evidence that a third party had confessed to the crime at issue violated "traditional and fundamental standards of due

---

[17]    The exception set forth in HPE Rule 804(b)(3) "is identical with Fed. R. Evid. 804(b)(3)."  Commentary on HRE Rule 804.

[18]    This court discussed HRE Rule 804(b)(3) in a somewhat cursory fashion in <u>State v. Mabuti</u>, 72 Haw. 106, 110-11, 115, 807 P.2d 1264, 1267, 1269 (1991).

803

process" and deprived the defendant of a fair trial. Id. at 302-03. Chambers, however, is manifestly distinguishable from the case before us. Chambers was accused of murdering a police officer who had been shot by someone in a crowd of twenty to twenty-five men attempting to prevent the officer from executing an arrest warrant on another individual. Id. at 285-87. After Chambers was himself arrested for having allegedly committed the murder, another man who had been in the crowd, Gable McDonald,

> gave a sworn confession [to Chambers's attorneys] that he shot [the officer]. He also stated that he had already told a friend of his, James Williams, that he shot [the officer]. He said that he used his own pistol, a nine-shot .22-caliber revolver, which he had discarded shortly after the shooting    .... Once the confession had been transcribed, signed, and witnessed, McDonald was turned over to the local police authorities and was placed in jail.
>
> One month later, at a preliminary hearing, McDonald repudiated his prior sworn confession. . . . The local justice of the peace accepted McDonald's repudiation and released him from custody. The local authorities undertook no further investigation of his possible involvement.
>
> Chambers' case came on for trial in October of the next year. At trial, he endeavored to develop two grounds of defense. He first attempted to show that he did not shoot [the officer]. Only one officer testified that he actually saw Chambers fire the shots. Although three officers saw [the murdered officer] shoot Chambers and testified that they assumed he was shooting his attacker, none of them examined Chambers to see whether he was still alive or whether he possessed a gun. Indeed, no weapon was ever recovered from the scene and there was no proof that Chambers had ever owned a .22-caliber pistol. One witness testified that he was standing in the street near where [the murdered officer] was shot, that he was looking at Chambers when the shooting began, and that he was sure that Chambers did not fire the shots.
>
> [Chambers's] second defense was that Gable McDonald had shot [the officer]. He was only partially successful, however, in his efforts to bring before the jury the testimony supporting this defense. Sam Hardin, a lifelong friend of McDonald's, testified that he saw McDonald shoot [the officer]. A second witness, one of [the officer's] cousins, testified that he saw McDonald immediately after the shooting with a pistol in his hand. In addition to the testimony of these two witnesses, Chambers endeavored to

- 40 -

804

show the jury that McDonald had repeatedly confessed to the crime. Chambers attempted to prove that McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn statements to Chambers' counsel and three other times prior to that occasion in private conversations with friends.

In large measure, he was thwarted in his attempt to present this portion of his defense by the strict application of certain Mississippi rules of evidence. . . .

Chambers filed a pretrial motion requesting the court to order McDonald to appear. Chambers also sought a ruling at that time that, if the State itself chose not to call McDonald, he be allowed to call him as an adverse witness. . . . The trial court granted the motion requiring McDonald to appear but reserved ruling on the adverse-witness motion. At trial, after the State failed to put McDonald on the stand, Chambers called McDonald, laid a predicate for the introduction of his sworn out-of-court confession, had it admitted into evidence, and read it to the jury. The State, upon cross-examination, elicited from McDonald the fact that he had repudiated his prior confession. . . .

At the conclusion of the State's cross-examination, Chambers renewed his motion to examine McDonald as an adverse witness. The trial court denied the motion, stating: "He may be hostile, but he is not adverse in the sense of the word, so your request will be overruled." On appeal, the State Supreme Court upheld the trial court's ruling, finding that "McDonald's testimony was not adverse to appellant" because "[n]owhere did he point the finger at Chambers."

Defeated in his attempt to challenge directly McDonald's renunciation of his prior confession, Chambers sought to introduce the testimony of the three witnesses to whom McDonald had admitted that he shot the officer. . . . The State objected to the admission of this testimony on the ground that it was hearsay. The trial court sustained the objection.

