# EXHIBIT "B"

# Sound Testimony®

March 7, 2008

**Report**

**Assignment:**

Sound Testimony® was contacted by Richard Minatoya, Esq., Deputy Prosecuting Attorney, Department of the Prosecuting Attorney, County of Maui, to examine the recorded material on two standard audio cassettes. The task is to verify and confirm what another audio examiner, John J. Mitchell of Computer Audio Engineering (CAE) of Albuquerque, NM found to be on the tapes.

On February 1, 2008, I received a Fed-Ex (Medium Box) package from investigator Margo Evans that contained the following:

1. Audio cassette of a 911 recording
2. A redacted transcript of the 911 recording
3. Audio cassette of a pretext call recording
4. A transcript of the pretext call recording
5. A sealed manila envelope containing:
    a. CAE's CD of the 911 recording
    b. CAE's CD of the pretext call
    c. CAE's CD of the pretext call's recording segments
    d. CAE's CD of the 911 call's recording segments
    e. CAE's report on the calls and the recording segments
    f. A copy of the original 911 recording transcript with initialed annotations by John Mitchell
    g. An updated 911 recording transcript by CAE with timing markings in the left column and highlighted sections marked for me to verify, if verifiable
    h. Additional reports and notes from CAE regarding the 911 recording

**Audio Recordings to be examined:**
   a. Two Cassette Tapes were provided
       a. Cassette tape number one will be referred to as Q1
           I was informed that the original 911 tape could not be located and that Q1 was a first generation recording of the original 911 tape
       b. Cassette tape number two will be referred to as Q2
           I was informed that Q2 was an original cassette tape of a pretext call

---

814.410.4787                                          1185 Agnes Avenue
david@soundtestimony.com                              Johnstown, PA 15905

www.soundtestimony.com

EXHIBIT " B "

**Visual Description of Q1**

Q1. 911 Recording

 a. Unlabeled Maxell UR60 tape cassette (Normal Bias) - Manufacturer's Lot Number G1447401
  a. The cassette housing was initialed by me for identification purposes
  b. Both "Record Protect" tabs are removed
  c. Side A has the initials JM written in ink. The cassette housing has no other writing on any side and there are no labels applied.

 b. The cassette is in a full-sized swivel-open clear plastic cassette case
  a. The accompanying "L-Card" insert has been removed, turned with the manufacturer's label facing inward and placed back into the plastic case with the area that is provided for writing facing outward. There are two columns of writing on the "L-Card" insert.
   i. Column one: $95-39250
    As requested
    0300-0500

   ii. Column two: * NOTE *
    Pos. 13 (LAH 911), OH
    Dictaphone is labeled
    AS BUTTON #18. No --
    Button 18 is KB354 --
    Did the best I
    could. VJ
    <u>Over 10hrs for this</u>

  b. A small yellow colored note was affixed with adhesive and cellophane tape on the front of the plastic cassette.
   i. 911 Calls to
    dispatch, Maui
    Police Dept. On
    July 14, 1995
    MURDER-II

### Q1's Digital Transfer

Q1's recording was digitally transferred to Sound Testimony's digital system at unity gain, with no direct signal amplification or attenuation. The audio was transferred at a bit depth of 32 (floating point) and a sampling rate of 48,000 Hertz. 32-bit (floating point) was chosen due to its lower error build-up, compared to 16-bit and 24-bit integer systems, during the extensive processing that is required during a typical audio forensics examination.

Following Q1's transfer to the digital system, the tape was rewound and a second transfer was performed at the same volume level. For our purposes, the resulting files are called *Q1-Recording One* and *Q1-Recording Two*.

*Q1-Recording One* and *Q1-Recording Two* were each loaded into a multitrack audio editor where they were aligned with one another to a single sample level of accuracy. Then, the polarity (phase) of *Q1-Recording Two* was inverted and I observed that the signal was nulled out (0dB/silent) throughout the entire length of the recording. This demonstrated that Q1 had been accurately transferred to the digital system.

### Verification of CAE's findings for Q1 – 911 Call Tape

CAE's findings on the Q1 – 911 Tape with which I was tasked with verifying were highlighted by the District Attorney's office on a transcript prepared by CAE and a redacted 911 call transcript marked EXHIBIT# 66-B. All of the timing references are from CAE's transcript's timing column on the highlighted sheet.

