DEPARTMENT OF THE PROSECUTING ATTORNEY  207

BENJAMIN M. ACOB  4471
Prosecuting Attorney
PETER A. HANANO  6839
First Deputy Prosecuting Attorney
County of Maui
Wailuku, Maui, Hawaii  96793
Tel. No. 243-7630
Fax. No. 270-7927

Attorneys for Respondents

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TARYN CHRISTIAN,<br><br>    Plaintiff,<br><br>vs.<br><br>CLAYTON FRANK, Director,<br>STATE OF HAWAI'I, DEPARTMENT<br>OF PUBLIC SAFETY, et al.<br><br>    Respondents. | CIV. NO. 04-00743 DAE-LEK<br><br>RESPONDENTS EXPERT<br>WITNESS DISCLOSURES;<br>CERTIFICATE OF<br>SERVICE |

## **RESPONDENTS EXPERT WITNESS DISCLOSURES**

## **CERTIFICATE OF SERVICE**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIV. NO. 04-00743 DAE-LEK |
| | ) | |
| Plaintiff, | ) | RESPONDENTS EXPERT |
| | ) | WITNESS DISCLOSURES; |
| vs. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| CLAYTON FRANK, Director, | ) | |
| STATE OF HAWAI'I, DEPARTMENT | ) | |
| OF PUBLIC SAFETY, et al. | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RESPONDENTS EXPERT WITNESS DISCLOSURES

COME NOW, CLAYTON A. FRANK, Director, Department of

Public Safety, State of Hawaii, (hereinafter "Respondents"), by and through their

attorney, PETER A. HANANO, First Deputy Prosecuting Attorney for the County

of Maui, and hereby presents this Respondents Expert Witness Disclosures

pursuant to the First Stipulation to Allow Respondents Additional Time to

Conduct Testing and Submission of Expert Reports Regarding DNA Testing filed

on June 5, 2008 (Document 106).

Attached are the following reports submitted by Brian Wraxall, Chief

Forensic Serologist, Serological Research Institute:   1) Preliminary Analytical

Report dated January 24, 2008; 2) Analytical Report dated May 9, 2008; and 3)

Second Analytical Report dated June 10, 2008.

Also attached are the following reports submitted by Chantel Marie Giamanco, Forensic Scientist, Human Identification Technologies, Inc.: 1) Testing Report dated June 30, 2008; and 2) Testing Report dated July 8, 2008.

Also attached are the following reports submitted by David Smith, Sound Testimony: 1) Report dated March 7, 2008; 2) Q1 - Transcript of 911 Tape between 911 Operator and Mr. Perry signed on March 7, 2008; 3) Q2 - Transcript of Telephone Conversation Between Taryn Christian and Lisa Kimmey on August 17, 1995 signed March 7, 2008; 4) Q2 - Track Sheet of Segments From Christian / Kimmey Telephone Call on August 17, 1995; 5) Final Report including listening analysis of DVD-ROM WAV data files and Audio Enhancement Methodology Summary dated June 23, 2008; 6) Report of CAE's review of Sound Testimony's Findings dated July 3, 2008.

DATED:  Wailuku, Hawaii, <u>July 14, 2008</u>.

DEPARTMENT OF THE PROSECUTING ATTORNEY
BENJAMIN M. ACOB
PROSECUTING ATTORNEY

By_____
PETER A. HANANO
First Deputy Prosecuting Attorney
County of Maui
Attorney for Respondents

2

# BRIAN WRAXALL



**SEROLOGICAL    RESEARCH    INSTITUTE**

January 24, 2008

Mark Barrett
Attorney at Law
P.O. Box 896
Norman, OK 73070
via fax: (405) 366-8329

SERI Case No. M'5324'01
Civil No. 04-00743 DAE-LEK
Victim: Vilmar Cabaccong
Suspects: Taryn Christian
James Burkhart

## PRELIMINARY ANALYTICAL REPORT

As per court order requirements for me to provide results of analysis as of January 24th 2008, the following is a summary of my analysis to date:

Bloodstains were found on the following items:

**SERI Item 1**  Swabs from the Sidewalk (#12, 12A & 12B)
**SERI Item 2**  Knife Blade (#1)
**SERI Item 3**  Screwdriver (#3)
**SERI Item 5**  Swabs from Scene (#10, 10A, 11 & 11A)
**SERI Item 6**  Tank Top – Seidell (#5)

DNA STR typing revealed profiles consistent with Vilmar Cabaccong on all the above items.

**SERI Item 4**, Keys from Vehicle (#2), had traces of blood and provided only limited typing.

**SERI Items 7** (Jacket from Scene) and **Item 8** (Baseball Cap) have not been examined at this time.

Reference samples from Vilmar Cabaccong, Taryn Christian and Serena Seidell have been extracted for DNA content and subjected to DNA STR typing. STR profiles have been obtained from all three individuals. A reference sample from James Burkhart consists of only a hair sample. This has been extracted for DNA typing but no DNA profile has been obtained as of yet. It is possible a new reference sample (e.g. buccal swab or bloodstain) will be required.

The shorts (#4) from Serena Seidell has not been received (it was separated from her other clothing (#5) as per a note on the evidence box).

Some further analysis needs to be completed and the shorts (#4) will need to be analyzed when it arrives at my laboratory. On completion of all testing and full report will be issued.

SEROLOGICAL RESEARCH INSTITUTE

Brian Wraxall

Brian Wraxall
Chief Forensic Serologist

SERI/CaseFiles/M'532/'01/PreliminaryRpt.



RECEIVED
PROSECUTOR'S OFFICE

2008 MAY 12 PM 3: 55

COUNTY OF MAUI
WAILUKU, HI 96793

**SEROLOGICAL** · **RESEARCH** · **INSTITUTE**

May 9, 2008

Mark Barrett
Attorney at Law
P.O. Box 896
Norman, OK 73070

SERI Case No. M'5324'01
Civil Case No. 04-00743 DAE-LEK
Victim: Vilmar Cabaccang
Suspects: Taryn Christian
James Burkhart
Other: Serena Seidell

Peter A. Hanano, DPA
Department of the Prosecuting Attorney
County of Maui
150 S. High Street
Wailuku, Maui, HI 96793

## ANALYTICAL REPORT

On October 10th 2007, fourteen items of evidence were received in five separate boxes from Evidence Specialist Anthony Earles, Maui Police Department, via Federal Express (#'s 8452 4650 6820, 6875, 6864, 6853 and 6831). On April 15th 2008, one further item of evidence was received from Anthony Earles via Federal Express (#8654 0222 8159). They were analyzed as follows:

### ITEM 1   SWABS FROM SIDEWALK (#12)

This consists of four swabs labeled #12 (SERI item 1-1), 12A (item 1-2), 12B (item 1-3) and 12C (item 1-4). The first 3 swabs (1-1 through 1-3) have red brown staining which gave <u>positive</u> presumptive tests for blood. Each swab had been previously sampled. Item 1-4 consists of an intact swab, with no obvious staining, which gave a <u>negative</u> presumptive test for blood. Samples from each swab were extracted for DNA content and amplified using the Polymerase Chain Reaction (PCR). The resulting products were subjected to genetic marker analysis. The results are in the table below.

### ITEM 2   KNIFE (#1)

This consists of a black metallic handled knife with a double edged forked blade. The handle is approximately 4 inches long and the blade approximately 5 inches long by 1 ¼ inches wide. The groove in the blade was marked "This site for DNA – JF." No obvious blood stains were present but the area gave a <u>weak positive</u> presumptive test for blood. The area (2-2) was swabbed and extracted for DNA but <u>no</u> human DNA was detected. Between the fork of the blade there were areas of light brown staining which gave a <u>positive</u> presumptive test for blood. This area (2-1) was swabbed and extracted for DNA. The resulting extract was amplified by PCR and subjected to genetic marker analysis. The results are tabulated below. The handle gave a <u>weak positive</u> presumptive test for blood but was swabbed and extracted for DNA. Trace amounts of DNA were detected but gave inconclusive results for typing. A second swabbing was made and extracted for DNA and subjected to genetic marker typing. <u>No</u> results were obtained.

Mark Barrett
Peter A. Hanano
SERI Case No. M'5324'01
May 9, 2008
Page 2 of 9

### ITEM 3   SCREWDRIVER (#3)

This consists of a black handled "Phillips" screwdriver.  The plastic handle is approximately 2 ¾ inches long and the blade approximately 3 ¾ inches long.  There is heavy brown staining in and around the "Phillips" head which gave a <u>positive</u> presumptive test for blood.  This area, 3-1, was extracted for DNA content.  The handle was also stained with blood but two areas, the front (3-2) and back (3-3), were swabbed and extracted for DNA content.  The results were inconclusive so the three areas were re-swabbed, extracted for DNA, amplified by PCR and subjected to genetic marker analysis.  The results are tabulated below.

### ITEM 4   KEYS (#2)

This consists of four items on a key ring.  Green/Gold 'C' (4-1), a Honda car key, a transmitter and a key divider.  There were no obvious bloodstains on any item except the Green/Gold 'C' which gave a <u>positive</u> presumptive test for blood in one small area.  This area was swabbed and extracted for DNA content and amplified by PCR.  The resulting products were subjected to genetic marker analysis.  No conclusive results were obtained.

### ITEM 5   SWABS FROM SCENE (#10 & 11)

This consists of four previously sampled swabs labeled 10 (SERI item 5-1), 10A (item 5-2), 11 (item 5-3) and 11A (item 5-4).  All have heavy brown staining which gave a <u>positive</u> presumptive test for blood.  A sample from each was extracted for DNA, amplified by PCR and subjected to genetic marker analysis.  The results are tabulated below.

### ITEM 6   CLOTHING – SERENA SEIDELL (#5)

This consists only of a black bikini halter top size 'M' (There were <u>no</u> shorts in the evidence bag).  Three areas of dark staining were observed on the front of the halter top which gave <u>positive</u> presumptive tests for blood.  A sample from each area was extracted for DNA, amplified by PCR and subjected to genetic marker analysis.  The results are in the table below.

### ITEM 7   JACKET FROM SCENE (#6-8)

This consists of a black checkered long sleeve jacket with a "Go Big Stay Loose" label.  Brownish stains are present throughout the jacket and appear diluted and moldy.  The surface of the jacket gives a <u>positive</u> presumptive test for blood but there are no defined areas of staining.  Three small areas on the back of the left sleeve appear more defined and gave <u>positive</u> presumptive tests for blood.  These three areas 7-1, 7-2 and 7-3 were extracted for DNA, amplified by PCR and subjected to genetic marker analysis.  The results are tabulated below.

Mark Barrett
Peter A. Honano
SERI Case No. M'5324'01
May 9, 2008
Page 3 of 9

## ITEM 8  BASEBALL CAP (#2)

This consists of a blue baseball cap with "Michigan" on the front.  Inside the brim of the cap is extensive green black staining which gives <u>positive</u> presumptive tests for blood.  Five small blood stains from inside the brim and one faint stain located on the outside of the brim were extracted for DNA content, amplified by PCR and subjected to genetic marker testing.  The results are in the table below.

## ITEM 9  REFERENCE – SERENA SEIDELL

This consists of two pieces of bloodstained gauze.  A sample was extracted for DNA, amplified by PCR and subjected to genetic marker analysis.  The results are in the table below.

## ITEM 10  REFERENCE HAIR SAMPLES – TARYN CHRISTIAN

This item was <u>not</u> examined.

## ITEM 11  REFERENCE – TARYN CHRISTIAN

This consists of two pieces of blood stained gauze.  A sample was extracted for DNA content, amplified by PCR and subjected to genetic marker analysis.  The results are tabulated below.

## ITEM 12  REFERENCE HAIR SAMPLES – JAMES BURKHART

This consists of a bindle containing loose hairs and two microscope slides with mounted hairs.  A small number of loose hairs containing roots were sampled, extracted for DNA and amplified by PCR.  The resulting products were subjected to genetic marker analysis.  The results are in the table below.

## ITEM 13  REFERENCE HAIR SAMPLES – VILMAR CABACCANG

This item was <u>not</u> examined.

## ITEM 14  REFERENCE – VILMAR CABACCANG

This consists of two pieces of bloodstained gauze.  A sample was extracted for DNA content, amplified by PCR and typed.  The results are tabulated below.

## ITEM 15  KNIFE SHEATH

This item will be the subject of a future report.

Mark Barrett
Peter A. Honano
SERI Case No. M'5324'01
May 9, 2008
Page 7 of 9

## EXPLANATION AND INTERPRETATION

Deoxyribonucleic acid or DNA is found in nucleated cells, e.g., white blood cells, salivary, vaginal and tissue epithelial cells and spermatozoa. The DNA can be extracted and the amount obtained is proportional to the number of cells present.

Human DNA consists of a number of genetic marker or typing systems. The genetic marker systems typed in this laboratory are independent of each other and therefore can all be used to differentiate one sample from another. Thus, if two samples originate from the same source, they will exhibit the same characteristics. Similarly, if two samples exhibit different types, they must have originated from two sources. DNA from different sources may also exhibit the same genetic markers due to the limited number of marker types possible; therefore, a statistical frequency of occurrence of any combination of types is often provided to indicate the approximate number of individuals in a relevant group who may have those same genetic marker types.

The typing system utilized by this laboratory relies on identifying small specific sections of DNA wherein there are recognizable differences between people. There may be an elimination of a person using these systems, and if sufficient systems are utilized an identification to the exclusion of all others may be possible. The advantage of this method is that it requires substantially less DNA than earlier methods, as the recovered DNA can be amplified (increased in amount) in order to obtain successful typing. The amplification uses the Polymerase Chain Reaction (PCR) method.

Short Tandem Repeat (STR) markers are polymorphic DNA loci that contain a repeated nucleotide sequence. The STR repeat unit can be from two to seven nucleotides in length. STR loci can be amplified using the Polymerase Chain Reaction (PCR) process and the PCR products are then analyzed by electrophoresis to separate the alleles according to size. These markers are subsequently detected using fluorescent dye labeling. The following are STR markers: Amelogenin (gender identification), THO1, TPOX, CSF1PO, D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D2S1338, D16S539, and D19S433.

It is generally accepted in the scientific community that one of the biggest risks to PCR based typing is contamination. This can occur in three main areas: 1) In the field by either investigators or other persons in the vicinity through sneezing, coughing, shedding hair, sloughing skin, etc., 2) by laboratory personnel either by mixing samples or as per 1, 3) from amplified DNA product in the laboratory.

We cannot control the type of contamination in example 1. We control the type of contamination in example 2 by taking precautions and the use of a blank control. In example 3 there have been no instances of this type of contamination in this laboratory and the set up of the lab virtually guarantees that this will not occur.

Mark Barrett
Peter A. Honano
SERI Case No. M'5324'01
May 9, 2008
Page 8 of 9

## EXPLANATION AND INTERPRETATION (continued)

The type of contamination in example 3 is prevented by taking handling precautions and by the design of the laboratory.

Because the PCR method can amplify very small amounts of DNA, contamination of the samples is always an important concern. Consequently, the reagents used in the extraction are themselves subjected to the entire extraction, amplification, and typing process without adding any DNA. This blank control should show no activity at the typing stage, thereby strongly indicating that contamination has **not** occurred. If any typing result is obtained, contamination could have occurred in the evidence samples.

In this case some DNA activity was found in the extraction blank associated with a first group of evidence stains (items 1 through 4). Subsequently where possible these items were resampled. The evidence stains in this case are badly degraded. This is due to age and/or bad storage. Consequently only incomplete or no DNA profiles have been determined in many samples.

## CONCLUSIONS

1.  All the seven swabs from the scene (items 1 and 5) have bloodstains that originate from the same source. Although all the profiles are not complete, in my opinion, the blood stains all originated from Vilmar Cabaccang but <u>not</u> Serena Seidell, Taryn Christian or James Burkhart. Item 1-4 is a control swab from the scene that shows the presence of trace amounts of DNA. No conclusion can be drawn regarding it's source.

2.  Blood stains from the fork of the knife blade (item 2-1) and the head of the screwdriver originate, in my opinion, from Vilmar Cabaccang but <u>not</u> Serena Seidell, Taryn Christian or James Burkhart. No conclusions can be drawn regarding the limited activity found on the knife handle (2-2 and 2-3) or the screwdriver handle (3-2 and 3-3).

3.  The bloodstain on the halter top (item 6-1) originates, in my opinion, from Vilmar Cabaccang but <u>not</u> Serena Seidell, Taryn Christian or James Burkhart. No conclusions can be drawn for areas 6-2 and 6-3 due to low levels of activity.

