## AFFIDAVIT OF JOHN J. MITCHELL
### JULY, 2008

I, John Mitchell, having been duly sworn, state upon oath:

1. I am an audio engineer residing in Albuquerque, New Mexico. I have over forty years experience in electronic audio techniques. I have analyzed and enhanced audio recordings regarding the Vilmar Cabaccang homicide in Maui, Hawaii. I have also analyzed and attempted to analyze the sound in video recordings connected with the case and I have viewed images on video recordings.

2. The primary audio recordings I have analyzed contain (1) a conversation between Taryn Christian and Lisa Kimmey, (2) a recording of a call placed, by Rob Perry, Jr., to a 911 operator.

3. The videos I have viewed include a video of the crime scene and two videos taken by security cameras at the Gas Express in Kihei, Maui, Hawaii.

### Christian-Kimmey Tape

4. Regarding the Christian-Kimmey tape, I determined that (1) Christian, during his conversation with Kimmey, twice explicitly denied that he killed Vilmar Cabaccang, (2) those explicit denials could not be readily heard on a copy of the tape recording without the sound volume being temporarily

—EXHIBIT A—

increased at the times when the denials occurred, (3) a juror listening to a copy of the tape recording at constant sound volume likely would not have heard the denials on the tape, (4) if the defense had hired an audio expert prior to trial, the defense could have soundly rebutted the prosecution position that the Kimmey-Christian tape was simply a confession tape.

5 . Particular statements of denial on the Christian-Kimmey tape:

– "I wasn't the one who stabbed him, Lisa, and I know that for a fact."

– "I'm not the one who did it."

6. A transcript of the Christian-Kimmey tape is attached as Exhibit MI-1. That transcript is accurate except that the word "Lisa" should be inserted between the word "him" and the word "and" on page 11, line 20.

7. A report describing my analysis of the Christian-Kimmey tape and a 911 tape is attached as Exhibit MI-2. The statements I made in Exhibit MI-2 are correct.

**911 Tape**

8. Upon analyzing and enhancing the 911 tape, I prepared a transcript of that tape. The transcript, which is a correct account of as much as I can hear on the tape, is attached as Exhibit MI-3. Expansion files to assist with the hearing

of some passages on the 911 tape are submitted with the original of this affidavit on a disc marked Exhibit MI 4.   This disc is also marked "Christian 2007" and "WAV Data Files."  These expansion files were made by me in accordance with established audio enhancement techniques.  No content of the recording was changed in making the expansion files.  The expansion files slow the playback of the audio source and correct changes of pitch.  Both techniques are to enable the words to become more distinct.

9.  Included on the  911 tape are these utterances:

– The name of  "James Burkhart."  The complete sentence in which the Burkhart name appears is this: "James Burkhart just walked off;"

– The name of  "Chris Diaz."  A complete sentence which contains the Diaz name: "Tell her we were robbed by Chris Diaz."  The name "Chris" by itself also is spoken at one point by an unidentified speaker;

– "Why didn't the alarm go off, turned it on a long time ago." Considering the context, comparison with other audio apparently spoken  by Cabaccang, and the identification of Cabaccang's voice to me my Cabaccang's cousin, Vilmar Cabaccang appears to be the person making the statement regarding the alarm.

### Review of Work of David Smith, Sound Testimony

10.   Attached as Exhibit MI 5, is a report on my review of David

Smith's audio analysis in this case.    That report is accurate.  Also attached is a

DVD regarding my review of David Smith's work.  That DVD, marked Exhibit

MI-6A

~~MI-6~~ and "Sound Testimony Review; Substantiating Evid. Data," accurately

shows work I performed in analyzing the David Smith material.


11.  I have read David Smith's response to my criticism of his work.

After having read that response, my position regarding his work is the same.


12.  The principal problem with his analysis is that telephone

transmissions are monaural and that Smith, during the recording process,

converted the audio to two-channel files with different audio material on each

channel.   It impedes rather than enhances the ability to decipher the full

contents of recordings if listening is on a two-channel adaptation with different

audio material on each channel of a one-time monaural sound transmission.

## Video

13.   I examined two videotapes from the Gas Express in Kihei and one

videotape taken by police of the crime scene.  A report summarizing my review

MI-6B

of the videotapes is attached as Exhibit MI-6.  That report is accurate.  I made a

DVD of some still images mentioned in my report.  That DVD, marked Exhibit

MI- 7, and marked with a case number and the notation "Video Evidence Data

Files,"   contains images that were extracted from the four videotapes.  The

DVD accurately depicts the images listed on pages 4 and 5 of my video report.

14.    Among the images captured is that of a person who arrived at the

Gas Express at 3:13 a.m.

Further affiant saith not.

JOHN J. MITCHELL

Subscribed and sworn to before me on this ___16___ day of July, 2008.

NOTARY PUBLIC

My commission expires: Feb 26, 2012

NOTARIAL SEAL
AARON HOFFMAN
Notary Public
STATE COLLEGE BORO, CENTRE CNTY
My Commission Expires Feb 26, 2012

FROM : PAUL BRENT SMITH          FAX NO. : 808 876 1858          Mar. 22 2002 12:27PM P12

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118

Certified Shorthand Reporters

ADVANCED COURT REPORTING

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

COPY

TARYN CHRISTIAN,

Petitioner

vs,

STATE OF HAWAII,

Respondent,

S.P.P. NO. 00-1-0002(2)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT M-1

FROM : PAUL BRENT SMITH              FAX NO. : 808 876 1858        Mar. 22 2002 12:27PM  P13

2

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

1                *    *    *    *    *    *

2    (:08)    UNIDENTIFIED MALE:    The following case,

3    complainant is Cabaccang, C-A-B-A-C-C-A-N-G, first name

4    is Vilmar, V, as in Victor, I-L-M-A-R, middle initial

5    is P.   Address will be number 6 Kulanihakoi Street,

6    Kihei, Maui, Hawaii.   Date of occurrence is 7/14/95,

7    Kihei.   Report number is 95-39250.   Classification,

8    murder in the second, heading.

9    (:40)    DETECTIVE FUNES:    This is Detective Tony Funes

10   of the Maui Police Department.   The date is August 17,

11   1995.   We are about ready to make a phone call from the

12   Maui Police Department Detective Division.   An

13   attempt -- an attempt will be made to contact the

14   following individual: Taryn, T-A-R-Y-N; surname is

15   Christian, C-H-R-I-S-T-I-A-N.   The caller is a female

16   identified as Lisa Kimmey, K-I-M-M-E-Y.   She will be

17   using the Maui Police Department Detective Division,

18   phone and calling her former boyfriend, Taryn

19   Christian.   She will speak with him in regards to her

20   allegations she has reported to this investigator, A.

21   Funes, earlier this date, 8/17/95, whereby she

22   indicates that her former boyfriend, Taryn Christian,

23   had told her on or about July 17 or 18, 1995, that he,

24   Taryn Christian, had stabbed an individual down in the

25   Kihei area a couple days prior.

1  "New Paragraph."  This conversation between
2  Christian and Kimmey will be in line with this
3  investigation.
4  (2:51)  (Telephone ringing.)
5  (3:04)  UNIDENTIFIED FEMALE: Aloha.  You have reached
6  878-2625.  (3:18) 12:35.  You have reached Chien Design
7  and the Birds of Paradise Collection & Company.  Please
8  leave a message after the beep and we'll return your
9  call as soon as we come in.  Thank you.
10 (3:46)  LISA: Hi Taryn.  Um, I was hoping it would be
11 your lunch break around now.  It's been about a half an
12 hour since I last called.  It's just -- it's 12:35.
13 Um, can you please call me back at 244-6424.  I want
14 you to know that I love you and that everything's going
15 to be all right.  I just wanted to really talk to you
16 and see what you're doing and hear your voice, so I'll
17 try to call back later.  Bye.
18 (4:28)  LISA: Hello.
19 (4:29)  TARYN: Hello.
20 (4:30)  LISA: Hi.
21 (4:31)  TARYN: Hi.
22 (4:32)  LISA: How are you?
23 (4:33)  TARYN: I'm okay.
24 (4:35)  LISA: Are you mad at me?
25 (4:37)  TARYN: About what?

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

4

1  (4:39)  LISA:  About telling Jennifer.

2  (4:41)  TARYN:  Very.  Wha- --

3  (4:44)  LISA:  She's not going to tell anyone, okay.

4  (4:48)  TARYN:  You don't know that.

5  (4:50)  LISA:  Taryn, you're going to be okay.

6  (4:52)  TARYN:  I don't know that.

7  (4:55)  LISA:  Are you scared?

8  (4:57)  TARYN:  What do you think?  More than ever.

9  More than ever.

10  (5:05)  LISA:  Now, do you want to leave sooner?

11  (5:07)  TARYN:  I don't know.

12  (5:09)  LISA:  She's not going to tell anyone, okay?

13  (5:14)  TARYN:  What about her boyfriend?

14  (5:16)  LISA:  She ain't telling her boyfriend.  I

15  promised to make her not tell anyone.

16  (5:20)  TARYN:  And what did she say?

17  (5:21)  LISA:  What?

18  (5:22)  TARYN:  Who talked to you?

19  (5:23)  LISA:  What do you mean?

20  (5:24)  TARYN:  Who did you talk to?

21  (5:26)  LISA:  Who'd talked to me?

22  (5:28)  TARYN:  What?

23  (5:29)  LISA:  What are you talking about?

24  (5:30)  TARYN:  Didn't you tell me to call at you at

25  this house?

5

1  (5:33)  LISA:  Oh, it's at her friend's house.

2  (5:36)  TARYN:  Who -- what you're talking about?  Oh,

3  Jennifer's friend?

4  (5:39)  LISA:  Yeah.

5  (5:40)  TARYN:  Oh, okay.  What I mean -- fuck.

6  (5:45)  LISA:  I mean when I told her that you stabbed

7  that guy, she got really scared but she's not going to

8  tell anyone.

9  (5:49)  TARYN:  Wait, wait, wait.  Say that again.  She

10 what?

11 (5:51)  LISA:  When I told her that it was you who did

12 the stabbing, she got scared, but she didn't tell

13 anyone; she promised me.

