DEPARTMENT OF THE PROSECUTING ATTORNEY  207

BENJAMIN M. ACOB  4471
Prosecuting Attorney
PETER A. HANANO  6839
First Deputy Prosecuting Attorney
RICHARD MINATOYA  5840
Deputy Prosecuting Attorney
County of Maui
Wailuku, Maui, Hawaii  96793
Tel. No. 243-7630
Fax. No. 270-7927

Attorneys for Respondents

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIV. NO. 04-00743 DAE-LEK |
| | ) | |
| Plaintiff, | ) | RESPONDENTS RESPONSE |
| | ) | TO PETITIONER'S OPENING |
| vs. | ) | BRIEF FILED ON JULY 18, |
| | ) | 2008; DECLARATION OF |
| CLAYTON FRANK, Director, | ) | PETER A. HANANO; |
| STATE OF HAWAI'I, DEPARTMENT | ) | EXHIBIT "A"; CERTIFICATE |
| OF PUBLIC SAFETY, et al. | ) | OF SERVICE |
| | ) | |
| Respondents. | ) | |

## RESPONDENTS RESPONSE TO PETITIONER'S OPENING BRIEF FILED ON JULY 18, 2008

## DECLARATION OF PETER A. HANANO

## EXHIBIT "A"

## CERTIFICATE OF SERVICE

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES............................................................ ii

  I.  STATEMENT OF RELEVANT FACTS............................................ 1

  II.  STANDARDS OF REVIEW................................................... 8

     A.  28 U.S.C. § 2254........................................................... 8

     B.  Procedural Default........................................................ 9

  III.  ARGUMENT............................................................... 11

     A.  Bad Faith Destruction of Evidence.................................. 11

     B.  Evidence of Prior Identification of Different Person........................ 15

     C.  Ineffective Assistance Re Tape Enhancement.................................. 19

        1.  Christian-Kimmey Tape................................................. 22

        2.  911 Tape............................................................. 23

     D.  Misleading and Improper Eyewitness Identification Evidence.................................................................. 26

     E.  Petitioner's Other Remaining Issues................................ 29

  IV.  CONCLUSION............................................................ 31

# TABLE OF AUTHORITIES CITED

Page

## CASES

Arizona v. Youngblood, 488 U.S. 51 (1988)...................................... 14

Brady v. Maryland, 373 U.S. 83 (1963).......................................... 15, 16, 17

California v. Trombetta, 467 U.S. 479, 485 (1984)........................... 13, 14

Coleman v. Thompson, 501 U.S. 722, 732 (1991)............................ 9

Edwards v. Carpenter, 529 U.S. 446, 451 (2000)............................. 9

Manson v. Brathwaite, 432 U.S. 98 (1977)...................................... 27, 28, 29

Murray v. Carrier, 477 U.S. 478, 488 (1986)................................... 10

Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34
    L.Ed.2d 401 (1972).................................................................. 27

Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992)............................. 10

Schlup v. Delo, 513 U.S. 298, 327 (1995)....................................... 11

Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199
    (1967)...................................................................................... 27

Strickland v. Washington, 466 U.S. 668 (1984).............................. 20, 21, 22, 25

Strickler v. Greene, 527 U.S. 263 (1999)........................................ 17

United States v. Frady, 456 U.S. 152, 168 (1982)........................... 10

Williams v. Taylor, 529 U.S. 362, 412-13 (2000)............................ 9

## TABLE OF AUTHORITIES CITED

Page

### UNITED STATES CODE

28 U.S.C. Section 2254(d)..................................................................................   31

28 U.S.C. Section 2254(e)(1)............................................................................   31

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIV. NO. 04-00743 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | RESPONDENTS RESPONSE |
| vs. | ) | TO PETITIONER'S OPENING |
| | ) | BRIEF FILED ON JULY 18, |
| CLAYTON FRANK, Director, | ) | 2008 |
| STATE OF HAWAI'I, DEPARTMENT | ) | |
| OF PUBLIC SAFETY, et al. | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS RESPONSE TO PETITIONER'S
OPENING BRIEF FILED ON JULY 18, 2008**

I.    **STATEMENT OF RELEVANT FACTS**.

Petitioner Taryn Christian ("Petitioner") filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") on December 22, 2004.

On May 1, 2007, the Court issued an Order Granting Petitioner's Motion for

Leave to Conduct Discovery and Findings and Recommendation Regarding

Petition for Writ of Habeas Corpus.  (See Doc. 73).  According to that Order, the

Court issued findings regarding exhaustion of Petitioners grounds as follows:

In **Ground One** - denial of right to testify in violation of Petitioner's
Fifth, Sixth, and Fourteenth Amendments to the United States Constitution,

the Court found that this ground was exhausted. (See Doc. 73, at 23). (This finding remained undisturbed after a subsequent review of the May 1, 2007, Order by Judge David Alan Ezra).

