IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | ) | CIVIL NO. 04-00743 DAE-LEK |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CLAYTON FRANK, Director, | ) | |
| State of Hawaii, Department | ) | |
| of Public Safety, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**FINDINGS AND RECOMMENDATION TO GRANT IN PART AND
DENY IN PART PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Taryn Christian ("Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") on December 22, 2004. Respondents Richard Bissen, Acting Director,[1] and the State of Hawaii Department of Public Safety (collectively "Respondents") filed their Answer to the Petition on September 30, 2005. Petitioner filed a Reply on December 15, 2005. United States District Judge David Alan Ezra referred the Petition to this Court pursuant to 28 U.S.C. § 636(b) and Rule LR72.5 of the Local Rules of Practice of the United States District Court for the District of Hawaii ("Local Rules"). This Court conducted an evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll.

_____

[1] Mr. Bissen was replaced with Respondent Iwalani D. White, Interim Director, pursuant to Fed. R. Civ. P. 25(a)(1). Ms. White has since been replaced by Respondent Clayton Frank, Director.

§ 2254, on August 18, 2008.  Appearing for Petitioner were Mark Barrett, Esq., and Keith Shigetomi, Esq., and appearing for Respondents were Richard Minatoya, Esq., and Peter Hanano, Esq. After careful consideration of the parties' submissions, the evidence presented at the hearing, and the relevant case law, this Court FINDS and RECOMMENDS, for the reasons set forth below, that the Petition be GRANTED as to Ground Two and DENIED as to Grounds One, Three, Four, Five, Six, Seven, and Nine.

**BACKGROUND**

In 1997, Petitioner was convicted of one count of murder in the first degree, one count of use of a deadly or dangerous weapon in the commission of the crime, and one count of theft in the third degree in connection with the stabbing death of Vilmar Cabaccang.  Petitioner was sentenced to concurrent sentences of life imprisonment with the possibility of parole, five years imprisonment, and one year imprisonment, respectively.

On July 14, 1995, Cabaccang and his girlfriend, Serena Seidel, awoke in the middle of the night when they heard a noise outside.[2]  Seidel saw someone sitting in Cabaccang's car and the two of them ran outside.  The man in the car fled and they gave chase.  Seidel stopped to try to get help and, when she

---

[2] This Court has set forth the facts of this case in previous orders.  The Court, however, will repeat them here in light of the complex and critical factual issues involved in Petitioner's claims.

2

caught up to Cabaccang, he and the man were struggling.
Cabaccang said the man had a knife and wanted to kill him.
Seidel attempted to assist and the man bit her on the wrist.
Eventually, the attacker dropped his knife and walked away.
Phillip Schmidt, who lived in the area, heard shouting and
screaming around 3:00 a.m.  When he came out to investigate, he
saw a young man walking away.  Schmidt found Cabaccang nearby and
asked him if the man walking away was the person who injured him.
Cabaccang said it was.  Cabaccang later died from stab wounds.
See State v. Christian, 88 Haw. 407, 411, 967 P.2d 239, 243
(1998).

        The police initially regarded James "Hina" Burkhart as
a suspect but later ruled him out because both Seidel and Schmidt
failed to identify him and two witnesses placed him elsewhere at
the time of the stabbing.  Approximately three days after the
incident, Petitioner allegedly confessed to his former
girlfriend, Lisa Kimmey.  In a photographic lineup, both Seidel
and Schmidt identified Petitioner as the man at the crime scene.
See id. at 411-12, 967 P.2d at 243-44.

        In a published opinion dated November 10, 1998, the
Hawaii Supreme Court affirmed Petitioner's conviction on two
counts.[3]  Petitioner did not seek a writ of certiorari from the

_____

        [3] The supreme court reversed Petitioner's conviction of use
of a deadly or dangerous weapon in the commission of a crime.
                                          (continued...)

United States Supreme Court.  On January 31, 2000, Petitioner filed a petition for post-conviction relief under Rule 40 of the Hawaii Rules of Penal Procedure ("Rule 40 Petition").  Within that proceeding, Petitioner filed a Motion to Produce Evidence for Inspection and Testing on April 23, 2002.  On May 2, 2002, the circuit court denied his Rule 40 Petition without a hearing. Petitioner filed a motion for reconsideration on May 13, 2002. The circuit court held a hearing on the motion to produce evidence and the motion for reconsideration, but denied both motions.  On appeal, the Hawaii Supreme Court affirmed the decision ("Rule 40 Appeal").  The instant Petition followed.

The Petition raises the following grounds for habeas relief: 1) deprivation of Petitioner's right to testify on his own behalf ("Ground One"); 2) improper exclusion of Burkhart's confessions ("Ground Two"); 3) ineffective assistance of trial counsel based on various actions and omissions by counsel ("Ground Three");[4] 4) actual innocence ("Ground Four"); 5) admission of improper identification evidence ("Ground Five"); 6) admission of false and/or misleading evidence ("Ground Six"); 7) ineffective assistance of appellate counsel ("Ground Seven"); 8)

---

[3](...continued)
See Christian, 88 Haw. at 411, 967 P.2d at 243.

[4] Although Petition includes the ineffective assistance of counsel claim regarding trial counsel's allegedly defective closing argument in Ground Eight, the Court will discuss this claim in Ground Three.

4

ineffective assistance of trial counsel regarding counsel's advice about his right to testify ("Ground Eight"); and 9) whether the prosecution suppressed or destroyed exculpatory evidence by returning Cabaccang's vehicle to his family before the defense had the opportunity to examine it ("Ground Nine").[5] [Mem. in Supp. of Petition at i-ii.]

On May 1, 2007, this Court issued its Order Granting Petitioner's Motion for Leave to Conduct Discovery and Findings and Recommendation Regarding Petition for Writ of Habeas Corpus ("5/1/07 Order/F&R"). This Court found, *inter alia*, that: Grounds One, Two,[6] and Seven were exhausted; the claims in Ground Three were exhausted, with the exception of Petitioner's claim that trial counsel was ineffective for failing to object to some of the prosecutor's remarks during closing argument, which was technically exhausted but procedurally defaulted; and Grounds Four, Five, Six, Eight, and Nine were technically exhausted but

--------

[5] Petitioner raised the two arguments which this Court has deemed "Ground Nine" within a list of eleven arguments in Ground Three, but, insofar as these two arguments do not allege the ineffective assistance of counsel, the Court considered them as a separate ground for habeas relief. [Mem. in Supp. of Petition at 24.] The Court arguably could construe the two arguments as additional allegations of ineffective assistance, but the Court declined to do so in the 5/1/07 Order/F&R.

[6] Petitioner expressly abandoned his claim that the exclusion of the Burkhart confessions violated his rights under the Fifth Amendment of the United States Constitution. [Reply, filed Dec. 16, 2005, at 2.] His claims that the exclusion violated his rights under the Sixth Amendment and the due process clause of the Fourteenth Amendment are exhausted.

procedurally defaulted.  This Court also ruled that Petitioner could conduct limited discovery in this case and recommended that the district judge hold an evidentiary hearing on the Petition.

Respondents appealed the 5/1/07 Order/F&R with regard to this Court's ruling on Grounds Three, Seven, and Eight.  On September 12, 2007, the district judge issued his order granting Respondents' appeal in part and denying it in part ("9/12/07 Order").  The district judge affirmed this Court's finding that Ground Seven was exhausted.  With regard to Ground Three, the district judge affirmed this Court's decision, but noted that this Court should have found that Petitioner's claim that trial counsel committed ineffective assistance by failing to object to the prosecutor's closing argument was unexhausted.  The district judge, however, found that this error was harmless because the claim was waived.  With regard to Ground Eight, the district judge vacated this Court's decision and found that this Court should have ruled that Ground Eight was unexhausted.  The district judge also affirmed this Court's decision to permit discovery, clarifying that discovery was limited to Petitioner's exhausted claims that are based on newly discovered evidence. Finally, the district judge instructed the Petitioner to file a motion requesting an evidentiary hearing after the completion of discovery.

Petitioner filed his Motion for Evidentiary Hearing on March 13, 2008.  In an April 4, 2008 order, this Court set the evidentiary hearing for August 18, 2008 and instructed the parties to present all direct testimony for the evidentiary hearing by declaration or affidavit, with any exhibits, by July 18, 2008.

On July 18, 2008, Petitioner filed his Notice of Affidavits, Exhibits for Evidentiary Hearing ("Notice of Affidavits"), which included affidavits from John J. Mitchell, Philip Schmidt, Patricia Mullins, Darryl Carlson, and Georgiana Frayer-Luna.  Mitchell is an audio engineer who analyzed: a tape recording of a conversation between Petitioner and Lisa Kimmey ("Christian-Kimmey tape"); a tape recording of a 911 call placed by Rob Perry, Jr. ("Perry 911 tape"); a video of the crime scene; and two videos taken by security cameras at a Gas Express in Kihei, Maui.  Mitchell's analysis indicated that, at two points during Christian-Kimmey tape, Petitioner expressly denied killing Vilmar Cabaccang.  Mitchell also stated that these denials could not be readily heard unless the volume on the recording was temporarily increased.  Thus, if a juror listened to the recording at a constant volume, he would not have heard the denial.  Mitchell's enhancement of the Perry 911 tape revealed that someone said "James Burkhardt [sic] just walked off".  [Notice of Affidavits, Exh. A (Aff. of John J. Mitchell)

7

at ¶ 9.] Mitchell believes the speaker to be Cabaccang. [Notice of Affidavits, Exh. MI-2 at 3.]

Schmidt stated that the person he saw walking away from the scene had long hair in the back and that one of the reasons he picked Petitioner from a photographic line-up was that he appeared to have long hair in the picture. Prior to trial, Schmidt learned that Petitioner had worked at a restaurant next to a golf course where Schmidt played. Schmidt thought he might have identified Petitioner because he recognized Petitioner's face from the restaurant and expressed doubts to the police. Schmidt's affidavit states that he recently reviewed photographic line-ups and now "feel[s] certain that Christian was not the person [he] saw walking away." [Notice of Affidavits, Exh. B (Aff. of Phillip Schmidt) at ¶ 5.] Schmidt identified another man as the person he saw walking away from the crime scene. An investigator told him it was a picture of Burkhart.

Mullins, an acquaintance of Burkhart, stated that Burkhart confessed to her that he was the one who killed Cabaccang. Burkhart told her that he would get away with it because Seidel would not identify him as the killer.

On July 14, 2008, Respondents filed a declaration by David A. Smith. Respondents also filed declarations by Brian Wraxall, Chantel Giamanco, and Clyde Holokai on July 18, 2008. Smith is an audio engineer who analyzed recordings of the

Christian-Kimmey tape and the Perry 911 tape.  For the most part,
Smith verified the two denials that Mitchell found in the
Christian-Kimmey tape.  Smith, however, emphasized that he also
found eighteen instances where Petitioner admitted or insinuated
that he was responsible for Cabaccang's death.  With regard to
the Perry 911 tape, Smith stated, *inter alia*, that he could not
verify Mitchell's opinion that an unidentified male stated
"James Burkhardt just walked off".  In Smith's opinion, this
statement is unintelligible and further, the first work cannot be
"James", which consists of two syllables with a rising pitch on
the second.

        Petitioner contacted Wraxall to conduct DNA testing on
various items in this case.  Wraxall states that all of the swabs
from the scene that he tested originated from the same source.
Wraxall stated that the DNA profiles were not complete, but in
his opinion, the blood originated from Cabaccang and not Seidel,
Petitioner, or Burkhart.  Wraxall also opined that the blood
stains on the fork of the knife blade, the head of the
screwdriver, the halter top, and three of six areas on the
baseball cap originated from Cabaccang and not Seidel,
Petitioner, or Burkhart.  DNA recovered from two areas on the
jacket is consistent with Petitioner's DNA profile and not
Seidel's, Cabaccang's, or Burkhart's.  The blood stain on another
area of the baseball cap was a mixture, and Cabaccang cannot be

excluded as the source.  Other areas on the knife sheath also had mixtures from which Seidel, Cabaccang, and Burkhart were excluded as possible donors.  Petitioner, however, is a potential donor.