. . . [Chambers] argued to the court that, especially where there was other proof in the case that was corroborative of these out-of-court statements, [the] testimony as to McDonald's self-incriminating remarks should have been admitted as an exception to the hearsay rule. Again, the trial court sustained the State's objection.

. . . .

In sum, then, this was Chambers' predicament. As a consequence of the combination of Mississippi's "party witness" or "voucher" rule and its hearsay rule, he was unable to either cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity. . . .

. . . .

Chambers was denied an opportunity to subject McDonald's

damning repudiation and alibi to cross-examination. . . .

[His] request to cross-examine McDonald was denied on the basis of a Mississippi common-law rule that a party may not impeach his own witness. . . .

[A]s applied in this case, [the "voucher" rule] plainly interfered with Chambers' right to defend against the State's charges.

. . . .

We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses. The trial court refused to allow him to introduce the testimony [of witnesses who] would have testified to the statements purportedly made by McDonald, on three separate occasions shortly after the crime, naming himself as the murderer. The State Supreme Court approved the exclusion of this evidence on the ground that it was hearsay.

The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. California v. Green, 399 U.S. 149, 158 (1970). A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest--an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made. Mississippi recognizes this exception but applies it only to declarations against pecuniary interest. It recognizes no such exception for declarations, like McDonald's in this case, that are against the penal interest of the declarant.

This materialistic limitation on the declaration-against-interest hearsay exception appears to be accepted by most States in their criminal trial processes, although a number of States have discarded it. Declarations against penal interest have also been excluded in federal courts under the authority of Donnelly v. United States, 228 U.S. 243, 272-73 (1913), although exclusion would not be required under the newly proposed Federal Rules of Evidence. Exclusion, where the limitation prevails, is usually premised on the view that admission would lead to the

frequent presentation of perjured testimony to the jury. It is believed that confessions of criminal activity are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or proprietary interest. . . .

The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case -- McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver . . . . The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminating and unquestionably against interest. McDonald stood to benefit nothing by disclosing his role in the shootings to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. . . .

Id. at 287-89, 291-92, 294-95, 298 (footnotes and some citations omitted) (some brackets in original and some added).

It is apparent that corroborating circumstances of the type noted by the Chambers court are not present in the instant case. First, no eyewitness linked Burkhart to the stabbing of Cabaccang. On the contrary, the two individuals who had an opportunity to observe Cabaccang's assailant failed to identify Burkhart in a photo lineup, and instead, both identified Christian as the attacker. Cf. State v. Mabuti, 72 Haw. 106, 110-11, 115, 807 P.2d 1264, 1267, 1269 (1991) (holding that unavailable but uncontroverted gang-slaying participant's confession, which contained "great detail about exactly what transpired -- from the injuries which the victim suffered[] to exactly who [the declarant] saw hitting or assisting in beating

- 43 -

the victim [--]," should have been admitted as statement against interest, pursuant to HRE 804(b)(3), at behest of proponent who declarant saw that evening but could not say was present or had participated in the fatal beating). Moreover, the prosecution offered two witnesses who placed Burkhart at another location at the time of the stabbing. Second, neither of the two confessions allegedly made by Burkhart were sworn, as was McDonald's confession to Chambers's attorneys. Finally, while there is evidence that Burkhart owned an unusual "butterfly" knife, Christian himself conceded that the split blade knife found at the crime scene was not a "butterfly" knife. The only arguably corroborating evidence offered by Christian did not link Burkhart to the crime, but rather, in a rather tenuous manner, to the neighborhood in which the crime took place, by indicating that Burkhart had failed to appear at the nearby home of his friends, who had been expecting his visit that evening.

On these facts, we cannot say that the circuit court abused its discretion in ruling that the corroboration proffered by Christian was too weak "clearly [to] indicate" the trustworthiness of Burkhart's confessions to Auld and Mullins. See HRE Rule 804(b)(3). Accordingly, we hold that the circuit court did not err in excluding them from the evidence at trial.