CAE's 911 Call Transcript findings:
1. Finding at 0:19.3
   UNIDENTIFIED FEMALE: (Unintelligible)
   a. **NOT VERIFIED**

2. Finding at 0:27.9
   UNIDENTIFIED FEMALE: Don't call him an asshole
   a. **NOT VERIFIED**

3. Finding at 0:42.6
   OPERATOR: …females or…
   a. **VERIFIED**

4. Finding at 0:45.4
   UNIDENTIFIED FEMALE: You get help. This is serious.
   a. **NOT VERIFIED**

5. Finding at 0:53.4
   UNIDENTIFIED SPEAKER: (Indistinguishable)
   a. **VERIFIED**

6. Finding at 0:54.1
   UNIDENTIFIED SPEAKER: Really.
   a. **NOT VERIFIED**

7. Finding at 1:20.9
   UNIDENTIFIED FEMALE: Vilmar
   a. **NOT VERIFIED**

8. Finding at 1:22.7
   UNIDENTIFIED MALE: (Unintelligible)
   a. **VERIFIED**

9. Finding at 1:24.0
   UNIDENTIFIED FEMALE: Help. Tesha
   a. **NOT VERIFIED**
   b. **The corrected transcript reads, "Tesha"**

10. Finding at 1:27.0
    UNIDENTIFIED MALE: You lose today.
    a. **NOT VERIFIED**

11. Finding at 1:29.2
    OPERATOR: Okay. Can you, um… are you able to see them or…
    a. **VERIFIED**

12. Finding at 1:35.4
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

13. Finding at 1:37.2
    UNIDENTIFIED SPEAKER: Chris
    a. **NOT VERIFIED** — 'Phased' telephone sound of voice indicates possible telephone interference is the voice source
    b. **The corrected transcript reads, "Christa"**

14. Finding at 1:47.3
    UNIDENTIFIED MALE: Drop him.
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "Drop it."**

15. Finding at 2:00.3
    UNIDENTIFIED MALE: Don't panic.
    a. **VERIFIED**

16. Finding at 2:01.0
    UNIDENTIFIED FEMALE: (Crying)
    a. **VERIFIED with qualification that the corrected script indicates that the speaker is crying out "Nooooooo. (Crying.) Oh, My God."**

17. Finding at 2:06.5
    UNIDENTIFIED SPEAKER: (Likely is system cross-talk. "Tell her to call back" can be heard,)
    a. **VERIFIED**

18. Finding at 2:19.7
    MR. PERRY: Oh, no, I can... I can go out there.
    a. **VERIFIED**

19. Finding at 2:23.1
    UNIDENTIFIED FEMALE: Stop.
    a. **VERIFIED**

20. Finding at 2:50.6
    UNIDENTIFIED FEMALE: Tesha.
    a. **VERIFIED**

21. Finding at 2:51.0
    (Background voices)
    a. **VERIFIED**

22. **Finding at 2:58.6**
    UNIDENTIFIED FEMALE: I'm looking out the window. I can see movement now.
    a. **NOT VERIFIED**

23. Finding at 3:01.9
    UNIDENTIFIED MALE: Call the...
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "Call them."**

24. Finding at 3:11.1
    UNIDENTIFIED MALE: He'll outrun the police.
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "He'll be Okay."**

25. Finding at 3:23.8
    UNIDENTIFIED MALE: It was really tough. I didn't mean it. He's really dark inside.
    a. NOT VERIFIED — May have been spoken by two different people
    b. The corrected transcript reads:
        1. FIRST UNIDENTIFIED MALE: "I'm really cut…" (Unintelligible)
        2. SECOND UNIDENTIFIED MALE: (Unintelligible) "…side"

26. Finding at 3:27.3
    UNIDENTIFIED MALE: Who was it?
    a. VERIFIED

27. Finding at 3:32.3
    MALE WITNESS: There was a guy right here and he went…
    a. NOT VERIFIED
    b. The corrected transcript reads, "There was a guy…" (Unintelligible)