4.  The DNA recovered from the stains 7-1 and 7-3 from the jacket is degraded and gives a limited profile. The profiles obtained are consistent with the profile of Taryn Christian but not Serena Seidell, Vilmar Cabaccang, or James Burkhart.

5.  Only three of the six areas on the Baseball Cap (items 8-1, 8-2 and 8-5) resulted in DNA profiles. Although slightly degraded, in my opinion, the stains originated from Vilmar Cabaccang but <u>not</u> Serena Seidell, Taryn Christian or James Burkhart.

Mark Barrett
Peter A. Honano
SERI Case No. M'5324'01
May 9, 2008
Page 9 of 9

## EVIDENCE DISPOSITION

The evidence will be returned to Maui Police Department.  Residual DNA extracts and samples
of reference material will be retained at SERI.

SEROLOGICAL RESEARCH INSTITUTE

Brian Wraxall
Chief Forensic Serologist

SERI1/CaseFiles/M'5324'01/Rpt.1



RECEIVED
PROSECUTOR'S OFFICE

2008 JUN 20 PM 2:39

**SEROLOGICAL    RESEARCH    INSTITUTE**

COUNTY OF MAUI
WAILUKU, HI 96793

June 10, 2008

Mark Barrett
Attorney at Law
P.O. Box 896
Norman, OK 73070

SERI Case No. M'5324'01
Civil Case No. 04-00743 DAE-LEK
Victim: Vilmar Cabaccang
Suspects: Taryn Christian
    James Burkhart
Other: Serena Seidell

Peter A. Hanano, DPA
Department of the Prosecuting Attorney
County of Maui
150 S. High Street
Wailuku, Maui, HI 96793

## SECOND ANALYTICAL REPORT

On October 10th 2007, fourteen items of evidence were received in five separate boxes from Evidence Specialist Anthony Earles, Maui Police Department, via Federal Express (#'s 8452 4650 6820, 6875, 6864, 6853 and 6831). On April 15th 2008, one further item of evidence was received from Anthony Earles via Federal Express (#8654 0222 8159). An Analytical Report was issued on May 9th 2008. The following items were analyzed as follows:

### ITEM 8   BASEBALL CAP (#2)

Four further areas from the brim of the cap were extracted for DNA content, amplified by PCR and subjected to genetic testing. The results are in the table below.

### ITEM 15   KNIFE SHEATH

This consists of a heavy duty black fabric knife sheath with a belt loop and a metal belt clip. There was no obvious staining on the sheath except for a small area on the back of the sheath next to the belt clip. This staining gave a positive presumptive test for blood and the area was designated 15-4. Three areas of the sheath were selected for examination for the presence of DNA from the owner or handler. Area 15-1 is the flap which holds the knife (when present) in place. Area 15-2 is the area just inside the belt loop and 15-3 is the metal belt clip. All three areas, together with area 15-4, were swabbed separately with sterile water and the swabs were extracted for DNA content. The resulting extracts were amplified by PCR and subjected to genetic marker analysis. The results are in the table below. After analyzing the results a further examination was conducted on the sheath. The belt loop was cut open and inspected using low power microscopy, revealing apparent cellular debris. The area was swabbed (15-5) and two areas sampled by cutting. Area 15-6 is the right front side of the loop and 15-7, the right back side of the loop. All three samples were extracted for DNA content, amplified by PCR and subjected to genetic marker analysis. The results are tabulated below.

3053 RESEARCH DRIVE • RICHMOND, CA 94806 • (510) 223-7374 (SERI) • FAX (510) 222-8887

Mark Barrett
SERI Case No. M'5324'01
June 10, 2008
Page 3 of 3

## EXPLANATION & INTERPRETATION

See previous report

## CONCLUSIONS

1.    The blood staining on the Baseball Cap (item 8) area 8-7 is severely degraded and indicates a mixture. Vilmar Cabaccang cannot be excluded as a donor to the mixture.

2.    Area 8-8 of the Baseball Cap produced no results and areas 8-9 and 8-10 revealed only trace amounts of DNA. So no conclusion as to the source can be drawn.

3.    Little or no DNA activity was detected on areas 15-1, 15-3 or 15-4 of the knife sheath (item 15).

4.    The DNA obtained from the other areas from the Knife Sheath (15-2, 15-5, 15-6 and 15-7) are mixtures. Serena Seidell, Vilmar Cabaccang and James Burkhart are all excluded as being a donor to the mixtures. Taryn Christian is a potential donor to the mixture. Alternately, one person out of 40,000 individuals (or 0.0025%) in the general population could be a donor to the DNA on the knife sheath.

## EVIDENCE DISPOSITION

All items of evidence were returned to the Maui Police Department on May 9th 2008. Residual DNA extracts and samples of reference materials will be retained at SERI.

SEROLOGICAL RESEARCH INSTITUTE

Brian Wraxall
Chief Forensic Serologist

SERI1/CaseFiles/M'5324'01/Rpt.2

# CHANTEL MARIE GIAMANCO



# HUMAN IDENTIFICATION TECHNOLOGIES, INC.

440 Business Center Court, Redlands, CA 92373

1-877-DNA2HIT

909-557-1831 (FAX)

**Testing Report**



An ASCLD/LAB-*International* accredited laboratory (since 2007)

### Testing Performed
STR Typing

| | | | |
|---|---|---|---|
| **HIT Case #:** | DT-08-0033 | **Date of Report:** | June 30, 2008 |
| **Client:** | Peter Hanano | | |
| | First Deputy Prosecuting Attorney | | |
| | County of Maui | | |
| **Address:** | 150 South High Street | **Administrative Review** | |
| | Wailuku, Hawaii 96793 | By: *Merul Angaria* | |
| **Phone:** | 808-270-7777 | | |
| **Fax:** | 808-270-7625 | | |
| **Client Case#(s):** | 04-00743 DAE-Lek | Date: 6/30/08 | |

## Evidence

On June 5, 2008, Human Identification Technologies, Inc. received the following items of evidence from the Maui Police Department, CID via Federal Express:

| Item Designation | Description |
|---|---|
| N/A | Fingernail scrapings (10) from Cabaccang |
| 2 | Baseball cap |
| 6 | Jacket |

The evidence was assigned the following HIT, Inc. item designations and barcode numbers:

| HIT Item Designation | Description | Barcode Number |
|---|---|---|
| 1 | Fingernail scrapings (10) from Cabaccang | 08000070 |
| 2 | Baseball cap | 08000071 |
| 3 | Jacket | 08000072 |

Testing Report                          DT-08-0033                          June 30, 2008

## SUMMARY

The STR-DNA alleles detected from item 1.1 [scrapings (3 fingers) and swab of packaging (1) from right hand] indicate a single source, male, STR-DNA profile. Vilmar Cabaccang is included as a possible contributor. Taryn Christian and James Hina Burkhart are excluded as possible contributors.

The three STR-DNA alleles detected from item 1.2 [scrapings (3 fingers) and swab of packaging (1) from left hand] are consistent with a low level, partial, STR-DNA result. The alleles detected are consistent with Vilmar Cabaccang. No alleles foreign to Vilmar Cabaccang were detected. Taryn Christian and James Hina Burkhart are excluded as possible contributors of the three alleles.

Blood was not detected from item 2.1.A (swabs from front band area of baseball cap). Human DNA was not detected.

Although a low level of human DNA was detected from item 2.1.B (swab from left side of band area of baseball cap), an STR-DNA profile was not obtained.

Human blood is present on item 3.1 (cutting from lower back side of jacket) and item 3.2 (cutting from front, middle, near the seam of jacket). The STR-DNA alleles detected indicate a single source, male, STR-DNA profile. The STR-DNA profile detected matches the DNA profile determined for Vilmar Cabaccang. Taryn Christian and James Hina Burkhart are excluded as possible contributors.

## Examinations

The following item was examined visually and with an Alternate Light Source for the location of possible biological stains. Two areas of this item were also screened for the presence of blood and tested using a more specific test for the presence of human blood:

| HIT Item Designation | Description |
| --- | --- |
| 3 | Jacket |

The following item was screened for the presence of blood:

| HIT Item Designation | Description |
| --- | --- |
| 2 | Baseball cap (4 areas on inner band near bill) |

Testing Report                    DT-08-0033                    June 30, 2008

The following items were extracted for DNA analysis:

| HIT Item Designation | Description |
|---|---|
| 1.1 | Scrapings (3 fingers) and swab of packaging (1) from right hand |
| 1.2 | Scrapings (3 fingers) and swab of packaging (1) from left hand |
| 2.1.A | Swabs (2) from front band area of baseball cap |
| 2.1.B | Swab from left side of band area of baseball cap |
| 3.1 | Cutting from lower back side of jacket |
| 3.2 | Cutting from front, middle, near the seam of jacket |

The extracts were evaluated for the presence of human DNA. All of the extracts, except item 2.1.A, were then amplified using the Identifiler™ kit, and analyzed on a 310 Genetic Analyzer.

The alleles detected were then compared to the STR-DNA profiles determined for the following reference samples (from SERI Second Analytical Report dated June 10, 2008):

- Reference From – Vilmar Cabaccang
- Reference From – Taryn Christian
- Hair Reference – James Hina Burkhart

**Results**

Possible biological stains were observed visually on the following item. Alternate Light Source examination revealed no additional stains. This item screened positive for the presence of blood and tested positive using a more specific test for human blood:

| HIT Item Designation | Description |
|---|---|
| 3 | 2 questioned areas located on the jacket |

The following item screened negative for the presence of blood:

| HIT Item Designation | Description |
|---|---|
| 2 | Baseball cap (4 areas on inner band near bill) |

The DNA typing results are presented in Tables I, II, and III on the following pages. The DNA typing results for the reference samples (from SERI Second Analytical Report dated June 10, 2008) are also presented in Tables I, II, and III.

Testing Report                    DT-08-0033                    June 30, 2008

## Conclusions

### ITEM 1.1 – SCRAPINGS (3 FINGERS) AND SWAB OF PACKAGING FROM RIGHT HAND
The STR-DNA results indicate a single source, male, STR-DNA profile. Degradation is indicated. Vilmar Cabaccang is included as a possible contributor. Taryn Christian and James Hina Burkhart are excluded as possible contributors. This STR-DNA profile can be expected to occur in unrelated individuals at random in:

Less than 1 in 7 billion African-Americans [calculated as 1 in $2.8 \times 10^{23}$ (280 sextillion)]
Less than 1 in 7 billion Caucasians [calculated as 1 in $1.2 \times 10^{23}$ (120 sextillion)]
Less than 1 in 7 billion Southwestern Hispanics [calculated as 1 in $4.5 \times 10^{22}$ (45 sextillion)]

### ITEM 1.2 – SCRAPINGS (3 FINGERS) AND SWAB OF PACKAGING FROM LEFT HAND
The three STR-DNA alleles detected are consistent with a low level, partial STR-DNA result. Male DNA was detected. Inhibition is indicated. The alleles detected are consistent with Vilmar Cabaccang. No alleles foreign to Vilmar Cabaccang were detected. Taryn Christian and James Hina Burkhart are excluded as possible contributors of the three alleles. Individuals meeting the criteria for inclusion as a potential contributor of the three STR-DNA alleles detected in this low level, partial DNA result can be expected to occur at random among the following unrelated individuals:

1 in 28 African Americans
1 in 57 Caucasians
1 in 11 Southwestern Hispanics

### ITEM 2.1.A – SWABS (2) FROM FRONT BAND AREA OF BASEBALL CAP
Blood was not detected. Human DNA was not detected.

### ITEM 2.1.B – SWAB FROM LEFT SIDE OF THE BAND AREA OF BASEBALL CAP
Although a low level of human DNA was detected, an STR-DNA profile was not obtained.

### ITEM 3.1 – CUTTING FROM LOWER BACK SIDE OF JACKET
Human blood is present. The STR-DNA results indicate a single source, male, STR-DNA profile. The STR-DNA profile detected matches the DNA profile determined for Vilmar Cabaccang. Taryn Christian and James Hina Burkhart are excluded as possible contributors. This STR-DNA profile, which matches Vilmar Cabaccang, can be expected to occur in unrelated individuals at random in:

Less than 1 in 7 billion African-Americans [calculated as 1 in $3.0 \times 10^{24}$ (3.0 septillion)]
Less than 1 in 7 billion Caucasians [calculated as 1 in $1.0 \times 10^{24}$ (1.0 septillion)]
Less than 1 in 7 billion Southwestern Hispanics [calculated as 1 in $6.8 \times 10^{23}$ (680 sextillion)]

Testing Report                         DT-08-0033                         June 30, 2008

**ITEM 3.2 – CUTTING FROM FRONT, MIDDLE, NEAR THE SEAM OF THE JACKET**
Human blood is present. The STR-DNA results indicate a single source, male, STR-DNA profile. The STR-DNA profile detected matches the DNA profile determined for **Vilmar Cabaccang**. **Taryn Christian and James Hina Burkhart** are excluded as possible contributors. This STR-DNA profile, which matches Vilmar Cabaccang, can be expected to occur in unrelated individuals at random in:

Less than 1 in 7 billion African-Americans [calculated as 1 in $3.0 \times 10^{24}$ (3.0 septillion)]
Less than 1 in 7 billion Caucasians [calculated as 1 in $1.0 \times 10^{24}$ (1.0 septillion)]
Less than 1 in 7 billion Southwestern Hispanics [calculated as 1 in $6.8 \times 10^{23}$ (680 sextillion)]

<u>**Disposition of Evidence**</u>

Evidence under barcode numbers 08000070, 08000071, and 08000072 is temporarily secured at Human Identification Technologies, Inc. and will be returned to Maui Police Department, CID.

The following DNA analysis by-products will be stored at Human Identification Technologies, Inc. under barcode number 08000080 for a minimum of ten years:

Extracted DNA fractions:  Items 2.1.A, 2.1.B (consumed), SC (consumed), EC, RB (consumed), 1.1, 1.1 (1:10), 1.2, SC-2, EC-2, RB-2, 3.1, 3.1 (1:10), 3.2, 3.2 (1:10), EC-3, RB-3
Extracted substrates:  Items 2.1.A, 2.1.B, SC, SC-2, 3.1, and 3.2

The agency(s) from which the original evidence was received must notify Human Identification Technologies, Inc. in writing 90 days prior to the date of destruction of the DNA analysis by-products if said agency(s) require extended storage of the DNA analysis by-products generated by Human Identification Technologies, Inc.


*Chantel Marie Giamanco*

**Chantel Marie Giamanco**
**Forensic Scientist**



# HUMAN IDENTIFICATION TECHNOLOGIES, INC.

440 Business Center Court, Redlands, CA 92373
1-877-DNA2HIT
909-557-1831 (FAX)

### Testing Report



An ASCLD/LAB-*International* accredited
laboratory (since 2007)

## Supplemental Report I

### Testing Performed
STR Typing

| | | | |
|---|---|---|---|
| HIT Case #: | DT-08-0033 | Date of Report: | July 8, 2008 |
| Client: | Peter Hanano | | |
| | First Deputy Prosecuting Attorney | | |
| | County of Maui | | |
| Address: | 150 South High Street | Administrative Review | |
| | Wailuku, Hawaii 96793 | By: | |
| Phone: | 808-270-7777 | | |
| Fax: | 808-270-7625 | | |
| Client Case#(s): | 04-00743 DAE-Lek | | |

*Kelli Feneran*
Date: July 8, 2008

### Evidence

See HIT, Inc. report dated June 30, 2008 for a description of evidence items and the corresponding HIT, Inc. item designations and barcode numbers.

### SUMMARY

See HIT, Inc. report dated June 30, 2008 for a previous summary.

The low level of human DNA detected from item 2.1.C [cuttings (5) from inner band of baseball cap] did not produce STR-DNA typing results.

### Examinations

See HIT, Inc. report dated June 30, 2008 for a description of previous examinations.

The following item was extracted for DNA analysis:

| HIT Item Designation | Description |
|---|---|
| 2.1.C | Cuttings (5) from inner band of baseball cap |

The extract was evaluated for the presence of human DNA. The extract was then amplified using the Identifiler™ kit, and analyzed on a 310 Genetic Analyzer.

Testing Report                    DT-08-0033                    July 8, 2008

## Conclusions

See HIT, Inc. report dated June 30, 2008 for previous conclusions.

**ITEM 2.1.C – CUTTINGS (5) FROM INNER BAND OF BASEBALL CAP**
The low level of human DNA detected did not produce STR-DNA typing results.

## Disposition of Evidence

See HIT, Inc. report dated June 30, 2008 for previous disposition of evidence.