14 (6:00)  TARYN:  What -- what if she does?

15 (6:03)  LISA:  Why did you do it, Taryn?

16 (6:05)  TARYN:  Do what?

17 (6:06)  LISA:  Why did you go down there and do that?

18 (6:09)  TARYN:  I don't know.  You think I don't regret

19 it?  Shit.

20 (6:13)  LISA:  Well, like it -- it seems like you have

21 no conscience of stabbing that guy.

22 (6:18)  TARYN:  Of course I do.  You may not -- of --

23 I -- it didn't happen like that, okay.

24 (6:25)  LISA:  Taryn, I'm scared.

25 (6:27)  TARYN:  Why?

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING
Sheridan & Associates, Inc.

6

1    (6:28)   LISA:  Because I don't want anything to happen

2    to you.

3    (6:31)   TARYN:  Well, you're kind of screwing it up,

4    you know.

5    (6:33)   LISA:  I'm screwing it up?  You're the one that

6    stabbed him, not me.

7    (6:36)   TARYN:  Will you be quieter?

8    (6:38)   LISA:  No one's home.  I'm here by myself.

9    They went to the store.

10   (6:42)   TARYN:  Oh.

11   (6:50)   LISA:  So you think it's my fault that you're

12   going to go to jail now for stabbing him?

13   (6:54)   TARYN:  No.

14   (6:55)   LISA:  I'm not the one who stabbed him.

15   (6:56)   TARYN:  I know, but, you know, you're the one

16   whose saying all this shit.

17   (7:01)   LISA:  I was crying and saying it -- I was like

18   "Why did you do it?  Why did you do it," and she heard

19   me.

20   (7:05)   TARYN:  You know that's bullshit, okay.

21   (7:08)   LISA:  You make it seem like it's my fault for

22   what you did.

23   (7:11)   TARYN:  No.  But it didn't even happen like

24   that, and you know it.

25   (7:16)   LISA:  Happen like what?

7

1  (7:18)  TARYN:  (Sigh.).

2  (7:25)  LISA:  Are you scared that they might find your

3  fingerprints on the knife?

4  (7:28)  TARYN:  Of course.

5  (7:31)  LISA:  Do you think they found your hat?

6  (7:34)  TARYN:  Yeah.

7  (7:36)  LISA:  Do you remember where the hat dropped

8  when you --

9  (7:39)  TARYN:  No.

10  (7:39)  LISA:  -- ran away?

11  (7:40)  TARYN:  No.

12  (7:44)  LISA:  Taryn, I want you to know I love you,

13  okay?

14  (7:49)  TARYN:  I know.

15  (7:51)  LISA:  I love you a lot and I'll never stop

16  loving you no matter what.  I just wish you would have

17  told me about that girl, okay?

18  (8:00)  TARYN:  (No audible response.)

19  (8:04)  LISA:  What?  What?

20  (8:07)  TARYN:  Hold.  Okay, now.  Do you want to know

21  one of the reasons why I couldn't handle going out with

22  you no more?

23  (8:21)  LISA:  I can't hear you.

24  (8:22)  TARYN:  Do you want to know one of the reasons

25  why I couldn't handle going out with you no more?

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

8

1  (8:25)  LISA:  Why?

2  (8:26)  TARYN:  Cause every time we get in a fight, you

3  threaten me about that.

4  (8:29)  LISA:  I would never threaten you about it.

5  (8:31)  TARYN:  So many times and you know it.

6  (8:34)  LISA:  Taryn, you know how hard it is for me to

7  live with the thought?  I have nightmares --

8  (8:37)  TARYN:  What --

9  (8:37)  LISA:  -- about it.

10  (8:38)  TARYN:  About what?  Like you think I have any

11  better?  Do you think I have nice dreams?

12  (8:42)  LISA:  So why -- okay, can I just ask you a

13  question?

14  (8:45)  TARYN:  What?

15  (8:46)  LISA:  Is the reason why you dumped me and went

16  to that girl is because she doesn't know about it and

17  when you're with her you don't think about it and when

18  you're with me, you think about it and I make you

19  remember it?  Is that the reason?

20  (9:01)  TARYN:  Kind of.

21  (9:02)  LISA:  Taryn, why?  You didn't need to do

22  that.  I was gonna be there for you.

23  (9:06)  TARYN:  You keep on bringing it up and making

24  me feel bad.

25  (9:08)  LISA:  And so that's why you had sex with her?

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

9

1  (9:11)   TARYN:  No, it's not.  It wasn't like that,

2  okay.  She fucking had a boyfriend and everything.  I

3  didn't think nothing was going to happen.

4  (9:17)  LISA:  Your -- you're the one who was going all

5  over her.

6  (9:20)  TARYN:  What do you mean?

7  (9:21)  LISA:  You -- she told me you were hanging all

8  over her.  You were trying to kiss her.  You were

9  putting your hands all over her.

10  (9:27)  TARYN:  When?

11  (9:30)  LISA:  When I talked to her on the phone.

12  (9:32)  TARYN:  No.

13  (9:33)  LISA:  You were the one who was making all the

14  moves.

15  (9:35)  TARYN:  No.  She has a boyfriend herself.

16  (9:39)  LISA:  She said she broke up with him.  You

17  guys had sex, Taryn, and I was having sex with you,

18  too.

19  (9:46)  TARYN:  Lisa, I told you how many times and you

20  would, like, not get off my back.  I told you I just

21  want to be friends with you.

22  (9:53)  LISA:  You're not being a friend.  A friend

23  doesn't have sex with someone, two people at the same

24  time.  A friend doesn't -- Taryn, I have to live with

25  what you did for like so long.  Are you at your mom's

FROM : PAUL BRENT SMITH        FAX NO. : 808 876 1858        Mar. 22 2002 12:31PM P21

10

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118

Certified Shorthand Reporters

ADVANCED COURT REPORTING

1  house?

2  (10:10) TARYN:  Yeah, seen all the cars around the

3  neighborhood (indistinguishable).

4  (10:17) LISA:  Don't worry.  You're going to be okay.

5  (10:19) TARYN:  I'm not.  Have you told Brooke?

6  (10:23) LISA:  No, I just told Jennifer and she's not

7  going to tell, she promised me.

8  (10:27) TARYN:  You didn't tell this girl.  Are you

9  going to tell this girl?

10  (10:32) LISA:  What?

11  (10:34) TARYN:  Would you?

12  (10:36) UNIDENTIFIED SPEAKER:  (Indistinguishable).

13  (10:37) LISA:  Am I going to tell -- what?

14  (10:39) TARYN:  Are you going to tell this girl?

15  (10:40) LISA:  Am I going to?  No.

16  (10:43) TARYN:  Promise?

17  (10:44) LISA:  Why would I?

18  (10:46) TARYN:  I don't know, maybe you don't want them

19  to like me anymore.

20  (10:49) LISA:  Maybe I don't want them to like you?

21  What are you talking about?  Taryn, I'm not going to

22  tell them you killed that guy, okay.

23  (11:04) TARYN:  Okay.

24  (11:05) LISA:  What?  I can't hear you.  I can't hear

25  you.

1 1

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118

Certified Shorthand Reporters

ADVANCED COURT REPORTING

1  (11:10) TARYN:  You told them that I got you pregnant

2  and all that.

3  (11:12) LISA:  You did.

4  (11:13) TARYN:  It's not their business to know.

5  (11:15) LISA:  Well, it's my -- Taryn, we've been going

6  out for a year-and-a-half.  I have every right to know

7  that you're sleeping with her.

8  (11:20) TARYN:  Lisa, I tried so hard, you know.

9  (11:25) LISA:  No, Taryn, I -- you know, it's hard for

10  me, too, knowing that you stabbed that guy and he's

11  totally innocent, and do you know, every time I see a

12  car that says "In loving memory of Vilmar," I want to

13  puke.

14  (11:15) TARYN:  Do you think I took him?  How do you

15  think I feel?  I'm not the one who did it.

16  (11:42) LISA:  And so you think it's -- okay.  So you

17  think that I should feel more sorry for you because

18  you're the one who stabbed him and not me?

19  (11:48) TARYN:  No, no, I -- I wasn't the one who

20  stabbed him and I know that for a fact.

21  (11:54) LISA:  You had the knife.  It's your knife,

22  Taryn, it's your hat, it's your jacket, everything.

23  (11:59) TARYN:  I know, but he was the one who pulled

24  the knife.

25  (12:02) LISA:  Oh, so you're saying, while you guys

12

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

1   were rolling around on the ground, he stabbed himself.

2   (12:05) TARYN:  I'm not saying that.

3   (12:07) LISA:  Taryn --

4   (12:08) TARYN:  Lisa, please don't talk about this on

5   the phone, okay?

6   (12:11) LISA:  Why not?

7   (12:13) TARYN:  Why?  Do you want to bust me and shit?

8   (12:15) LISA:  What are you talking about?  Taryn, I

9   will never stop loving you as long as I live, but I'm

10  hurt by you.

11  (12:25) TARYN:  I know you are.

12  (12:27) LISA:  Where are you?

13  (12:28) TARYN:  I'm at work.

14  (12:29) LISA:  At your mom's house?

15  (12:34) TARYN:  Why do you want to talk to my mom so

16  bad?

17  (12:37) LISA:  Because I wanted to tell her what you

18  did.

19  (12:40) TARYN:  What do you mean?

20  (12:41) LISA:  How you did that stuff with that girl.

21  (12:44) TARYN:  Why do you want --

22  (12:46) LISA:  And you didn't need to bullshit me and

23  tell me, "Oh, my favorite month is April."

24  (12:50) TARYN:  Why --

25  (12:51) LISA:  That was such a crock, Taryn.  You have

FROM : PAUL BRENT SMITH          FAX NO. : 808 876 1858          Mar. 22 2002 12:32PM P24

13

1   been lying.  You have been lying to me for months.

2   (12:56) TARYN:  Haven't I tried to break up with you?

3   (12:59) LISA:  You haven't tried.  You have like -- you

4   know what, Taryn, you don't tell people, "I love you, I

5   want to marry you," if you want to break up with the

6   person.

7   (13:07) TARYN:  Lisa, I've been telling you for a long

8   time.