In **Ground Two** - exclusion of the Burkhart confessions in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the Court found that Petitioner's Sixth and Fourteenth Amendment claims were exhausted. The Court also noted that Petitioner's Fifth Amendment claim in this ground was expressly abandoned by Petitioner. (See Doc. 73, at 25). (These findings remained undisturbed after a subsequent review of the May 1, 2007, Order by Judge Ezra).

In **Ground Three** - ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution, the Court found that Petitioner's claims were exhausted. (See Doc. 73, at 39). (This finding was later reviewed and upheld by Judge David Ezra in an Order filed on September 12, 2007. (See Doc. 80, at 20)).

In **Ground Four** - substantive actual innocence claim pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the Court found that Petitioner's Sixth and Fourteenth Amendment claims were technically exhausted, and the district court could consider Ground Four unless one of the exceptions[1] apply. (See Doc. 73, at 43-44). (This finding remained undisturbed after a subsequent review of the May 1, 2007, Order by Judge Ezra).

In **Ground Five** - improper identification evidence claim pursuant to the Fourteenth Amendment to the United States Constitution, the Court found that the procedural default doctrine therefore applies and the district court cannot consider Petitioner's claims in Ground Five unless one of the exceptions apply. (See Doc. 73, at 45). (This finding remained undisturbed after a subsequent review of the May 1, 2007, Order by Judge David Alan Ezra).

In **Ground Six** - admission of false or misleading evidence claim pursuant to the Fourteenth Amendment to the United States Constitution,

---

[1] Cause and actual prejudice or fundamental miscarriage of justice. See *Infra*, Sect. II.B.

the Court found that the procedural default doctrine therefore applies and the district court cannot consider Petitioner's claims in Ground Five unless one of the exceptions apply. (See Doc. 73, at 47). (This finding remained undisturbed after a subsequent review of the May 1, 2007, Order by Judge David Alan Ezra).

In **Ground Seven** - ineffective assistance of appellate counsel, in violation of the Sixth Amendment to the United States Constitution, the Court found that Ground Seven was exhausted. (See Doc. 73, at 21). (This finding was affirmed after a subsequent review by Judge Ezra. (See Doc. 80, at 21)).

In **Ground Eight** - ineffective assistance of trial counsel regarding Petitioner's right to testify, in violation of the Sixth Amendment to the United States Constitution, the Court found that the procedural default doctrine therefore applies and the district court cannot consider Petitioner's claims in Ground Five unless one of the exceptions apply. (See Doc. 73, at 47). (This finding was vacated after a subsequent review of the May 1, 2007, Order by Judge Ezra. There, Judge Ezra found that Petitioner failed to exhaust his allegations in Ground Eight because Petitioner did not fairly present his federal claims to the highest state court. (See Doc. 80, at 22)).

(See Doc. 80, at 20-22).

Following the appeal of the May 1, 2007, Order and the subsequent appeal to Judge Ezra, the discovery process began. As part of the discovery process, Petitioner requested that various items of evidence be sent to Petitioner's expert, Brian Wraxall ("Wraxall"), for DNA analysis. As a result of Wraxall's DNA analysis, Wraxall concluded as follows:

1.   All the seven swabs from the scene (items 1 and 5) have bloodstains that originate from the same source. Although all the profiles are not complete, in my opinion, the blood stains all originated from Vilmar Cabaccang but *not Serena Seidell, Taryn Christian or James Burkhart*. Item 1-4 is a control swab from the scene that shows the

presence of trace amounts of DNA. No conclusion can be drawn regarding it's source;

2. Blood stains from the fork of the knife blade (item 2-1) and the head of the screwdriver originate, in my opinion, from Vilmar Cabaccang but *not Serena Seidell, Taryn Christian or James Burkhart*. No conclusions can be drawn regarding the limited activity found on the knife handle (2-2 and 2-3) or the screwdriver handle (3-2 and 3-3);

3. *The bloodstain on the halter top (item 6-1) originates, in my opinion, from Vilmar Cabaccang but not Serena Seidell, Taryn Christian or James Burkhart*. No conclusions can be drawn for areas 6-2 and 6-3 due to low levels of activity;

4. The DNA recovered from the stains 7-1 and 7-3 from the jacket is degraded and gives a limited profile. ***The profiles obtained are consistent with the profile of Taryn Christian** but not Serena Seidell, Vilmar Cabaccang, or James Burkhart*.

5. Only three of the six areas on the Baseball Cap (items 8-1, 8-2 and 8-5) resulted in DNA profiles. Although slightly degraded, in my opinion, *the stains originated from Vilmar Cabaccang but not Serena Seidell, Taryn Christian or James Burkhart*;

6. The blood staining on the Baseball Cap (Item 8) area 8-7 is severely degraded and indicates a mixture. Vilmar Cabaccang cannot be excluded as a donor to the mixture.