Giamanco conducted DNA testing for Respondents on ten fingernail scrapings recovered from Cabaccang, a baseball cap, and a jacket.  Giamanco's analysis of scrapings from three fingers from Cabaccang's right hand indicated that Cabaccang was a possible contributor and that Petitioner and Burkhart were excluded as possible contributors.  Her analysis of scrapings from three fingers from Cabaccang's left hand indicated that there were no alleles foreign to Cabaccang and that Petitioner and Burkhart were excluded as possible contributors.  Giamanco also tested human blood found in two areas of the jacket and the resulting DNA profile matched Cabaccang's profile.  Petitioner and Burkhart were excluded as possible contributors.

Holokai, a Maui Police Department officer, was one the officers who responded to the incident.  Cabaccang was conscious when Holokai arrived and stated that he had been stabbed in the back and that he did not know who the responsible party had been.

Petitioner filed his Brief Regarding Evidentiary Hearing Issues ("Opening Brief") on July 19, 2008.  On July 31, 2008, Respondents filed their Response to Petitioner's Opening Brief Filed on July 18, 2008.

On August 6, 2008, Petitioner filed his Motion to Submit Supplemental Declarations and Affidavits ("Motion to Supplement"), asking the Court to consider declarations from Rudy Cabanting, Helen E. Beatty-Auweloa, Richard Smith, and five declarations from Darryl Carlson and to allow Petitioner to call these witnesses and others referenced in their declarations at the evidentiary hearing. On August 13, 2008, Petitioner filed his Motion to Permit Petitioner's Testimony at Evidentiary Hearing. On August 14, 2008, this Court denied these motions, finding, *inter alia*, that Petitioner had fair notice of the July 18, 2008 deadline for declarations and affidavits and he did not present any reasons that would justify his failure to submit declarations and affidavits from these proposed witnesses by that date. The Court also noted that Petitioner's proposed testimony was more appropriate if and when he received a new trial and was not relevant to the issues that the parties would address during the evidentiary hearing.

At the evidentiary hearing, Petitioner also called Annie Leong, who was working at the Gas Express in Kihei on the night in question, around the time of the incident. She testified that the police interviewed her and asked her to identify the man she saw come into the Gas Express.

**LEGAL STANDARD**

**I.    Habeas Relief**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 402-04 (2000).  For purposes of § 2254(d)(1), "[c]learly established Federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision[,]" Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (citations omitted), and refers to the holdings, rather than the dicta, of the Supreme Court's decisions.  See Williams, 529 U.S. at 412.

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant relief only when the state court "arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently . . . on a set of materially indistinguishable

12

facts." <u>Williams</u>, 529 U.S. at 412-13.

Under the "unreasonable application" clause, a federal court may grant relief only "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. The "unreasonable application" clause of § 2254(d)(1) applies if the state court cited the correct Supreme Court principles, but applied them to the facts of the prisoner's case in an unreasonable manner. <u>See</u> <u>id.</u> at 407. In order to be an unreasonable application of federal law, the state court's application must be "objectively unreasonable." <u>Id.</u> at 409. Although only Supreme Court caselaw is binding, Ninth Circuit precedent is "relevant persuasive authority in determining whether a state court decision is objectively reasonable." <u>Chia v. Cambra</u>, 360 F.3d 997, 1002-03 (9th Cir. 2004) (citation and quotation marks omitted).

## II.  **Exhaustion**

The exhaustion of available state remedies is ordinarily a prerequisite to obtaining federal habeas corpus relief. <u>See</u> 28 U.S.C. § 2254(b)(1)(A), (c); <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004). In order to exhaust his available state remedies, a petitioner must "fairly present" his federal claim "in each appropriate state court (including a state supreme court with powers of discretionary review)[.]" <u>Baldwin</u>, 541 U.S. at

29.  A court may also deem a petitioner's claims exhausted if he demonstrates that there are no remaining state remedies available to adequately address the violation of his rights.  See § 2254(b)(1)(B), (c); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  This includes the situation where, although the petitioner raised a federal claim, the state supreme court declined to address it on the merits because of a violation of a state procedural rule.  In that case, the exhaustion requirement is technically satisfied because the petitioner cannot return to state court to bring the claim, but the petitioner's procedural default may bar the district court from considering it.  See Smith v. Baldwin, 510 F.3d 1127, 1139 (9th Cir. 2007).

## III. **Procedural Default**

The Ninth Circuit has stated that:

> The procedural default doctrine bars federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.  Not all state procedural bars are adequate to foreclose federal review.  For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.

Hanson v. Mahoney, 433 F.3d 1107, 1113 (9th Cir. 2006) (citations omitted).  Generally, there is no procedural default unless "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."  Coleman v. Thompson, 501 U.S. 722, 735-36 (1991) (citation

14

and quotation marks omitted).  An implied procedural default occurs when a petitioner fails to bring a claim to the highest state court and would be procedurally barred from presenting it if he returned to state court.  See O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999) ("There is no dispute that this state court remedy - a petition for leave to appeal to the Illinois Supreme Court - is no longer available to Boerckel; the time for filing such a petition has long passed.  Thus, Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims." (citations omitted)).

If a petitioner has procedurally defaulted on a claim, the federal court reviewing his habeas petition must determine whether the default should be excused.  See Hanson, 433 F.3d at 1114.  A procedural default will be excused where the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  If the petitioner can establish one of these exceptions, the federal court may consider the procedurally defaulted claim.  See id.

A.  **Cause and Actual Prejudice**

In order to establish cause for a procedural default, the petition must "'show that some objective factor external to

15

the defense impeded counsel's efforts to comply with the State's procedural rule.'" Id. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  The United States Supreme Court has not adopted a precise definition of what constitutes "cause".  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  The Supreme Court, however, has identified at least three instances that may constitute cause: 1) the factual or legal basis of the claim was not available to the petitioner; 2) some interference by state officials made the petitioner's compliance impracticable; and 3) the default was the result of the ineffective assistance of counsel.  See Carrier, 477 U.S. at 488.

In order to establish prejudice, the petitioner "must show not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 494 (citation and quotation marks omitted) (alteration and emphases in original). Although the Supreme Court has "refrained from giving precise content to the term prejudice," United States v. Frady, 456 U.S. 152, 168 (1982) (citation and quotation marks omitted), it has stated that the standard is "significantly greater" than the showing necessary to establish plain error on direct appeal.  See Carrier, 477 U.S. at 493-94.

16

**B.    <u>Fundamental Miscarriage of Justice</u>**

A court on habeas review may also excuse a petitioner's procedural default if there was a fundamental miscarriage of justice.  See <u>id.</u> at 496.  A petitioner can establish a fundamental miscarriage of justice if he can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"[7]  <u>Id.</u>  In order to meet the probability standard, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).  In other words, the issue is whether reasonable jurors, who were properly instructed by the trial court and who are assumed to fairly consider all the evidence and to follow the court's instructions, would have been able to find the petitioner guilty beyond a reasonable doubt in light of the new evidence.  <u>See</u> <u>id.</u> at 329.  This is a higher standard than the prejudice standard discussed *supra*.  <u>See</u> <u>id.</u> at 327.  When reviewing the petitioner's showing, the habeas court is not bound the admissibility rules which govern trials.  The court must consider

---

[7] A claim that the petitioner's actual innocence claim excuses his procedural default is distinguishable from a substantive actual innocence claim.  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 313-14 (1995) (distinguishing <u>Herrera v. Collins</u>, 506 U.S. 390 (1993)).  In a substantive actual innocence claim, the petitioner argues that, even assuming that there were no errors in his trial and sentencing, the execution of an innocent person violates the Eighth Amendment.  <u>See</u> <u>id.</u> at 314.

17

"all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Id. at 328 (quotation marks omitted). Thus, the habeas court cannot rule that a petitioner's showing is inadequate merely because there was sufficient evidence in the trial record to support the verdict. See id. at 331.

## DISCUSSION

I.    **Statute of Limitations**

In the present case, Petitioner was required to file his application for writ of habeas corpus within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A). The Hawaii Supreme Court issued its opinion affirming two counts of Petitioner's conviction on November 10, 1998. Petitioner did not seek a writ of certiorari from the United States Supreme Court. His conviction therefore became final ninety days later, or on February 8, 1999. See Clay v. United States, 537 U.S. 522, 527 (2003). The statute of limitation began to run the next day, and, barring statutory or equitable tolling, expired one year later, on February 9, 2000.

Section 2244(d)(2) states: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  Petitioner filed his Rule 40 Petition on January 31, 2000, with nine days remaining on his limitations period, which was tolled as long as the Rule 40 Petition was pending.  A petition for state collateral review of a criminal conviction "is pending as long as the ordinary state collateral review process is 'in continuance'- *i.e.,* 'until the completion of' that process.  In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'"  <u>Carey v. Saffold</u>, 536 U.S. 214, 219-20 (2002).

After the circuit court denied his Rule 40 Petition and his motion for reconsideration, Petitioner filed an appeal.  The Hawaii Supreme Court issued a Summary Disposition Order affirming the circuit court on November 24, 2004.  Petitioner filed a motion for reconsideration of the Summary Disposition Order on December 6, 2004.[8]  The Hawaii Supreme Court denied Petitioner's

_____

[8] A party may file one motion for reconsideration of an appellate decision.  <u>See</u> Haw. R. App. P. 40(a), (e).  There is no provision in the Hawaii Rules of Appellate Procedure prohibiting the filing of a motion for reconsideration from a decision on an appeal regarding a Rule 40 petition.  <u>See</u>, <u>e.g.</u>, Tex. R. App. P. 79.2(d) ("A motion for rehearing an order that denies habeas
(continued...)

motion for reconsideration on December 15, 2004.  [Petition, Appx. R.]  The § 2244(d) limitation period began to run again on December 16, 2004.  Petitioner had nine days to file Petition, and he did so on December 22, 2004.  The Petition is therefore timely.

## II.  **Exhaustion of Petitioner's Claims**

Before the Court renders its findings and recommendations on the merits, the Court must determine which of Petitioner's claims are before the Court.

In the 5/1/07 Order/F&R, this Court issued findings and conclusions that addressed whether Petitioner had exhausted each of his claims.  Respondents appealed the 5/1/07 Order/F&R with regard to Grounds Three, Seven, and Eight.  In the 9/12/07 Order, the district judge affirmed this Court's decision with regard to Grounds Three and Seven, but vacated this Court's decision with regard to Ground Eight.  The 9/12/07 Order did not address

---

[8](...continued)
corpus relief under Code of Criminal Procedure, articles 11.07 or 11.071, may not be filed.  The Court may on its own initiative reconsider the case.").  This Court therefore considers the motion for reconsideration of the Summary Disposition Order part of Hawaii's post-conviction procedures for purposes of § 2244(d)(2).

The party seeking reconsideration must file his motion "within 10 days after the filing of the opinion, dispositional order, or ruling[.]"  Haw. R. App. P. 40(a).  Ten days after the filing of the Summary Disposition Order in this case was December 4, 2004, which was a Saturday.  Petitioner therefore had until Monday, December 6, 2004 to file his motion for reconsideration.  See Haw. R. App. P. 26(a).

Petitioner's options with regard to the claims that the district judge ruled were unexhausted, see *infra*, nor did it remand the matter to this Court.  Neither party sought clarification or reconsideration of the 9/12/07 Order, and Petitioner did not seek leave to file an amended petition in light of the order.

**A.    Exhausted Claims**

In the 5/1/07 Order/F&R, this Court concluded that Grounds One, Two, and Seven were exhausted.  Respondent did not appeal the Court's conclusions regarding Grounds One and Two and the district judge affirmed this Court's conclusion that Ground Seven was exhausted.  This Court also concluded that, with the exception of Petitioner's claim that trial counsel was ineffective for failing to object to some of the prosecutor's remarks during closing argument, the claims in Ground Three were exhausted.  The district judge affirmed this Court's conclusion that the majority of Petitioner's claims within Ground Three were exhausted.  Thus, the merits of these claims are squarely before the Court at this time.

**B.    Technically Exhausted Claims**

Petitioner raised the claims in Grounds Four, Five, Six, and Nine in his Rule 40 Petition and in the Rule 40 Appeal. The Hawaii Supreme Court, however, held that Petitioner waived these claims because he did not raise them in his direct appeal. The supreme court did not expressly address the claims in Ground

Nine, but this Court believes that those claims fall within the supreme court's holding that Petitioner's claims should have been raised in his direct appeal.  Petitioner fairly presented these claims in each appropriate state court, albeit not at the proper time.  This Court therefore concluded that these claims are technically exhausted.  This Court also found that the procedural default doctrine applies because the Hawaii Supreme Court declined to address these claims because Petitioner failed to meet state procedural requirements for the timely presentation of claims.  The district judge's 9/12/07 Order did not disturb these decisions.  This Court therefore cannot consider the merits of Grounds Four, Five, Six, and Nine unless Petitioner can demonstrate cause for the default and actual prejudice or that the failure to consider the claims will result in a fundamental miscarriage of justice.