C.    Christian Was Not Denied The Effective Assistance Of Counsel.

As his final point of error on appeal, Christian argues that his trial counsel was ineffective in erroneously advising

- 44 -

him (1) that it was too late to testify after the close of the
evidence and (2) against engaging in further outbursts regarding
the matter in the jury's presence.  Christian contends that this
"erroneous" advice exhibited a "lack of skill" on his counsel's
part, rising to the level of ineffective assistance.

As the discussion in section III.A reflects, the law in
this jurisdiction regarding whether and under what circumstances
a criminal defendant may withdraw a prior waiver of his right to
testify has been unsettled until now.  Inasmuch as (1) there was,
and still remains, no Hawai`i case law conferring on a criminal
defendant the unbridled prerogative to rescind such a waiver
following a properly conducted Tachibana colloquy and (2) the
evidence that Christian advised his counsel that he wished to
adduce was inadmissible, counsel's advice to Christian that
"we're beyond [the evidentiary] stage of the trial" can neither
be said to have fallen outside the range of competence demanded
of attorneys in criminal cases, in general, nor to have
constituted a specific error or omission reflecting counsel's
lack of skill, judgment, or diligence, in particular.  See
Richie, 88 Hawai`i at 39, 960 P.2d at 1247; Fukusaku, 85 Hawai`i
at 479-80, 946 P.2d at 49-50.  In any event, assuming arguendo
that the advice given was erroneous, Christian did not follow it.
Rather, he attempted to retract his waiver in spite of his
attorney's admonitions and was afforded a full opportunity to be
heard with respect to his reasons for wishing to do so.
Accordingly, the legal advice in question could not have been

prejudicial.

Christian's suggestion that his counsel's admonition "not to engage in any further outburst in front of the jury because . . . it [would] only hurt his cause and not help him" amounted to ineffective assistance is nonsensical. Outbursts in the courtroom, as the trial court correctly warned Christian, may be considered a waiver of the right to be present and potentially result in the defendant's removal. HRPP Rule 43(b)(2) (1996); State v. Castro, 69 Haw. 633, 651 n.11, 756 P.2d 1033, 1045-46 & n.11 (1988). Moreover, counsel's advice was obviously supported by sound tactical considerations, inasmuch as Christian's disruptive behavior was not likely to endear him to the jury. We hold that Christian's claim of ineffective assistance of counsel is without merit.

    D.    Christian's Simultaneous Conviction Of The Charged Offenses Of Use Of A Deadly Or Dangerous Weapon In The Commission Of A Crime (Count II) and Second Degree Murder (Count I) Is Barred By This Court's Opinion In State v. Jumila.

In State v. Jumila, 87 Hawai`i 1, 950 P.2d 1201 (1998), this court reasoned as follows:

> "because HRS § 134-6(a) [(1993 and Supp. 1997)[19]] requires the actual commission of an underlying felony," the prosecution "is required to prove all of the conduct, attendant circumstances, and results of conduct that comprise the underlying crime" in order to convict a defendant of violating HRS § 134-6(a). State v. Israel, 78 Hawai`i 66, 74-75, 890 P.2d 303, 311-

---

[19]    HRS § 134-6(a) provides in relevant part that "[i]t shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony . . . ." (Emphasis added.)

12 (1995). Therefore, by virtue of the statutory definition of HRS § 134-6(a), the felony underlying an HRS § 134-6(a) charge will always be "established by proof of the same or less than all the facts required to establish the commission of the" HRS § 134-6(a) offense. Consequently, the felony underlying an HRS § 134-6(a) offense is, as a matter of law, an included offense of the HRS § 134-6(a) offense.

    . . . .

    Because the felony underlying an HRS § 134-6(a) offense is an included offense of the HRS § 134-6(a) offense, pursuant to HRS § 701-109(1)(a) [(1993)[20]], [the defendant] should not have been convicted of both the HRS § 134-6(a) offense and the underlying second degree murder offense. If he should not have been convicted of both offenses, then, of course, he should not have received separate sentences for each offense. . .