28. Finding at 3:40.5
    MALE WITNESS: He, he's about 6'2".
    a. VERIFIED

29. Finding at 3:42.8
    MALE WITNESS: He's wearing… he's wearing a…
    a. NOT VERIFIED
    b. The corrected transcript reads, "He's wearing…"

30. Finding at 3:53.7
    UNIDENTIFIED SPEAKER: Yeah, I think that's right.
    a. NOT VERIFIED

31. Finding at 3:54.9
    OPERATOR: Baggy Pants
    a. VERIFIED with qualification that the statement may not have been made by the OPERATOR

32. Finding at 4:20.1
    MR. PERRY: …arm.
    a. VERIFIED

33. Finding at 04:25.6
    UNIDENTIFIED MALE: On his chest.
    a. VERIFIED

34. Finding at 4:37.3
    UNIDENTIFIED FEMALE: It was tough. I'm hot and sweating.
    a. **NOT VERIFIED**

35. Finding at 5:04.3
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

36. Finding at 5:06.8
    UNIDENTIFIED MAN: James Burkhardt just walked off.
    a. **NOT VERIFIED**

37. Finding at 5:08.1
    OPERATOR: Okay.
    a. **VERIFIED**

38. Finding at 5:08.5
    UNIDENTIFIED FEMALE: Save your breath.
    a. **NOT VERIFIED**

39. Finding at 5:08.8
    UNIDENTIFIED MALE: Get him.
    a. **NOT VERIFIED**

40. Finding at 5:14.2
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

41. Finding at 5:19.4
    UNIDENTIFIED MALE: Tell her we were robbed by Chris Diaz.
    a. **NOT VERIFIED**

42. **Finding at 5:22.2**
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

43. **Finding at 5:32.3**
    UNIDENTIFIED MALE: Why didn't the alarm go off. Turned it on a long time ago.
    a. **NOT VERIFIED** — May have been spoken by two different people
    b. The corrected transcript reads:
        1. FIRST UNIDENTIFIED MALE: "I was just killing time, you know. I got pushed around... (Unintelligible) ...long time ago."
        2. SECOND UNIDENTIFIED MALE: "Cannot breathe."

44. Finding at 5:36.1
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

45. Finding at 5:37.0
    UNIDENTIFIED MALE: Cannot breathe.
    a. **VERIFIED**

46. Finding at 5:42.9
    UNIDENTIFIED MALE: He laughed.
    a. **NOT VERIFIED**

47. Finding at 5:47.0
    UNIDENTIFIED MALE: (Unintelligible)
    a. **VERIFIED**

Redacted 911 Call Transcript marked EXHIBIT# 66-B findings:

48. First Finding on Page Seven
    UNIDENTIFIED MALE: "Don't Talk" (Indistinguishable)
    b. **NOT VERIFIED**

49. Second Finding on Page Seven
    UNIDENTIFIED MALE: (Indistinguishable)
    a. **NOT VERIFIED**
    b. The corrected transcript reads, (Unintelligible) "...side"

50. Finding on Page Eight
    UNIDENTIFIED MALE: "Are you bad?"
    a. **NOT VERIFIED**
    b. The corrected transcript reads, "Baggy Pants."

**Summary of Selected Audio Segment Verification:**

| Summary of Selected 911 Tape Audio Segment Verification | |
|---|---|
| VERIFIED | 22 |
| NOT VERIFIED | 26 |
| VERIFIED WITH QUALIFICATION | 2 |

**Visual Description of Q2**

Q2. Pretext Call Recording between Taryn Christian and Lisa Kimmey

  c. Unlabeled Maxell UR60 tape cassette (Normal Bias) - Manufacturer's Lot Number F3047401
      a. The cassette housing was initialed by me for identification purposes
      b. Both "Record Protect" tabs are removed
      c. The cassette housing has no writing or label on Side A
      d. Side B has the initials JM written in ink and two labels are applied.
          i. The label that is applied at the top of the cassette housing has two lines of printing/writing. The first line states: MURDER II. 95-39250 A. Funes. The second line states: PHONE CALL Lisa Kimmey 08/17/95 [1235 hrs.
          ii. The label that is applied at the bottom of the cassette housing also has two lines of printing/writing. The first line states Kimmey SPOKE TO TARYN Christian. The second line states: CALL WAS MADE By Christian To Lisa.