The following DNA analysis by-products will be added to the contents of barcode number 08000080 and will be stored at Human Identification Technologies, Inc. for a minimum of ten years:

Extracted DNA fractions:  Items 2.1.C (consumed), EC-4, and RB-4 (consumed)
Extracted substrates: Item 2.1.C

The agency(s) from which the original evidence was received must notify Human Identification Technologies, Inc. in writing 90 days prior to the date of destruction of the DNA analysis by-products if said agency(s) require extended storage of the DNA analysis by-products generated by Human Identification Technologies, Inc.


*Chantel Marie Giamanco*

**Chantel Marie Giamanco**
**Forensic Scientist**

Testing Report        DT-08-0033        July 8, 2008

## Description of Testing Methodologies Employed

### ('x' indicates method used in this case)

**Body Fluid Testing**

| | | |
|---|---|---|
| | Ortho-tolidine | Used as a presumptive test for suspected bloodstains |
| | Acid Phosphatase (AP) | Used as a presumptive test for suspected semen stains |
| | Alternate Light Source (ALS) | Used to locate biological stains such as semen by promoting fluorescence |
| | Radial diffusion | Used for detection of amylase (an enzyme found in high concentration in saliva) |
| | ABAcard® HemaTrace® | Used in concert with sample appearance, the ortho-tolidine test, and human DNA typing results to determine if human blood is present. Note: this test is known to cross-react with higher primates and ferrets. Therefore, a conclusion that human blood is present is based on the entire analysis scheme and assumes the absence of ferret and/or higher primate blood. |
| | SERATEC® PSA SEMIQUANT | Used as a confirmatory test for seminal fluid. Detects the presence of prostate-specific antigen (PSA). |
| | Cellular microscopy | Extracts are stained with safranin (or nuclear fast red) followed by picroindigocarmine |

**DNA Extraction**

| | |
|---|---|
| X | Organic extraction (phenol/chloroform, Microcon®) |
| | Differential extraction-designed to separate non-sperm cell DNA from sperm cell DNA (phenol/chloroform, Microcon®) |
| | QIAamp® DNA Micro |
| | Concentration of extracts using Vacufuge |

**DNA Quantitation**

| | |
|---|---|
| X | Applied Biosystems Quantifiler™ run on an ABI Prism® 7000 Sequence Detection System |

**DNA Amplification**

| | |
|---|---|
| X | Applied Biosystems AmpF*l*STR® Identifiler™ PCR Amplification Kit |

Polymerase Chain Reaction (PCR) is used to amplify the following short tandem repeat (STR) loci:

| | | | |
|---|---|---|---|
| D8S1179 | D3S1358 | D2S1338 | D18S51 |
| D21S11 | TH01 | D19S433 | D5S818 |
| D7S820 | D13S317 | vWA | FGA |
| CSF1PO | D16S539 | TPOX | |

Plus: Amelogenin (gender determination locus)

**STR Typing**

| | |
|---|---|
| X | Capillary electrophoresis using ABI Prism® 310 Genetic Analyzer |

Page 4 of 4

# DAVID A. SMITH

# Sound Testimony®

March 7, 2008

**Report**

**Assignment:**

Sound Testimony® was contacted by Richard Minatoya, Esq., Deputy Prosecuting Attorney, Department of the Prosecuting Attorney, County of Maui, to examine the recorded material on two standard audio cassettes. The task is to verify and confirm what another audio examiner, John J. Mitchell of Computer Audio Engineering (CAE) of Albuquerque, NM found to be on the tapes.

On February 1, 2008, I received a Fed-Ex (Medium Box) package from investigator Margo Evans that contained the following:

1. Audio cassette of a 911 recording
2. A redacted transcript of the 911 recording
3. Audio cassette of a pretext call recording
4. A transcript of the pretext call recording
5. A sealed manila envelope containing:
   a. CAE's CD of the 911 recording
   b. CAE's CD of the pretext call
   c. CAE's CD of the pretext call's recording segments
   d. CAE's CD of the 911 call's recording segments
   e. CAE's report on the calls and the recording segments
   f. A copy of the original 911 recording transcript with initialed annotations by John Mitchell
   g. An updated 911 recording transcript by CAE with timing markings in the left column and highlighted sections marked for me to verify, if verifiable
   h. Additional reports and notes from CAE regarding the 911 recording

**Audio Recordings to be examined:**
   a. Two Cassette Tapes were provided
      a. Cassette tape number one will be referred to as Q1
         I was informed that the original 911 tape could not be located and that Q1 was a first generation recording of the original 911 tape
      b. Cassette tape number two will be referred to as Q2
         I was informed that Q2 was an original cassette tape of a pretext call

814.410.4787                                           1185 Agnes Avenue
david@soundtestimony.com                               Johnstown, PA 15905
                    www.soundtestimony.com

**Visual Description of Q1**

Q1. 911 Recording

    a.  Unlabeled Maxell UR60 tape cassette (Normal Bias) - Manufacturer's Lot Number G1447401
        a.  The cassette housing was initialed by me for identification purposes
        b.  Both "Record Protect" tabs are removed
        c.  Side A has the initials JM written in ink.  The cassette housing has no other writing on any side and there are no labels applied.

    b.  The cassette is in a full-sized swivel-open clear plastic cassette case
        a.  The accompanying "L-Card" insert has been removed, turned with the manufacturer's label facing inward and placed back into the plastic case with the area that is provided for writing facing outward.  There are two columns of writing on the "L-Card" insert.
            i.  Column one: $95-39250
                As requested
                0300-0500

           ii.  Column two: * NOTE *
                Pos. 13 (LAH 911), OH
                Dictaphone is labeled
                AS BUTTON #18. No –
                Button 18 is KB354 –
                Did the best I
                could.  VJ
                Over 10hrs for this

        b.  A small yellow colored note was affixed with adhesive and cellophane tape on the front of the plastic cassette.
           i.  911 Calls to
               dispatch, Maui
               Police Dept. On
               July 14, 1995
               MURDER-II

**Q1's Digital Transfer**

Q1's recording was digitally transferred to Sound Testimony's digital system at unity gain, with no direct signal amplification or attenuation. The audio was transferred at a bit depth of 32 (floating point) and a sampling rate of 48,000 Hertz. 32-bit (floating point) was chosen due to its lower error build-up, compared to 16-bit and 24-bit integer systems, during the extensive processing that is required during a typical audio forensics examination.

Following Q1's transfer to the digital system, the tape was rewound and a second transfer was performed at the same volume level. For our purposes, the resulting files are called *Q1-Recording One* and *Q1-Recording Two*.

*Q1-Recording One* and *Q1-Recording Two* were each loaded into a multitrack audio editor where they were aligned with one another to a single sample level of accuracy. Then, the polarity (phase) of *Q1-Recording Two* was inverted and I observed that the signal was nulled out (0dB/silent) throughout the entire length of the recording. This demonstrated that Q1 had been accurately transferred to the digital system.

**Verification of CAE's findings for Q1 – 911 Call Tape**

CAE's findings on the Q1 – 911 Tape with which I was tasked with verifying were highlighted by the District Attorney's office on a transcript prepared by CAE and a redacted 911 call transcript marked EXHIBIT# 66-B. All of the timing references are from CAE's transcript's timing column on the highlighted sheet.

CAE's 911 Call Transcript findings:
1. Finding at 0:19.3
   UNIDENTIFIED FEMALE: (Unintelligible)
      a. **NOT VERIFIED**

2. Finding at 0:27.9
   UNIDENTIFIED FEMALE: Don't call him an asshole
      a. **NOT VERIFIED**

3. Finding at 0:42.6
   OPERATOR: ...females or...
      a. **VERIFIED**

4. Finding at 0:45.4
   UNIDENTIFIED FEMALE: You get help. This is serious.
      a. **NOT VERIFIED**

5. Finding at 0:53.4
   UNIDENTIFIED SPEAKER: (Indistinguishable)
      a. **VERIFIED**

6. Finding at 0:54.1
   UNIDENTIFIED SPEAKER: Really.
      a. **NOT VERIFIED**

7. Finding at 1:20.9
   UNIDENTIFIED FEMALE: Vilmar
      a. **NOT VERIFIED**

8. Finding at 1:22.7
   UNIDENTIFIED MALE: (Unintelligible)
      a. **VERIFIED**

9. Finding at 1:24.0
   UNIDENTIFIED FEMALE: Help. Tesha
      a. **NOT VERIFIED**
      b. **The corrected transcript reads, "Tesha"**

10. Finding at 1:27.0
    UNIDENTIFIED MALE: You lose today.
       a. **NOT VERIFIED**

11. Finding at 1:29.2
    OPERATOR: Okay. Can you, um… are you able to see them or…
       a. **VERIFIED**

12. Finding at 1:35.4
    UNIDENTIFIED MALE: (Unintelligible)
       a. **VERIFIED**

13. Finding at 1:37.2
    UNIDENTIFIED SPEAKER: Chris
       a. **NOT VERIFIED — 'Phased' telephone sound of voice indicates possible telephone interference is the voice source**
       b. **The corrected transcript reads, "Christa"**

14. Finding at 1:47.3
    UNIDENTIFIED MALE: Drop him.
       a. **NOT VERIFIED**
       b. **The corrected transcript reads, "Drop it."**

15. Finding at 2:00.3
    UNIDENTIFIED MALE: Don't panic.
       a. **VERIFIED**

16. Finding at 2:01.0
    UNIDENTIFIED FEMALE: (Crying)
    a. **VERIFIED with qualification that the corrected script indicates that
       the speaker is crying out "Nooooooo. (Crying.) Oh, My God."**

17. Finding at 2:06.5
    UNIDENTIFIED SPEAKER: (Likely is system cross-talk. "Tell her to call back"
    can be heard,)
    a. **VERIFIED**

18. Finding at 2:19.7
    MR. PERRY: Oh, no, I can… I can go out there.
    a. **VERIFIED**

19. Finding at 2:23.1
    UNIDENTIFIED FEMALE: Stop.
    a. **VERIFIED**

20. Finding at 2:50.6
    UNIDENTIFIED FEMALE: Tesha.
    a. **VERIFIED**

21. Finding at 2:51.0
    (Background voices)
    a. **VERIFIED**

22. **Finding at 2:58.6**
    UNIDENTIFIED FEMALE: I'm looking out the window. I can see movement
    now.
    a. **NOT VERIFIED**

23. **Finding at 3:01.9**
    **UNIDENTIFIED MALE: Call the…**
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "Call them."**

24. Finding at 3:11.1
    UNIDENTIFIED MALE: He'll outrun the police.
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "He'll be Okay."**

25. Finding at 3:23.8
    UNIDENTIFIED MALE: It was really tough. I didn't mean it. He's really dark inside.
    a. **NOT VERIFIED — May have been spoken by two different people**
    b. **The corrected transcript reads:**
        1. **FIRST UNIDENTIFIED MALE: "I'm really cut..." (Unintelligible)**
        2. **SECOND UNIDENTIFIED MALE: (Unintelligible) "... side"**

26. Finding at 3:27.3
    UNIDENTIFIED MALE: Who was it?
    a. **VERIFIED**

27. Finding at 3:32.3
    MALE WITNESS: There was a guy right here and he went...
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "There was a guy..." (Unintelligible)**

28. Finding at 3:40.5
    MALE WITNESS: He, he's about 6'2".
    a. **VERIFIED**

29. Finding at 3:42.8
    MALE WITNESS: He's wearing... he's wearing a...
    a. **NOT VERIFIED**
    b. **The corrected transcript reads, "He's wearing..."**

30. Finding at 3:53.7
    UNIDENTIFIED SPEAKER: Yeah, I think that's right.
    a. **NOT VERIFIED**

31. Finding at 3:54.9
    OPERATOR: Baggy Pants
    a. **VERIFIED with qualification that the statement may not have been made by the OPERATOR**

32. Finding at 4:20.1
    MR. PERRY: ...arm.
    a. **VERIFIED**

33. Finding at 04:25.6
    UNIDENTIFIED MALE: On his chest.
    a. **VERIFIED**

34. Finding at 4:37.3
UNIDENTIFIED FEMALE: It was tough. I'm hot and sweating.
a. **NOT VERIFIED**

35. Finding at 5:04.3
UNIDENTIFIED MALE: (Unintelligible)
a. **VERIFIED**

36. Finding at 5:06.8
UNIDENTIFIED MAN: James Burkhardt just walked off.
a. **NOT VERIFIED**

37. Finding at 5:08.1
OPERATOR: Okay.
a. **VERIFIED**

38. Finding at 5:08.5
UNIDENTIFIED FEMALE: Save your breath.
a. **NOT VERIFIED**

39. Finding at 5:08.8
UNIDENTIFIED MALE: Get him.
a. **NOT VERIFIED**

40. Finding at 5:14.2
UNIDENTIFIED MALE: (Unintelligible)
a. **VERIFIED**

41. Finding at 5:19.4
UNIDENTIFIED MALE: Tell her we were robbed by Chris Diaz.
a. **NOT VERIFIED**

42. **Finding at 5:22.2**
UNIDENTIFIED MALE: (Unintelligible)
a. **VERIFIED**

43. **Finding at 5:32.3**
UNIDENTIFIED MALE: Why didn't the alarm go off. Turned it on a long time
ago.
a. **NOT VERIFIED — May have been spoken by two different people**
b. **The corrected transcript reads:**
1. **FIRST UNIDENTIFIED MALE: "I was just killing time, you
know. I got pushed around... (Unintelligible) ...long time
ago."**
2. **SECOND UNIDENTIFIED MALE: "Cannot breathe."**

44. Finding at 5:36.1
    UNIDENTIFIED MALE: (Unintelligible)
       **a. VERIFIED**

45. Finding at 5:37.0
    UNIDENTIFIED MALE: Cannot breathe.
       **a. VERIFIED**

46. Finding at 5:42.9
    UNIDENTIFIED MALE: He laughed.
       **a. NOT VERIFIED**

47. Finding at 5:47.0
    UNIDENTIFIED MALE: (Unintelligible)
       **a. VERIFIED**

Redacted 911 Call Transcript marked EXHIBIT# 66-B findings:

48. First Finding on Page Seven
    UNIDENTIFIED MALE: "Don't Talk"  (Indistinguishable)
       **b. NOT VERIFIED**

49. Second Finding on Page Seven
    UNIDENTIFIED MALE: (Indistinguishable)
       **a. NOT VERIFIED**
       **b. The corrected transcript reads, (Unintelligible) "…side"**

50. Finding on Page Eight
    UNIDENTIFIED MALE: "Are you bad?"
       **a. NOT VERIFIED**
       **b. The corrected transcript reads, "Baggy Pants."**

**Summary of Selected Audio Segment Verification:**

| Summary of Selected 911 Tape Audio Segment Verification | |
|---|---|
| VERIFIED | 22 |
| NOT VERIFIED | 26 |
| VERIFIED WITH QUALIFICATION | 2 |

**Visual Description of Q2**

Q2. Pretext Call Recording between Taryn Christian and Lisa Kimmey

    c. Unlabeled Maxell UR60 tape cassette (Normal Bias) - Manufacturer's Lot Number F3047401
        a. The cassette housing was initialed by me for identification purposes
        b. Both "Record Protect" tabs are removed
        c. The cassette housing has no writing or label on Side A
        d. Side B has the initials JM written in ink and two labels are applied.
            i. The label that is applied at the top of the cassette housing has two lines of printing/writing. The first line states: MURDER II. 95-39250 A. Funes. The second line states: PHONE CALL Lisa Kimmey 08/17/95 [1235 hrs.
            ii. The label that is applied at the bottom of the cassette housing also has two lines of printing/writing. The first line states Kimmey SPOKE TO TARYN Christian. The second line states: CALL WAS MADE By Christian To Lisa.

    d. The cassette is in a full-sized swivel-open clear plastic case
        a. The accompanying "L-Card" insert has the manufacturer's label facing outward as if it were a new tape. There is no writing on either side of the "L-Card" insert.
        b. Two labels are applied to the front of the swivel-open cassette case.
            i. The first label is a pre-printed red colored label with black letters stating: MASTER.
            ii. The second label has printing/writing that is separated by a drawn slash to separate the left and right hand sides of the label.
                1. The first line of the left label area states: MURDER-II 95-49250. The second line of the left label area states: CHRISTIAN CALLED LISA.
                2. The top line of the right label area states: A Funes. The second line of the right label area states: 08/17/95

**Q2's Digital Transfer**

Q2's recording was digitally transferred to Sound Testimony's digital system at unity gain, with no direct signal amplification or attenuation. The audio was transferred at a bit depth of 32 (floating point) and a sampling rate of 48,000 Hertz. 32-bit (floating point) was chosen again due to its lower error build-up, compared to 16-bit and 24-bit integer systems, during the extensive processing that is required during a typical audio forensics examination.