9   (13:08) LISA:  How come you told me last night you

10  wanted to marry me?

11  (13:12) TARYN:  Huh?

12  (13:13) LISA:  Last night you told me you wanted to

13  marry me.

14  (13:16) TARYN:  No, I didn't.

15  (13:17) LISA:  Yes, you did.

16  (13:18) TARYN:  What are you talking about?

17  (13:20) LISA:  Last night I said, "Do you still want to

18  marry me," you said, "Yes."

19  (13:24) TARYN:  I wasn't even with you last night.  I

20  didn't even talk to you.

21  (13:26) LISA:  I mean the night before.

22  (13:29) TARYN:  When did I say that?

23  (13:31) LISA:  You said that, Taryn, and you're not a

24  friend, you're not a friend to me.

25  (13:35) TARYN:  I want to be.

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

14

1  (13:36) LISA:  What?

2  (13:37) TARYN:  I want to be.

3  (13:38) LISA:  You want to be?  I can't be your

4  friend.  You cheated on me, you lied to me.

5  (13:45) TARYN:  You know the risk.

6  (13:48) LISA:  I kept your -- I'm keeping your secret,

7  and so for so long.  Do you know how much that hurts?

8  (13:53) TARYN:  You're not keeping it

9  (13:58) LISA:  What did you say?

10  (13:59) TARYN:  You're not keeping it.

11  (14:02) LISA:  I am keeping it.

12  (14:03) TARYN:  You already told somebody, someone who

13  hates my guts.

14  (14:07) LISA:  And so you think she's going to tell?

15  (14:09) TARYN:  What if she told her boyfriend?

16  (14:11) LISA:  She would never tell her boyfriend.  She

17  promised me, Taryn.  I know for a fact, okay.

18  (14:17) TARYN:  (No audible response.)

19  (14:21) LISA:  What?

20  (14:22) TARYN:  (No audible response.)

21  (14:24) LISA:  I can't hear you.

22  (14:26) TARYN:  After you told me that last night, that

23  you told her --

24  (14:28) LISA:  Yeah.

25  (14:30) TARYN:  -- never found you.

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

15

1  (14:31) LISA:  I can't hear you.

2  (14:33) TARYN:  After you told me that last night, that

3  you had already told her --

4  (14:38) LISA:  Yeah.

5  (14:39) TARYN:  -- when I got home, I tried to call.  I

6  even called Brooke's house.

7  (14:44) LISA:  You tried to call me?

8  (14:46) TARYN:  (Indistinguishable) -- at Brooke's

9  house.

10  (14:48) LISA:  Why'd you try and call me?

11  (14:49) TARYN:  (Indistinguishable.)

12  (14:51) LISA:  Well, I'm talking to you right now.

13  (14:54) TARYN:  She was like acting real weird.

14  (14:56) LISA:  Brooke was acting weird?

15  (14:58) TARYN:  She was acting weird.

16  (14:59) LISA:  I told her what you did with that girl.

17  (15:02) TARYN:  I know, and I thought you told her

18  something else.

19  (15:04) LISA:  No, I didn't.

20  (15:05) TARYN:  You're not understanding

21  (indistinguishable.)

22  (15:07) LISA:  You have to talk clearly.  I can't

23  understand you.

24  (15:11) TARYN:  (Indistinguishable) you're showing

25  yourself, you know.  You don't care if I go to jail.

16

1  Do you know how long it would be?  20 to 30 years.

2  (15:23) LISA:  And that's what scares you, you don't

3  want to go to jail?

4  (15:26) TARYN:  I'll been in that place till I'm 60

5  years old.  I'm 19 years old.  I'm not even 20.

6  (15:43) LISA:  Did you tell any of your friends that

7  you killed that guy?

8  (15:46) TARYN:  Fuck no.

9  (15:47) LISA:  So you've been keeping it inside?

10 (15:49) TARYN:  Uh-huh.

11 (15:50) LISA:  And I'm the only one you told?

12 (15:52) TARYN:  Yes.

13 (15:53) I wish you -- (15:53 through 15:55 blank) the

14 re- -- you went with that girl because when you're with

15 me, you know I know about it and I make you think about

16 it?

17 (16:02) TARYN:  It's just a lot of things, like when we

18 get into arguments.

19 (16:04) LISA:  So you -- do you really like that girl?

20 (16:07) TARYN:  I do, but I don't like -- as much as

21 falling in love with you.

22 (16:13) LISA:  You hurt me, Taryn.

23 (16:14) TARYN:  I know.

24 (16:15) LISA:  You hurt me so bad.

25 (16:17) TARYN:  I know.

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING
a division of Business, Inc.

17

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
*Certified Shorthand Reporters*

ADVANCED COURT REPORTING

1   (16:18) LISA:  Your promises meant nothing.  You know

2   how disgusted I feel right now?

3   (16:25) TARYN:  Why didn't you turn me in?

4   (16:26) LISA:  What?

5   (16:27) TARYN:  Why don't you just turn me in?

6   (16:29) LISA:  Why don't I just turn you in?

7   (16:31) TARYN:  Yeah.

8   (16:32) LISA:  Why do you always say that?

9   (16:33) TARYN:  You're still angry at me now.

10  (16:35) LISA:  I am angry with you.  I hate you right

11  now, but I still love you.  I will always love you.

12  (16:43) TARYN:  Me, too.  You might not think it, but I

13  do.

14  (16:48) LISA:  I know you love me, okay.  It's just

15  you're going through a really hard time right now, but

16  I was trying to be there for you.  I wanted to

17  understand where you were coming from, but you were

18  hiding your feelings from me.  Why didn't you just tell

19  me you were having a hard time because you were sad

20  about what you did to that guy?  You, like, walk around

21  like it never happened, but it did, Taryn.

22  (17:11) TARYN:  No, I walk around pretending.

23  (17:14) LISA:  Why do you pretend?  Why don't you just

24  cry about it for once?

25  (17:17) TARYN:  Other people would know.

18

1  (17:20) LISA:  So the thing that you're most scared

2  about is going to jail?

3  (17:25) TARYN:  Wouldn't you be?  Scared

4  (indistinguishable).

5  (17:37) LISA:  Well, do you think the cops found any of

6  your clothes?

7  (17:40) TARYN:  No.

8  (17:42) LISA:  No?

9  (17:42) TARYN:  I know they found that hat because they

10 described it.

11 (17:46) LISA:  Where did you dump that jacket, again?

12 (17:50) TARYN:  Don't worry about it.  I got rid of it.

13 (17:52) LISA:  Didn't you tell me you dumped it in a

14 Porta Potty or something?

15 (17:54) TARYN:  Why do you want to know?  You're not

16 going to have me busted, are you?

17 (17:58) LISA:  No.

18 (17:59) TARYN:  Do you promise?

19 (18:01) LISA:  I promise.

20 (18:03) TARYN:  Are you sure?  Just don't worry about

21 it, then.

22 (18:05) LISA:  Okay.

23 (18:07) TARYN:  You're not trying to got me busted, are

24 you?

25 (18:09) LISA:  No, Taryn.

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING
Barbour & Associates, Inc.

FROM : PAUL BRENT SMITH           FAX NO. : 808 876 1858        Mar. 22 2002 12:49PM P3

19

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING
A Subsidiary of Stenograph, Inc.

1  (18:10) TARYN:  Are you sure?

2  (18:12) LISA:   It's going to be okay.

3  (18:13) TARYN:  I don't know.

4  (18:15) LISA:   You hurt me more than I've ever -- you

5  know what's the difference, though?

6  (18:19) TARYN:  What?

7  (18:19) LISA:   Every other time I was used, I was used

8  but I didn't love the person, and now I have been used

9  again but this time it was a person I was in love

10 with.

11 (18:29) TARYN:  I wasn't using you.

12 (18:30) LISA:   You used me.

13 (18:32) TARYN:  No.

14 (18:33) LISA:   Yes, you did.  You used me.  I feel like

15 a dirty -- I feel so dirty because of you.

16 (18:40) TARYN:  Why?

17 (18:42) LISA:   Because of what you did, what you did to

18 me.  Every time I read the newspapers, all his friends

19 go, "Oh, he's such an innocent guy, he was really

20 loving and caring."

21 (18:53) TARYN:  Lisa, "shhh" okay.  You think I

22 don't --

23 (18:56) LISA:   I don't understand how you can just

24 pretend like nothing happened.

25 (19:00) TARYN:  You think it's easy?

20

1  (19:01) LISA:  Every time I try to talk to you about

2  it, you get mad at me.

3  (19:04) TARYN:  Because I hate thinking about it.

4  (19:06) LISA:  And so is that why you've been pushing

5  me away?

6  (19:08) TARYN:  Oh, no.

7  (19:10) LISA:  Ever since you stabbed that guy, Taryn,

8  you've been totally being hateful towards me,

9  everything.

10  (19:17) TARYN:  No.  Maybe.  I don't know

11  (19:20) LISA:  But I didn't do anything.  It's you who

12  did the thing.  Taryn, isn't it in your conscience that

13  you killed someone?

14  (19:29) TARYN:  Of course.  Every day.

15  (19:37) LISA:  What?  I'm scared.

16  (19:41) TARYN:  Why?

17  (19:42) LISA:  Cause I love you.  I really -- I never

18  wanted -- I really wanted to marry you, Taryn.  I had

19  all our dreams planned and everything and you ruined

20  them.  You promised me you'd never leave me.  You

21  promised me you wanted to marry me.  You can't go

22  around lying to two girls at the same time, pretending

23  everything's going to be all right, and lying to

24  yourself, but you know you did it.

25  (20:10) TARYN:  Lisa, please.

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

21

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118

Certified Shorthand Reporters

ADVANCED COURT REPORTING

Schütze & Associates, Inc.

1  (20:11) LISA:  Do you know how upset I am?

2  (20:13) TARYN:  Mom, this is great chicken salad.

3  (20:20) LISA:  Did you tell your mom?

4  (20:21) TARYN:  What?

5  (20:22) LISA:  That you stabbed that guy.

6  (20:24) TARYN:  No.

7  (20:27) LISA:  So she doesn't know?

8  (20:28) TARYN:  No.