7. Area 8-8 of the Baseball Cap produced no results and areas 8-9 and 8-10 revealed only trace amounts of DNA. So no conclusion as to the source can be drawn.

8. Little or no DNA activity was detected on areas 15-1, 15-3 or 15-4 of the knife sheath (Item 15);

9. The DNA obtained from the other areas from the Knife Sheath (15-2, 15-5, 15-6 and 157) are mixtures. Serena Seidell, Vilmar Cabaccang and James Burkhart are all excluded as being a donor to the mixtures. ***Taryn Christian is a potential donor to the mixture***.

Alternatively, one person out of 40,000 individuals (or 0.0025%) in the general population could be a donor to the DNA on the knife sheath.

(See Doc. 116-3, at 8-11). (Emphasis added).

As part of the discovery process, Respondents also submitted items of evidence to a DNA expert, Chantel Giamanco ("Giamanco"). As a result of Giamanco's DNA analysis, Giamanco concluded as follows:

1.    The STR-DNA alleles detected from ITEM 1.1 [scrapings (3 fingers) and swab of packaging (1) from right hand] indicate a single source, male, STR-DNA profile. Vilmar Cabaccang is included as·a possible contributor. *Taryn Christian and James Hina Burkhart are excluded as possible contributors;*

2.    The three STR-DNA alleles detected from ITEM 1.2 [scrapings (3 fingers) and swab of packaging (I) from left hand] are consistent with a low level, partial, STR-DNA result. The alleles detected are consistent with Vilmar Cabaccang. No alleles foreign to Vilmar Cabaccang were detected. *Taryn Christian and James Hina Burkhart are excluded as possible contributors of the three alleles;*

3.    Blood was not detected from ITEM 2.1.A (swabs from front band area of baseball cap). Human DNA was not detected. Although a low level of human DNA was detected from item 2.1.B (swab from left side of band area o(baseball cap), an STR-DNA profile was not obtained. The low level of human DNA detected from item2.1.C [cuttings (5) from inner band of baseball cap] did not produce STR-DNA typing results;

4.    Human blood is present on ITEM 3.1 (cutting from lower back side of Jacket) and ITEM 3.2 (cutting from front, middle, near the seam of jacket). The STR-DNA alleles detected indicate a single source, male, STR-DNA profile. ***The STR-DNA profile detected matches the DNA profile determined for Vilmar Cabaccang.*** *Taryn Christian and James Hina Burkhart are excluded as possible contributors;*

(See Doc. 116-4, at 6-7). (Emphasis added).

Additionally, as part of the discovery process, Respondents also submitted the 911 tape and the Lisa Kimmey/Taryn Christian tape to audio expert David Smith ("Smith"), for analysis. As far as the 911 tape, Smith could not find *any* mention of the name "James Burkhart" on the 911 tape. (See Doc. 116-5, at 4-10, 15-25).

Furthermore, as far as the Kimmey-Christian tape, although Smith concurred with Petitioner's audio technician that Petitioner said, "I wasn't the one who stabbed him . . .", Smith was able to extract and compile eighteen instances of *inculpatory* statements made by Petitioner to Lisa Kimmey. (See Doc. 116-5, at 43-47).

On April 4, 2008, the Court ordered among other things, that Petitioner's expert witness reports were due by June 6, 2008, and that Petitioner file an Opening Brief by July 18, 2008.

On June 6, 2008, filed *Petitioner Christians June 6, 2008 Expert Witness Disclosures*. (See Doc. 107). Interestingly, Petitioner did not include in the filing, the majority of the reports prepared by Petitioner's expert, Brian Wraxall. Instead, Petitioner merely filed two pages of Wraxall's entire thirteen (13) page report. (See Doc. 118-3, 4, 5).

On July 18, 2008, Petitioner filed his *Petitioner Christian's Notice of Affidavits, Exhibits For Evidentiary Hearing.* (See Doc. 121). Included in the filing was an affidavit from Darryl Carlson, a private investigator (See Doc. 121-5), and an affidavit from Georgiana Frayer-Luna (See Doc. 121-6). Both affidavits contain multiple hearsay statements. These two hearsay documents should be stricken by the Court.

On July 19, 2008, Petitioner untimely filed a document entitled *Petitioner's July, 2008 Brief Regarding Evidentiary Issues.* (See Doc. 122). This document consisted of eight (8) pages which apparently serves as Petitioner's "Opening Brief". In the Opening Brief, Petitioner's "Legal Arguments" section consists of a mere one and one-half pages. In that section of the Opening Brief, Petitioner includes two (2) new claims: *1) Bad Faith Destruction of Evidence, and 2) Evidence of Prior Identification of Different Person. In the remaining one-half page of the brief, Petitioner argues two claims: 1) Ineffective Assistance Re Tape Enhancement, and 2) Misleading and Improper Eyewitness Identification Evidence.* In addition to the above, Petitioner stated in his Opening Brief that, "Christian of course continues to assert that he is entitled to relief based on not being allowed to testify, not being allowed to present Burkhart confessions, and receiving ineffective assistance of counsel on appeal. (See Doc. 122, at 5). Other than this one sentence, Petitioner did not specifically elaborate or provide case law

or statutory authority, or provide any legal analysis of how and/or why he is entitled to relief under these claims.