### C.     Unexhausted Claims

        This Court also concluded that Petitioner's Ground Three claim that trial counsel was ineffective for failing to object to some of the prosecutor's remarks during closing argument ("Ground Three Closing Claim") and Petitioner's Ground Eight claim were technically exhausted but procedurally defaulted.  Neither Petitioner's direct appeal nor his Rule 40 Petition raised the Ground Three Closing Claim.  This Court therefore concluded that Petitioner waived this claim because

Petitioner was clearly aware of the prosecutor's improper remarks and could have raised an ineffective assistance claim based on counsel's failure to object in his Rule 40 Petition. [5/1/07 Order/F&R at 40 (citing Haw. R. Pen. P. 40(a)(3)).] This Court further concluded that the claim was technically exhausted because, if he tried to return to state court to bring the claim, Rule 40(a)(3)[9] would bar him from doing so. Thus, this Court concluded that the procedural bar doctrine prohibits the district court from considering it on habeas review unless one of the exceptions apply. The district judge concluded that this was error and that this Court should have found that the claim was unexhausted.[10]

---

[9] Rule 40(a)(3) states:

> Rule 40 proceedings shall not be available and relief thereunder shall not be granted where the issues sought to be raised have been previously ruled upon or were waived. Except for a claim of illegal sentence, an issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule, and the petitioner is unable to prove the existence of extraordinary circumstances to justify the petitioner's failure to raise the issue. There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.

[10] The district judge stated:

(continued...)

With regard to Ground Eight, neither Petitioner's direct appeal nor his Rule 40 Petition raised the claim he now alleges - that trial counsel was ineffective because he gave Petitioner improper advice about his right to testify. Petitioner raised a similar argument in his direct appeal, but it was based on the more lenient state law standards of effective assistance of counsel.  This Court found and concluded that "Petitioner was clearly aware of the alleged ineffective

------

[10](...continued)
> The Magistrate Judge appeared to look at the lack of remedy upon <u>return</u> to state court instead of the lack of state court remedy <u>at the time of the filing</u> of the federal petition to find exhaustion, the latter of which is the correct time to consider to determine whether a petitioner has exhausted his or her state court remedies before coming to federal court.

[9/12/07 Order at 19 (citing <u>Batchelor v. Cupp</u>, 693 F.2d 859 (9th Cir. 1982); <u>Engle v. Isaac</u>, 456 U.S. 107, 125 n.28 (1982)) (emphases in original).]  However, the technical requirements for exhaustion are met where there is procedural default.

> The Supreme Court has noted that "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." <u>Coleman v. Thompson</u>, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  In cases such as this, where a petitioner <u>did not properly exhaust state remedies</u> and "the court to which the petitioner <u>would be required to present his claims</u> in order to meet the exhaustion requirement <u>would now find</u> the claims procedurally barred," the petitioner's claim is procedurally defaulted.  <u>Id.</u> at 735 n. 1, 111 S.Ct. 2546.

<u>Smith v. Baldwin</u>, 510 F.3d 1127, 1139 (9th Cir. 2007) (emphases added).

24

assistance when he filed his direct appeal and could have raised a federal claim in addition to his state claim.  Ground Eight is therefore technically exhausted, but it is procedurally defaulted." [5/1/07 Order/F&R at 53.]  The district judge concluded that this was error and that Ground Eight is unexhausted.  [9/12/07 Order at 22.]

In light of the district judge's 9/12/07 Order, the Petition is a mixed petition containing some exhausted claims and some unexhausted claims.  See Rhines v. Weber, 544 U.S. 269, 273 (2005).  Section § 2254(b)(1)(A) requires "total exhaustion".  See id. at 274.  Where the court is presented with a mixed petition, it should stay the case and hold it in abeyance while the petitioner returns to the state court to exhaust his claims if the court finds that "there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless."  Id. at 277 (citing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State")).

The Court first turns to the issue whether Petitioner had good cause for failing to raise either his Ground Three

25

Closing Claim or Ground Eight in his direct appeal.  <u>Rhines</u> does

not provide guidance concerning what constitutes good cause for

failure to exhaust a claim.  The Ninth Circuit has held only that

the good cause requirement is more lenient than an "extraordinary

circumstances" standard.  <u>See</u> <u>Jackson v. Roe</u>, 425 F.3d 654,

661-62 (9th Cir. 2005).

> Many district courts have concluded that the
> standard is more generous than the showing needed
> for "cause" to excuse a procedural default.  <u>See</u>,
> <u>e.g.</u>, <u>Rhines v. Weber</u>, 408 F.Supp.2d 844, 849
> (D.S.D.2005) (applying the Supreme Court's mandate
> on remand).  This view finds support in <u>Pace [v.
> DiGuglielmo]</u>, where the Supreme Court acknowledged
> that a petitioner's "reasonable confusion" about
> the timeliness of his federal petition would
> generally constitute good cause for his failure to
> exhaust state remedies before filing his federal
> petition. 544 U.S. [408,] 416-17 [(2005)].

<u>Rhyne v. McDaniel</u>, No. 3:06-CV-00082-LRH-VPC, 2008 WL 2165955, at

*3 (D. Nev. May 21, 2008).

      Petitioner was clearly aware of the prosecutor's

improper remarks and could have raised the Ground Three Closing

Claim in his Rule 40 Petition.  Similarly, Petitioner was clearly

aware of the allegations which form the basis of Ground Eight,

but chose only to pursue an ineffective assistance of counsel

claim based on the more lenient state law standard.  The Court

therefore finds that Petitioner did not have good cause for

failing to exhaust these claims.  Further, if Petitioner returned

to state court to allege these claims, the state court would find

that Petitioner waived these claims pursuant to Hawaii Rule of

26

Penal Procedure 40(a)(3).  This Court therefore finds that a stay
of the Petition is not appropriate in this case.

If the court determines that it is not appropriate to
stay a mixed petition, "the court should allow the petitioner to
delete the unexhausted claims and to proceed with the exhausted
claims if dismissal of the entire petition would unreasonably
impair the petitioner's right to obtain federal relief." Rhines,
544 U.S. at 278 (citation omitted).  The Hawaii Supreme Court
issued its opinion on Petitioner's direct appeal on November 10,
1998 and the instant Petition was timely.  In light of the
passage of time in this case, however, Petitioner would be time
barred from filing a new habeas petition if the district judge
dismisses the entire Petition.  Thus, the dismissal of the entire
Petition would unreasonably impair Petitioner's right to obtain
federal relief.

This Court therefore RECOMMENDS that the district judge
allow Petitioner to choose between dismissal of the entire
Petition and deletion of the unexhausted claims so that he can
proceed with the exhausted claims.  If Petitioner chooses to
delete the unexhausted claims, the district judge should require
him file an amended petition deleting the two unexhausted claims
within two weeks.[11]  The district judge should give Respondents

---

[11] Petitioner should not be allowed to amend his other
claims or to add new claims because Petitioner never sought leave
(continued...)

two weeks from the filing of the amended petition to file their answer.  Assuming that Petitioner follows these instructions, Respondents can file a notice stating that they stand on their current answer, with the exception of the deleted claims.

Assuming that Petitioner will delete the two unexhausted claims, the Court now turns to the merits of Petitioner's exhausted claims.

### III.  **Ground One - Denial of Right to Testify**

After the State's rebuttal evidence, but before the parties presented closing arguments, Petitioner informed the trial court in front of the jury that he wanted to testify.[12]  In a conference in the court's chambers, trial counsel stated that he had informed Petitioner that it was beyond the point in the trial in which he could testify.  He also cautioned Petitioner that other outbursts in front of the jury would hurt his case.

---

[11](...continued)
to amend his Petition.  Essentially, all Petitioner need do is delete the paragraphs in the Petition addresses the unexhausted claims.

[12] The trial court conducted two colloquies with Petitioner about his right to testify in his own defense.  The first was prior to jury selection, [Answer, Exh. H (Trans. 2/24/97 at 5-6,] and the second was after trial counsel informed the trial court that he intended to call Lori Smith as the defense's last witness.  [Answer, Exh. R (Trans. 3/6/97 AM) at 3-5.]  Petitioner does not argue that the second colloquy, which was required by Tachibana v. State, 79 Haw. 226, 231, 900 P.2d 1293, 1298 (1995), was defective or that his wavier in response to that colloquy was otherwise invalid.  Petitioner changed his mind and sought to revoke the waiver.

28

Neither the prosecutor nor the judge contradicted trial counsel's statements, but the judge asked Petitioner if there was anything he wanted to say.  Petitioner responded that there was "a tape of a witness that was in the presence of [Burkhart] and [Seidel] on more than one occasion and shows that [Seidel] committed perjury" when she testified for the prosecution.[13]  [Answer, Exh. T (Trans. 3/10/97) at 5.]  Trial counsel then discussed how he had just received the tape that morning, although he learned of its existence during the first week of trial.  Counsel said he was told that Lori Smith and Patricia Mullins might be able to track down the witness, but by the end of trial, he only had the witness' first name and had no way to reach the witness.  The trial court asked Petitioner if he had anything else to say and he said that he did not.  [Id. at 5-6.]

The prosecutor then objected to the reopening of trial because the trial court had conducted a Tachibana colloquy with Petitioner, who was "rational, coherent and understanding at the time", and Petitioner chose not to testify.  [Id. at 6.]  The prosecutor also objected because the State had not received any discovery about the tape and because even trial counsel knew very little about the tape.  Further, the defense had already rested

---

[13] In his Petition, Petitioner states that this was not what he would have testified about at trial had he been permitted to take the stand.  He emphasizes that no one asked him during the chambers conference what his testimony would be.  [Mem. in Supp. of Petition at 7-8.]

its case.  The trial court refused to allow the defense to reopen
its case to allow Petitioner to testify.  [Id. at 6-7.]  In
addition, the trial court cautioned Petitioner that "if he makes
any further outbursts in front of the jury – first, not only is
his counsel correct it only hurts his case.  Secondly, if he
continues that, the Court will have no choice but to exclude him
from the courtroom."  [Id. at 7.]  The trial court and counsel
agreed to instruct the jury to disregard any statements made that
morning.  [Id. at 8.]

On March 20, 1997, Petitioner filed a motion for a new
trial.  [Answer, Exh. A (trial court case file) at 614-23.]  In a
May 12, 1997 supplemental memorandum in support of that motion,
he argued that the trial court should have allowed the defense to
reopen its case to allow Petitioner to testify.  Petitioner noted
that the Hawaii appellate courts had not addressed the issue
whether a defendant's waiver of his right to testify becomes
irrevocable after the conclusion of the presentation of evidence.
He noted, however, that language from a number of opinions
indicated that a defendant could elect to testify at any time
before the end of trial.  He argued that minimal delay or
disruption would have resulted if the trial court allowed him to
reopen his case.  He asserted that he was entitled to a new trial
because the denial of his right to testify was not harmless
beyond a reasonable doubt.  [Id. at 648-50.]

After oral argument on Petitioner's motion for a new
trial, the trial court initially agreed with the prosecution that
a new trial was not appropriate based on the information
available about the tape. [Answer, Exh. U (Trans. 5/29/07) at
13.] Thereafter, trial counsel clarified that Petitioner's
statement about the tape was not an offer of proof regarding his
intended testimony. Petitioner would have testified about his
version of the events in question and his testimony would have
substantially differed from the testimony of the prosecution's
witnesses. Trial counsel argued that Petitioner's testimony
would have supported an acquittal on the murder charge, or at
least a verdict of manslaughter. The trial court reaffirmed his
denial of Petitioner's request to testify on the ground that
Petitioner had previously declined to testify after the trial
court's colloquy and Petitioner waited until just before closing
arguments to try to change his mind. [Id. at 16, 19.]