    In order to remedy the HRS § 701-109 violation, the conviction and sentence for one of the two offenses must be reversed. When a defendant is convicted of an offense and a "lesser" included offense, see State v. Malufau, 80 Hawai`i 126, 138, 906 P.2d 612, 624 (1995) (order on motion for reconsideration) (an included offense is "lesser" when "it is an offense of a class and grade lower than the greater offense"), we simply reverse the conviction and sentence for the "lesser" included offense. See Vinge, 81 Hawai`i at 324, 916 P.2d at 1223; see also State v. Reyes, 5 Haw. App. 651, 659, 706 P.2d 1326, 1331, reconsideration denied, 5 Haw. App. 683, 753 P.2d 253 (1985). This solution is fair to the defendant because it remedies the HRE § 701-109 violation, and it is fair to the prosecution and the public because it sustains the conviction of the offense of the highest class and grade of which the defendant was convicted.

    In the instant case, however, the included offense is murder in the

---

[20]    HRS § 701-109 provides in relevant part:

    **Method of prosecution when conduct establishes an element of more than one offense.**  (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element.  The defendant may not, however, be convicted of more than one offense if:

        (a)    One offense is included in the other as defined in subsection (4) of this section . . . .

    . . . . .

        (4)    A defendant may be convicted of an offense included in an offense charged in the indictment or the information.  An offense is so included when:

        (a)    It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]

second degree, an offense of a higher class and grade than HRS § 134-6(a), a class A felony. HRS § 134-6(e). Under these circumstances, where (1) the second degree murder conviction was otherwise valid and (2) the HRS § 701-109 violation can be remedied by reversing the HRS § 134-6(a) conviction and sentence, we believe that it would be manifestly unfair to the prosecution and to the public to reverse the second degree murder conviction simply because it was the included offense. Accordingly, in order to remedy the HRS § 701-109 violation, we reverse Jumila's conviction and sentence on the HRS § 134-6(a) charge. Cf. State v. Liuafi, 1 Haw. App. 625, 644, 623 P.2d 1271, 1283 (1981) (where defendant's convictions of both attempted murder and failure to render assistance violated HRS § 701-109(1)(c) because inconsistent findings of fact were required to establish the commission of the offenses, the proper disposition was to vacate the conviction for failure to render assistance).

Id. at 3-4, 950 P.2d at 1203-04 (footnotes omitted).

HRS § 134-51(b), see supra note 2, which Christian was convicted of violating in Count II, is a class C felony. And, analogously to HRS § 134-6(a), "the [crime] underlying an HRS § [134-51(b)] charge will always be 'established by proof of the same or less than all the facts required to establish the commission of the' HRS § [134-51(b)] offense." Jumila, 87 Hawai`i at 3, 950 P.2d at 1203. Consequently, as is true with respect to felonies underlying HRS § 134-6(a) offenses, "the [crime] underlying an HRS § [134-51(b)] offense is, as a matter of law, an included offense of the HRS § [134-51(b)] offense," within the meaning of HRS § 701-109(4)(a), and Christian "should not have been convicted of both the HRS § [134-51(b)] offense and the underlying second degree murder offense." Id. at 2-3, 950 P.2d at 1202-03 (footnote omitted).

In light of the foregoing, we reverse, <u>sua sponte</u>, Christian's conviction of and sentence for his violation of HRS § 134-51(b), as charged in Count II.

## IV.   CONCLUSION

The second circuit court's judgment, conviction, and sentence with respect to Counts I (second degree murder) and III (attempted third degree theft) are affirmed.   However, because Christian's conviction of Count II (use of a deadly or dangerous weapon in the commission of a crime) and simultaneous conviction of Count I is barred under the rationale of this court's opinion in <u>Jumila</u>, Christian's conviction of and sentence in connection with Count II is reversed.

On the briefs:

Pamela O'Leary Tower for
   defendant-appellant Taryn
   Christian

Artemio C. Baxa and Simone C.
   Polak, Deputy Prosecuting
   Attorneys, for plaintiff-
   appellee State of Hawai`i

813