  d. The cassette is in a full-sized swivel-open clear plastic cassette case
      a. The accompanying "L-Card" insert has the manufacturer's label facing outward as if it were a new tape. There is no writing on either side of the "L-Card" insert.
      b. Two labels are applied to the front of the swivel-open cassette case.
          i. The first label is a pre-printed red colored label with black letters stating: MASTER.
          ii. The second label has printing/writing that is separated by a drawn slash to separate the left and right hand sides of the label.
              1. The first line of the left label area states: MURDER-II 95-49250. The second line of the left label area states: CHRISTIAN CALLED LISA.
              2. The top line of the right label area states: A Funes. The second line of the right label area states: 08/17/95

**Q2's Digital Transfer**

Q2's recording was digitally transferred to Sound Testimony's digital system at unity gain, with no direct signal amplification or attenuation. The audio was transferred at a bit depth of 32 (floating point) and a sampling rate of 48,000 Hertz. 32-bit (floating point) was chosen again due to its lower error build-up, compared to 16-bit and 24-bit integer systems, during the extensive processing that is required during a typical audio forensics examination.

As with Q1, following Q2's transfer to the digital system, the tape was rewound and a second transfer was performed at the same volume level. For our purposes the resulting files are called *Q2-Recording One* and *Q2-Recording Two*.

*Q2-Recording One* and *Q2-Recording Two* were also each loaded into a multitrack audio editor where they were aligned with one another to a single sample level of accuracy. Then, the polarity (phase) of *Q2-Recording Two* was inverted and I observed that the signal was nulled out (0dB/silent) throughout the entire length of the recording. This effectively demonstrated that Q2 had been accurately transferred to the digital system.

**Verification of CAE's findings for Q2 – Pretext Call Tape**

CAE's findings on the Q2 – Pretext Tape were listed in two separate sections of written material.

1. The first was a page entitled, "CD Track List", "Segments", From Kimmey/Chirstian(sp) Recording"
2. In the absence of a CD track list for the second CD and a transcript prepared by CAE, I had to rely on what was written in CAE's report sent to Mark Barrett in Norman, OK dated December 3, 2007.

**CAE's CD Track List and Report assertions:**
1. **Finding One:**
   TARYN: "Do you think that I took him? How do you think I feel? I'm not the one who did it."
   a. **PARTIAL VERIFICATION**

   c. Only the second and third sentences in this three-sentence phrase can be verified. After enhancement, analysis, and reviewing the transcript that I prepared, I have concluded that it should be:
   TARYN: "Do you think I feel good? How do you think I feel? I'm not the one who did it."

   d. This can be found on the Q2 - Pretext Call enhanced CD that I prepared at 11:28.5. I also have it accessible through the use of a track marker on the CD.

2. **Finding Two:**
   TARYN: "I wasn't the one who stabbed him and, Lisa, I know that for a fact."
   a. **VERIFIED**

   b. After enhancement, analysis, and repeated listening in the preparation of the revised transcript, I can verify that this is on the tape, although spoken almost in a whisper.

e. This can be found on the Q2 - Pretext Call enhanced CD that I prepared at **11:44.3**. I also have it accessible through the use of a track marker on the CD.

| Summary of Selected Pretext Tape Audio Segment Verification ||
|---|---|
| VERIFIED | 1 |
| PARTIALLY VERIFIED | 1 |

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding report and that the contents are true and correct to the best of my knowledge.

WITNESS my signature this __7th__ day of __March__ (March, 2008).

_[signature]_
Signature of Declarant

State of __Pennsylvania__ )
County of __Cambria__ )

On __7th__, 20__08__, __March__
personally came before me and, being duly sworn, signed the above document in my presence.

_[signature]_
Signature of Notary Public

Notary Public, In and for the County of __Cambria__
State of __Pennsylvania__

My commission expires: __November 14, 2009__                    Notary Seal

```
COMMONWEALTH OF PENNSYLVANIA
        NOTARIAL SEAL
KAREN L. RODKEY  NOTARY PUBLIC
JOHNSTOWN, CAMBRIA COUNTY, PA
MY COMMISSION EXPIRES NOV. 14, 2009
```