As with Q1, following Q2's transfer to the digital system, the tape was rewound and a second transfer was performed at the same volume level. For our purposes the resulting files are called *Q2-Recording One* and *Q2-Recording Two*.

*Q2-Recording One* and *Q2-Recording Two* were also each loaded into a multitrack audio editor where they were aligned with one another to a single sample level of accuracy. Then, the polarity (phase) of *Q2-Recording Two* was inverted and I observed that the signal was nulled out (0dB/silent) throughout the entire length of the recording. This effectively demonstrated that Q2 had been accurately transferred to the digital system.

### Verification of CAE's findings for Q2 – Pretext Call Tape

CAE's findings on the Q2 – Pretext Tape were listed in two separate sections of written material.

1. The first was a page entitled, "CD Track List", "Segments", From Kimmey/Chirstian(sp) Recording"
2. In the absence of a CD track list for the second CD and a transcript prepared by CAE, I had to rely on what was written in CAE's report sent to Mark Barrett in Norman, OK dated December 3, 2007.

### CAE's CD Track List and Report assertions:
1. **Finding One:**
   TARYN: **"Do you think that I took him? How do you think I feel? I'm not the one who did it."**
   a. **PARTIAL VERIFICATION**

   c. Only the second and third sentences in this three-sentence phrase can be verified. After enhancement, analysis, and reviewing the transcript that I prepared, I have concluded that it should be:
   TARYN: **"Do you think I feel good? How do you think I feel? I'm not the one who did it."**

   d. This can be found on the Q2 - Pretext Call enhanced CD that I prepared at **11:28.5.** I also have it accessible through the use of a track marker on the CD.

2. **Finding Two:**
   TARYN: **"I wasn't the one who stabbed him and, Lisa, I know that for a fact."**
   a. **VERIFIED**

   b. After enhancement, analysis, and repeated listening in the preparation of the revised transcript, I can verify that this is on the tape, although spoken almost in a whisper.

e. This can be found on the Q2 - Pretext Call enhanced CD that I prepared at **11:44.3**. I also have it accessible through the use of a track marker on the CD.

| Summary of Selected Pretext Tape Audio Segment Verification | |
| --- | --- |
| VERIFIED | 1 |
| PARTIALLY VERIFIED | 1 |

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding report and that the contents are true and correct to the best of my knowledge.

WITNESS my signature this _7th_ day of _March_ (March, 2008).

_____
Signature of Declarant

State of _Pennsylvania_ )
County of _Cambria_ )

On _7th_ , 20_08_ , _March_ _____
personally came before me and, being duly sworn, signed the above document in my presence.

_____
Signature of Notary Public

Notary Public, In and for the County of _Cambria_ _____
State of _Pennsylvania_

My commission expires: _November 14, 2009_                    Notary Seal

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KAREN L RODKEY  NOTARY PUBLIC
JOHNSTOWN. CAMBRIA COUNTY, PA
MY COMMISSION EXPIRES NOV. 14, 2009

Q1 — TRANSCRIPT OF 911 TAPE between 911 OPERATOR and MR. PERRY

| | | |
|---|---|---|
| 00:04.2 | OPERATOR: | 911. |
| 00:05.1 | MR. PERRY: | Hi, um, this is, uh, Rob Perry at 20D Haleakala Gardens, Kulanihakoi Street in Kihei. |
| 00:12.3 | OPERATOR: | Uh-huh. |
| 00:12.8 | MR. PERRY: | I'm just hearing some loud noises that I don't know if it's a domestic disturbance, but it's out on the street, some people are yelling. |
| 00:20.7 | OPERATOR: | Okay. |
| 00:21.5 | MR. PERRY: | And... |
| 00:21.6 | OPERATOR: | Out on the street in front of Haleakala Gardens? |
| 00:23.8 | MR. PERRY: | Yeah.  They're right, like, by the church or the, uh, Kiawe Terrace. |
| 00:27.9 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 00:29.3 | MR. PERRY: | There's some... |
| 00:30.2 | OPERATOR: | Is that the yelling that's going on out — that I hear in the background? |
| 00:32.4 | MR. PERRY: | Yes, that is, and that's — well, at least a few hundred yards away, you can tell. |
| 00:37.8 | UNIDENTIFIED FEMALE: | Tesha |
| 00:38.7 | MR. PERRY: | Hear it? |
| 00:39.0 | OPERATOR: | Okay.  Yes.  Is it male or female? |
| 00:42.3 | MR. PERRY: | It... |
| 00:42.6 | OPERATOR: | or females? |
| 00:43.0 | MR. PERRY: | I hear females and males. |

| | | |
|---|---|---|
| 00:50.0 | MR. PERRY: | There seems to be a number of people. |
| 00:51.2 | OPERATOR: | (Telephone dialing tones.) |
| 00:54.0 | ANOTHER PERSON ON TELEP"HONE LINE: | (Unintelligible) |
| 00:54.7 | OPERATOR: | (Telephone dialing tones.) |
| 00:56.1 | OPERATOR: | Can you tell what they're screaming at or saying? |
| 00:58.0 | MR. PERRY: | They're saying something like Sasha or Stasha, something like that. |
| 01:01.1 | OPERATOR: | Sasha. |
| 01:04.3 | UNIDENTIFIED FEMALE: | Tesha. |
| 01:05.9 | OPERATOR: | Is she looking for somebody? |
| 01:07.5 | MR. PERRY: | I have no idea. It sounds like she's looking for someone or something, and I'm hearing some male voices yelling in the background. |
| 01:15.0 | OPERATOR: | Same name. |
| 01:16.2 | MR. PERRY: | Yeah. Or they're yelling at the other lady now. |
| 01:22.5 | UNIDENTIFIED MALE: | (Unintelligible) |
| 01:23.3 | OPERATOR: | (Telephone dialing tones.) |
| 01:24.7 | UNIDENTIFIED FEMALE: | Tesha. |
| 01:27.1 | UNIDENTIFIED MALE: | (Unintelligible) |
| 01:27.7 | OPERATOR: | (Telephone dialing tones.) |
| 01:28.0 | MR. PERRY: | Some sort of arguing going on. |
| 01:29.3 | OPERATOR: | Okay. Can you, um, are you able to see them or... |

| 01:32.1 | MR. PERRY: | No, there's a hedge between me and the road from where my… |
| 01:35.3 | UNIDENTIFIED MALE: | Unintelligible) |
| 01:36.0 | OPERATOR: | You're just going by what you're hearing? |
| 01:37.2 | UNIDENTIFIED SPEAKER – PERHAPS OTHER OPERATOR OR CALLER (phased voice sound – perhaps telephone interference is the voice source) | Christa |
| 01:38.0 | MR. PERRY: | Yeah. |
| 01:38.3 | OPERATOR: | Okay. |
| 01:38.5 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 01:39.0 | MR. PERRY: | I'm hearing a big argument and it sounds like a fight going on now. |
| 01:42.0 | OPERATOR: | Now, a big argument. |
| 01:46.5 | UNIDENTIFIED FEMALE: | Tesha. |
| 01:47.4 | UNIDENTIFIED MALE: | Drop it. |
| 01:49.1 | OPERATOR: | Is it verbal or just… do you hear any punches? |
| 01:51.4 | MR. PERRY: | I hear verbal… stuff.  I don't see anything. |
| 01:55.4 | UNIDENTIFIED MALE: | Back up.  Get back.  Drop the knife. |
| 02:00.3 | UNIDENTIFIED MALE: | Don't panic. |
| 02:01.1 | UNIDENTIFIED FEMALE: | Nooooooo. (Crying.) Oh my God. |
| 02:01.8 | UNIDENTIFIED MALE: | (Unintelligible) |
| 02:02.2 | MR. PERRY: | I hear crying. |
| 02:03:0 | OPERATOR: | Crying.  Somebody's crying? |

| | | |
|---|---|---|
| 02:04.1 | MR. PERRY: | Yeah. |
| 02:04.5 | OPERATOR: | Okay. |
| 02:06.7 | UNIDENTIFIED SPEAKER: | (Unintelligible) |
| 02:07.9 | UNIDENTIFED SPEAKER: | Tell her to call back. |
| 02:11.3 | OPERATOR: | Okay. Hold on. What else? |
| 02:15.1 | MR. PERRY: | Hold on. Let me see if I can… |
| 02:18.2 | OPERATOR: | No, you don't have to look if you don't want to, just… |
| 02:19.9 | MR. PERRY: | Oh, no, I can… I can go out there. |
| 02:21.1 | OPERATOR: | Okay. |
| 02:23.4 | UNIDENTIFIED FEMALE: | Stop. |
| 02:25.3 | MR. PERRY: | It sounds like someone is being hurt. |
| 02:27.7 | OPERATOR: | Okay. It sounds like they're running or something? |
| 02:29.6 | MR. PERRY: | Yeah. (Door squeaks as it opens.) |
| 02:42.2 | MR. PERRY: | Okay. That is… yeah, my, ah, my father, who is the, ah, um, manager of this complex… |
| 02:48.4 | OPERATOR: | Yeah. |
| 02:48.5 | MR. PERRY: | has gone out to investigate, also. |
| 02:50.7 | OPERATOR: | Okay. (Background voices.) |
| 02:50.9 | UNIDENTIFIED FEMALE: | Tesha |
| 02:51.4 | UNIDENTIFED SPEAKERS | (Background Voices) |
| 02:53.5 | MR. PERRY: | Let me, let me go out. He's, he's right by. I can see what's going on now. |
| 02:57.1 | OPERATOR: | Okay. |

| | | |
|---|---|---|
| 02:58.0 | UNIDENTIFIED MALE: | (Unintelligible) |
| 02:58.7 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 03:00.2 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 03:02.2 | UNIDENTIFIED MALE: | Call them. |
| 03:03.3 | UNIDENTIFIED FEMALE: | Oh, God. |
| 03:04.2 | UNIDENTIFIED MALE: | Call the police. |
| 03:05.2 | UNIDENTIFIED FEMALE: | (Unintelligible) He's cut. |
| 03:05.6 | MR. PERRY: | Yes. |
| 03:06.9 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 03:07.4 | MR. PERRY: | Oh, God, there's something wrong. There's people bleeding. |
| 03:10.4 | OPERATOR: | Okay. |
| 03:10.7 | MR. PERRY: | There's some… |
| 03:10.9 | OPERATOR: | You need a medic, too. |
| 03:11.1 | UNIDENTIFIED MALE: | He'll be okay. |
| 03:12.3 | MR. PERRY: | Yeah, you're going to be all right. This… We need the police. Someone's hurt bad. |
| 03:15.6 | OPERATOR: | Is it a phone call? I mean, is it an accident or… |
| 03:18.0 | MR. PERRY: | Yes. There's someone, there's someone out here. He's bleeding. |
| 03:21.0 | OPERATOR: | Okay. |
| 03:21.8 | MR. PERRY: | Stay still. |
| 03:22.6 | OPERATOR: | Okay. |
| 03:22.7 | MR. PERRY: | We need an ambulance here. |

911 OPERATOR and MR. PERRY — Page 5 of 11

| | | |
|---|---|---|
| 03:23.4 | OPERATOR: | Tell him to stay still. |
| 03:24.2 | FIRST UNIDENTIFIED MALE: | I'm really cut... (unintelligible) |
| 03:26.2 | SECOND UNIDENTIFIED MALE: | (Unintelligible) ...side. |
| 03:27.3 | UNIDENTIFIED MALE: | Who was it? |
| 03:27.7 | UNIDENTIFIED MALE: | (Unintelligible) |
| 03:29.1 | OPERATOR: | What happened? |
| 03:30.5 | MR. PERRY: | Um, do you know what happened? |
| 03:32.6 | MALE WITNESS: | There was a guy... (unintelligible) |
| 03:33.2 | OPERATOR: | Was it a car accident? |
| 03:34.2 | MR. PERRY: | The guy ran off towards South Kihei Road. |
| 03:37.2 | OPERATOR: | Okay. Give me a description. |
| 03:38.5 | MR. PERRY: | I don't have a description. Uh... |
| 03:41.1 | MALE WITNESS: | He, he's about 6'2". |
| 03:42.9 | MR. PERRY: | 6'2". |
| 03:44.0 | MALE WITNESS: | He's wearing... |
| 03:44.6 | UNIDENTIFIED FEMALE: | Tesha. |
| 03:45.1 | MALE WITNESS: | a green flannel shirt. |
| 03:46.9 | MR. PERRY: | Green flannel shirt. |
| 03:48.2 | MALE WITNESS: | Baggy pants. |
| 03:49.0 | MR. PERRY: | Baggy pants. |
| 03:49.9 | MALE WITNESS: | (Unintelligible) |
| 03:50.8 | MALE WITNESS: | He looked like a Haole guy, huh? |
| 03:52.3 | MR. PERRY: | Haole guy? |

| | | |
|---|---|---|
| 03:53.1 | MALE WITNESS: | Was it a Haole guy? |
| 03:54.4 | FEMALE WITNESS: | Yes. |
| 03:54.9 | MR. PERRY | Yeah. |
| 03:55.3 | UNIDENTIFIED MALE: | Baggy Pants. |
| 03:57.3 | UNIDENTIFIED SPEAKER: | Hello? |
| 03:58.2 | OPERATOR: | Okay. |
| 03:59.2 | MR. PERRY: | Okay. I'm starting… I'm losing contact. Sorry. |
| 04:02.7 | OPERATOR: | Okay. |
| 04:04.1 | MR. PERRY: | Uh, can you still hear me? |
| 04:05.1 | OPERATOR: | How long ago did he run? |
| 04:06.3 | MR. PERRY: | How long ago did he run? |
| 04:07.8 | MALE WITNESS: | About four minutes ago. |
| 04:09.6 | OPERATOR: | (Telephone dialing tones.) |
| 04:10.0 | MR. PERRY: | Four minutes ago, about the time I started calling. |
| 04:13.1 | OPERATOR: | And he's heading towards? |
| 04:14.3 | MR. PERRY: | Uh, we have knife wounds here. |
| 04:16.1 | OPERATOR: | Okay. |
| 04:17.0 | MR. PERRY: | He's bleeding bad… his… |
| 04:18.5 | OPERATOR: | Okay. |
| 04:18.9 | MR. PERRY: | abdomen and… arm. |
| 04:21.1 | OPERATOR: | Abdomen and what? |
| 04:22.5 | MR. PERRY: | Abdomen and… Where are the wounds, please? |

911 OPERATOR and MR. PERRY — Page 7 of 11

| 04:25.6 | UNIDENTIFIED MALE: | His chest. |
| 04:25.6 | UNIDENTIFIED FEMALE: | On his chest. |
| 04:27.2 | MR. PERRY: | Chest and abdomen? |
| 04:28.5 | UNIDENTIFIED FEMALE: | Yes. |
| 04:29.3 | MR. PERRY: | Yes, chest and abdomen. |
| 04:31.3 | OPERATOR: | Okay. He's... he went towards Wailea. |
| 04:33.7 | MR. PERRY: | He went towards South Kihei Road, uh, toward the beach. |
| 04:37.8 | UNIDENTIFIED FEMALE: | (Unintelligible) |
| 04:39.6 | MR. PERRY: | From ah, from Haleakala Gardens, Kiawe Terrace area. |
| 04:44.4 | OPERATOR: | (Telephone dialing tones) |
| 04:49.2 | OPERATOR: | (Telephone dialing tones) |
| 04:53.7 | OPERATOR: | Okay. Did he take the knife with him or did he drop it? |
| 04:56.1 | MR. PERRY: | No, the knife is still here. |
| 04:57.6 | OPERATOR: | The knife is still there. |
| 04:58.6 | UNIDENTIFIED MALE: | Yes. |
| 04:59.0 | MR. PERRY: | Is the knife still there? |
| 05:00.5 | UNIDENTIFIED FEMALE: | Yes it's there. |
| 05:01.3 | MR. PERRY: | Don't touch the knife in case we need that. |
| 05:03.2 | UNIDENTIFIED FEMALE: | That's just not a problem, we won't do that. |
| 05:05.5 | MR. PERRY: | Okay. |
| 05:07.3 | UNIDENTIFIED MALE: | (Unintelligible) |

| | | |
|---|---|---|
| 05:08.6 | OPERATOR: | Okay. Hold on. We have medics and police coming, okay. |
| 05:12.1 | MR. PERRY: | Ah. Medics and police are coming. |
| 05:13.8 | UNIDENTIFIED SPEAKER – PERHAPS OTHER OPERATOR OR CALLER (phased voice sound – perhaps telephone interference is voice source) | Don't fight it. (Unintelligible) |
| 05:15.1 | OPERATOR: | Copy for me. |
| 05:15.8 | MR. PERRY: | What? |
| 05:16.9 | OPERATOR: | No, no, no. I'm talking |
| 05:17.6 | MR. PERRY | Okay. |
| 05:17.8 | OPERATOR | to the other dispatcher. Okay. |
| 05:20.1 | UNIDENTIFIED SPEAKER – PERHAPS OTHER OPERATOR OR CALLER (phased voice sound – perhaps telephone interference) | (Unintelligible) |
| 05:22.6 | OPERATOR: | Yeah, correct. |
| 05:26.7 | UNIDENTIFIED FEMALE: | Tesha. Tesha. |
| 05:30.2 | MR. PERRY: | Stay still, stay still. You don't want to keep bleeding. |
| 05:33.1 | UNIDENTIFIED MALE: | I was just killing time, you know. I got pushed around... (unintelligible) ...long time ago. |
| 05:37.7 | UNIDENTIFIED MALE: | Cannot breathe. |
| 05:38.6 | OPERATOR: | Okay. Only the one person is... |
| 05:39.9 | MR. PERRY: | He's complaining that he can't breathe. |

| | | |
|---|---|---|
| 05:41.5 | OPERATOR: | Okay. Hold on. |
| 05:42.8 | UNIDENTIFIED MALE: | (Unintelligible) |
| 05:44.3 | OPERATOR: | Okay. Hold on. I'm going to dispatch the medics. I'll be right back with you. |
| 05:47.3 | MR. PERRY: | Okay. (Telephone dialing tones.) (Intermittent line noise.) |
| 06:18.3 | OPERATOR: | Okay. Rob? |
| 06:21.1 | MR. PERRY: | Yes. Yeah, they're, they're here now. |
| 06:23.2 | OPERATOR: | Okay. Go ahead, go talk to them. |
| 06:25.0 | MR. PERRY: | Okay. |
| 06:26.6 | OPERATOR: | Okay, bye-bye. |
| 06:26.2 | MR. PERRY: | All right. |

(End of 911 recording.)