9  (20:32) LISA:  Are you eating lunch right now?  I

10  haven't eaten in a week.

11  (20:39) TARYN:  Oh, that's something I need to try

12  (indistinguishable).

13  (20:43) LISA:  What?  I lost like seven pounds, Taryn,

14  because I've been so upset.  Have I gotten ugly or

15  something?  Is that why you lost interest in me?  What

16  happened?

17  (20:58) TARYN:  (No audible response.)

18  (20:59) LISA:  What?

19  (21:00) TARYN:  No.

20  (21:01) LISA:  Taryn, no matter what happens, I want

21  you to know I love you, okay?  Okay?

22  (21:07) TARYN:  Why do you say that?

23  (21:09) LISA:  Cause you -- if you want to go off with

24  that girl, then go off with that girl, but always

25  remember that I love you and that I'll always remember

FROM : PAUL BRENT SMITH          FAX NO. : 808 876 1858          Mar. 22 2002 12:50PM P6

22

1   the good times we had together, okay?

2   (21:20) TARYN:  What's that?

3   (21:21) LISA:  If you want to go off with that girl --

4   you told that girl that you wanted to -- you told me

5   the reason why you wanted to move to the mainland is

6   because you were scared of getting caught for stabbing

7   that guy, but you told her the re- -- the reason you

8   wanted to go to the mainland is so you could be with

9   her.  You -- you told her you hated me and that you

10  couldn't wait to go to the mainland to be with her.

11  You can't screw around with me, Taryn.  I have real

12  feelings.  I have a heart that beats, okay?

13  (21:52) TARYN:  Me, too.

14  (21:55) LISA:  You haven't been showing it.  I thought

15  you loved me enough to at least tell me, you know.  You

16  tried.  Obviously you didn't try hard enough because

17  you were having sex with us at the same time.

18  (22:09) TARYN:  We were not.

19  (22:11) LISA:  You should have told me, Taryn, "I don't

20  want to be with you.  I want to be with someone else."

21  And then I tell -- you should have told me that you

22  were having sex with her.  And you said -- you said,

23  "I shouldn't have to tell you that."  You should have

24  to, tell you that -- I've put -- I've given you my

25  whole life.

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118
Certified Shorthand Reporters

ADVANCED COURT REPORTING

23

20 First Plaza, Suite 717 • Albuquerque, NM 87102
(505) 242-7233 • Fax (505) 764-8118

*Certified Shorthand Reporters*

**ADVANCED COURT REPORTING**

1       You are all that -- I felt like you were

2   everything to me.  You were my god.  I would have done

3   anything for you, and you don't even want to tell me

4   that you're having sex with someone else.  And then

5   what's that crap about oh, "Oh, April's my favorite

6   month because that's when we went to the Hyatt."  But

7   the whole time the reason you had April on your key

8   chain is because it was her name.  Do you know how bad

9   you hurt me?

10  (22:55) TARYN:  Yes.

11  (22:57) LISA:  Can you just tell me why you hurt me?

12  (23:00) TARYN:  Not on purpose.

13  (23:04) LISA:  Were you thinking when you hurt me?

14  (23:07) TARYN:  Guess not.

15  (23:09) LISA:  Can I ask you something?

16  (23:11) TARYN:  What?

17  (23:16) LISA:  When you had sex with her --

18  (23:20) TARYN:  Don't ask.  Too personal.

19  (23:22) LISA:  No, when you did --

20  (23:24) TARYN:  I don't want to answer.

21  (23:30) LISA:  Was it -- what do you think?

22  (23:35) TARYN:  What?

23  (23:39) LISA:  Were you happier doing it?  Were you?

24  Just answer "Yes" or "No."  Were you happy?

25  (23:54) TARYN:  Naturally.

24

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118
*Certified Shorthand Reporters*

**A**DVANCED **C**OURT **R**EPORTING

1   (23:55) LISA:  Huh?

2   (23:56) TARYN:  Okay, I'm not going to say.

3   (24:00) LISA:  Just tell me, were you happy when you

4   were doing it with her?

5   (24:03) TARYN:  Okay, Mom, I heard.

6   (24:06) LISA:  Were you happy when you were doing it

7   with her?

8   (24:08) TARYN:  I --

9   (24:10) LISA:  Huh?  I can't hear you.

10  (24:13) TARYN:  Can I -- you trapped me there.

11  (24:15) LISA:  Yeah.

12  (24:16) TARYN:  Will you be home later?

13  (24:17) LISA:  Were you thinking about me?

14  (24:20) TARYN:  Fuck yeah.

15  (24:21) LISA:  You were?

16  (24:22) TARYN:  Fuck yeah.  Can I -- can I -- are you

17  going to be home later?

18  (24:24) LISA:  Yeah.

19  (24:25) TARYN:  Okay.  What time?

20  (24:27) LISA:  Um, well, I'm going to -- Bruce is going

21  to give me a ride home after --

22  (24:32) TARYN:  You've got to hurry cause my dad has to

23  use the phone.

24  (24:34) LISA:  Okay, well --

25  (24:37) TARYN:  Hurry.

FROM : PAUL BRENT SMITH          FAX NO. : 808 876 1858          Mar. 22 2002 12:52PM  P9

25

1  (24:39) LISA:  Ta- -- Taryn, I just need to ask you, do

2  you have a conscience about what you did?

3  (24:43) TARYN:  Yes.  But, Lisa, I have to go.  Are you

4  going to be home later or not?

5  (24:47) LISA:  Yes.  If I'm not, can you call me at

6  Brooke's house?

7  (24:53) TARYN:  Uh-huh.

8  (24:54) LISA:  Okay.

9  (24:55) TARYN:  'Kay.

10  (24:56) LISA:  Cause I really don't want to be home

11  alone, you know what I mean?

12  (24:58) TARYN: Yeah.

13  (25:00) LISA:  'Kay, I love you, Taryn.

14  (25:01) TARYN:  Lisa, let go of it, you're too close.

15  (25:04) LISA:  What?

16  (25:05) TARYN:  Go home.

17  (25:06) LISA:  'Kay.

18  (25:07) TARYN:  Good.  'Kay.

19  (25:08) LISA:  I love you.  Taryn, I love you.

20  (25:15) TARYN:  I know.

21  (25:17) LISA:  I'm sorry, okay?

22  (25:19) TARYN:  Yeah.  I gotta go now.

23  (25:20) LISA:  Okay.

24  (25:21) TARYN:  Okay.

25  (25:21) LISA:  Okay.

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118

Certified Shorthand Reporters

ADVANCED COURT REPORTING

Scalese & Scalese, Inc.

26

1  (25:22) TARYN:  Good bye.

2  (25:22) LISA:  Bye.

3  (End of tape-recording.)

20 First Plaza, Suite 717 · Albuquerque, NM 87102
(505) 242-7233 · Fax (505) 764-8118

*Certified Shorthand Reporters*

ADVANCED COURT REPORTING

# Computer Audio Engineering

4810 Marquette Ave., N.E. · Albuquerque, New Mexico 87108
505-268-0496 · fax: 866-301-0925 · http://www.CAEaudio.com

June 2, 2008

Mark Barrett
111. N. Peter
Suite 100
Norman, OK 73069

**Report - Revised**

*RE: Taryn Christian vs. Richard Bissen, et al. Civil No. 04-00743-DAE-LEK audio evidence.*

**Assignment:**

Computer Audio Engineering (CAE) was engaged to investigate, analyze and enhance two audio recordings, and prepare a transcript of one of the recordings. The recordings were provided by the Maui Police Department and are believed to be the originals. Hereafter, these two tapes will be referred to as the "original" tapes, and their contents will be referred to as the "original" recordings.

**Physical Description of Tapes Provided:**

1. Kimmey-Christian Recording
   a. Maxell UR 60 tape cassette.
   b. Lot number F3047401.
   c. Label on side B.
       1. Murder-II 95-39250.
       2. Phone call Lisa Kimmey 08/17/95.
       3. 1235 hrs.
       4. A. Funes.
       5. Kimmey spoke to Taryn Christian, Call was made by Christian to Lisa.
   d. Tabs removed.
   e. Jewel case.
       1. Red "Master" tag.
       2. Murder-II 95-39250.
       3. Christian called Lisa 08/17/95.
       4. A. Funes.

   Initialed by me with red "JM" for future identification.

2. 911 Recording
   a. Maxell UR 60 tape cassette.
   b. Lot number G1447401.

— EXHIBIT  MI-2  —

c. Tabs removed.
d. No other identification on cassette.
e. Jewel case.
   1. Yellow Post-It note.
      a. 911 – calls to dispatch, Maui Police Dept. on July 14, 1995 Murder-II.
   2. Jewel case insert
      a. $95-39250 As requested. 0300-0500.
      b. *NOTE* Pos. 13 (LAH 911) on Dictaphone is labeled as button #18. No – button 18 is KB354 – Did the best I could. VJ (or VS). Over 10 hrs for this.

Initialed by me with red "JM" for future identification.

**Initial Procedure:**

Both original recordings were transferred to the CAE digital system. First, each was transferred at unity (no volume increase or equalization added) with a bit depth of 16 bits, and a sample rate of 44.1 kilohertz (hereafter, bit depth and sampling rate will be denoted as "X bit,/Y KHz"). This was done so that a comparison could be made to work done on copies of these recordings in November and December, 2000. Second, each original recording was again transferred to the CAE digital system using a higher resolution setting of 24 bit/48 KHz. A significant volume increase was applied during transfer, but no equalization was applied. Both recordings were slightly shorter than the copies used in 2000. This indicates a slight difference in device speed calibration of between one and two percent. This variation is not uncommon when transferring information from one physical device to another, and is not of concern. It does not change the dialogue content.

**Details:**

*Kimmey-Christian Recording:*

**16 bit/44.1KHz transfer:**
The original recording contained significantly less extraneous noise than the recording analyzed in 2000. This difference, of at least 3 decibels, represents a reduction of approximately half the extraneous noise. The amplitude (volume) of the recorded dialogue is same. However, because the original recording contains less noise, the signal (dialogue) can be heard more clearly. The fact that there is so much more noise on the 2000 tape indicates that it is a second or third (or even higher) generation copy of the original. Successive generations of analog recordings contain successively more noise and less signal detail.