Thus, due to the scant and sparse nature of Petitioner's claims and arguments in the Opening Brief, Respondents find it extremely difficult to adequately  respond to Petitioner's Opening Brief.  However, Respondents nevertheless respectfully submit the following arguments below to the Court as best as it can.

## II. **STANDARDS OF REVIEW**.

### A.    **28 U.S.C. § 2254.**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently

than this Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part).  Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>, at 413.  Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u>, at 411.

Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B. **Procedural Default**.

Petitioners are barred from raising procedurally defaulted claims in federal court unless they demonstrate:  (1) "cause" for failing to properly present the claim to the state court; and (2) "actual prejudice" resulting from such failure; or (3) "a fundamental miscarriage of justice." <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000); <u>Coleman v. Thompson,</u> 501 U.S. 722, 732 (1991).

In procedural default cases, the cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court. Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective factors that constitute cause include "interference by officials" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." Id.

Once the petitioner has established cause, he must show "actual prejudice" resulting from the errors of which he complains. United States v. Frady, 456 U.S. 152, 168 (1982). To establish prejudice resulting from a procedural default, a habeas petitioner bears "the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." United States v. Frady, 456 U.S. 152, 170 (1982).

Lastly, the miscarriage of justice exception allows a federal court to hear the merits of the procedurally defaulted claims if the failure to hear the claims would constitute a "miscarriage of justice." See Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992) (citations omitted). In the federal habeas corpus context, the "miscarriage of justice" exception is limited to habeas petitioners who can show

-10-

that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995). The required evidence must create a colorable claim of actual innocence, that the petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence which is innocence as a result of legal error. <u>Id.</u>, at 321, 329. It is not enough that the evidence show the existence of reasonable doubt; petitioner must show that "it is more likely than not that no 'reasonable juror' would have convicted him." <u>Id.</u>, at 329.

## III. **ARGUMENT**.

### A.    **Bad Faith Destruction of Evidence**.

In this first new claim, Petitioner alleges "the destruction of Serena Seidel's shorts was a bad faith destruction warranting relief under the due process clause of the federal constitution's Fourteenth Amendment". This new claim must be stricken from the Opening Brief since the claim was never previously raised. In addition, Petitioner asks this Court to grant him relief on this new claim based upon a three sentence argument in his Opening Brief. Even if this Court were to consider Petitioner's new claim, Petitioner has failed to meet his burden of proof.

First, with regard to this first new claim, Petitioner has not demonstrated either cause and actual prejudice, or that he is actually innocent. Petitioner could have moved to amend his Petitioner long before the July 18, 2008

filing of his Opening Brief. Respondents first notified Petitioner's attorney of the missing shorts in late February of this year. (See Exhibit "A"). However, Petitioner did not formally raise this claim until one month before the evidentiary hearing scheduled for August 18, 2008. In addition, the shorts were submitted by the *defense* as a trial exhibit and could have been withdrawn and submitted for testing by Petitioner before it was apparently destroyed.

Second, Petitioner has not demonstrated *actual* prejudice. In other words, Petitioner has failed to show that the inability to conduct DNA testing on Seidel's shorts actually prejudiced Petitioner. Indeed, the DNA analysis conducted by Petitioner's expert Brian Wraxall, on Seidel's black halter top which she was wearing at the time of the murder along with the shorts indicates otherwise. According to the conclusions of Wraxall, the bloodstains on the halter top originates from the victim, Vilmar Cabaccang and *__not__* Seidell, Burkhart, or Christian. Thus, there is a reasonable inference that the apparent bloodstains on Seidel's shorts would be consistent with Cabaccang's blood, and not the allegedly "potentially exculpatory evidence" as Petitioner now claims.

Third, Petitioner has failed to demonstrate that he is actually innocent. In fact, in addition to all of the reasons discussed in Respondent's Answer filed on September 30, 2005, there is new credible and reliable DNA evidence that undoubtedly confirms Petitioner as being the killer. Specifically,

Petitioner's own DNA expert concluded that bloodstains on the jacket that was found near the murder scene were consistent with the DNA profile of Petitioner and not Seidell, Cabaccang, or Burkhart. Moreover, Respondent's DNA expert concluded that other bloodstains on the same jacket were consistent with Cabaccang. In addition, Wraxall also concluded that Petitioner is a potential donor to DNA obtained from the knife sheath that was recovered at the murder scene, and that Burkhart was excluded as a donor.