In the instant Petition, Petitioner claims that the
trial court's denial of his request to testify because of the
timing of his request violated his rights under the Fifth, Sixth,
and Fourteenth Amendments to the United States Constitution. He
argues that, at the time of his trial, there was no state
procedural rule prohibiting a defendant from withdrawing or
revoking his waiver of his right to testify before the end of
trial. In fact, Hawaii case law at the time implied that a

31

defendant could do so.  Similarly, the Ninth Circuit has not
addressed the issue whether there is a point during a trial after
which it is too late for a defendant to withdraw or revoke his
waiver of his right to testify.  Petitioner therefore argues that
the trial court's denial of his request to testify was an
arbitrary limitation on his constitutional right to testify and
the limitation was disproportionate to the purpose such a rule
would serve.  [Id. at 9-11.]  Petitioner states that, if the
trial court had permitted him to testify, he would have denied
stabbing Cabaccang and would have said that a third man was at
the scene of the stabbing.  He contends that his testimony would
have helped to explain what happened at the time of the offense
and that the exclusion of this testimony was a prejudicial
constitutional violation which was an objectively unreasonable
application of clearly established federal law.  [Id. at 13.]

A.    **Applicable Law**

The United States Supreme Court has recognized that,
"state and federal rulemakers have broad latitude under the
Constitution to establish rules excluding evidence from criminal
trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006)
(citations and quotation marks omitted).  This discretion,
however, is not unlimited because the Due Process Clause of the
Fourteenth Amendment and the Compulsory Process and Confrontation
clauses of the Sixth Amendment "guarant[y] criminal defendants a

32

meaningful opportunity to present a complete defense." Id.
(citations and quotation marks omitted).  In addition, the Due
Process Clause of the Fourteenth Amendment, the Compulsory
Process Clause of the Sixth Amendment, and the Fifth Amendment
right against self-incrimination grant criminal defendants the
right to testify on their own behalf.  See Rock v. Arkansas, 483
U.S. 44, 51-52 (1987).  This right "is one of the rights that are
essential to due process of law in a fair adversary process."
Id. at 51 (citation and quotation marks omitted).

> Of course, the right to present relevant testimony
> is not without limitation.  The right may, in
> appropriate cases, bow to accommodate other
> legitimate interests in the criminal trial
> process.  But restrictions of a defendant's right
> to testify may not be arbitrary or
> disproportionate to the purposes they are designed
> to serve.  In applying its evidentiary rules a
> State must evaluate whether the interests served
> by a rule justify the limitation imposed on the
> defendant's constitutional right to testify.

Id. at 55-56.  In Rock, the Supreme Court held that a blanket
prohibition of all hypnotically refreshed testimony was an
arbitrary restriction on the defendant's right to testify unless
the state had clear evidence that all such testimony was invalid.
See id. at 61.

   **B.**    **Petitioner's Request to Testify at the End of Rebuttal**

        Petitioner alleges that the trial court denied him the
opportunity to reopen his case so that he could testify because
"the timing [was] inconvenient".  [Mem. in Supp. of Petition at

9.]  He asserts that the trial court applied a rule that it is
too late for a defendant to revoke his waiver of the right to
testify after the prosecution has presented its rebuttal evidence
but before closing argument, even though neither state nor
federal law supported such a rule.  Petitioner argues that this
rule was therefore arbitrary and disproportionate to any state
interest it was designed to serve.

        Petitioner misconstrues the trial court's ruling.  In
his motion for a new trial and in the instant Petition,
Petitioner says that, if he had been allowed to testify, he would
have given his own account of events and it would have been
substantially different from that of the prosecution's witnesses.
The Supreme Court expressly stated that "[a] defendant's
opportunity to conduct his own defense by calling witnesses is
incomplete if he may not present himself as a witness" "to
present his own version of events in his own words." Rock, 483
U.S. at 52.  If Petitioner, during the conference in chambers
before closing argument, expressed a desire to testify about his
version of events, this Court would likely find that any
inconvenience to the trial court or prejudice to the prosecution
from reopening the defense's case was minimal in comparison to
Petitioner's interest in testifying.  Petitioner, however, did
not do so.  During the conference in chambers, when the trial
court addressed Petitioner about his request to testify,

34

Petitioner responded only that there was a tape of a witness who could establish that Seidel perjured herself at trial.  Trial counsel addressed the issue of the tape and then the trial court asked Petitioner if there was anything else.  Petitioner said that there was not.  During the conference in chambers, Petitioner never said that he wanted to testify about his version of the events at issue.  While this may have been his subjective intent, the trial court did not consider it because Petitioner did not express this intent.  Based on the record, this Court finds that Petitioner's request to reopen his case to testify was based upon his desire to offer the purported perjury tape.

        "[A] criminal defendant does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Montana v. Egeloff, 518 U.S. 37, 42 (1996) (citation and quotation marks omitted).  First, although trial counsel learned about the tape during the first week of trial, he did not disclose any information about the tape until the conference in chambers.  Even at the conference, trial counsel stated that he had not listened to the tape.  [Answer, Exh. T (Trans. 3/10/97) at 6.]  Thus, to allow Petitioner to reopen his case to introduce or testify about the tape would have been unfair to the prosecution.  Moreover, the statements on the tape were inadmissible hearsay to which no exceptions applied.  See Haw. R.

35

Evid. 801-05.  There were absolutely no indications of the
reliability of the statements because the person on the tape, the
contents of the tape, and the circumstances under which the
person made the tape were unknown.  Petitioner could not
authenticate the tape or lay foundation for it because he
apparently was not one of the persons who made the tape.  <u>See</u>
Haw. R. Evid. 602 (personal knowledge), 901 (authentication),
1002 (original required).  Under these circumstances, the state's
interest in excluding Petitioner's testimony about the tape
outweighed Petitioner's interest in testifying.

        The trial court's denial of Petitioner's request to
testify at after the prosecution completed its rebuttal case was
neither arbitrary nor disproportionate to the purposes the
evidentiary and criminal discovery rules were designed to serve.
This Court therefore FINDS that the trial court's ruling was not
contrary to clearly established federal law.

        C.    <u>**Petitioner's Motion for a New Trial**</u>

        In his motion for a new trial, Petitioner stated that,
if he had been allowed to testify, he would have given his
version of the events at issue.  This was a different request
from the one Petitioner posed in before closing argument.  This
new request was no more than "'an afterthought after
conviction.'"  <u>See</u> <u>United States v. Pino-Noriega</u>, 189 F.3d 1089,
1096 (9th Cir. 1999) (quoting <u>United States v. Martinez</u>, 883 F.2d

36

750, 760 (9th Cir. 1989)).[14]

The Ninth Circuit has stated that to allow a defendant to "'abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government.'" Id. (quoting Martinez, 883 F.2d at 761). In Pino-Noriega, the defendant informed the trial court that he wanted to testify in his own defense after the jury had reached a verdict, but before the jury was brought into the courtroom to read the verdict. See id. at 1093. In holding that the defendant waived his right to testify by not asserting it until after the jury reached a verdict, the Ninth Circuit stated:

> once there is a verdict, it is too late simply to "reopen the evidence," and a new trial becomes necessary. Allowing a defendant to have two trials, one based on his lawyer's strategy (where the defendant does not testify) and one based on his own strategy (where the defendant does testify), does not promote fairness, justice, or order, see Martinez, 883 F.2d at 761, and preventing this type of situation from arising is clearly a "legitimate interest[ ] in the criminal trial process." Rock, 483 U.S. at 55, 107 S.Ct. 2704.

Id. at 1096 (alteration in original).

---

[14] The Ninth Circuit noted that Martinez had been vacated on other grounds, but its reasoning on a defendant's desire to testify after conviction was still sound. See Pino-Noriega, 189 F.3d at 1096 (citing United States v. Joelson, 7 F.3d 174, 178 n.1 (9th Cir. 1993) (noting that Martinez was vacated because jury selection was conducted by a magistrate judge rather than a district court judge, but approving its reasoning)).

In the present case, Petitioner waited until his motion for a new trial to assert his right to testify about his version of the events at issue.  To give Petitioner a new trial at that point would have been unfair to the government and would not have promoted justice and order in the judicial system.  This Court therefore FINDS that the denial of Petitioner's motion for a new trial based was not an arbitrary or disproportionate restriction of his right to testify, nor was it contrary to clearly established federal law.

This Court RECOMMENDS that the district judge DENY the Petition as to Ground One.

## IV.    Ground Two - Exclusion of the Burkhart Confessions

Petitioner's trial witness list included the names of four persons who would testify that Burkhart confessed to killing Cabaccang.[15]  Trial counsel presented an offer of proof as to two

---

[15] The trial court's case file includes Petitioner's February 18, 1997 List of Potential Witnesses and his February 24, 1997 Supplemental List of Potential Witnesses.  [Answer, Exh. A (trial court case file) at 385-87, 404-05.]  The witness lists, however, only contain the potential witnesses' names.  There are no statements about what their potential testimony would be.

Insofar as trial counsel only made an offer of proof regarding two of those witnesses, it is unclear whether he intended to withdraw the other two witnesses or whether he made his offer of proof based on common factual issues that were illustrated by Auld's and Mullins' proposed testimony.  In the argument of another claim, Petitioner argues that trial counsel could have made an offer of proof regarding a third witness, but counsel withdrew this witness, which constituted ineffective assistance of counsel.  Thus, it appears that there were at least three witnesses available for the defense.

of the four witnesses.  [Mem. in Supp. of Petition at 14.]  When

addressing the defense's offer of proof the trial court stated:

> THE COURT:   . . . These are statements by
> witnesses which are offered pursuant to [Haw. R.
> Evid.] Rule 804(b)(3) as statements against the
> penal interest by Mr. Burkhart, namely that he was
> responsible for the crime which is the subject of
> this case.
>     Before such statements can come in under the
> rule, the Court is required to make a preliminary
> finding that there has been sufficient
> corroboration.  In the words of the rule, "a
> statement tending to expose the declarant to
> criminal liability and offered to exculpate the
> accused is not admissible unless corroborating
> circumstances clearly indicate the trustworthiness
> of the statement."
>     THE COURT: First, Mr. Ranken, you need to
> make clear what your offer of proof is, who the
> witnesses are, . . . and point out or offer
> evidence as to what corroborating circumstances
> clearly indicate the trustworthiness of those
> statements.

[Answer, Exh. Q (Trans. 3/5/97 PM) at 3-4.]

Trial counsel stated that he would present the

testimony of William Auld and Patricia Mullins.  Auld shared a

jail cell with Burkhart in 1995 and Auld would testify that

Burkhart admitted to stabbing Cabaccang.  Burkhart also told Auld

that he liked the feel of Cabaccang's blood running down his

hands and arms.  Mullins was a friend of Burkhart's and she also

had known Cabaccang for a long time.  [Id. at 4.]  She would

testify, inter alia, that she had conversation with Burkhart

about four days after the stabbing.  She had learned he was a

suspect and confronted him about what he did.  He told her "I got

39

to do what I got to do." [Id. at 6.]  Burkhart told Mullins that
Cabaccang came after him and that he was going to get away with
it because he had Seidel "wrapped around [his] finger so good[.]"
[Id.]  He also told her that he "got what he wanted and . . . got
happy," which Mullins understood to mean he obtained drugs out of
what he did.  [Id. at 6-7.]  Subsequently, Mullins saw Burkhart
in the Maui Community Correctional Center, where both of them
were incarcerated, and he told her "you better keep your mouth
shut" and "you better not rat on me."  [Id. at 7.]

        Trial counsel argued that the following evidence
constituted corroborating circumstances under Rule 804(b)(3):

    -Tesha Santana, Cabaccang's neighbor, was a friend of
        Burkhart's and he was supposed to come to her house on
        the night in question;
    -Cabaccang's car was apparently opened with his keys and
        Petitioner did not have access to the keys because he
        did not know either Cabaccang or Seidel;
    -Robert Boisey Pimentel would testify that Burkhart had an
        unusual knife that matched descriptions of the knife
        used in the attack on Cabaccang;
    -Judith Laury would testify that Seidel did not call for
        help, but repeatedly yelled Tesha, which trial counsel
        argued showed she wanted one of Burkhart's friends
        there because he was at the scene;
    -Jennifer Santana, Tesha's mother, would testify that
        Burkhart had long hair in the back at the time of the
        incident;
    -Jennifer Santana would also testify that, within a couple
        of weeks after the stabbing, they received two calls
        warning Tesha to keep her mouth shut because Tesha had
        made comments suggesting that Burkhart was involved in
        the stabbing;
    -Auld's and Mullins' statements corroborate each other.