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding transcript and that the contents are true and accurate to the best of my knowledge.

WITNESS my signature this ___7th___ day of _____ (March, 2008).


_____
Signature of Declarant



State of _Pennsylvania_ )
County of _Cambria_ )

On ___7th___, 20_08_, _March_ _____
personally came before me and, being duly sworn, signed the above document in my presence.

_Karen L Rodkey_
Signature of Notary Public

Notary Public, In and for the County of _Cambria_
State of _Pennsylvania_

My commission expires: _Nov 14 2009_                    Notary Seal


COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KAREN L. RODKEY NOTARY PUBLIC
JOHNSTOWN, CAMBRIA COUNTY, PA
MY COMMISSION EXPIRES NOV. 14, 2009

Q2 — TRANSCRIPT OF TELEPHONE CONVERSATION BETWEEN TARYN
CHRISTIAN AND LISA KIMMEY on August 17, 1995

| | | |
|---|---|---|
| 00:10.8 | DET. FUNES: speaking into tape recorder | In the following case, complainant is Cabaccang. First name is Vilmar. V as in Victor, i – l – m – a – r. Middle initial is a P. Address will be number 6 Kulanihakoi street, Kihei, Maui, Hawaii. Date of occurrence is 7/14/95 — Kihei. Report number is 95-39250. Classification is MURDER II. |

Heading:
This is Detective Tony FUNES of the Maui Police Department.
The date is August 17, 1995. We are about ready to make a
phone call from the Maui Police Department, detective division.
An attempt… an attempt will be made to contact the following
individual. Taryn T–A-R-Y–N. Surname is Christian, C-H-R-I-
S-T-I-A-N. The caller, a female identified as Lisa KIMMEY, K-
I-M-M-E-Y. She would be using the Maui Police Department
detective division phone and calling her former boyfriend, Taryn
CHRISTIAN. She will speak with him in regards to her
allegations she has reported to this investigator, A. FUNES,
earlier this date, 8/17/1995, whereby she indicates that her former
boyfriend, Taryn CHRISTIAN, had told her on or about July 17
or 18, 1995 that he, Taryn CHRISTIAN, had stabbed an
individual down in the Kihei area a couple of days prior.

This conversion between CHRISTIAN and KIMMEY will be in
line with this investigation.

| | | |
|---|---|---|
| 02:51.4 | TELE-PHONE RING-ING | TELEPHONE CALL BEGINS (Telephone ringing sounds) |
| 03:04.2 | FEMALE: | Aloha, you have reached 878-3625. |

(Telephone ringing sounds)

1235. You have reached (unintelligible) Design and the Birds of
Paradise Collection and Company. Please leave a message after
the beep and we will return your call as soon as we can. Thank
you.

03:46.2    LISA:    Hi, Taryn. I was hoping it would be your lunch break around now. It's been about a half an hour since I last called. It's 12:35. Um, can you please call me back at 244-6424. I want you to know that I love you and that everything's going to be all right. I just wanted to talk to you and see what you're doing and hear your voice, so I'll try to call back later. Bye.

04:27.2    LISA:    Hello.
04:28.2    TARYN:    Hello.

04:29.2    LISA:    Hi.
04:29.9    TARYN:    Hi.

04:31.2    LISA:    How are you?
04:32.2    TARYN:    I'm okay.

04:34.0    LISA:    Are you mad at me?
04:36.0    TARYN:    About what?

04:38.1    LISA:    About telling Jennifer.
04:40.0    TARYN:    (Unintelligible).

04:43.2    LISA:    She's not going to tell anyone, okay?
04:47.3    TARYN:    You don't know that.

04:47.7    LISA:    Taryn, you're going to be okay.
04:51.0    TARYN:    I don't know that.

04:53.8    LISA:    Are you scared?
04:55.7    TARYN:    What'd you think? More than ever. I'm OK.

05:03.6    LISA:    Now do you want to leave sooner?
05:05.4    TARYN:    I don't know.

05:08.0    LISA:    She's not going to tell anyone, okay?
05:12.3    TARYN:    What about her boyfriend?

05:14.4    LISA:    She didn't tell her boyfriend. I promise to make her not tell anyone.
05:18.5    TARYN:    And what did she say?

05:19.6    LISA:    What?
05:20.1    TARYN:    Who talked to you?

CHRISTIAN – KIMMEY TELEPHONY CALL — Page 2 of 17

| 05:22.0 | LISA: | What do you mean? |
| 05:22.6 | TARYN: | Who would talk to me? |

| 05:24.8 | LISA: | Who would talk to me? |
| 05:26.0 | TARYN: | What? |

| 05:27.0 | LISA: | What are you talking about? |
| 05:28.2 | TARYN: | You said for me to call you at this house. |

| 05:31.5 | LISA: | Oh, it's at her friend's house. |
| 05:34.5 | TARYN: | Who, who are you talking about?  Oh, Jennifer's friend? |

| 05:37.2 | LISA: | Yeah. |
| 05:38.0 | TARYN: | Oh, okay. |
| 05:41.3 | TARYN: | (Unintelligible) |

| 05:43.5 | LISA: | I mean when I told her that you stabbed that guy, she got really scared but she's not going to tell anyone. |
| 05:47.3 | TARYN: | Wait, wait, (Under Lisa's voice) wait, say that again.  She what? |

| 05:49.7 | LISA: | When I told her that it was you who did the stabbing, she got scared but she didn't tell anyone. |
| 05:56.9 | TARYN: | Wha... |
| 05:56.9 | LISA: | She promised me. |

| 05:57.9 | TARYN: | What if she does? |

| 06:00.7 | LISA: | Why did you do it, Taryn? |
| 06:03.3 | TARYN: | Do what? |

| 06:03.7 | LISA: | Why did you go down there and do that? |
| 06:06.5 | TARYN: | I don't know.  You think I don't regret it?  Shit. |

| 06:11.5 | LISA: | Well, like it, it seems like you have no conscience of stabbing that guy. |
| 06:15.6 | TARYN: | Of course I do.  You mean... I... It didn't happen like that OK? |

| 06:22.5 | LISA: | Taryn, I'm scared. |
| 06:24.7 | TARYN: | Why? |

| 06:25.8 | LISA: | 'Cause I don't want anything to happen to you. |
| 06:28.2 | TARYN: | Well, you're kind of screwing it up, you know. |

CHRISTIAN – KIMMEY TELEPHONY CALL — Page 3 of 17

| 06:33.3 | LISA: | I'm screwing it up? You're the one who stabbed him, not me. |
| 06:33.8 | TARYN: | Will you be quiet then? |

| 06:36.0 | LISA: | No one's home. I'm here all by myself. They went to the store. |
| 06:39.2 | TARYN: | (Unintelligible) |

| 06:47.0 | LISA: | So you think it's my fault that you're going to go to jail now for stabbing him? |
| 06:51.0 | TARYN: | No. |

| 06:51.6 | LISA: | I'm not the one who stabbed him |
| 06:53.3 | TARYN: | I know, but, you know, you're the one who's saying all the shit. |

| 06:58.5 | LISA: | I was crying and saying... I was like why did you do it? Why did you do it, and she heard me. |
| 07:02.4 | TARYN: | You know, that's bullshit, okay. |

| 07:05.5 | LISA: | You make it seem like it's my fault for what you did. |
| 07:08.3 | TARYN: | No. But it didn't even happen like that and you know it. |

| 07:13.0 | LISA: | Happen like what? |
| 07:15.0 | TARYN: | (SIGH) Unbelievable. (SIGH) |

| 07:21.5 | LISA: | Are you scared that they might find your fingerprints on the knife? |
| 07:25.0 | TARYN: | Of course. |

| 07:28.0 | LISA: | Do you think they found your hat? |
| 07:31.0 | TARYN: | Yeah. |

| 07:33.0 | LISA: | Do you remember where the hat dropped when you... |
| 07:35.5 | TARYN: | No. |

| 07:36.0 | LISA: | ... ran away? |
| 07:37.0 | TARYN: | No. |

| 07:41.0 | LISA: | Taryn, I want you to know I love you, okay? |
| 07:45.5 | TARYN: | I know. |

| 07:48.0 | LISA: | I love you and I'll never stop loving you, no matter what. I just wish you would have told me about that girl, okay? |
| 07:57.4 | TARYN: | (Whispers something unintelligible) |

| 08:00.5 | LISA: | What? What? |
| 08:03.6 | TARYN: | Hold. (Unintelligible) Do you want to know one of the reasons why I couldn't (unintelligible) going out with you no more? |
| 08:17.3 | LISA: | I can't hear you. |
| 08:18.5 | TARYN: | Do you want to know one of the reasons why I couldn't handle going out with you no more? |
| 08:21.3 | LISA: | Why? |
| 08:22.3 | TARYN: | 'Cause every time we get in a fight you threaten me about that. |
| 08:25.2 | LISA: | I would never threaten you about it. |
| 08:27.0 | TARYN: | It happened so many times and you know it. |
| 08:29.7 | LISA: | Taryn, you know how hard it is for me to live with the thought? I have nightmares about it. |
| 08:34.3 | TARYN: | Why? Do I... you think I have any better? Do you think I have nightmares? |
| 08:38.0 | LISA: | So why – okay, can I just ask you a question? |
| 08:41.3 | TARYN: | What? |
| 08:42.0 | LISA: | Is the reason why you dumped me and went to that girl is because she doesn't know about it and when you're with her you don't think about it and when you're with me you think about it and I make you remember it? |
| 08:52.2 | TARYN | Yeah |
| 08:53.5 | LISA: | Is that the reason? |
| 08:56.3 | TARYN: | Kind of. |
| 08:57.1 | LISA: | Taryn, why did you do that? I was going to be there for you. |
| 09:01.2 | TARYN: | Keep on bringing it up and making me feel bad. |
| 09:04.3 | LISA: | And so that's why you had sex with her? |
| 09:06.3 | TARYN: | No, it's not. It wasn't like that, okay? She, she fucking had a boyfriend and everything. I didn't think nothing's going to happen. |
| 09:12.5 | LISA: | You're the one who was going all over her. |
| 09:15.7 | TARYN: | What do you mean? |
| 09:16.4 | LISA: | You — she told me you were like hanging all over her. You were trying to kiss her, you were putting your hand all over her. |
| 09:22.3 | TARYN: | When? |

| 09:24.8 | LISA: | When I talked to her on the phone. |
| 09:26.9 | TARYN: | No. |

| 09:28.5 | LISA: | You were the one who was making all the moves. |
| 09:30.3 | TARYN: | No. She has a boyfriend... (unintelligible) |

| 09:33.8 | LISA: | She said she broke up with him. You guys had sex, Taryn, and I was having sex with you too. |
| 09:40.5 | TARYN: | Lisa, I told you how many times and you would like not get off my back. I told you. I just want to be friends with you. |

| 09:47.2 | LISA: | You're not being a friend. A friend doesn't have sex with someone, two people at the same time. A friend doesn't — Taryn, I have to live with what you did for like so long. Are you at your mom's house? |
| 10:04.0 | TARYN: | Yeah, so what? (Unintelligible). |

| 10:11.4 | LISA: | Don't worry. You're going to be okay. |
| 10:13.5 | TARYN: | I'm not. Have you told Brooke? |

| 10:17.1 | LISA: | No, I just told Jennifer and she's not going to tell. She promised me. |
| 10:21.1 | TARYN: | You going to tell that girl? |

| 10:23.5 | LISA: | What? (Whispered) |

| 10:25.2 | TARYN: | Are you going to tell those girls? |
| 10:26.3 | LISA: | What? |
| 10:28.3 | TAYRN: | Lisa? |

| 10:31.5 | LISA: | Am I going to tell what? |
| 10:33.5 | TARYN: | Are you going to tell those girls? |

| 10:34.5 | LISA: | Am I going to? |
| 10:35.4 | TARYN: | Yeah. |

| 10:36.2 | LISA: | No. |
| 10:37.3 | TARYN: | Promise. |

| 10:38.4 | LISA: | Why would I? |
| 10:40.1 | TARYN: | I don't know, maybe you don't want them to like (unintelligible). |

| 10:43.1 | LISA: | Maybe I don't want them to like you? What are you talking about? Taryn, I'm not going to tell them you killed that guy, okay? |
| 10:57.7 | TARYN: | Okay. |

| | | |
|---|---|---|
| 10:59.2 | LISA: | What? I can't hear you. I cannot hear you. |
| 11:03.5 | TARYN: | Tell them (unintelligible) pregnant and all that. |
| 11:05.7 | LISA: | You did. |
| 11:06.8 | TARYN: | It's not their business to know. |
| 11:08.5 | LISA: | Well, it's my — Taryn, we've been going out for a year and a half. I have every right to know that you're sleeping with her. |
| 11:13.2 | TARYN: | Lisa, I tried so hard, you know. |
| 11:18.5 | LISA: | No, Taryn, I — you know it's hard for me too knowing that you stabbed that guy and he's totally innocent, and do you know, every time I see a car that says "In Loving Memory of Vilmar", I want to puke. |
| 11:28.5 | TARYN: | Do you think I feel good? How do you think I feel? I'm not the one who did it? |
| 11:35.9 | LISA: | And so you think it's — okay, so you think that I should feel more sorry for you because you're the one who stabbed him and not me? |
| 11:44.3 | TARYN: | I... I wasn't the one who stabbed him Lisa. (almost whispering) I know that for a fact. |
| 11:47.7 | LISA: | You had the knife. It's your knife, Taryn, it's your hat, it's your jacket, everything. |
| 11:52.2 | TARYN: | I know, but he was the one who pulled the knife. |
| 11:55.1 | LISA: | Oh, shoot, so when you guys were rolling around on the ground, he stabbed himself? |
| 11:58.1 | TARYN: | I'm not saying (unintelligible). |
| 12:00.6 | LISA: | Taryn... |
| 12:01.1 | TARYN: | Lisa, please don't... please don't talk about this on the phone, 'kay? |
| 12:04.0 | LISA: | Why not? |
| 12:05.6 | TARYN: | Why? You want to bust me or something? |
| 12:08.0 | LISA: | What are you talking about? Taryn, I will never stop loving you as long as I live, but I'm hurt by you. |
| 12:18.2 | TARYN: | I know you are. |
| 12:19.5 | LISA: | Where are you? |
| 12:20.6 | TARYN: | I'm at work. |
| 12:22.1 | LISA: | At your mom's house? |
| 12:27.0 | TARYN: | Why do you want to talk to my Mom so bad? |

| 12:30.0 | LISA: | Cause I wanted to tell her what you did. |
| 12:32.7 | TARYN: | What do you mean? |

| 12:33.8 | LISA | How you did that stuff with that girl. |
| 12:36.7 | TARYN: | Why do you... |

| 12:37.0 | LISA: | And you don't need to bullshit me and tell me, "Oh, my favorite month is April." |
| 12:43.0 | TARYN: | Why (unintelligible) |

| 12:43.5 | LISA: | That was such a crock, Taryn. You've been lying. You have been lying to me for months. |
| 12:48.2 | TARYN: | Haven't I tried to break up with you? |

| 12:51.1 | LISA: | You haven't tried. You were like... you don't... Taryn, you don't tell people, "I love you, I want to marry you," if you want to break up with the person. |
| 12:59.3 | TARYN: | Lisa, I've been telling you for a long time. |

| 13:00.6 | LISA: | How come you told me last night you wanted to marry me? |
| 13:04.6 | TARYN: | Huh? |

| 13:05.5 | LISA: | Last night you told me you wanted to marry me. |
| 13:07.7 | TARYN: | No, I didn't. |

| 13:08.7 | LISA: | Yes, you did. |
| 13:10.3 | TARYN: | What are you talking about? |

| 13:11.9 | LISA: | Last night I said, "Do you still want to marry me?", you said, "Yes." |
| 13:16.2 | TARYN: | I wasn't even with you last night. I didn't even talk to you. |

| 13:18.3 | LISA: | I mean the night before. |
| 13:20.9 | TARYN: | When did I say that? |

| 13:22.9 | LISA: | You said that Taryn, and you're not a friend. You're not a friend to me. |
| 13:27.0 | TARYN: | I want to be. |

| 13:28.4 | LISA: | What? |
| 13:28.9 | TARYN: | I want to be. |

| 13:30.0 | LISA: | You want to be? I can't be your friend. You cheated on me, you lied to me. |
| 13:36.2 | TARYN: | You want to believe that? |