**24 bit/48KHz transfer:**
This higher resolution transfer resulted in significantly increased dialogue clarity, but no significant new information was found. Nevertheless, it provided clarification of the findings in 2000. There are two statements of denial – "I'm not the one who did it," and "I wasn't the one who stabbed him." There was one additional word found in the full phrase of the

second statement of denial, the word "Lisa". That full phrase was previously thought to be "I wasn't the one who stabbed him and I know that for a fact." The higher resolution recording revealed this to be, "I wasn't the one who stabbed him, Lisa, and I know that for a fact." No statements of confession were found.

The two statements of denial were isolated and processed for additional clarity. It should be noted that these statements can be heard clearly without any processing, simply by increasing the volume in those sections of the recording.

*911 Recording:*

**16 bit/44.1KHz transfer:**
The original recording contained significantly less extraneous noise than the recording analyzed in 2000. This difference, of at least 3 decibels, represents a reduction of approximately half the extraneous noise. The amplitude (volume) of the recorded dialogue remained the same, However, because the original recording contains less noise, the signal (dialogue) can be heard more clearly. Again, The fact that there is so much more noise on the 2000 tape indicates that it is a second or third (or even higher) generation copy of the original.

**24 bit/48KHz transfer:**
This higher resolution transfer resulted in significantly increased dialogue clarity and significant new information.

At 5:37.0, an unidentified male states that he "cannot breathe." Mr. Perry, the caller to 911, states at 5:39.9, "He's complaining that he can't breathe." This indicates that the previous speaker was Vilmar Cabaccang, the victim. This allows us to identify the sonic characteristics (timbre) of the voice of Mr. Cabaccang and to identify him as the speaker at other points during the 911 call. This is a very simple process, not unlike identifying the sound of an instrument playing in an orchestra. Mr. Cabaccang's voice is very distinctive among the audible voices on the recording. It is in the mid-baritone range, somewhat hoarse and lower pitched with few higher frequencies. No other speaker on this recording had these speech characteristics.

Additional clarification of the findings in 2000:

1. The name James Burkhardt is mentioned at 5:06.8. I believe the speaker to be Vilmar Cabaccang. At 5:08.5 an unidentified females says "Save your breath." This is an additional indication that the male speaker is Mr. Cabaccang.

2. The statement, "Why didn't the alarm go off. Turned it on a long time ago," is more clearly audible in the original recording. This is at 5:32.3 and is followed by the same speaker saying "Cannot breathe." This is followed at 5:39.3 by Mr. Perry indicating the previous male speaker as the victim, Vilmar Cabaccang.

3. The utterances by an unidentified male, "Back up. Get back. Drop the knife," still exist at 1:55.3.

4. The above is followed by "Don't panic," at 2:00.3 by an unidentified male speaker. In the 2000 transcript this was marked as indistinguishable.

Significant new information:

1. At 5:19.4 a male speaker can be heard saying "Tell her we were robbed by Chris Diaz." I believe this male speaker to be Vilmar Cabaccang.

2. At 1:37.2 the name Chris is mentioned. The speaker of this name cannot be identified as male or female. The origin of this cannot be identified as emanating from the 911 control room, the environment of Mr. Perry or from outside at the scene of the altercation.

3. At 0:45.4 an unidentified male says, "You get help. This is serious." This male voice is in the tenor range. Neither the speaker nor the person to whom the statement is directed can be identified from the recording.

4. At 1:27.0 an unidentified male says "You lose today."

5. At 1:47.3 an unidentified male says "Drop him."

**Overview of Significant Audio Information, in Sequence:**

**Table 1: Significant Utterances**

| | | |
|---|---|---|
| 0:45.4 | UNIDENTIFIED MALE: | You get help. This is serious. |
| 1:27.0 | UNIDENTIFIED MALE: | You lose today. |
| 1:37.2 | UNIDENTIFIED SPEAKER: | Chris. |
| 1:47.3 | UNIDENTIFIED MALE: | Drop him. |
| 1:55.3 | UNIDENTIFIED MALE: | Back up. Get back. Drop the knife. |
| 1:58.6 | UNIDENTIFIED FEMALE: | (Crying). |
| 2:00.3 | UNIDENTIFIED MALE: | Don't panic. |
| 2:01.0 | UNIDENTIFIED FEMALE: | (Crying). |

**Table 2:  Utterances Believed to be Attributable to Mr. Cabaccang**

| 3:23.8 | UNIDENTIFIED MALE: | It was really tough. I didn't mean it. He's really dark inside. |
|--------|---------------------|------------------------------------------------------------------|
| 5:06.8 | UNIDENTIFIED MALE: | James Burkhardt just walked off. |
| 5:08.8 | UNIDENTIFIED MALE: | Get him. |
| 5:19.4 | UNIDENTIFIED MALE: | Tell her we were robbed by Chris Diaz. |
| 5:32.3 | UNIDENTIFIED MALE: | Why didn't the alarm go off. Turned it on a long time ago. |
| 5:37.0 | UNIDENTIFIED MALE: | Cannot breathe. |

**Table 3: Basis for Identification of Vilmar Cabaccang's Voice**

| 5:39.3 | MR. PERRY: | He's complaining that he can't breathe. |
|--------|------------|------------------------------------------|

**Closing statement:**

Enhancement processing of the full recordings was not done, but isolated segments of the significant audio were processed for additional clarity. Expansion files were made to help the hearing process. An expansion file slows the playback of a digital audio source and corrects for change of pitch. By increasing the duration of the sample, the individual words become more distinct and the increased space between words reduces temporal masking. In other words, it allows the brain to process and interpret the sound better. This procedure is a standard technique used by speech and hearing scientists worldwide. It does not change the content of the dialogue.

Additional new dialogue was discovered but is not as significant to the case as that noted above. A new transcript of the 911 recording was prepared and contains all of the findings from that recording. The original recording transferred at 24 bit/48 KHz was used as the source for the transcription, and for the timings which were added to the transcript.

The Kimmey-Christian and 911 transcripts prepared by a court reporter in 2000 are still significant because they reflect that reporters ability to hear some of the significant information despite being at the disadvantage of having to use copies of the recordings that had less resolution than the 24 bit/48 KHz transfers of the originals used for this examination.

My compensation regarding the examination and analysis of the original 911 Recording and Kimmey-Christian Recording. is $4,712.50

## ATTESTATION

I, John J. Mitchell, having been duly sworn, State that I have prepared the foregoing original recordings evidence **REPORT** and that the contents therein are true and correct to the best of my knowledge and belief.

Dated this ___2___ day of ___June___, 2008.

_John J. Mitchell_

Subscribed and sworn to me this ___2___ day of ___June___, 2008 by John J. Mitchell.

Witness my hand and official seal.

My Commission expires: ___4/25/2011___

_Notary Public_

OFFICIAL SEAL
**MARGARET PACHECO-BATTLE**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: ___4/25/2011___

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | Civil No. 04-00743-DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RICHARD BISSEN, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TRANSCRIPT OF 911 TAPE

| 0:03.6 | OPERATOR: | 911. |
|---|---|---|
| 0:05.3 | MR. PERRY: | Hi, um, this is Rob Perry at 20D Haleakala Gardens, Kulanihakoi Street in Kihei. |
| 0:12.3 | OPERATOR: | Uh-huh. |
| 0:12.8 | MR. PERRY: | I'm just hearing some loud noises that I don't know if it's a domestic disturbance, but it's out on the street, some people are yelling. |
| 0:19.3 | UNIDENTIFIED FEMALE: | (Indistinguishable). |
| 0:20.6 | OPERATOR: | Okay. |
| 0:21.5 | MR. PERRY: | And... |
| 0:21.7 | OPERATOR: | Out on the street in front of Haleakala Gardens? |
| 0:23.8 | MR. PERRY: | Yeah. They're right, like, by the church or the, uh, Kiawe Terrace. |
| 0:27.9 | UNIDENTIFIED FEMALE: | Don't call him an asshole. |
| 0:29.2 | MR. PERRY: | There's some... |
| 0:30.1 | OPERATOR: | Is that the yelling that's going on out...that I hear in the background? |
| 0:32.4 | MR. PERRY: | Yes, that is, and that's...well, at least a few hundred yards away, you can tell. |
| 0:37.7 | UNIDENTIFIED FEMALE: | Tesha. |
| 0:38.7 | MR. PERRY: | Hear it? |

EXHIBIT MI-3

| 0:38.9 | OPERATOR: | Okay. Yes. Is it male or female... |
| 0:42.2 | MR. PERRY: | It... |
| 0:42.6 | OPERATOR: | ...females or... |
| 0:43.0 | MR. PERRY: | I hear females and males. |
| 0:45.4 | UNIDENTIFIED MALE: | You get help. This is serious. |
| 0:49.9 | MR. PERRY: | There seems to be a number of people. |
| 0:53.4 | UNIDENTIFIED SPEAKER: | (Indistinguishable). |
| 0:54.1 | UNIDENTIFIED SPEAKER: | Really. |
| 0:56.0 | OPERATOR: | Can you tell what they're screaming at or saying? |
| 0:58.0 | MR. PERRY: | They're saying something like Sasha or Stasha, something like that. |
| 1:01.1 | OPERATOR: | Sasha. |
| 1:04.2 | UNIDENTIFIED FEMALE: | Sasha. |
| 1:05.8 | OPERATOR: | Is she looking for somebody? |
| 1:07.4 | MR. PERRY: | I have no idea.  It sounds like she's looking for someone or something, and I'm hearing some male voices yelling in the background. |
| 1:15.0 | OPERATOR: | Same name. |
| 1:16.1 | MR. PERRY: | Yeah.  Or they're yelling at the other lady now. |
| 1:20.9 | UNIDENTIFIED FEMALE: | Vilmar |
| 1:22.7 | UNIDENTIFIED MALE: | (Indistinguishable). |
| | (Telephone tones.) | |
| 1:24.0 | UNIDENTIFIED FEMALE: | Help. Tesha. |
| 1:27.0 | UNIDENTIFIED MALE: | You lose today. |
| 1:27.8 | MR. PERRY: | Some sort of arguing going on. |
| 1:29.2 | OPERATOR: | Okay. Can you, um...are you able to see them or... |
| 1:32.1 | MR. PERRY: | No, there's a hedge between me and the road from where my... |
| 1:35.4 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 1:36.0 | OPERATOR: | You're just going by what you're hearing? |
| 1:37.2 | UNIDENTIFIED SPEAKER: | Chris. |