Fourth, in all other DNA tests, Burkhart was consistently ruled out as being a potential donor to any of the DNA evidence recovered from the crime scene evidence. Accordingly, Petitioner has failed to meet his burden of proof which would allow this Court to consider this first new claim, and therefore, this new claim must be denied outright.

Finally, in the alternative, even if this Court were to consider this new destruction of evidence claim on the merits, Petitioner again fails to meet his burden. The due process guarantee of the United States Constitution serves to protect the right of the accused in a criminal case to a fundamentally fair trial. Central to the protections of due process is the right to be accorded "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984).

The U.S. Supreme Court was not persuaded to hold otherwise by the argument that the inadvertent loss or destruction of evidence prevents its exculpatory value from being known, stating that "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and very often disputed, citing California v. Trombetta, 467 U.S. 479, 486 (1984) (due process does not require the preservation of a breath sample in a DUI prosecution).

In Arizona v. Youngblood, 488 U.S. 51 (1988), the United States Supreme Court held there is no violation of due process where the government's failure to preserve evidence is not in bad faith. In Youngblood, the state had negligently failed to preserve semen stains on the clothing of a sexual assault victim, but disclosed relevant police reports, lab reports and other evidence relating to the stains. The Court noted that the exculpatory value of the evidence was not apparent before it was destroyed, and declined to "impos[e] upon the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id.

Here, Petitioner fails to prove that the inadvertent destruction of Seidel's shorts by the State court amounted to a federal violation of Petitioner's due process rights. First, Petitioner simply alleges "bad faith of authorities" without citing to any specific facts which remotely indicates bad faith. Indeed, if

-14-

the State court destroyed the shorts in bad faith, one would reason that ALL of the evidence would have been destroyed as well.

Second, Petitioner's claim that the "wipe marks could well have been made by Burkhart's hands" constitutes unreasonable speculation in light of all of the expert DNA reports excluding Burkhart's DNA from all of the crime scene evidence analyzed. Indeed, based upon Wraxall's conclusion that the bloodstains on the halter top originated from Cabaccang, it is more likely that the "wipe marks" on Seidel's shorts would be more consistent with Cabaccang's DNA. Thus, Petitioner has failed to prove that his federal right to due process was violated.

B.    **Evidence of Prior Identification of Different Person.**

In this second new claim, Petitioner argues that "evidence that Leong and Schmidt had previously identified a different person constituted a violation of the principles under Brady v. Maryland, 373 U.S. 83 (1963)". Again however, like in Petitioner's first new claim above, Petitioner fails to specifically articulate how his constitutional rights under Brady were violated. Like in Petitioner's first new claim above, this second new claim must be stricken from the Opening Brief since the claim was never previously raised. In addition, Petitioner asks this Court to grant him relief on this new claim based upon a two sentence argument in his Opening Brief. Even if this Court were to consider Petitioner's new claim, Petitioner has failed to meet his burden of proof.

First, with regard to this second new claim, Petitioner has not demonstrated either cause and ***actual*** prejudice, or that he is actually innocent. It is unknown why Petitioner waited until the filing of his Opening Brief to raise this new claim. This "new" evidence was not discovered as a result of the recent discovery process in this federal habeas case as there was nothing preventing Petitioner from contacting or interviewing Leong or Schmidt prior to filing the instant Petition.

Second, Petitioner has not demonstrated actual prejudice as a result of this alleged withholding of exculpatory evidence. In addition, for the reasons discussed above and in addition to the Respondents' arguments raised in the Answer, Petitioner has again failed to demonstrate that he is actually innocent. Accordingly, Petitioner has failed to meet his burden of proof which would allow this Court to consider this second new claim, and therefore, this new claim must be denied outright.

Finally, in the alternative, even if this Court were to consider this new Brady claim on the merits, Petitioner again fails to meet his burden under the principles of that case.

In <u>Brady</u>, the United States Supreme Court held that a defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial "evidence favorable to an accused ... where the evidence is material either to

-16-

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation.

To be sure, not every violation of the duty to disclose constitutes a Brady violation. In Strickler v. Greene, 527 U.S. 263 (1999), the Supreme Court reminded us that "there is never a real Brady violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." 527 U.S. at 281 (internal quotation marks omitted). A "true" Brady violation therefore occurs only where the State suppressed the evidence, either willfully or inadvertently; the evidence at issue was favorable to the accused, because it is either exculpatory or impeachment material; and the evidence was material to the outcome such that the defendant was prejudiced by the suppression. Id., at 281-82.