[Id. at 7-9.]  The prosecutor argued that the defense had not
established corroboration or the trustworthiness of the

statements.  The prosecutor's arguments included: Burkhart had a
motive to lie to try to impress Auld and Mullins; both Auld's and
Mullins' credibility was questionable because both were
incarcerated at one point in time; Seidel testified that she did
not know Burkhart; and none of the witnesses picked Burkhart's
picture out of the photographic line-ups.  Further, Burkhart gave
a statement to a detective denying involvement in the stabbing.
The prosecutor also represented that Helen Beatty Auweloa could
testify that Burkhart was someplace else on the night of the
stabbing.  Finally, the prosecutor argued that the fact that
Cabaccang's keys were at the scene did not prove anything and the
defense's witness could not recall sufficient information about
Burkhart's knife to identify it as the one at the scene.  [Id. at
11-15.]

        The trial court ruled as follows: "I'm concluding on
balance that the requirements for the rule of the admission of
these statements have not been met.  I don't think the
trustworthiness of the statements are clearly demonstrated.  On
the contrary, I think they remain quite suspect and under the
Rules of Evidence are inadmissible."  [Id. at 19.]

        On appeal, the Hawaii Supreme Court affirmed the trial
court's ruling, holding that this case lacked the corroboration
found in Chambers v. Mississippi, 410 U.S. 284 (1973).  The
evidence here merely established a tenuous link between Burkhart

41

and the neighborhood where the stabbing took place; it did not
link him to the stabbing.  Further, there were two witnesses who
placed Burkhart somewhere else at the time of the stabbing and
neither of the alleged confessions were in sworn statements.  <u>See</u>
<u>Christian</u>, 88 Haw. at 430-31, 967 P.2d at 262-63.

        The instant Petition argues that the additional
evidence cited in the offer of proof was sufficient corroboration
to render the confessions admissible.  Petitioner argues that the
exclusion of Burkhart's confessions was prejudicial because he
could not rebut the prosecution's evidence that Burkhart was
somewhere else at the time of the stabbing.  He therefore claims
that the exclusion of the confessions violated the Due Process
Clause of the Fourteenth Amendment and his Sixth Amendment right
to present evidence.

    A.    **<u>Applicable Law</u>**

        As noted *supra*, Petitioner had a constitutional right
to "a meaningful opportunity to present a complete defense."
<u>Holmes</u>, 547 U.S. at 324 (internal quotation marks and citations
omitted).  Further, "[t]he right of an accused in a criminal
trial to due process is, in essence, the right to a fair
opportunity to defend against the State's accusations [and the]
rights to confront and cross-examine witnesses in one's own
behalf have long been recognized as essential to due process."
<u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973).

                            42

> It is clearly established federal law, as
> determined by the Supreme Court, that when a
> hearsay statement bears persuasive assurances of
> trustworthiness and is critical to the defense,
> the exclusion of that statement may rise to the
> level of a due process violation.  Chambers, 410
> U.S. at 302, 93 S.Ct. 1038.  "The Supreme Court
> has made clear that the erroneous exclusion of
> critical, corroborative defense evidence may
> violate both the Fifth Amendment due process right
> to a fair trial and the Sixth Amendment right to
> present a defense."  DePetris v. Kuykendall, 239
> F.3d 1057, 1062 (9th Cir.2001) (citing Chambers,
> 410 U.S. at 294, 93 S.Ct. 1038).

Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004).  As in the

present case, Chambers dealt with the exclusion of witnesses who

would have testified to statements purportedly made by Gable

McDonald, who claimed that he committed the murder for which

Chambers was convicted.  See 410 U.S. at 298.  The Supreme Court

noted that out-of-court statements are generally inadmissible

because they do not have the traditional indicia of reliability.

There are, however, some well established exceptions, one of the

most prevalent being the exception for declarations against

interest.  Declarations against interest are considered reliable

because a person is unlikely to lie if it is against his own

interest at the time.  See id. 299.  The Supreme Court held that:

> The testimony rejected by the trial court here
> bore persuasive assurances of trustworthiness and
> thus was well within the basic rationale of the
> exception for declarations against interest.  That
> testimony also was critical to Chambers' defense.
> In these circumstances, where constitutional
> rights directly affecting the ascertainment of
> guilt are implicated, the hearsay rule may not be
> applied mechanistically to defeat the ends of

43

justice.

Id. at 302.

In habeas review, courts within the Ninth Circuit determine whether the trial court's exclusion of evidence was contrary to or an unreasonable application of clearly established federal law by applying a balancing test, weighing the evidence's importance against the state's interest in excluding the evidence.  See Chia, 360 F.3d at 1003.  The Ninth Circuit has stated:

> In balancing these interests, we must, on the one hand, afford due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable . . . evidence.  On the other hand, we must stand vigilant guard over the principle that [t]he right to present a defense is fundamental in our system of constitutional jurisprudence. In light of these competing interests, federal habeas courts must determine what weight the various interests will carry when placed on the scales, and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.
>
> In assessing the interests at issue in this case, we invoke the five-part balancing test formulated in Miller [v. Stagner].  These factors include: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Miller, 757 F.2d [988,] 944 [(9th Cir. 1985)].

Id. at 1003-04 (citations omitted) (some alterations in original).

44

**B.    Whether Excluded Statements Were Reliable and Critical**

In the course of Petitioner's trial, trial counsel presented two theories: first, that Petitioner was not the one who killed Cabaccang; and later, that, if Petitioner killed Cabaccang, the circumstances warranted a finding that he acted in self-defense or under extreme emotional disturbance.  The probative value of Burkhart's alleged statements to Auld, Mullins, and any other proposed witness, cannot be called into question.  If believed, they would exonerate Petitioner.

"Self-inculpatory statements have long been recognized as bearing strong indicia of reliability." Chia, 360 F.3d at 1004 (citing Fed. R. Evid. 804(b)(3); Williamson v. United States, 512 U.S. 594, 599 (1994) ("[R]easonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.")).  The Ninth Circuit in Chia apparently found the excluded statements were reliable based on that fact alone. Further, although the Hawaii Supreme Court in Petitioner's direct appeal found that the excluded statements did not have the same level of corroboration as the statements in Chambers, this Court finds that there are significant similarities between this case and Chambers.  In Chambers, McDonald made spontaneous confessions to three "close acquaintances shortly after the murder occurred." 410 U.S. at 300.  The Supreme Court noted that:

> The sheer number of independent confessions
> provided additional corroboration for each.
> Third, whatever may be the parameters of the
> penal-interest rationale, each confession here was
> in a very real sense self-incriminatory and
> unquestionably against interest.  McDonald stood
> to benefit nothing by disclosing his role in the
> shooting to any of his three friends and he must
> have been aware of the possibility that disclosure
> would lead to criminal prosecution.  Indeed, after
> telling Turner of his involvement, he subsequently
> urged Turner not to "mess him up."

Id. at 300-01 (citations omitted).  In the present case,

Petitioner apparently could have called up to four witness who

would have testified that Burkhart confessed to them, and Mullins

would have testified that Burkhart later urged her not to "rat"

on him.  This Court therefore finds that the second factor of the

Miller balancing test is satisfied because there was sufficient

indicia of the reliability of the excluded Burkhart

confessions.[16]

    The third factor is also satisfied because the trier of

_____

    [16] The Court notes that the Burkhart confessions do not have
all of the corroborating evidence that the McDonald confessions
had.  McDonald made a sworn confession, which he later recanted;
eyewitness testimony supported the reports of McDonald's
confessions; and there was testimony that McDonald was seen with
a gun immediately after the shooting, as well as evidence that
McDonald had the same type of gun that the victim was shot with.
See Chambers, 410 U.S. at 300.  The Supreme Court held that the
McDonald confessions had "persuasive assurances of
trustworthiness" and that the trial court's exclusion of this
evidence, coupled with another erroneous ruling, violated
Chambers' due process rights.  See id. at 302.  Nothing in
Chambers, however, indicates that the same level of corroborating
evidence is required in all cases where a defendant seeks to
introduce hearsay testimony of a third party's confession.

fact could have evaluated the reliability of the Burkhart confessions.  The prosecutor could have cross-examined the witnesses about any prior convictions for crimes of dishonesty and about any motive that they may have had to lie or any reason that Burkhart may have had to lie to them.  For example, Respondents argue that Auld fancied himself a martial arts expert and therefore Burkhart may have fabricated a story about his own dangerous persona in an effort to impress Auld.  The jury would also have been able to evaluate the witnesses' demeanor on the stand to determine their credibility.  At trial, Petitioner attempted to call Burkhart as a witness, but he invoked the Fifth Amendment and declined to testify.  The trial court ruled that Burkhart was entitled to assert the Fifth Amendment.  [Answer, Exh. P (Trans. 3/5/97 AM) at 26-28.]  The Court notes, however, that Burkhart was interviewed during the investigation into Cabaccang's death and he denied any involvement.  If the Burkhart confessions were introduced at trial, the jury could have weighed their probative value against that of the prosecution's evidence.

The fourth factor, whether the excluded Burkhart confessions were the sole evidence on the issue or merely cumulative, is also satisfied.  There was testimony that Burkhart was somewhere else at the time of the incident.  Without the Burkhart confessions, Petitioner had no way to rebut this testimony.  The fifth factor is satisfied because this testimony

would have been a major part of Petitioner's attempted defense
that another person killed Cabaccang.

This Court therefore FINDS that the Burkhart
confessions had sufficient indicia of reliability and were
critical to Petitioner's attempted defense.  The Court now turns
to the issue whether their exclusion was contrary to or an
objectively unreasonable application of clearly established
federal law.

### C.    <u>Whether Exclusion was Contrary to Federal Law</u>

<u>Chambers</u> is clearly established federal law for habeas
purposes.  <u>See</u>, <u>e.g.</u>, <u>Chia</u>, 360 F.3d at 1003.  <u>Chambers</u> held
that, when a hearsay statement bears "persuasive assurances of
trustworthiness" and is critical to the defense, "constitutional
rights directly affecting the ascertainment of guilt are
implicated" and courts may not apply state hearsay rules
"mechanistically to defeat the ends of justice."  410 U.S. at
302.  The trial court did not cite <u>Chambers</u> or any other legal
authority besides Hawaii Rule of Evidence 803(b)(4).  The trial
court focused only on the corroboration required by Rule
803(b)(4) and did not consider whether the proposed testimony was
critical to Petitioner's defense or whether its exclusion would
affect Petitioner's constitutional rights.  The trial court
appeared to weigh Petitioner's supporting evidence against the
prosecution's evidence in determining whether there was

corroboration for the confessions.  The trial court should have left that process for the jury and should only have made a basic determination whether there was sufficient corroboration to render the confessions admissible.

This Court therefore FINDS that the trial court's exclusion of the proposed testimony about the Burkhart confessions was contrary to clearly established federal law, as set forth in <u>Chambers</u>.  The Court RECOMMENDS that the district judge GRANT the Petition with regard to Ground Two.

## V.    **Ground Three - Ineffective Assistance of Trial Counsel**

Petitioner argues that trial counsel's representation fell below the standard for the effective assistance of counsel established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  He argues that trial counsel rendered ineffective assistance by: failing to obtain and introduce an enhanced copy of Christian-Kimmey tape; failing to obtain and introduce an enhanced recording of the Perry 911 tape; failing to conduct sufficient forensic testing on the physical evidence; and changing defense theories in the middle of trial against Petitioner's wishes. Petitioner also references several other allegations of ineffective assistance which he raised in his Rule 40 Petition. [Mem. in Supp. of Petition at 18-24.]

49

A.    **Applicable Law**

The Sixth Amendment right to counsel "is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (citation and quotation marks omitted). If defense counsel provides inadequate legal assistance, he deprives the defendant of his right to effective assistance. See id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id.

The United States Supreme Court has recently stated:

> Ineffective assistance under Strickland [v. Washington] is deficient performance by counsel resulting in prejudice, 466 U.S. [668,] 687, 104 S.Ct. 2052 [(1984)], with performance being measured against an "objective standard of reasonableness," id., at 688, 104 S.Ct. 2052, "under prevailing professional norms," ibid.; Wiggins v. Smith, [539 U.S. 510,] 521, 123 S.Ct. 2527 [(2003)].