CHRISTIAN – KIMMEY TELEPHONY CALL — Page 8 of 17

| 13:39.9 | LISA: | I kept your... I'm keeping your secret, and for so long. Do you know how much that hurts? |
| 13:44.8 | TARYN: | You're not keeping it. |
| 13:49.3 | LISA: | What did you say? |
| 13:50.6 | TARYN: | You're not keeping it. |
| 13:53.3 | LISA: | I am keeping it. |
| 13:54.3 | TARYN: | You (unintelligible) buddy, someone who hates my guts. |
| 13:58.7 | LISA: | And so you think she's going to tell? |
| 14:00.6 | TARYN: | What if she told her boyfriend. |
| 14:02.4 | LISA: | She would never tell her boyfriend. She promised me, Taryn. I know for a fact, okay? |
| 14:10.6 | TARYN: | Mm-hum. |
| 14:12.2 | LISA: | What? |
| 14:14.6 | TARYN: | (Unintelligible) |
| 14:15.6 | LISA: | I can't hear you. |
| 14:17.2 | TARYN: | After you told me that last night? Mother... |
| 14:19.5 | LISA: | Yeah. |
| 14:21.4 | TARYN: | Turn it down. |
| 14:22.4 | LISA: | I can't hear you. |
| 14:24.0 | TARYN: | After you told me that last night... that... you... had told her? |
| 14:29.0 | LISA: | Yeah. |
| 14:29.7 | TARYN: | Like that whole entire call? (Unintelligible) |
| 14:34.9 | LISA: | She tried to call me? |
| 14:36.4 | TARYN: | (Unintelligible) |
| 14:38.8 | LISA: | Why'd you try and call me? I'm talking to you right now. |
| 14:44.9 | TARYN: | She was like acting real weird. |
| 14:47.0 | LISA: | Brooke was acting weird? |
| 14:48.8 | TARYN: | She was acting weird. |

| 14:49.8 | LISA: | I told her what you did with that girl. |
| 14:52.5 | TARYN: | I know, and I thought you told her something else. |

| 14:54.6 | LISA: | No, I didn't. |
| 14:55.8 | TARYN: | You're not (unintelligible) |

| 14:58.4 | LISA: | You have to talk clearly. I can't understand you. |
| 15:00.8 | TARYN: | (Unintelligible) do something to myself. (Unintelligible) You know what happens if I go to jail? Do you know how long (unintelligible) …20 to 30 years. |

| 15:13.3 | LISA: | And that's what scares you? You don't want to go to jail? |
| 15:16.1 | TARYN: | I'll be able to like be done… (unintelligible) …50 years old. and I'm not even 20. |

| 15:33.3 | LISA: | Did you tell any of your friends that you killed that guy? |
| 15:35.9 | TARYN: | Uh-uh. |

| 15:37.5 | LISA: | So you've been keeping it inside? |
| 15:39.1 | TARYN: | Uh-huh. |

| 15:40.3 | LISA: | And I'm the only one you told? |
| 15:41.7 | TARYN: | Yes. |

| 15:42.5 | LISA: | I wish you.. and so that's the reason why you went with that girl, because when you're with me, you know I know about it and I make you think about it? |
| 15:51.3 | TARYN: | It's just a lot of things, like when we get into arguments. |

| 15:53.7 | LISA: | So do you really like that girl? |
| 15:57.1 | TARYN: | I do, but not like… as much as I fell in love with you. |

| 16:02.5 | LISA: | You hurt me, Taryn. |
| 16:03.9 | TARYN: | I know. |

| 16:05.0 | LISA: | You hurt me so bad. |
| 16:06.8 | TARYN: | I know. |
| 16:07.3 | LISA: | Your promises meant nothing. You don't know how disgusted I feel right now. |

| 16:14.1 | TARYN: | (Unintelligible) |
| 16:15.8 | LISA: | What? |
| 16:16.7 | TARYN: | Why don't you just turn me in? |

| 16:18.6 | LISA: | Why don't I just turn you in? |
| 16:20.6 | TARYN: | Yeah. |

| 16:21.1 | LISA: | Why do you always say that? |
| 16:22.9 | TARYN: | If you're so angry with me, do it. |

| 16:24.6 | LISA: | I am angry with you. I hate you, I know, but I still love you. I will always love you. |
| 16:32.0 | TARYN: | (Unintelligible) You might not think about it. (Unintelligible) |

| 16:36.9 | LISA: | I know you love me, okay, it's just you're going through a really hard time right now. I was trying to be there for you. I wanted to understand where you were coming from, but you were hiding your feelings from me. Why didn't you just tell me you were having a hard time because you were sad about what you did to that guy? You like walk around like it never happened, but it did, Taryn. |
| 16:59.6 | TARYN: | No, I walk around pretending. |

| 17:02.9 | LISA: | Why do you pretend? Why don't you just cry about it for once? |
| 17:06.0 | TARYN: | Other people would know. |

| 17:09.1 | LISA: | So the thing that you're most scared about is going to jail? |
| 17:13.3 | TARYN: | Wouldn't you be? (Unintelligible) I deserve it. |

| 17:25.5 | LISA: | Well, do you think the cops found any of your clothes? |
| 17:29.0 | TARYN: | No. |

| 17:30.2 | LISA: | No? |
| 17:30.6 | TARYN: | I know that they found that hat because they described it. |

| 17:35.0 | LISA: | Where did you dump that jacket again? |
| 17:38.5 | TARYN: | Don't worry about it. I got it covered. |

| 17:40.9 | LISA: | Didn't you tell me you dumped it in a Porta Potty, or something? |
| 17:43.0 | TARYN: | Why do you want to know? You're not getting me for something, are you? |

| 17:46.6 | LISA: | No. |
| 17:47.7 | TARYN: | OK. Promise? |

| 17:49.7 | LISA: | I promise. |
| 17:50.9 | TARYN: | Are you sure? Just don't worry about it then. |

| 17:53.8 | LISA: | Okay. |
| 17:55.2 | TARYN: | You're not trying to get me busted, are you? |

| 17:57.2 | LISA: | No, Taryn. |
| 17:59.5 | TARYN: | Are you sure? |

| 17:59.6 | LISA: | It's going to be okay. |
| 18:01.2 | TARYN: | I don't know. |

| 18:03.4 | LISA: | You hurt me more than I've ever — you know what's the difference, though?  Every other time I was used, I was used but I didn't love the person, and now I have been used again, but this time I'm... it was a person I was in love with. |
| 18:16.7 | TARYN: | I wasn't using you. |

| 18:17.8 | LISA: | You used me. |
| 18:19.6 | TARYN: | No. |

| 18:20.5 | LISA: | Yes, you did.  You used me.  I feel like a dirty... I feel so dirty because of you. |
| 18:27.9 | TARYN: | Why? |

| 18:29.7 | LISA: | Because of what you did, what you did to me.  Every time I read the newspapers, all his friends go, "Oh, he's such an innocent guy, he was really loving and caring." |
| 18:40.3 | TARYN: | Lisa, shh, okay.  You think I don't? |

| 18:44.0 | LISA: | I don't understand how you can just pretend like nothing happened. |
| 18:47.5 | TARYN: | You think it's easy? |

| 18:48.5 | LISA: | Every time I try to talk to you about it, you get mad at me. |
| 18:51.4 | TARYN: | Because I hate... (unintelligible). |

| 18:53.7 | LISA: | And so is that why you've been pushing me away? |
| 18:56.0 | TARYN: | I don't know. |

| 18:57.9 | LISA: | Ever since you stabbed that guy, Taryn, you've been totally hateful towards me, everything. |
| 19:04.4 | TARYN: | No.  Maybe.  I don't know. |

| 19:07.4 | LISA: | But I didn't do anything, it's you who did the thing.  Taryn, isn't it in your conscience that you killed someone? |
| 19:16.6 | TARYN: | Of course.  Every day. |

CHRISTIAN – KIMMEY TELEPHONY CALL — Page 12 of 17

| 19:23.7 | LISA: | What? I'm scared. |
| 19:28.0 | TARYN: | Why? |

| 19:28.5 | LISA: | 'Cause I love you. I never wanted... I really wanted to marry you, Taryn. I had all our dreams planned and everything and you ruined them. You promised me you'd never leave me. You promised me you wanted to marry me. You can't go around lying to two girls at the same time, pretending everything's going to be all right, and lying to yourself, but you know you did it. |
| 19:56.2 | TARYN: | Lisa, please. |

| 19:57.9 | LISA: | Do you know how upset I am? |
| 19:59.8 | TARYN: | Mom, it's Lisa. (Unintelligible) |

| 20:06.1 | LISA: | Did you tell your mom? |
| 20:07.7 | TARYN: | What? |

| 20:09.0 | LISA: | That you stabbed that guy? |
| 29:10.6 | TARYN: | No. |

| 20:13.1 | LISA: | So she doesn't know? |
| 20:14.7 | TARYN: | No. |

| 20:18.4 | LISA: | Are you eating lunch right now? I haven't eaten in a week. |
| 20:25.3 | TARYN: | Oh, (unintelligible). |

| 20:29.2 | LISA: | What? I lost like seven pounds, Taryn, because I've been so upset. Have I gotten ugly or something? Is that why you lost interest in me? What happened? |
| 20:44.0 | TARYN: | I don't... |

| 20:44.9 | LISA: | What? |
| 20:45.6 | TARYN: | I don't know. |

| 20:47.0 | LISA: | Taryn, no matter what happens, I want you to know I love you. okay? Okay? |
| 20:52.3 | TARYN: | Why do you say that? |

| 20:55.1 | LISA: | 'Cause you, if you want to go off with that girl, then go off with that girl, but always remember that I love you and that I'll always remember the good times we had together, okay? |
| 21:05.6 | TARYN: | What's that? |

21:06.8  LISA:    If you want to go off that, with that girl, you told that girl that you wanted to. You told me the reason why you wanted to move to the mainland is because you were scared of getting caught for stabbing that guy, but you told her the reason you wanted to go to the mainland is so you could be with her. You, you told her you hated me and that you couldn't wait to go to the mainland to be with her. You can't screw around with me, Taryn. I have real feelings. I have a heart that beats, okay?

21:37.9  TARYN:   Me too.

21:39.8  LISA:    You haven't been showing it. I thought you loved me enough to at least tell me, you know. You tried. Obviously you didn't try hard enough because you were having sex with us at the same time.

21:54.0  TARYN:   You were not (unintelligible).

21:56.3  LISA:    You should have told me, Taryn, "I don't want to be with you. I want to be with someone else." And then you should have told me that you were having sex with her. You said... you said, "I shouldn't have to tell you that." You should have to tell me that — I've put — I've given you my whole life. You are all that I felt like you were everything to me. You're my God, I would have done anything for you and you don't even want to tell me that you're having sex with someone else. And then what's that crap about, "Oh, April's my favorite month because that's when we went to the Hyatt"? But the whole time, the reason you had April on your key chain was because it was her name. Do you know how bad you hurt me?

22:39.5  TARYN:   Yes.

22:41.0  LISA:    Can you just tell me why you hurt me?
22:44.8  TARYN:   Not on purpose.

22:48.5  LISA:    Were you thinking when you hurt me?
22:51.3  TARYN:   I guess not.

22:53.2  LISA:    Can I ask you something?
22:55.2  TARYN:   What?

23:00.0  LISA:    When you have sex with her...
23:03.8  TARYN:   Don't ask some questions.

23:06.0  LISA:    No, when you did.
23:07.9  TARYN:   (Unintelligible)

| 23:13.5 | LISA: | (Unintelligible) |
| 23:15.9 | TARYN: | What? |

| 23:17.3 | LISA: | What do you think? |
| 23:18.9 | TARYN: | What? |

| 23:22.9 | LISA: | Were you happier doing it? Were you? Just answer yes or no. Were you happy? |
| 23:37.3 | TARYN: | (Unintelligible) |

| 23:38.8 | LISA: | Huh? |
| 23:39.9 | TARYN: | Okay, I'm not going to do that. |

| 23:43.9 | LISA: | Just tell me, were you happy when you were doing it with her? |
| 23:46.8 | TARYN: | Okay, Mom, I heard. |

| 23:49.5 | LISA: | Were you happy when you were doing it with her? |
| 23:51.7 | TARYN: | (Unintelligible) |

| 23:53.2 | LISA: | Huh? I can't hear you. |
| 23:56.2 | TARYN: | Can I (unintelligible). |

| 23:58.3 | LISA: | Yeah. |
| 23:59.6 | TARYN: | Will you be home then? |

| 24:00.2 | LISA: | Were you thinking about me? |
| 24:03.3 | TARYN: | (Unintelligible) |

| 24:04.5 | LISA: | You were? |
| 24:05.2 | TARYN: | Uh-huh. Can I, can I... Are you going to be home later? |

| 24:08.0 | LISA: | Yeah. |
| 24:08.7 | TARYN: | Okay, what time? |

| 24:10.3 | LISA: | Um, well, I'm going to (unintelligible) Bruce is going to give me a ride home after... |
| 24:15.4 | TARYN: | You got to hurry 'cause my dad has to use the phone. |

| 24:16.8 | LISA: | Okay, well... |
| 24:19.8 | TARYN: | Hurry. |

| 24:21.5 | LISA: | (Unintelligible) Do you have a conscience about what you did? |
| 24:25.8 | TARYN: | Yes. But Lisa, I have to go. Are you going to be home then or not? |

| 24:30.0 | LISA:   | Yes. If I'm not, can you call me at Brooke's house? |
| 24:35.3 | TARYN:  | Uh-huh. |

| 24:37.0 | LISA:   | 'kay. |
| 24:38.1 | TARYN:  | 'kay. |

| 24:38.9 | LISA:   | 'Cause I really don't want to be home alone. You know what I mean? |
| 24:41.3 | TARYN:  | Yeah. |

| 24:42.5 | LISA:   | 'kay, I love you, Taryn. |
| 24:43.6 | TARYN:  | OK. Go then. (Unintelligible) |

| 24:47.0 | LISA:   | What? |
| 24:47.5 | TARYN:  | Go home. |

| 24:49.2 | LISA:   | 'kay |
| 24:49.9 | TARYN:  | Good. 'kay? |

| 24:50.5 | LISA:   | I love you. |
| 24:52.0 | TARYN:  | 'kay. |

| 24:55.1 | LISA:   | Taryn? |
| 24:56.0 | TARYN:  | Yes? |

| 24:56.8 | LISA:   | I love you. |
| 24:57.6 | TARYN:  | I know. |

| 24:59.7 | LISA:   | I'm sorry, okay? |
| 25:01.2 | TARYN:  | Yeah, I got to go now. |

| 25:02.5 | LISA:   | Okay. |
| 25:03.4 | TARYN:  | Okay? |

| 25:03.7 | LISA:   | Okay. |
| 25:04.3 | TARYN:  | Bye. |

| 25:04.9 | LISA:   | Bye. |

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding transcript and that the contents are true and accurate to the best of my knowledge.

WITNESS my signature this _____7th_____ day of _____March_____ (March, 2008).