| 1:37.8 | MR. PERRY: | Yeah. |
| 1:38.1 | OPERATOR: | Okay. |
| 1:38.4 | UNIDENTIFIED FEMALE: | (Indistinguishable.) |
| 1:38.8 | MR. PERRY: | I'm hearing a big argument and it sounds like a fight going on now. |
| 1:41.9 | OPERATOR: | Now, a big argument. |
| 1:46.4 | UNIDENTIFIED FEMALE: | Tesha. |
| 1:47.3 | UNIDENTIFIED MALE: | Drop him. |
| 1:49.1 | OPERATOR: | Is it verbal or just...do you hear any punches? |
| 1:51.2 | MR. PERRY: | I hear verbal stuff. I don't see anything. |
| 1:55.3 | UNIDENTIFIED MALE: | Back up. Get back. Drop the knife. |
| 1:58.6 | UNIDENTIFIED FEMALE: | (Crying). |
| 2:00.3 | UNIDENTIFIED MALE: | Don't panic. |
| 2:01.0 | UNIDENTIFIED FEMALE: | (Crying). |
| 2:02.0 | MR. PERRY: | I hear crying. |
| 2:02.8 | OPERATOR: | Crying. Somebody's crying? |
| 2:04.0 | MR. PERRY: | Yeah. |
| 2:04.2 | OPERATOR: | Okay. |
| 2:06.5 | UNIDENTIFIED SPEAKER: | (Likely is system cross-talk. "Tell her to call back" can be heard). |
| 2:11.1 | OPERATOR: | Okay. Hold on. What else? |
| 2:15.1 | MR. PERRY: | Hold on. Let me see if I can… |
| 2:18.0 | OPERATOR: | No, you don't have to look if you don't want to, just... |
| 2:19.7 | MR. PERRY: | Oh, no, I can...I can go out there. |
| 2:20.9 | OPERATOR: | Okay. |
| 2:23.1 | UNIDENTIFIED FEMALE: | Stop. |
| 2:25.1 | MR. PERRY: | It sounds like someone is being hurt. |
| 2:27.4 | OPERATOR: | Okay. Sounds like they're running or something? |
| 2:29.4 | MR. PERRY: | Yeah. |
| 2:31.9 | (Door opens) | |

| 2:41.9 | MR. PERRY: | Okay. There's...yeah, my father, who is the, um, manager of this complex... |
| 2:48.1 | OPERATOR: | Yeah. |
| 2:48.3 | MR. PERRY: | ...has gone out to investigate, also. |
| 2:50.5 | OPERATOR: | Okay. |
| 2:50.6 | UNIDENTIFIED FEMALE: | Tesha. |
| 2:51.0 | (Background voices) | |
| 2:53.1 | MR. PERRY: | Let me, let me go out. He's...he's right by. I can see what's going on now. |
| 2:56.9 | OPERATOR: | Okay. |
| 2:58.6 | UNIDENTIFIED FEMALE: | I'm looking out the window. I can see movement now. |
| 3:01.9 | UNIDENTIFIED MALE: | Call the... |
| 3:03.0 | UNIDENTIFIED FEMALE: | Oh, God. |
| 3:03.8 | UNIDENTIFIED MALE: | Call the police. |
| 3:04.9 | UNIDENTIFIED FEMALE: | Help. |
| 3:05.2 | MR. PERRY: | Yes. |
| 3:06.5 | UNIDENTIFIED FEMALE: | (Indistinguishable). |
| 3:07.1 | MR. PERRY: | Oh, God, there's something wrong. There's people bleeding. |
| 3:10.0 | OPERATOR: | Okay. |
| 3:10.4 | MR. PERRY: | There's some... |
| 3:10.6 | OPERATOR: | You need a medic, too. |
| 3:11.1 | UNIDENTIFIED MALE: | He'll outrun the police. |
| 3:12.0 | MR. PERRY: | Yeah, you're going to be all right. This...we need the police. Someone's hurt bad. |
| 3:15.3 | OPERATOR: | Is it a phone call...I mean, is it an accident or... |
| 3:17.7 | MR. PERRY: | Yes. There's someone...there's someone out here. He's bleeding. |
| 3:20.6 | OPERATOR: | Okay. |
| 3:21.4 | MR. PERRY: | Stay still. |
| 3:22.2 | OPERATOR: | Okay. |

| 3:22.4 | MR. PERRY: | We need an ambulance here. |
| 3:22.8 | OPERATOR: | Tell him to stay still. |
| 3:23.8 | UNIDENTIFIED MALE: | It was really tough. I didn't mean it. He's really dark inside. |
| 3:27.3 | UNIDENTIFIED MALE: | Who was it? |
| 3:28.8 | OPERATOR: | What happened? |
| 3:30.1 | MR. PERRY: | Um, do you know what happened? |
| 3:32.3 | MALE WITNESS: | There was a guy right there and he went… |
| 3:32.8 | OPERATOR: | Was it a car accident? |
| 3:33.8 | MR. PERRY: | The guy ran off towards South Kihei Road. |
| 3:36.8 | OPERATOR: | Okay, give me the description. |
| 3:38.1 | MR. PERRY: | I don't have a description. Uh… |
| 3:40.5 | MALE WITNESS: | He, he's about 6'2". |
| 3:42.5 | MR. PERRY: | 6'2". |
| 3:42.8 | MALE WITNESS: | He's wearing…he's wearing a… |
| 3:44.2 | UNIDENTIFIED FEMALE: | Tesha… |
| 3:44.7 | MALE WITNESS: | -- a green flannel shirt. |
| 3:46.6 | MR. PERRY: | Green flannel shirt. |
| 3:47.7 | MALE WITNESS: | Baggy pants. |
| 3:48.5 | MR. PERRY: | Baggy pants. |
| 3:49.7 | MALE WITNESS: | Disappeared. |
| 3:50.5 | MALE WITNESS: | He looked like a haole guy. |
| 3:51.9 | MR. PERRY: | Haole guy. |
| 3:52.8 | MALE WITNESS: | Was it a haole guy? |
| 3:53.7 | UNIDENTIFIED SPEAKER: | Yeah, I think that's right. |
| 3:54.4 | MALE WITNESS: | Yeah. |
| 3:54.9 | OPERATOR: | Baggy pants. |
| 3:56.7 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 3:57.7 | OPERATOR: | Okay. |
| 3:58.7 | MR. PERRY: | Okay. I'm starting…I'm losing contact. Sorry. |

| 4:02.3 | OPERATOR: | Okay. |
| 4:03.4 | MR. PERRY: | Uh, can you still hear me? |
| 4:04.6 | OPERATOR: | How long ago did he run? |
| 4:05.8 | MR. PERRY: | How long ago did he run? |
| 4:07.9 | MALE WITNESS: | Um, about four minutes ago. |
| 4:09.6 | MR. PERRY: | Four minutes ago, about the time I started calling. |
| 4:12.6 | OPERATOR: | And he's heading towards... |
| 4:13.9 | MR. PERRY: | Uh, we have knife wounds here. |
| 4:15.8 | OPERATOR: | Okay. |
| 4:16.7 | MR. PERRY: | He's bleeding bad and... |
| 4:18.0 | OPERATOR: | Okay. |
| 4:18.5 | MR. PERRY: | The abdomen and... |
| 4:20.1 | MR. PERRY: | ...arm. |
| 4:20.6 | OPERATOR: | Abdomen and what? |
| 4:22.0 | MR. PERRY: | Abdomen and...where are the wounds, please? |
| 4:25.6 | UNIDENTIFIED MALE: | On his chest. |
| 4:25.8 | UNIDENTIFIED FEMALE: | On his chest. |
| 4:26.8 | MR. PERRY: | Chest and abdomen? |
| 4:28.2 | UNIDENTIFIED FEMALE: | Yes. |
| 4:28.7 | MR. PERRY: | Yes, chest and abdomen. |
| 4:30.8 | OPERATOR: | Okay. He's...he went towards Wailea. |
| 4:33.2 | MR. PERRY: | He went towards South Kihei Road, uh, toward the beach... |
| 4:37.3 | UNIDENTIFIED FEMALE: | It was tough. I'm hot and sweating. |
| 4:39.3 | MR. PERRY: | ...from Haleakala Gardens, Kiawe Terrace area. |
| 4:53.2 | OPERATOR: | Okay. Did he take the knife with him, or did he drop it? |
| 4:55.5 | MR. PERRY: | No, the knife is still here. |
| 4:57.1 | OPERATOR: | The knife is still there. |
| 4:58.4 | MR. PERRY: | Is the knife still there? |

| | | |
|---|---|---|
| 4:59.9 | UNIDENTIFIED FEMALE: | Yes (indistinguishable) there. |
| 5:00.1 | MR. PERRY: | Don't touch the knife in case we need that. |
| 5:02.9 | UNIDENTIFIED FEMALE: | That's just not a problem, we won't do that. |
| 5:04.3 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 5:05.2 | MR. PERRY: | Okay. |
| 5:06.8 | UNIDENTIFIED MALE: | James Burkhardt just walked off. |
| 5:08.1 | OPERATOR: | Okay. |
| 5:08.5 | UNIDENTIFIED FEMALE: | Save your breath. |
| 5:08.8 | UNIDENTIFIED MALE: | Get him. |
| 5:09.3 | OPERATOR: | Hold on. We have medics and police coming, okay. |
| 5:11.5 | MR. PERRY: | Ah, medics and police are coming. |
| 5:13.6 | UNIDENTIFIED FEMALE: | Don't fight it. |
| 5:14.2 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 5:14.4 | OPERATOR: | Copy for me. |
| 5:15.7 | MR. PERRY: | What? |
| 5:16.4 | OPERATOR: | No, no, no... |
| 5:17.0 | MR. PERRY: | Okay. |
| 5:17.2 | OPERATOR: | I'm talking to the other dispatcher. Okay. |
| 5:19.4 | UNIDENTIFIED MALE: | Tell her we were robbed by Chris Diaz. |
| 5:21.8 | OPERATOR: | Yeah, correct. |
| 5:22.2 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 5:23.7 | UNIDENTIFIED FEMALE: | Tesha. Tesha. |
| 5:29.8 | MR. PERRY: | Stay still, stay still. You don't want to keep bleeding. |
| 5:32.3 | UNIDENTIFIED MALE: | Why didn't the alarm go off. Turned it on a long time ago. |
| 5:36.1 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 5:37.0 | UNIDENTIFIED MALE: | Cannot breathe. |
| 5:38.0 | OPERATOR: | Okay. Only the one person is... |
| 5:39.3 | MR. PERRY: | He's complaining that he can't breathe. |
| 5:41.1 | OPERATOR: | Okay. Hold on. |