Here, Respondents deny all of Petitioner's allegations in this new claim of a Brady violation. Petitioner's factual basis and support for this claim is speculative, unreliable and suspect. First, in support of this claim, Petitioner relies upon a hearsay declaration from which refers to recent statements allegedly made by Annie Leong. Petitioner attempts to interject unreliable hearsay by submitting an alleged statement made by Leong without filing an affidavit/declaration by

-17-

Leong. In addition, Petitioner speculates that "since Leong would have been interviewed a time prior to Christian becoming a suspect, that person undoubtedly was not Christian and that information would have been exculpatory". (See Doc. 122, at 2-3). Thus, Petitioner has not shown that Leong's alleged statements were exculpatory.

Second, Petition also relies upon highly suspicious recent statements made by Phillip Schmidt. Now, after over ten years later, Schmidt apparently has changed his sworn trial testimony and now claims that Burkhart was the real killer. This recent recantation by Schmidt over ten years later is suspect. At trial Schmidt testified that:

> On July 14, 1995, at about 3:00 a.m., he was awakened by yelling and screaming. He got out and walked straight to the street. He saw a young man briskly walking down towards Kihei Road, and there was street light directly over the head of the young man. The young man turned and looked directly at him. To Schmidt's left, he saw Cabaccang, whom he did not know, lying on the ground and trying to get up with blood and several stab wounds. Schmidt testified, "I immediately asked [Cabaccang] if that was the person that did this to you, pointing down the sidewalk where the person was walking away, and he [Cabaccang] told me yes it was." He also asked Cabaccang whether the person who did this to him "was a local guy or a haole guy," and Cabaccang said, "Haole guy."

> Schmidt had a picture in his mind of the man he saw walking away. He made an in-court identification of Petitioner as the only man he saw walking down the street. Schmidt also testified that when he was shown the photographic line-up, State's Exhibit 39, by Detective Funes, he was frightened when he saw picture number 3, and the hair at the back of his neck stood up and it was "a frightening feeling." He recognized it as the face of the man he saw walking

down the street. Schmidt also testified that the man he saw walking down the street was not in State's Exhibit 56, another photographic line-up. (Note: State's Exhibit 56 contained the picture of Burkhart. (See testimony of Detective Funes, Vol. 4, Exh. "N", at 33-34).

(See Respondents Answer, Doc. 13, at 13-15).

Third, Petitioner has also failed to prove that this evidence existed prior to trial and that Respondents failed to disclose it to Petitioner. In fact, Schmidt's current change in his position regarding the photo line-up obviously occurred *after* Petitioner's trial. Clearly, up until and during the trial, Schmidt continued to identify Petitioner as the person he saw walking away from the murder scene on July 14, 1995. Thus, there is no Brady violation here.

C.    **Ineffective Assistance Re Tape Enhancement.**

In this claim, Petitioner simply argues that the "Sixth and Fourteenth Amendments are violated when counsel fails to utilize scientific evidence important to his client's case". However, Petitioner neither identifies the scientific evidence involved nor articulates how this evidence is important to his case. In addition, Petitioner has apparently added another new claim, namely a violation of the fourteenth amendment. This fourteenth amendment claim should be stricken.

Furthermore, since the sixth amendment claim was deemed to be exhausted by this Court, Petitioner must prove how the Hawai'i Supreme Court's denial of this ground resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Although it is unclear as to what "scientific evidence" is involved in this claim, Respondents assume that Petitioner is referring to the 911 tape and the Christian-Kimmey tape.

Here, Petitioner apparently alleges a violation of the Six Amendment's right to counsel pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In particular, Petitioner seems to allege ineffective assistance of trial counsel based on trial counsel's failure to employ expert analysis of both the Christian-Kimmey tape and the 911 recordings. However, in his Opening Brief, Petitioner again fails to specify how the Hawai'i Supreme Court's denial of this Ground resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Nevertheless, Petitioner's allegations are without merit.

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court articulated the two part federal standard in determining whether a claim that counsel's assistance was so defective required the reversal of the conviction or death sentence. <u>Id.</u>, at 687. In its decision, the <u>Strickland</u> court stated the following:

"[a] defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

\* \* \*

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."

\* \* \*

"At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

\* \* \*

"[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Strickland, at 677, 690-91. Furthermore, "[a]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective

-21-

assistance under the Constitution." Id., at 692. Even if a defendant shows that

particular errors of counsel were unreasonable, the defendant must show that they

actually had an adverse effect on the defense. Id., at 693. In other words, "the

defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Id.,

at 694. A reasonable probability is a probability sufficient to undermine

confidence in the outcome. Id.

        1.    **Christian-Kimmey Tape.**

        Petitioner apparently complains that his trial counsel was ineffective

because trial counsel did not have the taped conversation between Petitioner and

Kimmey subjected to expert analysis. This claim is without merit.