Rompilla v. Beard, 545 U.S. 374, 380 (2005). A court must be "highly deferential" in evaluating counsel's performance and must evaluate counsel's performance from counsel's perspective at the time, based on the facts of the particular case. See Strickland, 466 U.S. at 689-90. A court must not judge counsel's conduct through "the distorting efforts of hindsight[.]" Id. at 689. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that

is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (citation and quotation marks omitted).  In order to show that counsel's ineffective assistance was prejudicial, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  Prejudice, however, is presumed where: "the accused is denied counsel at a critical stage of his trial[;] . . . counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[;]" or where it is unlikely that "any lawyer, even a fully competent one, could provide effective assistance[.]" United States v. Cronic, 466 U.S. 648, 659-60 (1984); see also Bell v. Cone, 535 U.S. 685, 697 (2002) (stating that Cronic presumption of prejudice for failure to test the government's case only applies if defense counsel was guilty of a "complete" failure to perform during the "proceeding as a whole," not just at "specific points").

B.    **Petitioner's Claims**

1.    **Christian-Kimmey Tape**

At trial, he prosecution characterized the Christian-Kimmey tape as "represent[ing] an unequivocal confession". [Mem. in Supp. of Petition at 19.] For example, the prosecutor quoted the following excerpts during closing argument:

51

> Lisa says, "Taryn, I'm not going to tell them
> you killed that guy. Okay. Okay." Lisa says,
> "Every time I see a car that says 'In loving
> memory of Vilmar,' I want to puke. He says, "Do
> you think I feel good? How do you think I feel?
> You're not the one who did it."

[Answer, Exh. T (Trans. 3/10/97) at 15.]

The Petition asserts that what Petitioner actually said
was "I'm not the one who did it" and that he also said "I wasn't
the one who stabbed him." [Mem. in Supp. of Petition at 19.]
Petitioner argued that discovery was necessary to establish his
ineffective assistance of counsel claims. Petitioner's audio
engineer, John J. Mitchell, enhanced the Christian-Kimmey tape
and found that Petitioner twice explicitly denied that he killed
Cabaccang. Those denials, however, could only be heard if the
volume was temporarily increased at those points in the
recording. Mitchell opined that "a juror listening to a copy of
the tape recording at constant sound volume likely would not have
heard the denials on the tape," and "if the defense had hired an
audio expert prior to trial, the defense could have soundly
rebutted the prosecution position that the Kimmey-Christian tape
was simply a confession tape." [Notice of Affidavits, Exh. A
(Aff. of John J. Mitchell) at ¶ 4.] Mitchell included a
transcript of the tape, which included the two denials:

> LISA: No, Taryn, I – you know, it's hard for me,
> too, knowing that you stabbed that guy and he's
> totally innocent, and do you know, every time I
> see a car that says "In loving memory of Vilmar,"
> I want to puke.

52

TARYN: Do you think I took him?  How do you think
I feel?  I'm not the one who did it.
LISA: And so you think it's – okay.  So you think
that I should feel more sorry for you because
you're the one who stabbed him and not me?
TARYN: No, no, I – I wasn't the one who stabbed
him and I know that for a fact.

[Notice of Affidavits, Exh. MI-1 at 11, lines 9-20.]

Petitioner argues that, if the recording had been
enhanced or the volume of the recording had been adjusted
properly, the jury would have heard the correct statements.
Petitioner argues that trial counsel was apparently unaware of
the "I'm not the one who did it" statement because counsel never
mentioned the statement or refuted the prosecution's
representation of the recording's contents.  He claims that
counsel's failure to retain an audio expert to enhance the tape
to make the exculpatory statements clear constituted ineffective
assistance.  He further claims that counsel's failure prejudiced
him because it prevented the jury from hearing his denials of
guilt and the accurate recording would have provided
corroboration of Burkhart's confessions.  [Id. at 19-21.]

Petitioner trial counsel' had a "duty to make
reasonable investigations or to make a reasonable decision that
makes particular investigations unnecessary." Strickland, 466
U.S. at 691.  In determining whether his decision not to retain
an audio expert to enhance the Christian-Kimmey tape constituted
ineffective assistance, the Court must assess his decision "for

53

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.

Trial counsel was aware of Petitioner's statement "I wasn't the one who stabbed him, and I know that for a fact." Counsel read the statement to the jury from the transcript of the recording[17] during closing argument and played that portion of the tape for them. [Answer, Exh. T (Trans. 3/10/97) at 54-55.] Counsel even warned them that the statement was "a little hard to pick up." [Id. at 54.] He also told the jurors that there would be headphones in the jury room that they could "try to hear better." [Id. at 55.] Thus, trial counsel knew about one of the denials on the tape and knew that it was difficult to hear the statement. Counsel pointed these facts out to the jury in closing argument. Further, Mitchell testified at the evidentiary hearing that the two denials on the Christian-Kimmey tape could be heard simply by increasing the sound volume.

This Court therefore finds that trial counsel conducted a reasonable investigation into the contents of the Christian-Kimmey tape and his decision not to retain an audio expert to enhance the tape was with "the wide range of professionally competent assistance." See Strickland, 466 U.S. at 690. The fact that counsel either did not know about the second denial or,

---

[17] The transcript was not provided to the jury for use during deliberations, although they did have the tape.

if he did know about it, did not bring it up at trial, does not constitute deficient performance that fell below an objective standard of reasonableness under the circumstances at the time.

This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding the Christian-Kimmey tape was not contrary to or an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

### 2.    **Perry 911 Tape**

Petitioner also argues that trial counsel rendered ineffective assistance by failing to obtain and present an enhanced copy of the Perry 911 tape to the jury.  Robert Perry, Jr., came to the scene of the stabbing because he heard a commotion.  As he approached, he called 911.  Petitioner asserts that, by the end of the recording, Perry was at the scene and was standing next to Cabaccang.  Petitioner states that the recording reveals that a male, presumably Cabaccang, spoke the word "Burkhart".  This recording was produced to the defense in discovery, but counsel did not introduce it at trial.  [Mem. in Supp. of Petition at 21.]

In the instant proceedings, Mitchell states that, during the course of the Perry 911 tape, a male, who is not identified on the tape, said "James Burkhardt [sic] just walked

off." [Notice of Affidavits, Exh. MI-2 (report) at 5.] Mitchell believes that this statement can be attributed to Cabaccang. [Id.] Mitchell testified during the evidentiary hearing that "James Burkhart" can be heard without enhancing the tape, although the statement is a at a very low level. Thus, a person may need to listen to that portion a number of times in order to hear it.

Respondents' audio engineer, David Smith, also analyzed the Perry 911 tape. Smith stated in his affidavit that he could not verify Mitchell's opinion that an unidentified male said "James Burkhardt just walked off". In Smith's opinion, the statement is unintelligible. [Decl. of David A. Smith, filed July 14, 2008, at ¶¶ 12-13.] "Further, the first word could not be the name "James," because it consists of two syllables, with the second syllable having a rising pitch[.]" [Id. at ¶ 14.]

In this Court's view, the evidence presented for the evidentiary hearing indicates that reasonable audio experts could differ about whether the name "James Burkhart" can be heard on the Perry 911 tape. Further, Mitchell testified that the name can be heard without enhancing the tape. This Court therefore finds that trial counsel's decision not to retain an audio expert to enhance the Perry 911 tape was within "the wide range of professionally competent assistance." See Strickland, 466 U.S. at 690.

This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding the Perry 911 tape was not contrary to or an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

### 3.    Forensic testing

Petitioner also argues that trial counsel rendered ineffective assistance because he failed to conduct forensic testing, which would have supported Petitioner's innocence.  In particular, Petitioner argues that DNA testing could have placed Burkhart at the scene of the stabbing and that an analysis of the bite mark on Seidel could have shown that Petitioner was not the attacker.  [Mem. in Supp. of Petition at 22.]

In the instant proceedings, Petitioner had a full opportunity to conduct forensic testing on all available evidence.  The Court also notes that current DNA technology is undoubtedly more advanced than the DNA technology that was available at the time of his trial.  None of items tested, however, contained DNA from Burkhart.  In fact, Petitioner did not present any evidence regarding forensic testing at the` evidentiary hearing and the expert who Petitioner retained to conduct forensic testing testified as Respondents' witness.  This Court cannot find a reasonable probability that, if trial counsel

had conducted forensic testing, the result of the trial would have been different.  See Strickland, 466 U.S. at 694.

Thus, even assuming, *arguendo*, that trial counsel's failure to conduct forensic testing fell below the objective standard of reasonableness, Petitioner's ineffective assistance of counsel claim would still fail because he cannot establish prejudice.  This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding forensic testing was not contrary to or an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

### 4.   **Change in Defense Theory**

In his opening statement, trial counsel argued that Petitioner did not kill Cabaccang.  In his closing argument, counsel asked the jury to decide whether there was a reasonable doubt that Petitioner inflicted Cabaccang's wounds.  Counsel also argued that, if the jury determined that Petitioner did inflict the wounds, it had to decide whether Petitioner acted in self-defense and whether he acted under extreme emotional disturbance. [Mem. in Supp. of Petition at 33, 37-38.]  Trial counsel also stated that the defense did not contest the fact that Cabaccang tackled Petitioner and that Petitioner was on the ground under him.  [Id. at 38.]  Counsel stated that both Petitioner and

58

Cabaccang had knives in the struggle and that Petitioner had cuts
on his stomach and hand after the struggle.  Petitioner argues
that counsel's argument ignored evidence at trial which
established that Petitioner did not have cuts on his hand or body
after the incident.  [Id. at 39-40.]  Counsel also argued that
the presence of Cabaccang's blood on the back of Petitioner's
shirt showed that Cabaccang, who was already bleeding, attacked
Petitioner, who was face down on the ground.  Counsel argued that
Petitioner fought back to defend himself.  [Id. at 42-43.]
Counsel, however, acknowledged that, had Petitioner testified, he
would have denied committing the offense.  [Id. at 33.]

Petitioner argues that counsel's strategy during
closing argument was against Petitioner's wishes and gave the
jury the impression that the defense "was being less than
candid."  [Id. at 33-34.]  Trial counsel also stated during
closing argument that he did not know what happened on the night
in question, a statement Petitioner argues was against his best
interests.  [Id. at 34.]  Further, trial counsel's closing
argument presented a theory of the case that was similar to the
prosecution's.  [Id. at 41.]

Trial counsel also told the jury that Petitioner asked
him if the jury would think he was hiding something if he did not
testify.  Counsel stated that he believed there was no point in
putting Petitioner on the stand because the jurors likely would

not believe Petitioner.  They might think that, because of the
serious charges against him, Petitioner would say whatever he
thought was necessary to be acquitted.  Petitioner argues that
counsel's closing argument exacerbated the fact that he was not
allowed to testify.  [<u>Id.</u> at 44-45.]

        The Petition argues that counsel's closing argument was
"profoundly prejudicial".  [<u>Id.</u> at 46.]  Petitioner maintains
that counsel's argument lessened the prosecution's burden of
proof by conceding critical factual issues.  Petitioner argues
that trial counsel failed to subject the prosecution's case to
meaningful adversarial challenge, in violation of his Sixth
Amendment rights.  [<u>Id.</u> at 46-47.]  In connection with the
defense's motion for a new trial, trial counsel submitted an
affidavit stating that, if the court had allowed Petitioner to
testify, he would have denied stabbing Cabaccang and would have
described a third man at the scene.  Petitioner argues that this
is contrary to counsel's strategy during closing argument and
illustrates that counsel's closing argument seriously prejudiced
him.  [<u>Id.</u> at 49.]  He contends that there is a reasonable
probability that the outcome of the trial would have been
different were it not for counsel's errors during closing
argument.  [<u>Id.</u> at 50.]

        At the outset of trial, the defense's strategy was to
establish that Petitioner did not kill Cabaccang.  By the time of

closing arguments, however, trial counsel apparently altered the defense's strategy and presented self-defense and extreme emotional disturbance as alternative arguments.  This Court finds that, under the circumstances of the trial, this decision was within "the wide range of professionally competent assistance."  See Strickland, 466 U.S. at 690.  As discussed, *supra*, Burkhart invoked the Fifth Amendment when called as a defense witness and the trial court excluded the witnesses who would have testified that Burkhart confessed to killing Cabaccang.  These events certainly hurt the defense's ability to establish that another person, namely Burkhart, killed Cabaccang.  Trial counsel's strategic decision to also argue self-defense and extreme emotional disturbance was objectively reasonable under the circumstances.

Similarly, counsel's discussion of why counsel did not want Petitioner to testify and that Petitioner would have testified as to his version of the events at issue was apparently in response to the trial court's ruling about Petitioner's request to testify.  While trial counsel's statement that the jury would likely have disbelieved Petitioner's testimony may have been ill advised, the Court cannot say that it rose to the level of constitutionally deficient performance.