_____
Signature of Declarant


State of _____Pennsylvania_____ )
County of _____Cambria_____ )

On _____7th_____, 20_08_, _____March_____
personally came before me and, being duly sworn, signed the above document in my presence.

_____Karen L. Rodkey_____
Signature of Notary Public

Notary Public, In and for the County of _____Cambria_____
State of _____Pennsylvania_____

My commission expires: _____November 14, 2009_____                Notary Seal


COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KAREN L RODKEY  NOTARY PUBLIC
JOHNSTOWN, CAMBRIA COUNTY, PA
MY COMMISSION EXPIRES NOV. 14, 2009

## Q2 — TRACK SHEET OF SEGMENTS FROM CHRISTIAN / KIMMEY TELEPHONE CALL ON AUGUST 17, 1995

The time column refers to the Sound Testimony® prepared Q2 transcript.

### TRACK ONE

| 04:34.0 | LISA: | Are you mad at me? |
| 04:36.0 | TARYN: | About what? |

| 04:38.1 | LISA: | About telling Jennifer. |
| 04:40.0 | TARYN: | (Unintelligible). |

| 04:43.2 | LISA: | She's not going to tell anyone, okay? |
| 04:47.3 | TARYN: | You don't know that. |

| 04:47.7 | LISA: | Taryn, you're going to be okay. |
| 04:51.0 | TARYN: | I don't know that. |

| 04:53.8 | LISA: | Are you scared? |
| 04:55.7 | TARYN: | What'd you think?  More than ever.  I'm OK. |

### TRACK TWO

| 05:43.5 | LISA: | I mean when I told her that you stabbed that guy, she got really scared but she's not going to tell anyone. |
| 05:47.3 | TARYN: | Wait, wait, (Under Lisa's voice) wait, say that again.  She what? |

| 05:49.7 | LISA: | When I told her that it was you who did the stabbing, she got scared but she didn't tell anyone. |
| 05:56.9 | TARYN: | Wha... |
| 05:56.9 | LISA: | She promised me. |

| 05:57.9 | TARYN: | What if she does? |

### TRACK THREE

| 06:00.7 | LISA: | Why did you do it, Taryn? |
| 06:03.3 | TARYN: | Do what? |

| 06:03.7 | LISA: | Why did you go down there and do that? |
| 06:06.5 | TARYN: | I don't know.  You think I don't regret it?  Shit. |

| 06:11.5 | LISA: | Well, like it, it seems like you have no conscience of stabbing that guy. |
| 06:15.6 | TARYN: | Of course I do.  You mean... I... It didn't happen like that OK? |

| 06:22.5 | LISA: | Taryn, I'm scared. |
| 06:24.7 | TARYN: | Why? |

| 06:25.8 | LISA: | 'Cause I don't want anything to happen to you. |

CHRISTIAN – KIMMEY TELEPHONE CALL SEGMENTS— Page 1 of 7

| 12:04.0 | LISA: | Why not? |
| 12:05.6 | TARYN: | Why?  You want to bust me or something? |

**TRACK TEN**

| 13:39.9 | LISA: | I kept your... I'm keeping your secret, and for so long.  Do you know how much that hurts? |
| 13:44.8 | TARYN: | You're not keeping it. |

| 13:49.3 | LISA: | What did you say? |
| 13:50.6 | TARYN: | You're not keeping it. |

| 13:53.3 | LISA: | I am keeping it. |
| 13:54.3 | TARYN: | You (unintelligible) buddy, someone who hates my guts. |

| 13:58.7 | LISA: | And so you think she's going to tell? |
| 14:00.6 | TARYN: | What if she told her boyfriend. |

| 14:02.4 | LISA: | She would never tell her boyfriend.  She promised me, Taryn.  I know for a fact, okay? |
| 14:10.6 | TARYN: | Mm-hum. |

**TRACK ELEVEN**

| 14:22.4 | LISA: | I can't hear you. |
| 14:24.0 | TARYN: | After you told me that last night... that... you... had told her? |

| 14:29.0 | LISA: | Yeah. |
| 14:29.7 | TARYN: | Like that whole entire call? (Unintelligible) |

| 14:34.9 | LISA: | She tried to call me? |
| 14:36.4 | TARYN: | (Unintelligible) |

| 14:38.8 | LISA: | Why'd you try and call me?  I'm talking to you right now. |
| 14:44.9 | TARYN: | She was like acting real weird. |

| 14:47.0 | LISA: | Brooke was acting weird? |
| 14:48.8 | TARYN: | She was acting weird. |
| 14:49.8 | LISA: | I told her what you did with that girl. |
| 14:52.5 | TARYN: | I know, and I thought you told her something else. |

**TRACK TWELVE**

| 14:58.4 | LISA: | You have to talk clearly.  I can't understand you. |
| 15:00.8 | TARYN: | (Unintelligible) do something to myself.  (Unintelligible) You know what happens if I go to jail?  Do you know how long (unintelligible) ...20 to 30 years. |

| | | |
|---|---|---|
| 15:13.3 | LISA: | And that's what scares you?  You don't want to go to jail? |
| 15:16.1 | TARYN: | I'll be able to like be done… (unintelligible) …50 years old.  and I'm not even 20. |

| | | |
|---|---|---|
| 15:33.3 | LISA: | Did you tell any of your friends that you killed that guy? |
| 15:35.9 | TARYN: | Uh-uh. |

| | | |
|---|---|---|
| 15:37.5 | LISA: | So you've been keeping it inside? |
| 15:39.1 | TARYN: | Uh-huh. |

| | | |
|---|---|---|
| 15:40.3 | LISA: | And I'm the only one you told? |
| 15:41.7 | TARYN: | Yes. |

**TRACK THIRTEEN**

| | | |
|---|---|---|
| 16:15.8 | LISA: | What? |
| 16:16.7 | TARYN: | Why don't you just turn me in? |
| 16:18.6 | LISA: | Why don't I just turn you in? |
| 16:20.6 | TARYN: | Yeah. |

| | | |
|---|---|---|
| 16:21.1 | LISA: | Why do you always say that? |
| 16:22.9 | TARYN: | If you're so angry with me, do it. |

**TRACK FOURTEEN**

| | | |
|---|---|---|
| 16:36.9 | LISA: | I know you love me, okay, it's just you're going through a really hard time right now.  I was trying to be there for you.  I wanted to understand where you were coming from, but you were hiding your feelings from me.  Why didn't you just tell me you were having a hard time because you were sad about what you did to that guy?  You like walk around like it never happened, but it did, Taryn. |
| 16:59.6 | TARYN: | No, I walk around pretending. |

| | | |
|---|---|---|
| 17:02.9 | LISA: | Why do you pretend?  Why don't you just cry about it for once? |
| 17:06.0 | TARYN: | Other people would know. |

| | | |
|---|---|---|
| 17:09.1 | LISA: | So the thing that you're most scared about is going to jail? |
| 17:13.3 | TARYN: | Wouldn't you be?  (Unintelligible)  I deserve it. |

| | | |
|---|---|---|
| 17:25.5 | LISA: | Well, do you think the cops found any of your clothes? |
| 17:29.0 | TARYN: | No. |

| | | |
|---|---|---|
| 17:30.2 | LISA: | No? |
| 17:30.6 | TARYN: | I know that they found that hat because they described it. |

| | | |
|---|---|---|
| 17:35.0 | LISA: | Where did you dump that jacket again? |
| 17:38.5 | TARYN: | Don't worry about it.  I got it covered. |

| 17:40.9 | LISA: | Didn't you tell me you dumped it in a Porta Potty, or something? |
| 17:43.0 | TARYN: | Why do you want to know? You're not getting me for something, are you? |

| 17:46.6 | LISA: | No. |
| 17:47.7 | TARYN: | OK. Promise? |

| 17:49.7 | LISA: | I promise. |
| 17:50.9 | TARYN: | Are you sure? Just don't worry about it then. |
| 17:53.8 | LISA: | Okay. |
| 17:55.2 | TARYN: | You're not trying to get me busted, are you? |

| 17:57.2 | LISA: | No, Taryn. |
| 17:59.5 | TARYN: | Are you sure? |

| 17:59.6 | LISA: | It's going to be okay. |
| 18:01.2 | TARYN: | I don't know. |

**TRACK FIFTEEN**

| 18:44.0 | LISA: | I don't understand how you can just pretend like nothing happened. |
| 18:47.5 | TARYN: | You think it's easy? |

**TRACK SIXTEEN**

| 18:57.9 | LISA: | Ever since you stabbed that guy, Taryn, you've been totally hateful towards me, everything. |
| 19:04.4 | TARYN: | No. Maybe. I don't know. |

| 19:07.4 | LISA: | But I didn't do anything, it's you who did the thing. Taryn, isn't it in your conscience that you killed someone? |
| 19:16.6 | TARYN: | Of course. Every day. |

**TRACK SEVENTEEN**

| 20:06.1 | LISA: | Did you tell your mom? |
| 20:07.7 | TARYN: | What? |

| 20:09.0 | LISA: | That you stabbed that guy? |
| 29:10.6 | TARYN: | No. |

| 20:13.1 | LISA: | So she doesn't know? |
| 20:14.7 | TARYN: | No. |

**TRACK EIGHTEEN**

| ~~24:21.5~~ | | |
| 24:30.0 | LISA: | (Unintelligible) Do you have a conscience about what you did? |

24:25.8    TARYN:    Yes.  But Lisa, I have to go.  Are you going to be home then or not?

# Sound Testimony®

June 23, 2008

### Final Report including listening analysis of DVD-ROM WAV data files and Audio Enhancement Methodology Summary

**Assignment:**

Sound Testimony® was originally contacted by Richard Minatoya, Esq., Deputy Prosecuting Attorney, Department of the Prosecuting Attorney, County of Maui, to examine the recorded material on two standard audio cassettes. The task was to verify and confirm what John J. Mitchell, of Computer Audio Engineering (CAE) of Albuquerque, NM, found to be on the tapes.

Please see the previously submitted Q1 revised transcript, Q2 revised transcript, and the Q1 and Q2 Report for the results of the requested analysis.

On April 21, 2008, I received, via FedEx, a sealed, padded manila envelope from investigator Margo Evans that contained the following:

1. A DVD-ROM containing WAV data files
2. A cover letter dated February 29, 2008 from Mark Barrett, Esq. Of Norman, OK to Peter Hanano, First Deputy Prosecuting Attorney, 150 S. High Street, Wailuku, Maui, Hawaii 96793 stating "Dear Mr. Hanano: Enclosed is an audio disc corresponding with the previously sent report of Jack Mitchell. Sincerely, Mark Barrett"
3. An additional packet of material with a yellow colored post-it note on which "Previously Sent Reports" was written. The packet's first page is another cover letter from Mark Barrett, Esq. to Peter Hanano, Esq. describing the accompanying reports as copies of John J. Mitchell's December 2007 report and (2) transcripts of the 911 tape.
4. Although the (2) transcripts were not in the packet of material, Mr. Mitchell's December 2007 report was found. The report contained highlights of the Q2 transcript and a written overview contained in three tables of what Mr. Mitchell described as "Significant Audio Information, in Sequence:"

**Audio to be examined:**
1. One DVD-ROM was provided.
   a. It will be referred to as Q3.
   b. Margo Evans informed me via telephone that the disc's WAV data files included more recent files from CAE than those to which I previously had access.

814.410.4787
david@soundtestimony.com
www.soundtestimony.com

1185 Agnes Avenue
Johnstown, PA 15905

**Visual Description of Q3 DVD-ROM**

1. Memorex DVD+R DVD-ROM – the number 4355F1416+01472E08 is stamped on the bottom of the DVD hub ring.
   a. I initialed the DVD-ROM for identification purposes.
   b. The DVD-ROM has "Christian 2007" written across the top half of the disc and "Wav Data Files" written across the bottom half of the disc. A broad felt-tipped pen may have been used for all of the writing.
   c. The DVD-ROM is housed in a clear slim-line DVD case with a black plastic tray and a clear plastic top swivel top.
2. The electronic title burned on the DVD-ROM is "Christian Wav Data Files"
3. The DVD-ROM contained the following folders:
   a. "Alarm"
   b. "Alarm_new_proc"
   c. "Burkhardt"
   d. "Burkhardt_Isolation"
   e. "Burkhardt_new_proc"
   f. "Chris"
   g. "Chris_Diaz"
   h. "Christian_orig_16_44"
   i. "Christian_orig_24_48"
   j. "Drop_Him"
   k. "Get_help"
   l. "Get_him"
   m. "Kimmey Segments"
   n. "The_Fight"
   o. "You_Lose_Today"
4. Two Macintosh Operating System (OS) files, "Desktop DB" and "Desktop DF" share the root directory with the folders.

**Q3 Folder by Folder Analysis** (time code references are to Sound Testimony's® previously submitted Q1 and Q2 transcripts and are hereafter referred to as Q1-transcript and/or Q2 transcript.)

1. The "Alarm" folder contains four wav files corresponding approximately to 5:33.1 on the revised Q1 transcript.
   a. **Following repeated critical listening sessions after advanced enhancement' techniques were applied; it is possible that two different people may have spoken the words attributed to the victim, as the rhythm and timbre of the voices seem to be different.**
   b. **FIRST UNIDENTIFIED MALE: "I was just killing time, you know. I got pushed around... (Unintelligible) ...long time ago." SECOND UNIDENTIFIED MALE: "Cannot breathe."**
   c. **Nothing in the "Alarm" folder necessitates any change to the earlier findings.**

2. The "Alarm_new_proc" folder contains seven wav files corresponding approximately to 5:33.1 in the Q1 transcript.
   a. **Please see results of the analysis of the "Alarm" folder (Number 1)**
   b. **Nothing in the "Alarm_new_proc" folder necessitates any change to the earlier findings.**

3. The "Burkhardt" folder contains eight wav files corresponding approximately to 5:07.3 in the Q1 transcript.
   a. **This was initially not verified during repeated critical listening sessions after advanced enhancement techniques were applied.**
   b. **Nothing in the "Burkhardt" folder necessitates any change to the earlier findings.**

4. The "Burkhardt_Isolation" folder contains five wav files corresponding approximately to 05:07.3 in the Q1 transcript.
   a. **This was initially not verified during repeated critical listening sessions after advanced enhancement techniques were applied.**
   b. **Nothing in the "Burkhardt_Isolation" folder necessitates any change to the earlier findings.**

5. The "Burkhardt_new_proc" folder contains eight wav files corresponding approximately to 05:07.3 in the Q1 transcript.
   a. **This was initially not verified during repeated critical listening sessions after advanced enhancement techniques were applied.**
   b. **Nothing in "Burkhardt_new_proc" folder necessitates any change to the earlier findings.**

6. The "Chris" folder contains four wav files corresponding approximately to 1:37.2 in the Q1 transcript.
   a. **This was initially not verified during repeated critical listening sessions after advanced enhancement techniques were applied.**
   b. **The conclusion reached was that the 'Phased' telephone sound of the voice indicates possible telephone interference as the voice source.**
   c. **Since an additional syllable was heard, the corrected transcript reads, "Christa".**
   d. **Nothing in the "Chris" folder necessitates any change to the earlier findings.**

7. The "Chris_Diaz" folder contains nine wav files corresponding approximately to 5:20.1 in the Q1 transcript.
   a. **This was initially not verified during repeated critical listening sessions after advanced enhancement techniques were applied.**
   b. **Nothing in the "Chris_Diaz" folder necessitates any change to the earlier findings.**

8. The "Christian_orig_16_44" folder contains two wav files, one from Q1 and the other from Q2.
   a. **Nothing in the "Christian_orig_16_44" folder necessitates any change to the earlier findings.**

9. The "Christian_orig_24_48" folder contains two wav files, one from Q1 and the other from Q2.
   a. **Nothing in the "Christian_orig_24_48" folder necessitates any change to the earlier findings.**

10. The "Drop_Him" folder contains five wav files corresponding approximately to 1:47.4 in the Q1 transcript.
    a. **This was initially not verified during repeated critical listening sessions after advanced enhancement* techniques were applied.**
    b. **The corrected transcript reads, "Drop it." rather than "Drop Him."**
    c. **Nothing in the "Drop_Him" folder necessitates any change to the earlier findings.**

11. The "Get_help" folder contains four wav files.
    a. **This was initially not found during repeated critical listening sessions after advanced enhancement* techniques were applied.**
    b. **Nothing in the "Get_help" folder necessitates any change to the earlier findings.**

12. The "Get_him" folder contains four wav files corresponding approximately to 5:07.3 in the Q1 transcript.
    a. **This was initially not verified during repeated critical listening sessions after advanced enhancement* techniques were applied.**
    b. **Nothing in the "Get_him" folder necessitates any change to the earlier findings.**

13. The "Kimmey Segments" folder contains seven wav files corresponding approximately to 11:44.3 in the Q2 transcript.
    a. **This was initially verified during repeated critical listening sessions after advanced enhancement* techniques were applied.**
    b. **Nothing in the "Kimmey Segments" folder necessitates any change to the earlier findings.**

14. The "The_Fight" folder contains six wav files corresponding approximately to 1:55.3 in the Q1 transcript.
    a. **This segment matches the Sound Testimony®-enhanced Q1 and associated transcript findings.**

15. The "You_Lose_Today" folder contains five wav files corresponding approximately to 1:27.1 in the Q1 transcript.
    a. **This was initially not verified during repeated critical listening sessions after advanced enhancement* techniques were applied.**
    b. **Nothing in the "You_Lose_Today" folder necessitates any change to the earlier findings.**

_____

*Advanced Enhancement Techniques were a part of the examination and analysis process of Q1 and Q2.