| 5:42.9 | UNIDENTIFIED MALE: | He laughed. |
| 5:43.8 | OPERATOR: | Okay. Hold on. I'm going to dispatch the medics. I'll be right back with you. |
| 5:46.7 | MR. PERRY: | Okay. |
| 5:47.0 | UNIDENTIFIED MALE: | (Indistinguishable). |
| 5:47.6 | (Telephone tones). | |
| 6:18.5 | OPERATOR: | Okay. Rob? |
| 6:19.3 | MR. PERRY: | Yes. Yeah, they're...they're here now. |
| 6:22.6 | OPERATOR: | Okay. Go ahead, go talk to them. |
| 6:24.4 | MR. PERRY: | Okay. |
| 6:24.9 | OPERATOR: | Okay, bye-bye. |
| 6:25.4 | MR. PERRY: | All right. |

(End of 911 recording).

---

I, John J. Mitchell, having been duly sworn, State that I have prepared the foregoing **TRANSCRIPT** and that the contents therein are true and correct to the best of my knowledge and belief.

Dated this 29th day of Nov, 2007.

John J. Mitchell

Subscribed and sworn to me this 29 day of November, 2007 by John J. Mitchell.

Witness my hand and official seal.

My Commission expires: 4/25/2011

OFFICIAL SEAL
**MARGARET PACHECO-BATTLE**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: 4/25/2011

Notary Public

Page 8 of 8 Christian 911 recording

# Computer Audio Engineering

4810 Marquette Ave., N.E. · Albuquerque, New Mexico 87108
505-268-0496 · http://www.CAEaudio.com

June 2, 2008

Mark Barrett
111. N. Peter
Suite 100
Norman, OK 73069

RE:  *Taryn Christian vs. Richard Bissen, et al. Civil No. 04-00743-DAE-LEK*
*Review of respondent's audio expert's report*

## Report

**Assignment:**

Computer Audio Engineering (CAE) was engaged to review the report and audio files submitted by respondent's audio examiner David Smith, of Sound Testimony of Johnstown, Pennsylvania.

**Description of Material Provided:**

1. Printed copy of a report dated March 7, 2008.
2. Printed copy of Mr. Smith's transcript of the recording of the conversation between the 911 Operator and Rob Perry. Mr. Smith designates this recording as Q1.
3. Printed copy of Mr. Smith's transcript of the August 17, 1995, telephone conversation between Taryn Christian and Lisa Kimmey. Mr. Smith designates this recording as Q2.
4. Printed copy of Q2 – Track Sheet of Segments from Christian/Kimmey telephone call on August 17, 1995.
5. Three (3) audio CDs containing Mr. Smith's enhancements of the audio provided to him.
    a. Q1 – 911 Telephone Call – 911 Operator and Mr. Rob Perry.
    b. Q2 – Telephone Call – Taryn Christian and Lisa Kimmey.
    c. Q2 – Segments of Telephone Call – Taryn Christian and Lisa Kimmey.

Each item was initialed with a red "JM" for future identification.

**Analysis:**

An analysis of Mr. Smith's audio indicates that his work is technically flawed.  Both audio recordings are of telephone conversations. The telephone employs a monaural signal (*i.e.*, a telephone signal contains a single audio channel, or is monophonic). Mr. Smith transferred the original telephone recordings onto his audio system for analysis and enhancement. He then

EXHIBIT M1-5

burned audio CDs of his enhanced final work product. The files on all audio CDs are two channel recordings (this is the specification of an audio CD). When a monaural file is converted to a two-channel file it should have an identical signal on both channels. The audio provided by Mr. Smith is binaural (two channel), but the information on the two channels is significantly different.

Although Mr. Smith's two-channel audio is from a single source, the signal on the left and right channels differ with regard to audio event alignment and amplitude (volume). There are even some audio events present on one channel but not on the other. This makes listening to the content of the audio files very difficult. The mismatched channels create an auditory illusion that the audio signal actually pumps from side to side. Moreover, the sound on each channel interferes with the perception of the sound on the other, obscuring the dialogue either partially or totally at points.

*Substantiating evidence:*

To illustrate the problems outlined above, CAE has done a comparative analysis. The recording from the CD provided by Mr. Smith, labeled, "Q1 – 911 Telephone Call", was compared to a recording created by CAE of the same source material. The source for both recordings was the 911 recording provided by the respondent (both Mr. Smith's and the CAE recordings were transferred from the same physical recording). The recording from Mr. Smith's CD contains his enhancements. The recording made by CAE has not been enhanced; it is the original transfer as a one channel source that was converted to a two channel digital file.

CAE then created graphical representations (waveforms and spectrograms) of segments from Mr. Smith's audio, and compared them to similar representations of corresponding segments from the CAE audio. A waveform is a graphical representation of amplitude within a left to right time line. A spectrogram is a graphical representation of the audio and includes time on a horizontal scale, frequency on a vertical scale and energy intensity (amplitude/volume) as relative lightness or darkness (or variation and color saturation) of the audio events represented within the viewing window. These files are located in appropriately named folders (specifically, in folders named 'Spectrograms' and 'Waveforms', which are located in the folder, 'Comparison Graphics') on the data DVD labeled *Christian 04-00743-DAE-LEK; Sound Testimony Review; Substantiating Evid. Data*, which accompanies this report. Files depicting segments from Mr. Smith's audio contain the prefix, "Sound-Testimony," and files depicting segments from the CAE recording contain the prefix, "CAE." The complete directory of this data DVD is listed in Table 1. The files should be compared pairwise. For example, the file named "Sound-Testimony-waveform-1.jpg" should be compared with the file named, "CAE-waveform-1.jpg," etc. Visual inspection of these graphical representations shows unequivocally that the left and right channels of Mr. Smith's recording are different from each other, whereas the left and right channels of the CAE recording are identical.

CAE also created video clips showing the waveform, playing in real time, and an analysis window. This analysis window shows frequency content of the two channels in the upper portion. A properly processed file will show a single line representing both channels (in fact, these are two lines, perfectly superimposed). The audio files provided by Mr. Smith show two

distinct lines, indicating the frequency content of the two channels is different. The lower portion of the analysis window indicates sound position within the sound stage (i.e., within the stereo field created by playing the left and right channels simultaneously from different speakers). A properly processed file will have a single line in the middle to indicate the sound is centered. Mr. Smith's audio shows continual movement, is spread all over the sound stage and the left and right channels are different. This evidence is definitive and incontrovertible.

These video clips are located on the data DVD mentioned previously, and are in a folder named, "Comparison Video Examples". The files are provided in both Quicktime and AVI formats. The Quicktime files provide better visual quality than their AVI counterparts. Both formats can be played on both Macintosh and PC (Windows) platforms; however, playing the Quicktime versions of the videos requires that the Quicktime program be installed. If the Quicktime program is not available, the AVI files may be played using Windows Media Player. Due to the large size of these files, it is recommended that the files be extracted to hard disk to avoid slow disk read stutters and errors. The Quicktime files are named, "CAE_video.mov" and Sound_Testimony_video.mov." Their AVI counterparts are entitled, "CAE_video.avi" and Sound_Testimony_video.avi."

*Additional information:*

Mr. Smith was able to verify the two statements of denial by Mr. Christian on the Christian/ Kimmey recording. The original recording of this conversation is of better quality than the 911 recording, and these statements can be heard on the original, without enhancement, by increasing the volume at the appropriate spot. The shortcomings of Mr. Smith's audio are less of a problem with better original audio and did not prevent him from verifying these statements. It is interesting to note that Mr. Smith did not include these two statements of denial on the CD of segments he made of the Christian/Kimmey recording.

**Conclusion:**

There is no doubt that the audio provided by Mr. Smith contains different information on the left and right channels. The fact that the channels are different makes it more difficult for the listener to hear and identify the content of the dialogue. It is not possible to determine what within Mr. Smith's work procedure caused the disparity, or where within Mr. Smith's workflow it occurred. The original Christian/Kimmey recording is of higher quality than the original recording of the 911 call. Consequently, the content of the dialogue is unambiguous when proper volume adjustments are made, even on Mr. Smith's recording. However, the original recording of the 911 call presents significant difficulties for the listener under the best of circumstances, because much of the significant dialogue is in the background, is of very low amplitude and is produced by speakers other than the two individuals actually conversing on the telephone. Therefore, it is not surprising that Mr. Smith was unable to verify some parts of the dialogue that had been transcribed earlier by CAE in 2007, and by a certified court reporter in 2000. Stated simply, the product Mr. Smith has produced is flawed and substandard.

Table 1:    Directory of the data DVD labeled, *Christian 04-00743-DAE-LEK; Sound Testimony Review; Substantiating Evid. Data.*

Sound Testimony Data Files (Internal DVD name)

      Comparison Graphics
         Spectrograms
            CAE-spectro-1.jpg
            CAE-spectro-2.jpg
            CAE-spectro-3.jpg
            Sound-Testimony-spectro-1.jpg
            Sound-Testimony-spectro-2.jpg
            Sound-Testimony-spectro-3.jpg
         Waveforms
            CAE-waveform-1.jpg
            CAE-waveform-2.jpg
            CAE-waveform-3.jpg
            Sound-Testimony-waveform-1.jpg
            Sound-Testimony-waveform-2.jpg
            Sound-Testimony-waveform-3.jpg
      Comparison Video Examples
         AVI for Macintosh and PC (Windows)
            CAE_video.avi
            Sound_Testimony_video.avi
         Quicktime for Macintosh and PC (Windows)
            CAE_video.mov
            Sound_Testimony_video.mov

---

My compensation regarding the examination and analysis of the Sound Testimony report is $1,975.00

---

## ATTESTATION

I, John J. Mitchell, having been duly sworn, State that I have prepared the foregoing Sound Testimony review **REPORT** and that the contents therein are true and correct to the best of my knowledge and belief.