        First, trial counsel actually argued in closing arguments the

following:

> Lisa:  So you think it's okay?  So you think that I should feel
> more sorry for you because you're the one who stabbed him and not
> me?
>
> Taryn:  I'm not asking that.  I wasn't the one who stabbed him,
> and I know that for a fact;

(See Doc. 17, Vol. 4, Exh. "T", at 54-55). Third, trial counsel told the jury that

they will have headphones in the jury room so they could "try to hear (the tape)

better." (Id.). In addition, the jury was not provided a copy of the transcript, but

instead heard the tape and had the opportunity to review the tape in the jury room.

Furthermore, the jury had the opportunity to listen carefully to the tape with

headphones.  Obviously, the tape did not require any expert enhancement as

Petitioner's trial counsel was able to discern, without the aid of an expert, the exact

words that Petitioner now claims the audio expert found on the tape.  Additionally,

Petitioner has not explained how this one denial would have affected the jury's

guilty verdict in light of all of the other inculpatory statements Petitioner made on

the tape.  Accordingly, Petitioner not only fails to demonstrate that trial counsel's

failure to have the "Christian-Kimmey tape" enhanced was outside the wide range

of professionally competent assistance, but also that there was a reasonable

probability that such failure would have changed  the result of the proceeding.

       2.   **911 Tape.**

       Petitioner also apparently complains that trial counsel was ineffective

because trial counsel did not have the 911 tape recording enhanced.  Again,

Petitioner's claim is without merit since the issue was actually considered, and

rejected, by previous trial counsel Dennis Jung ("Mr. Jung").  In addition, expert

analysis of the 911 tape fails to conclusively show that Burkhart's name was

mentioned on the tape.

       First, in a hearing on November 20, 1996, Mr. Jung represented to the

trial court the following in pertinent part:

-23-

MR. JUNG:

\* \* \*

As far as the 911 recording is concerned, I have agreed to preliminary investigation on that regard and Lori Smith actually did do some analysis on the 911 tape and that the results of that analysis turned out negative. Since then I have been asked by the family -

THE COURT: Negative on what respect? Negative as to what?

MR. JUNG: The tape was turned over to an independent expert examiner to detect the presence of voices on the tape other than the known voices to the 911 operator. That came up negative.

(See Doc. 16, Vol. 3, Exh. "D", at 11-12). In addition, Mr. Jung told the trial court

that he had "no factual basis upon which to believe there is exculpatory evidence

contained in the 911 recording to request funds to conduct further testing. (Id., at

12). Moreover, Mr. Jung stated that in order to conduct the requested analysis on

the 911 tape, Mr. Jung needed more funds. (Id.).

Petitioner, in hindsight, is second-guessing the decision of Mr. Jung,

who determined that he (Mr. Jung) had no basis to believe that exculpatory

evidence existed on the 911 tape to warrant the need to request funds for further

testing. Judicial scrutiny of counsel's performance must be highly deferential, and

a fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. <u>Strickland,</u> at 669.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id.,</u> at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. <u>Id.,</u> at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Id.</u>

Finally, as a result of the federal discovery process, Respondents submitted the 911 tape for expert analysis. Despite this however, Respondents' audio expert, David Smith, was unable to detect any mention of James Burkhart's name anywhere on the 911 tape. This is consistent with Cabaccang not telling others, including his friend Officer Clyde Holokai, that James Burkhart was the one who stabbed him. Thus, Petitioner not only fails to demonstrate that trial counsel's failure to *further* enhance the 911 tape recording was outside the wide range of professionally competent assistance, but also fails to demonstrate that there was a reasonable probability that such failure would have changed  the result of the proceeding.

Accordingly, Petitioner has not adequately proven that defense counsel's entire performance was outside the wide range of professionally competent assistance.  Additionally, Petitioner has also failed to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Thus, the Hawai'i  Supreme Court's refusal to address this claim on the merits, or its alternative denial on the merits, was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Petitioner in not entitled to habeas relief.

D.    **Misleading and Improper Eyewitness Identification Evidence.**

Next, Petitioner apparently alleges a violation of the Fourteenth Amendment's right to due process clause due to the prosecution's alleged use of "misleading and improper eyewitness identification" evidence.  Under this claim, this Court previously found that the procedural default doctrine applies and the district court cannot consider this claim unless one of the exceptions apply.  (See Doc. 73, at 45).

In his Opening Brief, Petitioner has again not demonstrated either cause and *actual* prejudice, or that he is actually innocent.  Furthermore, Petitioner again fails to specifically articulate how and why he is entitled to relief under federal law.  Although Petitioner cites a couple of United State's Supreme Court

-26-

cases in his Opening Brief, Petitioner neither describes the particular facts of those cases, nor articulates in detail, the governing legal principles of those cases.