This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding the change of

61

the defense theory was not contrary to or an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

     **5.**   **Other allegations**

     In addition, Petitioner asks the court to consider seven other instances of trial counsel's alleged ineffective assistance[18] that Petitioner raised in his Rule 40 Petition. Petitioner alleges that trial counsel was ineffective in failing to: a) present a forensic pathologist to disprove the prosecution's theory of how the incident occurred; b) discredit a lay witness's identification of Petitioner's handwriting; c) introduce available evidence that Petitioner did not have stolen stereo equipment in his possession; d) make offers of proof regarding additional witnesses who would have given testimony about Burkhart confessions; e) call witnesses to contradict Burkhart's alibi; and f) present evidence that Seidel and Burkhart knew each other.  [Mem. in Supp. of Petition at 23-24.] The Petition does not contain any substantive analysis of these claims, apparently incorporating the arguments in the Rule 40 Petition by reference.

---

[18] Petitioner lists eleven arguments, but two are evidentiary issues which the Court identified as Ground Nine, two were addressed in Ground Three or in Ground Eight, and the final argument was ruled unexhausted by the district judge.

a.  **Forensic Pathologist**

Petitioner states that the prosecution's pathologist, Dr. Anthony Manoukian, gave substantial testimony about Cabaccang's position in relation to his attacker, as determined by the angle of his stab wounds.  Although trial counsel objected to this line of questioning and attempted to discredit his testimony on cross-examination, Petitioner alleges that trial counsel's failure to retain a forensic pathologist for the defense constituted ineffective assistance of counsel. [Petition, Appx. D (Addendum to Rule 40 Petition) at 64-65.] Petitioner also argues that trial counsel was constitutionally ineffective because he failed to question Dr. Manoukian about the fact that, because there was only blood on the front of Cabaccang's shirt, "it would have been a physical impossibility for [Petitioner] to have inflicted the fatal wounds to Cabaccang[.]"  [Id. at 65.]  Petitioner argues that trial counsel's omissions were highly prejudicial to him and constituted ineffective assistance of counsel.

In the instant proceedings, Petitioner had leave to conduct discovery, including:

> **IV. Other Items**
> . . . .
> B.  Respondents shall allow defense counsel reasonable access to and/or provide copies of any and all discoverable materials, including but not limited to, police reports, computer files, audio/video recordings, photographs,

                         charts, drawings, and exhibits.
                 . . . .
        V.    **Physical Evidence**
              A.    Within three months of the filing of
                    this order, Respondents shall allow
                    Petitioner's counsel reasonable
                    opportunity to examine the physical
                    evidence at MPD, at a mutually agreeable
                    time.
              B.    Petitioner's examination of the physical
                    evidence shall be limited to three
                    people: defense counsel, a photographer,
                    and <u>an expert in crime scene
                    reconstruction</u>.

[Initial Discovery Order, filed Sept. 21, 2007, at 5 (emphasis

added).]  Petitioner, however, did not present any crime scene

reconstruction evidence at the evidentiary hearing.  Thus, there

is no evidence supporting Petitioner's claim that, had trial

counsel retained a forensic pathologist, he or she could have

refuted Dr. Manoukian's testimony and established that it was

physically impossible for Petitioner to have inflicted

Cabaccang's fatal wounds.  Even assuming, *arguendo*, that trial

counsel's failure to retain a forensic pathologist was

objectively unreasonable, Petitioner cannot establish prejudice.

        This Court FINDS that the denial of Petitioner's

ineffective assistance of counsel claim regarding the failure to

retain a forensic pathologist was not contrary to or an

unreasonable application of clearly established federal law.  The

Court therefore RECOMMENDS that the district judge DENY Ground

Three with regard to this claim.

b.    **Handwriting Identification**

On February 14, 1997, Petitioner filed his Motion in Limine to Exclude Notebooks of Defendant ("Notebook Motion"). [Answer, Exh. A (trial court case file) at 313-18.]  The Notebook Motion sought to exclude a notebook containing descriptions and diagrams of various electronic equipment, including automobile stereo equipment.  Petitioner anticipated that the prosecution would attempt to introduce it in support of the attempted theft charge.  The Notebook Motion argued that it was inadmissible evidence of prior crimes, wrongs, or acts, pursuant to Hawaii Rules of Evidence 402, 403, and 404(b).  [Id. at 315.]  The trial court denied the Notebook Motion in part and granted it in part. [Answer, Exh. A (trial court case file) at 412.]  At trial, the prosecution called Tammy Dooley, a lay witness, to authenticate the notebook and pages therefrom by testifying that she had previously lived with Petitioner and Mike Haskel, that Petitioner and Haskel would write in the notebook, and that she could recognize Petitioner's handwriting.  [Answer, Exh. K (Trans. 2/26/97 PM) at 4, 9-12.]

The Petition argues that trial counsel was ineffective because he failed to discredit Dooley's identification of his handwriting by showing that a handwriting expert hired by the prosecution had been unable to identify the writing in question as Petitioner's.  The Petition provides no further information on

65

this claim, except to refer to the Rule 40 Petition.  Based on
this Court's review of the Rule 40 Petition and the trial court's
record, this Court finds that this argument relates to
Petitioner's conviction of attempted theft in the third degree.
Petitioner was sentenced to one year imprisonment for this
offense, to run concurrently with his life sentence for the
murder conviction.  [Answer, Exh. A (trial court case file) at
709 (Judgment).]  Petitioner had apparently served this sentence
by the time he filed the Petition and therefore was not "in
custody pursuant to the judgment" on this offense.  See 28 U.S.C.
§ 2254(b)(1); see also Maleng v. Cook, 490 U.S. 488, 491 (1989)
("We have never held, however, that a habeas petitioner may be
'in custody' under a conviction when the sentence imposed for
that conviction has fully expired at the time his petition is
filed.").  The district court therefore does not have habeas
jurisdiction over this claim.

    The Court RECOMMENDS that the district judge DISMISS
Petitioner's ineffective assistance of counsel claim regarding
handwriting identification for lack of jurisdiction.

### c.    Possession of Stereo Equipment

    The Petition alleges that trial counsel was ineffective
for "failing to utilize available evidence that the only stereo
equipment in [Petitioner's] possession was equipment he had
purchased."  [Mem. in Supp. of Petition at 23 (citing Rule 40

Petition, Argument Twenty-One).]  Again, the Petition provides no
further information on this claim.  Based on this Court's review
of the Rule 40 Petition and the trial court's record, this Court
finds that this argument relates to Petitioner's conviction of
attempted theft in the third degree.  For the reasons stated,
*supra*, this Court RECOMMENDS that the district judge DISMISS
Petitioner's ineffective assistance of counsel claim regarding
the possession of stereo equipment for lack of jurisdiction.

### d.    Burkhart Offers of Proof

        The Petition next argues that trial counsel was
ineffective because he failed to make offers of proof regarding
additional witnesses who would have testified that Burkhart
confessed to them.  [Mem. in Supp. of Petition at 23 (citing Rule
40 Petition, Argument Thirty-Eight).]  The Petition states that
the defense trial witness list included four witnesses who were
to testify that Burkhart confessed to them.  [Id. at 14.]  The
Rule 40 Petition, however, states that trial counsel referred to
three witnesses while addressing the matter in the trial court's
chambers.  According to Petitioner, "counsel without providing an
explanation on the record withdrew one of these witnesses."
[Petition, Appx. D (Addendum to Rule 40 Petition) at 135-36.]
Petitioner states that, after his trial, he discovered that trial
counsel was also serving as counsel for the third witness, Robert
Pimentel, at the time.  Petitioner argues that this was a

"profound conflict of interest" and that trial counsel deliberately withdrew Pimentel, to Petitioner's prejudice.  [<u>Id.</u> at 136.]  Petitioner asserts that Pimentel's testimony would have satisfied the concerns that the trial court raised about the trustworthiness of Auld's and Mullins' testimony.  Petitioner did not personally know Pimentel, who was a close friend of Burkhart's.  Further, Pimentel was not incarcerated with Burkhart at the time Burkhart confessed to him.  According to the Rule 40 Petition, trial counsel met with Pimentel at his residence, without an investigator present, and he told trial counsel that he was reluctant to testify because of his association with Burkhart.  Petitioner argued that this was improper and unprofessional because it put trial counsel in the position of being a potential witness.  Petitioner argues that trial counsel's withdrawal of Pimentel as a witness was prejudicial to him because his proposed testimony would have corroborated Auld's and Mullins' proposed testimony.  [<u>Id.</u> at 136-37.]

      First, trial counsel gave a thorough offer of proof regarding the admissibility of witnesses who would testify that Burkhart confessed to them.  This Court has already found that the trial court's exclusion of those witnesses was contrary to clearly established federal law.  Further, Petitioner has presented only unsubstantiated argument that Pimentel's testimony would have been perceived as more credible than Auld's and

68

Mullins'. Although he was allowed to conduct discovery regarding the Burkhart confessions, and Petitioner called Mullins as a witness in the evidentiary hearing, he presented no evidence about Pimentel. This Court therefore cannot find that trial counsel's failure to give an offer of proof regarding Pimentel's proposed testimony was constitutionally deficient. This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding the failure to make additional offers of proof of other Burkhart confession witnesses was not contrary to or an unreasonable application of clearly established federal law. The Court RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

### e.    **Burkhart Alibi**

The Petition argues that trial counsel was ineffective because he failed to call witnesses who could have contradicted Burkhart's alibi. [Mem. in Supp. of Petition at 24 (citing Rule 40 Petition, Argument Forty-Two).] The Rule 40 Petition states that Burkhart's cousin, Harry Auweloa, and his girlfriend, Helen Beatty, provided Burkhart's alibi by stating that he never left their residence from the evening of July 9, 1995 to the evening of July 22, 1995. Petitioner asserts that, in addition to the defense witnesses at trial, trial counsel knew the names of five witnesses who saw Burkhart in the vicinity of Kihei during that time. In fact, one of these witnesses made a police report after

the media identified Burkhart as a suspect in Cabaccang's death.
Petitioner argues that trial counsel had no plausible or tactical
reason not to call these witnesses and that his failure to do so
was constitutionally ineffective and prejudicial to Petitioner.
If trial counsel had called these witnesses, their testimony
would have corroborated Petitioner's defense.  [Petition, Appx. D
(Addendum to Rule 40 Petition) at 141-42.]

          Petitioner has presented only unsubstantiated argument
about these five unidentified witnesses.  This Court therefore
cannot evaluate whether trial counsel's decision not to call
these witnesses at trial was constitutionally deficient.  This
Court FINDS that the denial of Petitioner's ineffective
assistance of counsel claim regarding the failure to call
witnesses to contradict Burkhart's alibi was not contrary to or
an unreasonable application of clearly established federal law.
The Court therefore RECOMMENDS that the district judge DENY
Ground Three with regard to this claim.

          **f.   Seidel-Burkhart Relationship**

          Finally, the Petition argues that trial counsel was
ineffective because he failed to present evidence that Seidel and
Burkhart knew each other.  [Mem. in Supp. of Petition at 24
(citing Rule 40 Petition, Argument Forty-three).]  The Rule 40
Petition states that, during the first week of trial, trial
counsel learned of a potential defense witness who allegedly had

70

first-hand knowledge of Seidel's relationship with Burkhart. At trial, Seidel testified that she did not know Burkhart. According to the Rule 40 Petition, trial counsel's notes prove that counsel was provided with the witness' name, work address and telephone number, and pager number. Petitioner alleges that trial counsel failed to follow up on this information. He states that a tape recording was offered to trial counsel during the first week of trial, but trial counsel initially refused to accept the tape. Petitioner argues that trial counsel lied and denied having information about this witness when Petitioner brought the matter to the trial court's attention before closing arguments. [Petition, Appx. D (Addendum to Rule 40 Petition) at 142-44.]

Petitioner also states that, after trial, he wrote a letter to trial counsel requesting that he consider filing a motion to withdraw as counsel and seeking an extension of time for Petitioner to file a motion for new trial. Trial counsel did not respond to Petitioner's letter and filed a motion for a new trial or, in the alternative, for entry of judgment of lesser conviction on the murder conviction. The motion asserts that the defense hoped to produce affidavits of witnesses who had vital new evidence and were not known at the time of trial. The motion, however, does not say that the defense would provide further briefing after the witnesses submitted affidavits.