The procedure was conducted in the following manner.

1. The tapes were marked for later identification.

2. They were inspected for damage that could affect their ability to accurately reproduce audio for digitization.

3. Digital data files were created for each tape. As explained in the earlier reports, both tapes were digitally transferred to Sound Testimony's® digital system at unity gain, with no direct signal amplification or attenuation. The audio was recorded at a bit depth of 32 (floating point) and a sampling rate of 48,000 Hertz. 32-bit (floating point) was chosen due to its lower error build-up, compared to 16-bit and 24-bit integer systems, during the extensive processing that is required during a typical audio forensics examination.

   Both Q1 and Q2 had their tapes rewound and a second transfer was performed at the same volume level.

   Both of Q1's (and subsequently Q2's files) were loaded into a multitrack audio editor where they were aligned with one another to a single sample level of accuracy. The polarity (phase) of one of the two tracks was then inverted and I observed that the signal was nulled out (0dB/silent) throughout the entire recording. This effectively demonstrated that the tape(s) had been accurately transferred to the digital system.

4. Periods of critical listening sessions on high-quality headphones were performed to determine the type and magnitude of factors contributing to any lack of intelligibility. While not limited to the following, a few of the initial issues that were identified as having to be overcome on these particular tapes were:
    a. Both Q1 and Q2 exhibited excessive ambient/environmental noise to the extent that it interfered with speech clarity.

b. Q1 had interference and, at times, signal loss from the telephone used by Mr. Perry, the man who telephoned 911. As Mr. Perry was describing how he was moving closer to the scene, it sounded as if he was using a cordless telephone as the signal quality to and from what may have been his telephone's base station varied, resulting in the subsequent 911 recording's quality to be inconsistent.

c. Q1 required increasing clarity of other individuals who were also speaking near Mr. Perry's telephone.

d. Q2 had a large amount of gain/amplitude difference between Lisa Kimmey, who was near the telephone recording device and cassette recorder resulting in her voice being recorded at a high level, and Taryn Christian who was off site being recorded at a lower level that, at times, resulted in Mr. Christian's voice being masked by noise.

e. Q2 had a large amount of system noise from the cassette tape media itself as well as the noise generated by the telephone and the cassette recorder's internal electronics.

5. High-Resolution Spectroscopic Analysis of both Q1 and Q2's digitized waveforms was performed to look at the waveforms in the frequency domain:
   a. to determine the speech target range of each recording.
   b. to identify any consistent noise bands or tones that could be filtered.
   c. to visually see the level and frequency of speech compared to the noise levels through the use of time, frequency, and amplitude displays.

6. Advanced Enhancement included, but was not limited to, the following steps:
   a. Setting brickwall filters to limit the bandwidth to the range of the speech on each tape.
   b. 'Auditioning' a number of "Continuous Noise Filters" (CNF) from different software publishers to determine which tool would restore the highest level of voice clarity without removing any of the desired speech.
   c. A 'noiseprint' of the remaining broadband noise was captured (after the brickwall filtering) and used in the 'training' of all candidate Continuous Noise Filters. This procedure was followed for each tape.
   d. Critical listening to the entire tape in "preview" mode was necessary before applying the chosen CNF to determine that no dialogue was included in the noise that was going to be reduced. While listening, careful adjustments of the settings, unique to each software tool, were made to ensure the reduction of only noise and not speech material.
   e. After the CNF exhibiting the highest quality audio results was selected, the CNF process was applied and steps "c" and "d" were repeated, capturing a new, lower volume 'noiseprint' while applying the same safeguards to protect the speech material.
   f. After careful monitoring in "Preview" mode to ensure that no speech elements would be removed, an Adaptive Noise Filter's parameters were carefully set and the filter was then applied to reduce as much of the remaining noise as possible without removing any of the dialogue.

  g. In the case of Q2, a Dynamics Processor was applied to even out the amplitude differences of the Near/Distant recording levels of Lisa Kimmey and Taryn Christian.

7. While listening to the new enhanced recordings, two new transcripts that became the Q1 Transcript and the Q2 Transcript were created.

8. The sealed envelope from CAE was then opened and the Sound Testimony®-enhanced 911 audio file was aligned to match as closely as possible the starting time of the CAE-prepared 911 transcript for reference purposes.

9. Working from Q1 and Q2 enhanced recordings and the new transcripts, I determined which of the statements selected for verification by the Maui County Prosecutor's office could be verified.

10. I completed the verification process and wrote a report regarding my findings.

11. I created a Q1 enhanced audio CD and a Q2 enhanced audio CD.

12. I sent, via FedEx, signed copies of the Q1 transcript, the Q2 transcript, the Verification Report, the Q1 CD, and the Q2 CD to Margo Evans, Investigator on this case.

13. A second submission was made concerning statements in Q2 by Taryn Christian to Lisa Kimmey regarding the case. After isolating the statements, I created an audio CD containing the statements, a time code track sheet was created from which one could find the statements on the CD as well as look up the statements on the Sound Testimony®-created Q2 transcript. The CD and the track sheet were shipped, via FedEx, to Margo Evans.

---

This report is being sent, via FedEx, to Margo Evans along with the return of the DVD-ROM containing audio data files and the accompanying cover letters and report.

For the Maui Prosecutor's office's files, the package will also include the Sound Testimony®-enhanced Q1, Q2, and the Q2 Segment CDs as WAV data CDs rather than the Audio CD format discs that were previously sent. They are distinguishable from the original audio CDs by the addition of RED lettering on their labels indicating that they are data CDs. These CDs will not play in a standard audio CD player.

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding report and that the contents are true and correct to the best of my knowledge.

WITNESS my signature this _23_ day of _____ June (March, 2008).

_____
Signature of Declarant

State of _Pennsylvania_ )
County of _Cambria_ )

On _June 23rd_, 20_08_, _David Smith_ _____
personally came before me and, being duly sworn, signed the above document in my presence.

_Jeanne M Mack_
Signature of Notary Public

Notary Public, In and for the County of _Cambria_
State of _Pennsylvania_

My commission expires: _March 23, 2011_

Notary Seal

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JEANNE M. MACK, NOTARY PUBLIC
RICHLAND TWP, CAMBRIA COUNTY
MY COMMISSION EXPIRES MARCH 23, 2011

# Sound Testimony®

July 3, 2008

### Report of CAE's review of Sound Testimony's® Findings

**Assignment:**

I was asked by Richard Minatoya, Esq., Deputy Prosecuting Attorney, Department of the Prosecuting Attorney, County of Maui, to comment on CAE's observations of Sound Testimony®-prepared reports and accompanying CDs including Q1—Transcript of telephone call between 911 Operator and Mr. Robert Perry, Q2—telephone call between Taryn Christian and Lisa Kimmey, and a CD consisting of audio segments from Q2 with an associated track sheet. I was faxed the report and E-mailed the associated .jpg files on July 3, 2008.

Mr. Mitchell of CAE writes in his report,

> "An analysis of Mr. Smith's audio indicates that his work is technically flawed. Both audio recordings are of telephone conversations. The telephone employs a monaural signal (*i.e.*, a telephone signal contains a single audio channel, or is monophonic). Mr. Smith transferred the original telephone recordings onto his audio system for analysis and enhancement. He then burned audio CDs of his enhanced final work product. The files on all audio CDs are two channel recordings (this is the specifications of an audio CD). When a monaural file is converted to a two-channel file it should have an identical signal on both channels. The audio provided by Mr. Smith is binaural (two channel), but the information on the two channels is significantly different.
>
> Although Mr. Smith's two-channel audio is from a single source, the signal on the left and right channels differ with regard to audio event alignment and amplitude (volume). There are even some audio events present on one channel but not on the other. This makes listening to the content of the audio files very difficult. The mismatched channels create an auditory illusion that the audio signal actually pumps from side to side. Moreover, the sound on each channel interferes with the perception of the sound on the other, obscuring the dialogue either partially or totally at points."

814.410.4787
david@soundtestimony.com

www.soundtestimony.com

1185 Agnes Avenue
Johnstown, PA 15905

The following are my observations on Mr. Mitchell's comments.

Although according to the www.caeaudio.com website, "CAE specializes in intelligibility enhancement, using proprietary methodologies developed in-house." No details concerning these methodologies have been revealed. However, Mr. Mitchell's comments on Sound Testimony[*] findings provide some disclosure.

CAE's Q1—911 call opinion—Observations

While Mr. Mitchell is correct that the analyzed Q1—911 recording was initially of a monaural telephone conversation and that the telephone signal is monaural, he is incorrect when he writes that the original telephone recording was transferred into a forensic audio system for analysis and enhancement.

In the Q1 report that Mr. Mitchell reviewed I wrote, "I was informed that the original 911 tape could not be located and that Q1 was a first generation recording of the original 911 tape." The cassette that I received containing the 911 call information was a copy of that 911 call tape. Despite the fact that this appears in the report reviewed by Mr. Mitchell, he writes, "Mr. Smith transferred the original telephone recordings…" This is incorrect. Also, I was unable to obtain any information regarding the type of cassette recorder on which the duplicate recording was made.

At the beginning of the Q1—911 tape's critical listening analysis, I used a monaural cassette recorder/reproducer. I heard the typical 'smearing' of what few high frequencies were on the tape and adjusted the tape machine head's azimuth (a physical adjustment made to the tape machine's head to make its perpendicularity to the tape path as close as possible to that of the recording head's perpendicularity on the machine on which the tape was recorded) to correct it. After subsequent listening on three different stereo cassette recorder/reproducers, I concluded that although the original 911 call was monaural, there was different information on both cassette channels. I knew that I must capture BOTH channels of information. I adjusted the azimuth of the tape recorder playback head to be in alignment with the tape before transferring the material. The extent to which I worked to ensure an accurate transfer is detailed in my Q1—911 report.

Mr. Mitchell writes, "The audio provided by Mr. Smith is binaural (two channel), but the information on the two channels is significantly different." That is correct. That was also my finding when listening to the cassette BEFORE transfer.

This situation of having non-identical information on both cassette channels could have come about in any number of ways. For example, the cassette recorder on which the Q1—911 Call COPY was created may have been a stereo machine of not very high quality. Regardless of what circumstance(s) created the situation, the end result was a tape with differing degrees of information on both channels.

Mr. Mitchell's contention that the left and right waveforms of the audio files that I captured and enhanced look different in both the waveform and spectral views proves the

point that they contain different information. That is why I captured BOTH channels. The differences between the channels were not introduced by my system. It was evident during the critical listening portion of the examination before the transfer.

Mr. Mitchell states that he recorded monaurally and then copied the recorded channel to a second channel to create a two-channel recording.

To have recorded a monaural signal as Mr. Mitchell has done would have required one or more of the following decisions and/or steps:
1. He would have had to select a channel, left or right, to record and ignore the information on the other channel. This is the equivalent of taking one fingerprint, photocopying it four times, and then saying that you now have fingerprints of the entire hand.
2. He may have summed (combined) both channels while recording.
3. He may have played the tape on a monaural tape machine.
4. Either (2) or (3) would have a result similar to what I heard when listening to the tape on a monaural recorder/reproducer. In the analysis of audio, capturing all of the recorded information is important. Both channels of information should have been recorded on their own separate tracks. Mr. Mitchell did not do that.

Mr. Mitchell then writes, "Visual inspection of these graphical representations shows unequivocally that the left and right channels of Mr. Smith's recordings are different from each other, whereas the left and right channels of the CAE recording are identical." Of course CAE's left and right channels look identical, they are identical. If only one channel was recorded, the resultant waveforms have one channel's information pasted over to an additional channel. If only one channel was recorded, some of the information could be missing.

Without knowing the proprietary method used by Mr. Mitchell, this may help explain why his enhanced final product contains substantially more noise and less intelligible speech than Sound Testimony's® final product.

CAE's Q2—Taryn Christian and Lisa Kimmey telephone call—Comments

> Mr. Mitchell writes, "Mr. Smith was able to verify the two statements of denial by Mr. Christian on the Christian/ Kimmey recording. The original recording of this conversation is of better quality then the 911 recording, and these statements can be heard on the original, without enhancement, by increasing the volume at the appropriate spot. The shortcomings of Mr. Smith's audio are less of a problem with better original audio and did not prevent him from verifying these statements. It is interesting to note that Mr. Smith did not include these two statements of denial on the CD of segments he made of the Christian/Kimmey recording."

The following are my observations on Mr. Mitchell's comments.

Mr. Mitchell's states that the "shortcomings of Mr. Smith's audio are less of a problem with better original audio and did not prevent him from verifying these statements." To imply that both statements were categorically verified is not true. While one of the statements was verified, the other was verified with qualification. CAE's transcript claimed that Taryn Christian stated, **"Do you think that I took Him? How do you think I feel? I'm not the one who did it."**

Only the second and third sentences in this three-sentence phrase could be verified. After enhancement and analysis of the audio file and reviewing the transcript that I prepared, it is now obvious that Mr. Christian did not say, **"Do you think that I took him?"** The corrected transcript reads, **"Do you think I feel good?**

This can be found on the Q2 - Pretext Call enhanced CD that I prepared at 11:28.5. I also have it accessible through the use of a CD track marker. Mr. Mitchell writes, "these statements can be heard on the original, without enhancement, by increasing the volume at the appropriate spot." In fact, they were heard accurately and in their entirety only after the Sound Testimony[®] enhancement.

While Mr. Mitchell writes that it is interesting to note that I did not include either of these statements on the Q2—Segments CD of the Christian/Kimmey recording, there was no need for their inclusion as they had already been examined at the request of the Department of the Prosecuting Attorney, County of Maui. The Q2—Segments CD of the Christian/Kimmey recording and its associated transcript, to which Mr. Mitchell is referring, were additional excerpts of the Christian/Kimmey conversation that were not highlighted or even mentioned in any CAE report.

When Mr. Mitchell claims that so much of the material was not verified in the Q2—Pretext Call because of the "shortcomings of Mr. Smith's audio", it should be noted that these same audio techniques did not prevent the final enhancement from revealing many corrections to the CAE transcript, including a correction to one of the two verified statements (one with qualification). These changes can be identified and clearly heard by anyone with reasonable hearing.

> Mr. Mitchell writes, "There is no doubt that the audio provided by Mr. Smith contains different information on the left and right channels. The fact that the channels are different makes it more difficult for the listener to hear and identify the content of the dialogue."

Again, this proves that both channels of information should have been recorded on their own separate tracks. Mr. Mitchell did not do that.

The waveforms described by Mr. Mitchell as "definitive and incontrovertible" are indeed evidence. They demonstrate that copying one track to an additional track creates two identical audio tracks that contain identical looking and sounding waveforms. While this is obvious, and only proves that CAE recorded one track of material when two tracks should have been recorded, it also helps to explain further why CAE's end product contains less intelligible speech.

Overall, the review of the material is an imaginative approach to attempt to explain why so many of CAE's transcript statements could not be confirmed even when listening to (and looking at) CAE-enhanced audio material.

I, David A. Smith, am a resident of Johnstown, County of Cambria, State of Pennsylvania, and do hereby certify, swear or affirm, and declare that I am competent to give the following declaration: I have prepared the preceding report and that the contents are true and correct to the best of my knowledge.

WITNESS my signature this _____9_____ day of ___July___ (July, 2008).

_____
Signature of Declarant


State of ___Pennsylvania___ )
County of ___Cambria___ )

On _9 July_____, 20 _08_ , _David Smith_____
personally came before me and, being duly sworn, signed the above document in my presence.

_____
Signature of Notary Public

Notary Public, In and for the County of ___Cambria___
State of ___Pennsylvania___

My commission expires: _____

Notary Seal

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
FRANCES M. SAUTER, NOTARY PUBLIC
RICHLAND TWP., CAMBRIA COUNTY
MY COMMISSION EXPIRES OCT. 14, 2009