Dated this _2_ day of _June_, 2008.

_John J. Mitchell_
John J. Mitchell

Subscribed and sworn to me this _2_ day of _June_, 2008 by John J. Mitchell.

Witness my hand and official seal.

My Commission expires: _____4/25/2011_____

_Margaret Pacheco Battle_
Notary Public

OFFICIAL SEAL
**MARGARET PACHECO-BATTLE**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: 4/25/2011

# Computer Audio Engineering

4810 Marquette Ave., N.E. · Albuquerque, New Mexico 87108
505-268-0496 · http://www.CAEaudio.com

June 2, 2008

Mark Barrett
111. N. Peter
Suite 100
Norman, OK 73069

*RE: Taryn Christian vs. Richard Bissen, et al. Civil No. 04-00743-DAE-LEK video evidence.*

## Report

**Assignment:**

Computer Audio Engineering (CAE) was engaged to investigate, analyze and enhance three video recordings. The recordings were provided by the Maui Police Department to local council, Keith Shigetomi, who forwarded them to CAE. Two tapes are believed to be the originals and the third is marked as being a copy.

**Physical Description of Tapes Provided:**

1. Bank ATM video
   a. No brand name is on the physical cassette. Box indicates 3M.
   b. No lot number is on the physical cassette.
   c. The format is VHS.
   d. Edge label indicates:
      1. 07/13/95 12:45 to 7/14/96 16:35
      2. Det. A. Funes 07/14/95 1655 HRS.
      3. Number tags are on both ends – 8296 and either 06 or 90 on the other end. It's difficult to discern the 06 or 90.
   e. The police property report indicates this recording was recovered from Sandra Kobayashi, a representative of the First Hawaiian Bank, Kihei.

The tape was initialed with red "JM" for future identification.

2. Gas Express video
   a. Physical cassette indicates a Fuji SVHS.
   b. Lot number 90641KWA ST120
   c. Edge label states NAVCO. No other markings.
   d. Top label states NACO, 13, 4/95, 95-39250, BK

— EXHIBIT M16 B —

e. The police property report indicates this recording was recovered from Gas Express, Ohukai Road, from within the office and was turned over to Det. Brian Kaya by Gas Express employee Donald S. Bailes.

The tape was initialed with red "JM" for future identification.

3. Crime Scene video
    a. No brand name is on the physical cassette. Box indicates RCA.
    b. Lot number B5F 031C T-120.
    c. Format is VHS.
    d. Edge label indicates:
        1. 95-39250 Crime Scene Video
        2. 15 Kulanihakoi Kihei Hi.
        3. Copy of prosecutor's copy.

The tape was initialed with red "JM" for future identification.

**Details:**

CAE is primarily an audio facility. Occasionally CAE must work with video, extract the audio from that video for processing, and then synchronize the audio and video together. To do so CAE has professional equipment and software. However, for this specific examination anyone with a modern personal computer could have achieved similar results, since most computers are sold with video capture and processing software pre-installed. This was not a video expert's job. No enhancement of the videotapes was necessary. Series of still images were extracted from the videos, and are included (without enhancement) on the data DVD, *Christian 04-00743-DAE-LEK Video Evidence Data Files,* which accompanies this report. Additional copies of the photos were enlarged and brightened; these images are also on the DVD.

The goal of the examination of the Bank ATM and Gas Express videos was to find images of a male individual who is reported to have entered the Gas Express between 3 AM and 3:30 AM on 7/14/95. The existence of this individual is documented in a report by Officer Ricky Udoi dated, "7/14/95 0725 hours". To locate images of this individual, the Bank ATM video was searched one frame at a time. The Gas Express video was quickly determined to have been recorded on the wrong date and the examination was discontinued. The examination of the Crime Scene video was to search for any potentially helpful information, either visual or verbal.

*Evidentiary Findings:*

1. Gas Express video

This recording is for the wrong date and the examination of it was discontinued. This tape is marked as tape 13. According to the report by Officer Ricky Udoi, the tape for the correct date and time period is marked as number 11.

2. Bank ATM video

The bank ATM tape has clear images from two cameras. One camera is outside, by the ATM machine, and shows part of the parking area, the gas pumps, anyone using the machine and people entering the store. The other camera has a field of view inside the store from behind the counter but shows only registers 2 and 3, not register 1. The cameras take a new still image every 4 seconds. Usually the new image is from the other camera but occasionally the same camera will take a second image. This new image every 4 seconds is consistent and there are no time gaps in the recording.

Only one customer enters the Gas Express between 3 AM and 3:24:17 AM. This person is male and arrives as a passenger in an automobile at 3:13:13 AM. The vehicle leaves at 3:15:05 AM. The customer cannot be seen returning to the vehicle before it departs.

Images of this customer can be seen on several camera shots both outside and inside the store. These images were captured to graphic files. Only one image exposes the customer's face, which is at 3:14:29 AM. Unfortunately the video system time stamp covers a portion of the face. This image was captured as a still photo and imported to PhotoShop for enlargement and brightening.

A subsequent segment of the same video shows the arrival of police at the Gas Express at 4:35 AM. Two officers can be seen on the sidewalk at 4:35:53. It appears they are arriving together. A third officer can be seen on the sidewalk at 4:48:48, along with two police cars in an adjacent parking area. At 5:51:29 four officers can be seen in front of the Gas Express. All officers leave by 5:57:57.

3. Crime Scene video

Several still images from the crime scene video were captured, including pictures of the knife, the screwdriver, the keys and a full view of the crime scene. No enhancements were done on these images. These images are included on the data DVD.

There were two areas of interest found regarding audio.

    a. At the video time stamp of 4:48 AM there is a radio transmission in which the dispatcher says, "Officer's encountered a suspect. Was at 217 Akai St. He had a description of a responsible."

    b. At the video time stamp of 5:45 AM a male speaker says, "Well, I know one thing, whoever's responsible he's making a deal. He must have had those keys."

These two segments were isolated and the audio enhanced and synchronized back to the video. Separate audio files were also made. These files are located in appropriately labeled folders on the accompanying data DVD.

**Additional information:**

The captured still images, the video and the audio are presented with this report on the previously mentioned DVD data disk marked as *Christian 04-00743-DAE-LEK Video Evidence Data Files*. The directory of the disk is listed in Table 1. All files are accessible by both Macintosh and PC (Windows) computers. The video files are in AVI format, and may be viewed with Windows Media Player on a PC, or Quicktime on Macintosh. Because these files are relatively large, it is recommended that they be extracted to hard disk to avoid slow disk read stutters and errors.

---

Table 1:  Directory of the data DVD labeled, *Christian 04-00743-DAE-LEK Video Evidence Data Files*

Video Evidence Data Files
Bank ATM Video
Images of Cops
2-cops-4-35.jpg
3rd-cop-4-48.jpg
4th-cop-5-51.jpg
Male Customer Images
Male_Image_2_1.jpg
Male_Image_2_2.jpg
Male_Image_2_3.jpg
Male_Image_2_4.jpg
Male_Image_2_5.jpg
Male_Image_2_6.jpg
Male_Image_2_7.jpg
Male_Image_2_8.jpg
Male_Image_2_out-of-car.jpg
Male_Image_2_side-of-car.jpg
Male_Image_Brighter.jpg
Male_Image_cropGF2.jpg
Male_Image_Enlarged.jpg
Male_Image_Enlarged_Brighte.jpg
Male_Image_Enlarged_Very_Br.jpg
Male_Image_Normal.jpg
Male_Image_Very_Bright.jpg
Male_Image_Very_Large.jpg
Male_Image_Very_Large_Brigh.jpg
Male_Image_Very_Large_Very_.jpg
Slow Motion Video of Customer
Male Image slo-mo video.avi

Table 1:  Directory of the data DVD labeled, *Christian 04-00743-DAE-LEK*
*Video Evidence Data Files* (Continued)

Bank ATM Video (Continued)
    Video Files
        Bank Tape Original 3 to 330.avi
        Bank Tape Original cops 1.avi
        Bank Tape Original cops 2.avi

Crime Scene Video
    Audio Segments
        Audio Sync Video
            Had those keys.avi
            Radio Transmission video.avi
        Had_those_keys
            Had those keys FINAL-22exp.wav
            Had those keys FINAL-31exp.wav
            Had those keys FINAL-42exp.wav
            Had those keys FINAL-53exp.wav
            Had those keys FINAL.wav
        Radio_Transmission
            Radio Transmission FINAL-24exp.wav
            Radio Transmission FINAL-33exp.wav
            Radio Transmission FINAL-41exp.wav
            Radio Transmission FINAL-52exp.wav
            Radio Transmission FINAL.wav
    Images
        Full-Scene-1.jpg
        Full-Scene-2.jpg
        Keys.jpg
        Knife-1.jpg
        Knife-2.jpg
        Screwdriver-1.jpg
        Screwdriver-2.jpg
        Screwdriver-3.jpg

---

My qualifications, including a list of the cases in which I have testified within the last four years, are contained in my *curriculum vitae*, which is attached.  I have authored no publications relating to videotapes. My compensation regarding the examination and analysis of the videotapes is $3,750.00.

---

## ATTESTATION

I, John J. Mitchell, having been duly sworn, State that I have prepared the foregoing video examination **REPORT** and that the contents therein are true and correct to the best of my knowledge and belief.

Dated this _2_ day of _June_, 2008.

_____
John J. Mitchell

Subscribed and sworn to me this _2_ day of _June_, 2008 by John J. Mitchell.

Witness my hand and official seal.

My Commission expires: _4/25/2011_

_____
Notary Public

OFFICIAL SEAL
**MARGARET PACHECO-BATTLE**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: _4/25/2011_