In <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977), the United States Supreme Court held that a photograph identification by a trained law enforcement officer was, under the totality of the circumstances," sufficient. There, the Court stated the following:

> We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-<u>Stovall</u>[2] confrontations. The factors to be considered are set out in <u>Biggers</u>, 409 U.S., at 199-200, 93 S.Ct., at 382.[3] These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

---

[2]  <u>Stovall v. Denno</u>, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

[3]  <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972):

> We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Manson v. Brathwaite, at 114 (footnotes added).

In this case, the totality of the circumstances show that the photographic identification (as presented with pictures of other individuals) was reliable.

First, at trial, both Seidel and Schmidt demonstrated a high degree of certainty in selecting Petitioner from the photo-lineup. Both testified that they had a good opportunity to view Cabaccang's killer. In fact, Seidel not only fought with the killer, but repeatedly told the killer to "drop the knife." (See Doc. 16, Vol. 3, Exh. "K", at 69). When shown the photo line-up by Detective Funes on August 22, 1995, a little over a month after the murder, Seidel shook and cried, picked number three, and said "this is him." (See Doc. 17, Vol. 4, Exh. "N", at 35-36).

Similarly, Schmidt had the opportunity to view Petitioner as Petitioner walked away from the murder scene. According to Schmidt, he had a "picture in his mind of the man he saw walking away". (See Doc. 16, Vol. 3, Exh. "L", at 17). When shown the photographic line-up, State's Exhibit 39, by Detective Funes, he was frightened when he saw picture number 3, and the hair at the back of his neck stood up and it was "a frightening feeling." (Id., at 42-43).

Second, although now Schmidt claims that he misidentified Petitioner, as previously discussed, Schmidt's current position is unreliable and

-28-

highly suspect. In fact, at trial, Schmidt testified that he chose "number 3" in the

photo lineup (State's Exhibit 39) because of Schmidt's "recognition of the face",

and not because of "[t]he brightness or the lightness or the dark or anything". (See

Doc. 16, Vol. 3, Exh. "L", at 43). Clearly, Schmidt chose Petitioner's photo due to

Schmidt's recognition of Petitioner's face and not because of the alleged improper

shading. Thus, Schmidt's previous trial testimony is consistent with the forensic

evidence that Petitioner was present at the murder scene. A fact that Petitioner

now concedes.

      Accordingly, weighing this against the allegation that the photograph

was suggestive because of the alleged shading, one cannot reach the conclusion

that the photographic lineup procedure warrants federal habeas relief. It cannot be

said that there was "a very substantial likelihood of irreparable misidentification."

<u>Manson</u>, 432 U.S. at 116 (citation omitted). Therefore, the Hawai`i Supreme

Court's refusal to address this claim on the merits, or its alternative denial on the

merits, was not contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States.

Thus, Petitioner in not entitled to habeas relief

E.    **<u>Petitioner's Other Remaining Issues</u>**.

      In his Opening Brief, Petitioner states the following:

> Christian of course continues to assert that he is entitled to
> relief based on not being allowed to testify, not being allowed to
> present Burkhart confessions, and receiving ineffective assistance of
> counsel on appeal. Since the evidentiary hearing material impacts
> those issues more remotely, they are not reamplified in connection
> with this evidentiary hearing brief.

(See Doc. 122, at 5). Here, as in the past, Petitioner fails to articulate the specific

facts and/or legal principles which entitled him to relief. If, however, this Court

considers these arguments despite Petitioner's failure to provide any argument

whatsoever, Respondents respectfully request that this Court consider

Respondents Answer filed on September 30, 2005. Specifically, in response to

Petitioner's claim that he is entitled to relief based on not being allowed to testify,

Respondents direct this Court to Respondents Answer. (See Doc. 13, at 48-52).

Furthermore, in response to Petitioner's claim that he is entitled to

relief based upon not being allowed to present Burkhart's alleged confessions,

Respondents again direct this Court to Respondents Answer. (See Doc. 13, at 52-

58).

In addition, in response to Petitioner's claim that he is entitled to

relief based upon ineffective assistance of appellate counsel, Respondents again

direct this Court to Respondents Answer. (See Doc. 13, at 84-91).

Finally, in addition to all of the above, Respondents also ask this

Court to consider all additional reliable and credible evidence brought to light as

-30-

the result of the entire federal discovery process, including the DNA evidence which implicates Petitioner and exculpates James Burkhart.

## IV.   **CONCLUSION.**

Based upon the foregoing reasons, in addition to all of the reasons stated in Respondents Answer filed on September 30, 2005, Respondents respectfully request that this Honorable Court deny and dismiss the Petition filed on December 22, 2004, and any additional new claims raised since Petitioner's initial filing.

DATED:  Wailuku, Hawai`i, July 31, 2008.

Respectfully submitted,

DEPARTMENT OF THE PROSECUTING ATTORNEY
BENJAMIN M. ACOB,
PROSECUTING ATTORNEY

By_____
PETER A. HANANO
First Deputy Prosecuting Attorney
County of Maui
Attorney for Respondents