Petitioner argues that trial counsel did not investigate or contact these witnesses after filing the motion.

Petitioner has presented only unsubstantiated argument about the tape and this witness, who Petitioner does not identify.  Further, Petitioner presented no evidence that trial counsel lied to the trial court in chambers about the tape.  This Court cannot evaluate whether trial counsel's failure to investigate this witness was constitutionally deficient.  This Court FINDS that the denial of Petitioner's ineffective assistance of counsel claim regarding the failure to introduce evidence of Burkhart and Seidel's relationship was not contrary to or an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that the district judge DENY Ground Three with regard to this claim.

      C.    **Summary of Ground Three**

This Court FINDS that Petitioner's claims of ineffective assistance of trial counsel are without merit.  This Court therefore RECOMMENDS that the district judge DENY the Petition as to Ground Three.

**VI.**   **Ground Seven - Ineffective Assistance of Appellate Counsel**

Petitioner argues that the attorney who represented him in his direct appeal rendered ineffective assistance.  He argues that appellate counsel was ineffective for failing to present all of the ineffective assistance of trial counsel claims that he

72

raised in his Rule 40 Petition and in the instant Petition. Petitioner also argues that, if appellate counsel had conducted an adequate review of the record, she would have realized that the trial testimony of the prosecution's DNA analyst was inaccurate and that the eyewitness identification was problematic.  This failure to adequately pursue his direct appeal allegedly violated his Sixth Amendment rights.  [Mem. in Supp. of Petition at 32-33.]

In his Motion for Leave to Conduct Discovery, filed April 19, 2006, Petitioner noted that Joanne Furuya, director of the Honolulu Police Department Crime Laboratory, testified that there were insufficient samples to test some areas of blood found at the scene.  When Furuya testified in a hearing related to Petitioner's Rule 40 Petition, she testified that, if there is enough blood to be detected, DNA testing should be attempted. Petitioner therefore argues that Furuya's trial testimony was misleading.  Even assuming, *arguendo*, that appellate counsel's failure to raise this argument was constitutionally deficient, Petitioner cannot establish that he was prejudiced.  There is no evidence that the result of the proceedings would have been different if Petitioner had been able to introduce further DNA evidence either at trial or in support of his Rule 40 Petition.

With regard to Petitioner's claim that appellate counsel was ineffective for failing to argue that Petitioner's

73

conviction was based on improper identification evidence,
Petitioner has presented Schmidt's testimony that he now believes
his identification of Petitioner in the police photographic line-
up was incorrect.  Schmidt testified at trial about the
possibility that he may have recognized Petitioner from his
employment at the restaurant near the golf course.  [Answer, Exh.
L (Trans. 3/3/97 AM) at 43-45.]  Trial counsel attempted to
discredit Schmidt's identification of Petitioner in the
photographic line-up by questioning him about issues such as
whether Petitioner's picture was brighter than the others and
whether the lighting in the picture affected his choice.  [Id. at
55.]  Under these circumstances, this Court cannot find that
appellate counsel's representation was constitutionally deficient
for failing to raise the allegedly deceptive identification
evidence on appeal.

        Finally, to the extent that Petitioner has not
established his ineffective assistance of trial counsel claims,
Petitioner cannot establish that appellate counsel was
ineffective for failing to assert trial counsel's ineffective
affective assistance.  This Court FINDS that the denial of
Petitioner's ineffective assistance of appellate counsel claims
was not contrary to or an unreasonable application of clearly
established federal law.  The Court therefore RECOMMENDS that the
district judge DENY the Petition with regard to Ground Seven.

**VII. <u>Procedurally Defaulted Claims</u>**

This Court previously ruled that Grounds Four, Five, Six, and Nine were procedurally defaulted.  The district judge's 9/12/07 Order did not disturb these rulings.  On habeas review, the federal courts generally can only consider a procedurally defaulted claim if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

**A.    <u>Cause and Prejudice</u>**

In order to establish cause for a procedural default, the petition must "'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991).  In the present case, the potential causes that Petitioner has asserted are: the government's failure to allow him to conduct DNA testing on the forensic evidence in this case; and ineffective assistance of counsel.  "Ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." <u>See</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000) (emphases in original).  This Court, however, has found that all of Petitioner's ineffective assistance claims are

without merit.  Further, Petitioner was allowed to conduct DNA testing in this case and the results do not support Petitioner's cause argument.  The district court therefore can only consider Petitioner's procedurally defaulted claims if the fundamental miscarriage of justice exception applies.

B.  **Actual Innocence**

Petitioner argues that the failure to consider his procedurally defaulted claims would result in a fundamental miscarriage of justice because he is actually innocent.  The argument that a court should consider a habeas petitioner's procedurally defaulted claims because he is actually innocent is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Schlup v. Delo, 513 U.S. 298, 315 (1995) (citation and quotation marks omitted). A habeas petitioner establishes this gateway argument if "new facts raised sufficient doubt about his guilt to justify the conclusion that his [sentence] would be a miscarriage of justice *unless* his conviction was the product of a fair trial." Id. at 316 (emphasis in original).  In other words, the court must find that no juror, acting reasonably and obeying his instructions requiring proof beyond a reasonable doubt, would have voted to convict Petitioner in light of the new evidence. See id. at 329. Where, as here, the court conducts an evidentiary hearing, in

76

assessing the probative force of the new evidence presented at
the evidentiary hearing in connection with the evidence presented
at the petitioner's trial, the court considers "how the timing of
the submission and the likely credibility of the affiants bear on
the probable reliability of that evidence." See id. at 332.

        The new evidence that Petitioner presented includes
Schmidt's testimony that Petitioner was not the person that he
saw walking away from the scene.  Schmidt recently identified
James Burkhart as the person he saw walking away.  He explains
that he may have originally recognized Petitioner in the
photographic line-up because Petitioner worked at a restaurant
near a golf course that Schmidt frequented.  Schmidt testified
about the restaurant connection at trial, but still identified
Petitioner.  Schmidt admits that his recollection of the events
was clearer at the time of the incident and at the time of
Petitioner's 1997 trial than it is today.  Further, Schmidt
testified at the evidentiary hearing that, when he saw
Petitioner's picture in the photographic line-up during the
police investigation, he experienced a frightened feeling.  See
also Answer, Exh. L (Trans. 3/3/97 AM) at 42-43 ("The third one I
came across, it frightened me.  The hair on the back of my neck
stood up . . . .").  It seems unlikely to the Court that
Petitioner's picture would have caused such a feeling if Schmidt
only saw him in passing at a restaurant.  [Id. at 44 (Schmidt

testified at trial "I don't have any idea why I would have reacted that way to someone just because I'd seen them at work.").] Schmidt also testified that at least six months had passed between the last time he saw Petitioner at the restaurant and the police photographic line-up. [Id. at 44-45.] In addition, although Schmidt explains the reason for his allegedly erroneous identification of Petitioner, Schmidt offers no explanation why he was unable to identify Burkhart at the time of the incident and trial. Thus, this Court finds Schmidt's trial testimony to be more reliable than his testimony in connection with the evidentiary hearing.

If this Court accepts Mitchell's testimony that the statement "James Burkhardt just walked off" can be heard on the Perry 911 tape, it only establishes that Burkhart was at the scene. While it does provide some support for Petitioner's claim that it was Burkhart who killed Cabaccang, it does not link Burkhart to the attack. Petitioner has alleged that Burkhart was injured in the altercation and that Gas Express employees saw Burkhart come into the store with an injured hand at about the time of the incident. Even if Burkhart did go into the Gas Express with an injured hand, this still does not establish that Burkhart attacked Cabaccang. If Burkhart was injured during the altercation with Cabaccang, it would seem likely that some of his blood would have been found at the scene. Neither of the

forensic experts in the instant proceedings, however, found Burkhart's DNA on the items tested in this case.

Both of the audio experts in this case agreed that there are two denials on the Christian-Kimmey tape. Only one denial is new evidence because trial counsel pointed out one of the denials at Petitioner's trial. The addition of the second denial does not add much support to Petitioner's theory of the case, particularly because of the numerous other areas in the tape where he admits liability, either directly or by implication. For example, the conversation includes the following exchanges:

| | | |
|---|---|---|
| 06:03.7 | LISA: | Why did you go down there and do that? |
| 06:06.5 | TARYN: | I don't know.  You think I don't regret it? . . . . |
| 06:11.5 | LISA: | Well, like it, it seems like you have no conscience of stabbing that guy. |
| 06:15.6 | TARYN: | Of course I do.  You mean . . . I . . . . It didn't happen like that OK? |
| . . . . | | |
| 15:33.3 | LISA: | Did you tell any of your friends that you killed that guy? |
| 15:35.9 | TARYN: | Uh-uh. |
| 15:37.5 | LISA: | So you've been keeping it inside? |
| 15:39.1 | TARYN: | Uh-huh. |
| 15:40.3 | LISA: | And I'm the only one you told? |
| 15:41.7 | TARYN: | Yes. |

[Decl. of David A. Smith, filed July 14, 2008, Exh. E at 1, 5.]

Finally, Petitioner presented Mullins' testimony that Burkhart confessed to her.  Mullins' credibility as a witness is

79

not strong.  She admitted to numerous convictions for crimes of dishonesty and her relationship with Burkhart is of a questionable nature.  Petitioner, however, had other witnesses available for trial who also would have testified that Burkhart confessed to them.  This Court has considered all of the new evidence in conjunction with the evidence presented at trial – in particular, Seidel's identification of Petitioner as the assailant.  Burkhart's confessions are certainly significant, but having considered all of the evidence, this Court cannot make the necessary finding that no juror, acting reasonably and obeying his instructions requiring proof beyond a reasonable doubt, would have voted to convict Petitioner in light of the new evidence. See Schlup, 513 U.S. at 329.  The Court emphasizes that this finding is solely for the purpose of Petitioner's procedurally defaulted claims.  The Court expresses no opinion on the merits of Petitioner's case on retrial.

        This Court FINDS that Petitioner has not established that he is actually innocent under the standards set forth in Schlup and therefore the federal courts cannot consider his procedurally defaulted claims on habeas review.  This Court RECOMMENDS that the district judge DENY the Petition as to Grounds Four, Five, Six, and Nine.

**VIII.    Missing Evidence**

        In Petitioner's evidentiary hearing brief, he argues

80

that his Fourteenth Amendment due process rights were violated because the government destroyed or lost Seidel's shorts. Based on photographs of the shorts, Petitioner believes that there were blood stains on them that were created when someone wiped their hands on them. Petitioner argues that, because Burkhart had an injured hand and because he and Seidel were boyfriend and girlfriend, Burkhart could have wiped his hands on her shorts. Thus, Petitioner contends that the shorts were potentially exculpatory. This Court, however, notes that Petitioner never moved to amend the Petition to include a claim based on the alleged destruction of the shorts. The Court therefore RECOMMENDS that the district judge DENY this claim.

## CONCLUSION

On the basis of the foregoing, this Court HEREBY FINDS AND RECOMMENDS that the district judge ORDER Petitioner to chose between dismissal of the entire Petition or the filing of an amended petition without the unexhausted claims. If Petitioner chooses to file an amended Petition, the Court RECOMMENDS that the district judge ORDER Petitioner to do so within two weeks and ORDER Respondents to file an answer to the amended petition no later than seven days after Petitioner files the amended Petition.

Assuming that Petitioner deletes the unexhausted claims, this Court RECOMMENDS that the district judge dispose of

81

the merits of the remaining claims as follows:

1)    GRANT the Petition as to Ground Two; and

2)    DENY the Petition as to Grounds One, Three, Four, Five, Six, Seven, and Nine.

The Court further RECOMMENDS that the district judge:

A)    ORDER Respondents to release Petitioner within seven days after the judgment in the instant case is filed, subject to appropriate release conditions, unless the State elects to retry Petitioner;[19] and

B)    ORDER Respondents to report to the district court, within ten days after the judgment in the instant case is filed, whether Petitioner was released or will be retried.

IT IS SO FOUND AND RECOMMENDED.

DATED AT HONOLULU, HAWAII, August 29, 2008.



 /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge


**TARYN CHRISTIAN V. CLAYTON FRANK; CV 04-00743 DAE-LEK; FINDINGS AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART PETITION FOR WRIT OF HABEAS CORPUS**

---

[19] See Herrera v. Collins, 506 U.S. 390, 403 (1993) ("The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to try the successful habeas petitioner[.]").