UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | |
|---|---|---|
| TARYN CHRISTIAN, | § | CIV. NO. 04-00743 |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | |
| | § | |
| CLAYTON FRANK, Director, | § | |
| State of Hawaii Department of | § | |
| Public Safety, and STATE OF | § | |
| HAWAII DEPARTMENT OF | § | |
| PUBLIC SAFETY, | § | |
| | § | |
| Respondents. | § | |
| _____ | § | |

ORDER DENYING MOTION TO REOPEN HABEAS CORPUS
PROCEEDINGS PURSUANT TO RULE 60

Before the Court is Petitioner's Motion to Reopen Habeas Corpus

Proceedings Pursuant to FRCP 60(b)/Independent Action Due to Newly

Discovered Evidence of Fraud on the Court. (Dkt. # 267.) The Court held an

evidentiary hearing on this motion on July 14, 2014, and March 16 and 17, 2015.

(Dkts. ## 345, 376, 377.) A final hearing on the motion was held on December 1,

2015. (Dkt. # 404.) Gary Modafferi represented Petitioner Taryn Christian, and

Moana Lutey represented Respondents.

Upon careful consideration of the arguments asserted in the

supporting and opposing memoranda, as well as the arguments presented at the

hearings, the Court **DENIES** Petitioner's motion. (Dkt. # 267.)

## FACTUAL BACKGROUND

Petitioner is a Hawaii state prisoner serving a life sentence with a forty-year minimum period of incarceration for murder in the second degree. (Dkt. # 267 at 12.)  The conviction arose out of his alleged involvement in the July 14, 1995 murder of Vilmar Cabaccang ("Cabaccang").  The facts that follow are taken from the voluminous record in this case.

On the night of the murder, Cabaccang and his girlfriend, Serena Seidel ("Seidel"), awoke from sleep and saw through the window that someone was inside of Cabaccang's car.  Cabaccang and Seidel ran outside to confront the intruder, but the intruder fled on foot.  Cabaccang and Seidel began chasing the intruder, but Seidel briefly stopped to summon a friend's help from a nearby residence.  When no one answered the door, Seidel continued her pursuit.

When Seidel caught up to Cabaccang and the intruder, she found the two men engaged in a struggle.  Cabaccang warned Seidel that the intruder had a knife.  Seidel was undeterred from attempting to assist Cabaccang, and eventually their combined effort caused the intruder to drop the knife and flee the scene.  At that point, Seidel observed blood in the area of the struggle and saw that Cabaccang had been stabbed.  A short time later, Phillip Schmidt ("Schmidt") a local resident who had heard the noise from the struggle, rushed to the scene.

2

When Schmidt saw Cabaccang's injuries, he called 911.  Cabaccang eventually died from the knife wounds.

Although police also investigated James Burkhart ("Burkhart") and Christian Dias ("Dias") as potential suspects, they ultimately prosecuted Petitioner Taryn Christian ("Petitioner" or "Christian") for the crime.  The prosecution's theory was based on five major categories of evidence: (1) a statement from Christian's ex-girlfriend, Lisa Kimmey ("Kimmey"), that he had confessed to her; (2) a recording of a call between Christian and Kimmey, which the prosecution argued contained a confession; (3) Christian's baseball cap found at the scene of the crime; (4) discarded gloves matchin the type that Christian's employer, Pukalani Country Club and Restaurant, had in its kitchen; (4) the fact that Christian had previously stolen car radios from parked cars and had identified Cabaccang's car as a target in a notebook; and (5) photo identifications from Seidel and Schmidt identifying Christian in a photo lineup.

Petitioner was ultimately convicted by a jury in 1997 of second-degree murder, attempted third-degree murder, attempted third-degree theft and use of a deadly or dangerous weapon in the commission of a crime.

PROCEDURAL BACKGROUND

On December 22, 2004, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1997 conviction and sentence ("Prior Petition").  (Dkt. # 1.)  On September 30, 2008, this Court issued an order granting the Prior Petition as to one ground and denying it as to all other grounds.  (Dkt. # 153.)  The Court ordered that Petitioner be released within seven days of the entry of judgment unless the State elected to retry Petitioner.  Both Petitioner and Respondents filed notices of appeal.  (Dkts. ## 157, 165.)

On February 19, 2010, the Ninth Circuit reversed the Order.  Christian v. Frank, 595 F.3d 1076, 1078 (9th Cir. 2010).  However, the Ninth Circuit did not order remand and declined to issue a certificate of appealability.  Christian v. Frank, 365 F. App'x 877, 879 (9th Cir. 2010).

On March 11, 2010, Petitioner filed a petition for panel rehearing and a petition for rehearing en banc.  The Ninth Circuit denied both petitions on May 19, 2010 (Dkt. # 221), issuing its Mandate on May 27, 2010 (Dkt. # 222).  Petitioner filed a petition for writ of certiorari with the Supreme Court on August 17, 2010, which was denied on November 1, 2010.  Christian v. Frank, 131 S. Ct. 511 (2010).

4

On January 7, 2011, Petitioner moved to reopen his habeas proceeding pursuant to Federal Rule of Civil Procedure 60(b), alleging newly discovered evidence of fraud on the Hawaii state court, this Court, and the Ninth Circuit Court of Appeals.  (Dkt. # 229.)  In an order dated February 23, 2011, this Court held that it had been stripped of jurisdiction to consider Petitioner's Rule 60(b) motion when Respondents and Petitioner filed notices of appeal with respect to the Prior Petition.  (Dkt. # 255 at 3.)  Instead, the Court construed Petitioner's motion as a second or successive petition for writ of habeas corpus.  (Id.)  Noting that a petitioner may not file a second or successive petition for writ of habeas corpus unless he first obtains authorization from the court of appeals, see 28 U.S.C. § 2244(b)(3), the Court transferred Petitioner's motion to the Ninth Circuit.  (Id. at 4.)

On November 15, 2011, the Ninth Circuit, treating Petitioner's motion as an application for authorization to file a second or successive petition for writ of habeas corpus, denied the application.  See Christian v. Frank, No. 11-70561 (9th Cir. Nov. 15, 2011) (Dkt. # 16).  On January 23, 2012, Petitioner filed a writ of mandamus, arguing that the Ninth Circuit failed to follow established procedures of appellate review in characterizing Petitioner's Rule 60(b)(3) motion as "something it is not" (Dkt. # 261-1); the Ninth Circuit denied the writ on February

16, 2012 (Dkt. # 260).[1]  On May 14, 2012, Petitioner filed a petition for a writ of certiorari (Dkt. # 261), which the Supreme Court denied on October 9, 2012 (Dkt. # 263).

On April 17, 2013, Petitioner filed the instant Motion to Reopen Habeas Corpus Proceedings Pursuant to Federal Rule of Civil Procedure 60(b) Motion/Independent Action Due to Newly Discovered Evidence of Fraud on the Court.  (Dkt. # 267.)  In his Motion, Petitioner claims that evidence has come to light that Respondents perpetrated a fraud on the court that corrupted the integrity of Petitioner's original habeas corpus proceeding.  (Id. at 11.)  The Court determined that Petitioner's motion is not a second or successive petition for writ of habeas corpus, but instead alleges fraud upon the court, which this Court has jurisdiction to review under Rule 60(d)(3) of the Federal Rules of Civil Procedure. (Dkt. # 286 at 5–11.)

Because the record before the Court was insufficient to establish the precise value of the evidence allegedly withheld, the Court held an evidentiary hearing on Petitioner's motion on July 16, 2014.  (Dkt. # 348.)  However, because the Court was unable to hear all of the relevant evidence and because Petitioner

_____

[1] The Ninth Circuit denied Petitioner's subsequent writ of mandamus on December 23, 2013.  (Dkt. # 293.)

had obtained counsel only shortly before the hearing, the hearing was continued until March 16, 2015, at which time additional evidence was presented to the Court.  (Dkts. ## 362, 377.)

On July 6, 2015, Petitioner submitted his closing brief in support of his Rule 60 motion.  (Dkt. # 390.)  Respondents filed a response on July 20, 2015 (Dkt. # 391), and Petitioner filed a reply on July 27, 2015 (Dkt. # 395).  Petitioner's motion is discussed below.

## APPLICABLE LAW

### I.   Federal Rule of Civil Procedure 60

In order to preserve the finality of judgments, the Federal Rules of Civil Procedure limit a party's ability to seek relief from a final judgment.  Phelps v. Alameida, 569 F.3d 1120, 1135 (9th Cir. 2009).  Rule 60(b) lists six grounds under which a court may relieve a party from a final judgment:

(1)   mistake, inadvertence, surprise, or excusable neglect;

(2)   newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)   fraud (whether previously intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)   the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  A motion seeking relief from a final judgment under Rule 60(b) must be made "within a reasonable time" and any motion under one of the first three grounds for relief must be made "no more than a year after the entry of judgment."  Id. R. 60(c)(1).

Despite the time limitations in Rule 60(b), "[c]ourts have inherent equity power to vacate judgments obtained by fraud."  United States v. Estate of Stonehill, 660 F.3d 415, 443 (9th Cir. 2011) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).  Rule 60(d)(3) preserves this inherent power and recognizes that Rule 60 does not "limit a court's power . . . to set aside a judgment for fraud on the court."  Fed. R. Civ. P. 60(d)(3); accord Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) ("Federal Rule of Civil Procedure 60(b) preserves the district court's right to hear an independent action to set aside a judgment for fraud on the court."); Estate of Stonehill, 660 F.3d at 443 ("Rule 60(b), which governs relief from a judgment or order, provides no time

limit on courts' power to set aside judgments based on a finding of fraud on the court.").[2]

II.    Fraud on the Court

The Supreme Court has "justified the 'historic power of equity to set aside fraudulently begotten judgments' on the basis that 'tampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public.'" In re Levander, 180 F.3d 1114, 1118 (9th Cir. 1999) (quoting Chambers, 501 U.S. at 44).  Nonetheless, "[a] court must exercise its inherent powers with restraint and discretion in light of their potency."  Id. at 1119.

Any relief for fraud on the court must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a

---

[2] Prior to the amendments to the Federal Rules of Civil Procedure in 2007, the savings clause for fraud on the court was contained in Rule 60(b), and courts thus referred to Rule 60(b) as preserving a court's inherent power to set aside a final judgment for fraud on the court.  As part of the stylistic amendments in 2007, the savings clause language was moved from subsection (b) to subsection (d)(3). Compare Fed. R. Civ. P. 60(b) (2006) ("This rule does not limit the power of a court to entertain an independent action . . . to set aside a judgment for fraud on the court."), with Fed. R. Civ. P. 60(d)(3) (amended 2007) ("This rule does not limit a court's power to: . . (3) set aside a judgment for fraud on the court."); see also Fed. R. Civ. P. 60 (advisory committees notes to 2007 amendments) ("The language of Rule 60 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only.").

departure' from rigid adherence to the doctrine of res judicata." United States v. Beggerly, 524 U.S. 38, 46 (1998) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17 (1976)).  Additionally, the Ninth Circuit has repeatedly emphasized that "[e]xceptions which would allow final decisions to be reconsidered must be construed narrowly in order to preserve the finality of judgments." Abatti v. Comm'r, 859 F.2d 115, 119 (9th Cir. 1988); see also Appling, 340 F.3d at 780; Dixon v. Comm'r, 316 F.3d 1041, 1046 (9th Cir. 2003).

Fraud on the court "'embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'" Appling, 340 F.3d at 780 (quoting In re Levander, 180 F.3d at 1119) (alteration in original). "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it "harm[ed] the integrity of the judicial process.'" Estate of Stonehill, 660 F.3d at 444 (quoting Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)).

Although "one of the concerns underlying the 'fraud on the court' exception is that such fraud prevents the opposing party from fully and fairly presenting his case," this showing alone is not sufficient.  Abatti, 859 F.2d at 119. Instead, it "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1131 (9th Cir. 1995) (internal quotation marks omitted); see also Appling, 340 F.3d at 780 ("Fraud on the court requires a 'grave miscarriage of justice,' and a fraud that is aimed at the court." (quoting Beggerly, 524 U.S. at 47)).  Additionally, a showing of prejudice to the party seeking relief is not required.  Dixon, 316 F.3d at 1046.

"Non-disclosure, or perjury by a party or witness, does not, by itself, amount to fraud on the court."  Appling, 340 F.3d at 780; accord In re Levander, 180 F.3d at 1119; see also Hazel-Atlas Glass Co., 322 U.S. at 245 ("This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed to have been possibly guilty of perjury."). Additionally, the Supreme Court has held that a party's failure to "thoroughly search its records and make full disclosure to the Court" does not amount to fraud on the court.  Beggerly, 524 U.S. at 47.

11

Furthermore, non-disclosure by an officer of the court may amount to fraud on the court only if it was "so fundamental that it undermined the workings of the adversary process itself." Estate of Stonehill, 660 F.3d at 445; see also 11 Charles Alan Wright et al., Federal Practice and Procedure § 2870 (3d ed. 2014) ("[T]here is a powerful distinction between perjury to which an attorney is a party and that which no attorney is involved. . . . [W]hether perjury constitutes a fraud on the court should depend on whether an attorney or other officer of the court was a party to it."). Non-disclosure by an officer of the court, however, does not rise to this level if it had a "limited effect on the district court's decision" and the withheld information would not have "significantly changed the information available to the district [or habeas] court." Estate of Stonehill, 660 F.3d at 446.

The Ninth Circuit has "struggled to define the conduct that constitutes fraud on the court." Id. at 444. And "the term 'fraud on the court' remains a nebulous concept.'" In re Levander, 180 F.3d at 1119 (quoting Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp., 12 F.3d 1080, 1085 (Fed. Cir. 1993)). Nevertheless, the Ninth Circuit "places a high burden on [the party] seeking relief from a judgment," Latshaw v. Trainer Wortham & Co., Inc., 452 F.3d 1097, 1104 (9th Cir. 2006), and the party seeking relief must prove fraud by clear and convincing evidence, Estate of Stonehill, 660 F.3d at 443–44.

12

DISCUSSION

Petitioner argues that Respondents perpetrated a fraud on the habeas court by actively concealing information from the Court during Petitioner's habeas proceedings.  (Dkt. # 267 at 11–12.)  Specifically, he asserts that Respondents purposefully withheld exculpatory evidence during the proceedings to defeat Petitioner's claims.  (Id.)  Petitioner alleges in his motion that the withheld evidence includes: (1) corroborating eye-witness identifications of Burkhart by Schmidt and Annie Leong ("Leong"), and evidence that Respondent elicited false testimony from Leong; (2) Gas Express surveillance video of Burkhart which refutes any claim of his alibi; (3) evidence that Burkhart's alibi was false; (4) crime scene evidence including latent prints recovered on the driver's door of the victim's car; (5) exonerating evidence in the form of a 911 recording; (6) evidence that Petitioner did not make a confession; (7) additional witnesses to Burkhart's confession; (8) physical evidence of Seidel's shorts and blood swabs of blood taken from the crime scene; and (9) impeachment evidence from the 911 tape. (Dkt. # 267 at 9.)

Petitioner contends that Respondents' withholding of the foregoing evidence prohibited the Court from concluding that his case was similar to that of the petitioner in Chambers v. Mississippi, in which the Supreme Court held that the

13

petitioner had been deprived of his due process right to a fair trial by the exclusion of certain exculpatory evidence.  See Chambers v. Mississippi, 410 U.S. 284, 302–03 (1973).  Petitioner alleges that Respondents' concealment of the evidence in his case directly links Burkhart to the murder, thus exonerating him from the crime.  (Dkt. # 267 at 18.)

In response, Respondents deny any allegations of fraud, misrepresentation, and misconduct during Petitioner's habeas proceedings.  (Dkt. # 287 at 18.)  Respondents contend that the prosecution performed its duties in good faith and has not denied Petitioner any due process of law.  (Id.) Respondents argue that Petitioner is unable to meet his burden of proving by clear and convincing evidence that Respondents committed a fraud on the habeas court. (Id.)

I.    Corroborating Eyewitness Identifications

A.    Phillip Schmidt Identification

Petitioner first contends that Respondents withheld evidence that Schmidt, an eyewitness at the scene of the crime who saw the assailant flee, had originally identified the assailant as Burkhart, the person Petitioner claims is responsible for Cabbacang's murder, from a photographic lineup only three days after the murder.  (Dkt. # 267 at 18–19.)  Petitioner also alleges that Schmidt was

incorrectly informed that Petitioner had confessed to the murder just prior to his identification of Petitioner in a second photo lineup presented to him five weeks after the first lineup; Petitioner contends that this information was also withheld from the habeas court. (Id.) Petitioner argues that Respondents not only withheld Schmidt's identification of Burkhart from the habeas court and the Ninth Circuit, but also went further and attempted to impeach Schmidt's testimony after he recanted his identification of Petitioner. (Id.)

In response, Respondents contend that their counsel had not been aware of Schmidt's "recent representation that [Schmidt] first identified Burkhart from a police line-up prior to identifying Petitioner." (Dkt. # 287 at 18.) Respondents assert that Schmidt's statements concerning his identification of Burkhart were inconsistent with his sworn statements made under oath at Petitioner's 1997 trial and at the 2008 habeas proceedings. (Id. at 18–19.) Respondents also contend that there was no fraud in their prior action to impeach Schmidt's recent recantation of his prior identification of Petitioner. (Id. at 19.) Respondents argue that a 1999 conviction provided Schmidt a motive to change his prior testimony, and that Respondents' use of this conviction in questioning Schmidt was proper. (Id.) Respondents also point out that Schmidt testified on

15

behalf of Petitioner at the habeas proceeding, and that Petitioner had ample opportunity to present Schmidt's original identification then.  (Id.)

Schmidt originally testified as a witness for the prosecution during Petitioner's criminal trial in 1997.  (Dkt. # 371-7.)  At the trial, Petitioner's counsel questioned Schmidt about the first photo lineup presented to him shortly after the murder in July 1995; Schmidt agreed with Petitioner's counsel that "none of the men on that first lineup is the one [he] saw [at the scene]," but that he remembered incorrectly "identifying that one of those men [on that first photo lineup] may have been the person" involved in Cabaccang's murder.  (Id. at 43.)  Petitioner's counsel declined to follow up with Schmidt regarding his initial identification of someone other than Petitioner.  Schmidt was shown the first photo lineup again at trial and positively stated that none of the pictures in that lineup was "the person [he saw] walking down the street."[3]  (Id. at 37.)

---

[3] Although not a basis for his fraud on the habeas court motion, Petitioner contends that this photo lineup has since gone missing and that the police reports associated with Schmidt's identification of Burkhart are also missing without any explanation. (Dkt. # 405-1 at 9.)

On March 5, 1997, the trial court conducted a hearing pursuant to Rule 103 of the Hawaii Rules of Evidence[4] during the trial to determine whether there was sufficient corroboration of Burkhart's alleged confessions to admit them into evidence.  The transcript of that proceeding shows that Respondents' counsel, in arguing why the confessions should be excluded from evidence, stated that "Mr. Burkhart's picture appeared in photo arrays that were displayed to several witnesses, and no one picked out Mr. Burkhart.  That's a significant fact."  (Dkt. # 370-3 at 11.)  Ultimately, after hearing additional evidence and testimony, the trial court denied the alleged confessions from being presented to the jury.

Eleven years later, at the 2008 habeas hearing, Schmidt was again called as a witness; this time he testified for Petitioner.  (Dkt. # 147 at 31.) Schmidt was questioned at this hearing concerning "the prior photo lineups" that he looked at in 1995.  (Id. at 35.)  Schmidt agreed that he was shown two photo lineups.  (Id.)  When questioned concerning the first photo lineup, he agreed that he didn't "identify anybody as the one that was walking away."  (Id. at 36.)  He testified that he "now know[s that lineup] contains a photo of James Burkhart] but

---

[4] "Under Hawaii Rule of Evidence 804(b)(3), a 'statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.'"  Christian, 595 F.3d at 1079 n. 3.

he agreed that "at that time [he] didn't identify James Burkhart." (Id.) Schmidt agreed later in his testimony that he "picked out Taryn Christian from a lineup not James Burkhart." (Id. at 47.) Schmidt further testified that his memory was better in 1997 than it was in 2008 at the habeas hearing. (Id. at 47.) Schmidt disagreed that he still had "a clear image of the person [he] saw walking away" and stated that he was "not positive" that the person was Burkhart. (Id. at 53.) At no time did Schmidt inform the habeas court that he ever positively identified Burkhart in the first photo lineup.

Subsequently, at the hearing before the Ninth Circuit in 2009, Respondent's counsel affirmatively stated that "[i]n this case, the eyewitnesses at the location identified the Petitioner, not anybody else. There's nothing to tie this third party, Mr. Burkhart to the location." (Dkt. # 268-6 at 5.) Later in the hearing, Petitioner's counsel, during his argument, stated that "Mr. Burkhart was the original suspect in the case. According to much of the evidence, he matched the description in the case . . . ." (Id. at 15.) In response to that statement, one of the circuit judges interrupted Petitioner's counsel to say "[b]ut the eyewitnesses did not identify him in the photo lineup, rather they identified the [Petitioner] here." (Id.) Petitioner's counsel's reply to the circuit judge concerned only Burkhart's

18

alibi evidence and there was no further mention of a photo lineup identification of Burkhart.  (Id. at 15–16.)

Ultimately, the Ninth Circuit held that the Hawaii Supreme Court's decision that the facts in Petitioner's case were materially distinguishable from Chambers v. Mississippi, 410 U.S. 284 (1973), was reasonable.  Christian v. Frank, 595 F.3d 1076 (9th Cir. 2010).  In reviewing the Hawaii Supreme Court's decision, the Ninth Circuit stated that "no eyewitnesses linked Burkhart with the scene of the crime."  Id. at 1083.  The Ninth Circuit further stated that "the Hawaii Supreme Court noted that the only two eyewitnesses present at the murder, Seidel and Schmidt, had both failed to identify Burkhart in photo lineups and instead had individually identified Christian as the culprit."  (Id. at 1083–84.)  Among other evidence and after reviewing the case, the Ninth Circuit stated that "[t]here are such significant factual differences between the case before us and Chambers that the Hawaii Supreme Court's decision to distinguish the two cases was not unreasonable."  Id. at 1084.

On the facts presented, Petitioner has not shown clear and convincing evidence of perjury or fraudulent nondisclosure by Respondents.  Schmidt's testimony from Petitioner's trial was clear that he initially identified someone else, presumably Burkhart, in the first photo lineup and before his later identification of

19

Petitioner.  In fact, it was Petitioner's counsel that asked Schmidt about his initial identification in the first lineup.  While Petitioner states that he only learned of Schmidt's identification of Burkhart in the initial photo lineup through an independent investigation in July 2010 (see, e.g., Dkt. # 405-1 at 11), Schmidt's testimony at trial is evidence that Petitioner's trial counsel was aware that Schmidt initially identified someone other than Petitioner at least as far back as 1997.

As for Petitioner's contention that Schmidt was falsely informed that Petitioner had already confessed to Cabaccang's murder just prior to his identification of Petitioner in the second lineup, this is not the proper subject of a fraud on the habeas court challenge.  Even if this contention is true, this is not evidence that Respondents committed a fraud on the habeas court by incorrectly informing Schmidt that Petitioner had already confessed to the murder.

Additionally, Schmidt's apparent recantation of his identification of Petitioner during the habeas proceedings does not include any clear statement that he initially identified Burkhart in 1995 in the first photo lineup.  When questioned on the subject, Schmidt's testimony at the habeas hearing indicates that he could not say for sure that it was Burkhart he saw the night of the murder.  For instance, he stated that he was "not positive" that the person he saw was Burkhart.  (Dkt. # 147 at 53.)  His recantation instead focuses on his belief that he might have been

20

mistaken in identifying Petitioner as the person he identified at the scene of the crime, and not on his belief that it was definitely Burkhart he saw the night of the crime.

And, while it is true, as Petitioner contends, that Respondents did not inform the habeas court or the Ninth Circuit that Schmidt previously identified Burkhart in the first photo lineup, Petitioner has not produced clear and convincing evidence that Respondent's <u>counsel</u>, at any stage of the proceedings, ever had knowledge of Schmidt's initial identification of Burkhart.  <u>Cf.</u> <u>Beggerly</u>, 524 U.S. at 47 (holding that a party's failure to "thoroughly search its records and make full disclosure to the Court" is not fraud on the court).  Without such evidence, Petitioner cannot meet his burden of demonstrating fraud on the habeas court.

Furthermore, Respondents' contention that Schmidt identified only Petitioner, and not Burkhart, in a photo lineup is consistent throughout the history of this case.  Respondents' representation to the trial judge in March 1997 that no one identified Burkhart is the same position Respondents maintained eleven years later during the habeas proceedings.  Thus, there does not appear to be any perjury or nondisclosure to the habeas court regarding Respondents' consistent position that Schmidt did not identify Burkhart in a photo lineup.

21

In any case, Petitioner also failed to disclose Schmidt's identification to the habeas court and the Ninth Circuit, despite evidence that Petitioner knew about Schmidt's initial identification of Burkhart in the photo lineup at least as far back as Petitioner's 1997 criminal trial. Therefore, by presenting Schmidt as his witness at the habeas hearing, Petitioner's counsel had the ability to argue to the Court, and Schmidt had the opportunity to testify, that Schmidt initially identified Burkhart, or at the very least someone other than Petitioner, in the initial photo lineup.

Additionally, Petitioner's contention that it was improper for Respondents to question Schmidt at the habeas proceeding in an attempt to impeach his recantation is without merit. Respondents' questioning of Schmidt concerning a possible motive for his recantation following an incident with the Maui Police, wherein Schmidt testified he had a negative experience and that it was something he would "never forget," was not improper. (Dkt. # 147 at 41.)

Despite all of this, even if Petitioner had clear and convincing evidence that Respondents intentionally withheld evidence of Schmidt's initial identification of Burkhart the night of the murder, it does not appear to be evidence that is "so fundamental that it undermined the workings of the adversary process itself." Estate of Stonehill, 660 F.3d at 445. Neither has Petitioner offered clear

22

and convincing evidence that Respondents' failure to disclose Schmidt's

identification of Burkhart constitutes the kind of "'unconscionable plan or scheme

which is designed to improperly influence the court in its decision.'"  Pizzuto v.

Ramirez, 783 F.3d 1171, 1181 (9th Cir. 2015) (quoting Toscano v. Comm'r, 441

F.2d 930, 934 (9th Cir. 1971)).  As discussed, Petitioner's trial counsel obviously

knew that Schmidt had originally identified someone else, and the jury was

presented with this testimony before finding Petitioner guilty of the crime.[5]

On this record, Petitioner has not demonstrated that Respondents have

attempted to "hide a key fact from the [habeas] court and the opposing party."

Estate of Stonehill, 660 F.3d at 445.   Petitioner has not demonstrated by clear and

convincing evidence that Respondents intentionally withheld any evidence at the

habeas proceeding or at the hearing before the Ninth Circuit that Schmidt initially

identified Burkhart as the person he saw walking away from the scene of

Cabaccang's murder.  Petitioner therefore has not demonstrated fraud on the

habeas court for this contention.

---

[5] The jury was also presented with evidence upon which it could conclude that
Schmidt may have mistakenly recognized Petitioner in the second lineup because
he had seen him prior to the night of the murder at the Pukalini Golf Course where
Petitioner worked in the kitchen.  (Dkt. # 371-7 at 34.)

B.   <u>Annie Leong Testimony</u>

Petitioner asserts that Respondents committed fraud on the habeas court by eliciting false testimony from Annie Leong, who was working at Gas Express, a gas station and convenience store, on the night of the murder.  (Dkt. # 267 at 21.)  Petitioner contends that Respondents' questioning of Leong at the habeas hearing elicited false testimony that concealed her identification of Burkhart as the person she saw in the convenience store the night of murder.  (<u>Id.</u>)  On cross-examination by Respondents at the habeas hearing, Leong testified that she met with Petitioner's trial counsel, Richard Icenogle ("Icenogle"), and an investigator, shortly after the murder, and was shown two 4-x-6 photos for identification.  (Dkt. # 147 at 69–70.)  Petitioner contends that this testimony is false because Icenogle submitted a declaration in 2010 that he never met Leong and was never provided discovery of two 4-x-6 photos.  (Dkt. # 267 at 19.)

Respondents argue that Petitioner's allegation is without merit.  (Dkt. # 287 at 21.)  They assert that although their counsel supplied the name "Icenogle" to Leong as she was beginning to answer the question, she had already begun to state his name.  (<u>Id.</u>)  Finally, Respondents contend that they did not improperly withhold a purported identification of Burkhart by Leong because Leong never actually identified Burkhart as the individual seen entering the Gas Express.  (<u>Id.</u>)

24

Petitioner has not provided sufficient evidence that Respondents elicited false testimony from Leong. Icenogle's declaration that he never met with Leong was not made until 2010, two years after the habeas proceeding. (See Dkt. # 268-2 at 1–3.) In any case, Petitioner has not provided evidence that Respondents positively knew that Icenogle never met with Leong at the time she testified at the habeas proceeding. While there is some evidence presented by Petitioner that Respondents questioned Leong regarding who was present when she was shown the photos and in preparation for her testimony just prior to the habeas proceeding, there is not clear evidence that Respondents intentionally induced Leong to lie or falsely testify concerning this occurrence. (See Dkt. # 386 at 105.)

Likewise, the fact that Respondent's counsel is the person who actually stated Icenogle's name during the habeas hearing when he questioned Leong is not evidence of fraud on the habeas court; the transcript indicates that Leong had already begun to state Icenogle's name, with some apparent hesitation on its pronunciation, when counsel for the Respondents supplied the name. (See Dkt. # 147 at 69–70.) Accordingly, Petitioner has not presented clear and convincing evidence that Respondents' questioning of Leong amounted to a fraud on the habeas court.

Additionally, Petitioner's allegation that Respondents withheld Leong's identification of Burkhart is without merit because there is no credible evidence that Leong actually made a positive identification of Burkhart.  While Petitioner argues that Leong was presented with two 4-x-6 photos and made an identification of one of them as the man she saw in Gas Express the night of the murder, the evidence indicates that Leong later identified a different person, Garrett Duane Brawith, as the individual who entered the store on the night in question.  (Dkt. # 287-7 at 3; Dkt. # 287-8 at 2.)  While Leong's description of the individual may have matched that of Burkhart, there is no evidence that Leong herself ever positively identified Burkhart as the individual in Gas Express. Nevertheless, even if Leong did identify Burkhart, her identification of him was contradicted by her subsequent identification of Brawith.

And while Respondents assert that they have never been able to locate the 4-x-6 photos that Leong was shown, this does not appear to be a fact hidden from the habeas court.  Leong's testimony at the habeas proceeding makes clear that she was shown two 4-x-6 photos "shortly after the time [she] saw somebody with apparently an injured hand in Gas Express," and that she was able to "pick somebody out of those photographs."  (Dkt. # 147 at 67.)

26

Still, even if Respondent's actions at the habeas proceeding amount to non-disclosure regarding Leong's possible identification of Burkhart in the photos, there was sufficient evidence in the record to allow the habeas court to make an inference that Leong identified Burkhart when she was questioned at the habeas proceeding regarding the photos.  Thus, there is no indication that any potential non-disclosure of Leong's alleged identification of Burkhart constituted fraud on the habeas court.

II.   <u>Gas Express Surveillance Video</u>

Petitioner alleges that Respondents withheld a surveillance tape from Gas Express labeled "Tape 11," and instead provided only a distorted tape from First Hawaiian Bank dated on the day following the murder.  (Dkt. # 267 at 19–20.)  He contends that this amounted to fraud on the court because of Respondents' actions in concealing, suppressing, altering and substituting key evidence that would exonerate him.  (Dkt. # 291 at 14.)

Respondents argue that they provided Petitioner with all of the discovery evidence that existed at the time.  (Dkt. # 287 at 20.)  They contend that other than an isolated reference from a police report based on Annie Leong's statement to police during the investigation of the crime, there is no other mention of Tape 11 in the police records for the case, and Respondents allowed Petitioner's

27

counsel to review all the evidence in the Maui Police Department's ("MPD")

possession.  (Id.)  Respondents also assert that, in any case, the police report which

indicates that another tape was recovered from Gas Express was provided to

Petitioner during the habeas hearing, and that Petitioner's counsel was advised that

the evidence was being held at the MPD.[6]  (Id.)  Respondents contend that

Petitioner's counsel was allowed to view this and all other evidence in possession

of the MPD at that time.  (Id.)

 While Petitioner argues that surveillance videos in existence from

First Hawaiian Bank and possibly from Gas Express may have been mishandled, or

at the very least misidentified, prior to Petitioner's habeas proceeding (see Dkt.

# 390 at 40–41), any potential mishandling is insufficient to show fraud on the

habeas court.  Petitioner has not demonstrated that any mishandling of the tape

amounted to a plan or scheme to improperly influence the habeas court, especially

in light of the fact that Petitioner's habeas counsel had the opportunity to review

the evidence, including any tapes, in the MPD's possession prior to the habeas

proceeding.  See Pizzuto v. Ramirez, 783 F.3d 1171, 1180 (9th Cir. 2015) ("[A]

party bears a high burden in seeking to prove fraud on the court, which must

---

[6] According to Stipulated Exhibit 33, the MPD reported being in possession of two Gas Express video tapes in April 2008: the Gas Express "First Hawaiian Bank – outside" tape and the Gas Express "Office" tape.  (Dkt. # 349, Ex. 33.)

involve a plan or scheme which is designed to improperly influence the court in its decision." (quotation marks omitted)).

Furthermore, Petitioner has not produced sufficient evidence that Respondents ever had Tape 11 in its possession.  The Court ordered that Respondents produce Tape 11, but it was not produced because the MPD could not find any such tape.  (Dkts. ## 382, 383.)  In any case, as Respondents persuasively point out,[7] even if Tape 11 was located and its contents viewed, it is not clear proof needed to prove fraud on the habeas court that it was indeed Burkhart, and not Petitioner, that attacked Cabaccang on the night of the murder, even if it refutes any possible alibi by Burkhart.  (See Dkt. # 391 at 14; Dt. # 291 at 15–16.) Therefore, any lack of production of Tape 11 on the part of Respondents is not evidence of fraud on the habeas court because the relevant inquiry is not whether potentially fraudulent conduct 'prejudiced the opposing party,' but whether it "harm[ed] the integrity of the judicial process.'"  Estate of Stonehill, 660 F.3d at 444.  Petitioner has not met his burden on this account.

_____

[7] Respondents quote Judge Kobayashi's observation at the habeas proceeding that "[e]ven if Burkhart did go into the Gas Express with an injured hand, this still does not establish that Burkhart attacked Cabaccang."  (Dkt. # 391 at 14.)

III.   <u>False Alibi for Burkhart</u>

Petitioner alleges that in July 2010, his investigator interviewed Burkhart's cousin, Harry Auweloa, one of the witnesses who supported Burkhart's supposed alibi, who stated that neither he nor his wife, Helen Beatty ("Beatty"), could provide Burkhart an alibi, as prosecutors represented during the original case and habeas proceeding.  (Dkt. # 267 at 20.)  Petitioner alleges that Respondents committed fraud on the court by presenting a false alibi for Burkhart to the habeas court.  (<u>Id.</u>)

In response, Respondents contend that in July 1995, when police interviewed Auweloa one week after the murder, he stated to police that Burkhart stayed at his residence from July 9, 1995, to July 22, 1995, and did not leave during this period.  (Dkt. # 287 at 24.)  Additionally, Beatty stated to police that she had seen Burkhart sleeping in their spare bedroom when she got up to feed her baby between 1:00 a.m. and 3:00 a.m. on the morning of July 14, 1995.  (<u>Id.</u> at 25.)  Respondents argue that because the recent declarations are based on present recollection, and not what the witnesses knew in 1995, they did not commit fraud on the habeas court.  (<u>Id.</u>)

Approximately thirteen years later, in July 2008, Beatty submitted a declaration in which she stated that "[t]o my best recollection [Burkhart] was in my

home when I fell asleep" and that she "would not know if he was there" when she

was still sleeping later that night.  (Dkt. # 349-6.)  The habeas hearing was held in

August 2008, one month after Beatty's declaration; however, the declaration was

excluded from that proceeding because Petitioner submitted it after the Court's

deadline. (Dkt. # 146 at 11.)  Petitioner was also precluded from offering Beatty's

testimony because the "proposed testimony was more appropriate if and when

[Petitioner] received a new trial and was not relevant to the issues that the parties

would address during the evidentiary hearing."  (Id.)  The declaration from

Auweloa was not made until 2010.  (Dkt. # 268-3 at 10.)  Like Beatty's

declaration, Auweloa does not make an affirmative statement that Burkhart was

not at his residence on the night in question; instead, the declaration is handwritten

and contains one line that states "while working I wouldn't know that if [Burkhart]

was home, or while[8] sleeping also."  (Id.)

        Petitioner's contention that Respondents committed fraud on the

habeas court by submitting false evidence of an alibi for Burkhart is without merit.

Beatty's declaration, made one month prior to the habeas proceeding and thirteen

years after her original statement to the police, does not provide a clear statement

---

[8] Presumably, Auweloa meant "was."

that Burkhart was not at her home the night of the murder.  Additionally, Auweloa's declaration from 2010 is not clear evidence that Burkhart did not have an alibi.  On this record, Petitioner has not submitted sufficient evidence that Respondents falsified Burkhart's alibi when it represented to the habeas court that Burkhart had an alibi on the night of Cabaccang's murder.

Additionally, during the habeas proceeding, it had already been determined that testimony and evidence concerning Burkhart's possible alibi was not relevant.  (See Dkt. # 146 at 11.)  The determination that the evidence was not relevant indicates that the Court was already aware of the substance of Beatty's declaration and potential testimony.  Any representation one way or another by Respondent in regard to Burkhart's alibi would therefore be inconsequential.

Accordingly, Petitioner has not provided sufficient evidence that Respondents' representation of Burkhart's alibi at the habeas proceedings significantly affected the outcome of the case.  At most, Petitioner has provided evidence, in the form of Beatty and Auweloa's declarations submitted some thirteen or more years after the murder, that they were not sure whether Burkhart was home on the night in question.  These declarations are not clear and convincing evidence that Respondents committed a fraud on the Court by relying on the declarants' original statements to the police, soon after the murder in 1995

32

that Burkhart was at their home on the night of Cabaccang's murder.  Therefore,

Petitioner has not provided clear and convincing evidence of fraud on the habeas

court on this ground.

IV.    Crime Scene Evidence

Petitioner argues that it was not until 2009 that he learned that

detectives recovered fingerprint evidence from the driver's door of Cabaccang's

vehicle at the scene, prior to the forensic examination for latent prints that took

place later at the MPD.  (Dkt. # 267 at 20.)  Petitioner contends that he also later

learned that a bag containing an ice pick, condoms, and a pager/phone were

recovered at the scene of the crime.  (Id.)  Petitioner asserts that Respondents

withheld this evidence, and then argued to the habeas court that no evidence linked

Burkhart to the scene of the crime, amounting to fraud on the habeas court.  (Id.)

In response, Respondents contend that Petitioner's claim lacks merit

because Petitioner was provided full access to the evidence recovered in the case.

(Dkt. # 287 at 26.)  Respondents argue that they are unaware of any police report

referencing the ice pick, pager/phone, or condoms as recovered evidence.  (Id.)

Additionally, Respondents argue that the recovered forensic evidence was included

in the 433-page police report file Petitioner received.  (Id. at 26–27.)

33

Petitioner has not met his burden to show that Respondents committed a fraud on the habeas court by suppressing fingerprint evidence or any other alleged evidence obtained from Cabaccang's vehicle.  Prior to the habeas proceeding, in January 2008, Petitioner's habeas counsel personally viewed all of the evidence contained at the MPD.  (Dkt. # 287-3.)  His attorney had access to the voluminous police report file which included evidence pertaining to fingerprints and the other evidence recovered from Cabaccang's vehicle.  (Id.; Dkt. # 287-10.)  Additionally, the results of a latent fingerprint analysis were provided to Petitioner's counsel, but the results identified only Cabaccang's prints.  (Id.)  Petitioner's prior counsel was likewise shown the police reports.  (Dkt. # 32-2 at 14, 20.)

Further, Petitioner cannot claim that a fraud on the habeas court occurred by any alleged non-disclosure of the recovery of "a bag containing an ice pick, condoms, and a pager/phone" from Cabaccang's vehicle.  Petitioner has not produced a police report or some other reliable evidence which identifies that this evidence was indeed recovered; he has presented only the hearsay testimony of its recovery from Richard Smith, an investigator hired by Petitioner.  (Id.)

In any case, even if Petitioner could prove that Respondents withheld evidence concerning a bag found in Cabaccang's vehicle or that latent prints were

34

obtained from the vehicle, he has not demonstrated that the non-disclosure would not have been "so fundamental that it undermined the workings of the adversary process itself." Estate of Stonehill, 660 F.3d at 445. Petitioner has not produced clear and convincing evidence that a fraud on the habeas court occurred by Respondents' non-disclosure of the evidence obtained from Cabaccang's vehicle.

V.   Allegedly False Audio Expert Testimony

Petitioner alleges that Respondents committed a fraud on the habeas court by introducing false testimony at the habeas hearing from their audio expert David Smith, who testified that he could not verify if Cabaccang identified Burkhart on an audio recording made shortly before he died. (Dkt. # 267 at 21.) Petitioner argues that two lay witnesses, Schmidt and Rudy Cabanting, a cousin of Cabaccang, each separately identified and verified that the unidentified voice in the background of the 911 call was Cabaccang and that Cabaccang stated "James Burkhart just walked off." (Id.) Petitioner claims that this evidence implicates the veracity of Smith's testimony and the overall integrity of the habeas evidentiary proceeding. (Id.)

Respondents contend that during the habeas hearing, both sides presented audio experts, and that although Petitioner's expert, John Mitchell, stated that he could hear a voice say "James Burkhart just walked off," Respondents'

35

expert, Smith, testified he could not verify that statement.  (Dkt. # 287 at 27.)

Respondents also point out that in the magistrate judge's Findings and

Recommendation to Grant in Part and Deny in Part Petition for Writ of Habeas

Corpus (Dkt. # 146), that court stated, "the evidence presented for the evidentiary

hearing indicates that reasonable audio experts could differ about whether the

name James Burkhart can be heard on the Perry 911 tape."  (Dkt. # 287 at 28.)

Petitioner has not established evidence of fraud on the habeas court

based on Smith's testimony at the habeas hearing.  This Court has already

recognized the magistrate judge's determination during the habeas proceedings that

reasonable audio experts could disagree as to whether Cabaccang did in fact

mention Burkhart's name shortly before he died.  (Dkt. # 153 at 27; Dkt. # 146 at

56.)  In such case, the Ninth Circuit, in reviewing the district court's ruling on

Petitioner's habeas petition, was likely aware of the difference of opinion

regarding whether Cabaccang uttered a statement that "James Burkhart just walked

off" prior to issuing its opinion.

Furthermore, Petitioner has not presented evidence that Respondents

elicited any false testimony from Smith during the habeas proceeding.  Smith's

testimony at the habeas proceeding was that it was his opinion that it was

"unintelligible" as to whether Burkhart's name could be heard on the audio.  There

is no evidence that Smith lied about this or that he or Respondents manipulated the original audio recording, as Petitioner suggests.

       While Petitioner urges the Court to consider that two lay witnesses without any audio analysis training, Schmidt and Cabanting, both identified Cabaccang as mentioning Burkhart's name on the audio, this is not evidence of Respondents' fraud on the habeas court.  In any case, there is evidence that Schmidt did not hear Burkhart's name on the recording right away.  Schmidt's testimony at the evidentiary hearing on Petitioner's instant Rule 60 motion was that Petitioner's investigator, along with Petitioner's mother,[9] came to play the audio at his work and that his first impression of the recording was that Cabaccang said "blueberry, cherry."  (Dkt. # 386 at 65.)  Schmidt's second impression of the recording was that Cabaccang said "fruit tart."  (Id.)  He testified that he finally heard the word "Burkhart" after hearing the audio in succession at least eight times.  (Id.)

---

[9] Given that it was Petitioner's investigator, along with his mother, that presented the audio recording to Schmidt, Respondents suggest that this is evidence that Schmidt was swayed into believing he heard the word "Burkhart" on the recording (Dkt. # 391 at 10); Schmidt also testified that Petitioner's mother attempted to sway him when she came to his house and "offered to make [him] some pies or cakes or cookies, and [that he] felt very uncomfortable with that."  (Dkt. # 386 at 10.)

Based on the evidence presented, Petitioner has not met his burden of providing clear and convincing evidence of Respondents' fraud on the habeas court in Smith's testimony at the habeas proceeding.

## VI.   Alleged Fraud Upon the Ninth Circuit Court of Appeals

Petitioner alleges that Respondents committed fraud on the habeas court when Respondents informed the Ninth Circuit, at the hearing on appeal of the district court's habeas decision, that Petitioner had not, in fact, confessed to Cabaccang's murder.  (Dkt. # 267 at 22.)  Petitioner argues this position is converse to the position Respondents argued at trial that Petitioner had made a confession to his girlfriend.  (Id.)  In regards to this alleged confession, Petitioner also argues that prosecutors, prior to the argument at the Ninth Circuit, deliberately manipulated audio tapes of Petitioner's conversations to make his denials appear to be a confession that they knew Petitioner never made.  (Id.)

In response, Respondents argue that Petitioner's expert, John Mitchell ("Mitchell"), when testifying at the habeas evidentiary hearing, stated that he could not discern any confession on the tape, and that Respondents simply acknowledged the same to the Ninth Circuit when asked if Petitioner had confessed.  (Dkt. # 287 at 28–29.)  Respondents contend that this consistency does not amount to fraud on the habeas court.  (Id.)

38

At Petitioner's criminal trial, Respondents argued and presented evidence that Petitioner had confessed to the crime.  (See, e.g., Dkt. # 371-2 at 9–11.)  During closing arguments, the prosecution argued that Petitioner admitted his guilt to Lisa Kimmey, his former girlfriend, in a recorded tape of their conversation ("Christian-Kimmey tape").  (Id.)  The prosecution characterized this tape as Petitioner's confession.  (Id.)

At the district court's habeas proceeding in 2008, Mitchell was asked during cross-examination by Respondents' counsel about his analysis of the Christian-Kimmey tape.  (Dkt. # 147 at 23.)  Mitchell testified that he "found two statements of denial" on the tape and that after analysis, he concluded that "no statements of confession were found."  (Id.)  When further asked by Respondents' counsel if "there were statements of confession or insinuating responsibility for the murders," Mitchell answered "I found some conversational mannerisms that I don't consider to be confessions.  I did not find at any point where Mr. Christian said, I killed this person, I stabbed this person, I did this.  These were conversational mannerisms."  (Id. at 24.)

At the hearing on Petitioner's appeal of his habeas case to the Ninth Circuit, when asked by the circuit judge about Petitioner's confession in the case

and whether it was a voluntary confession, Respondents' counsel stated that "[t]here was no confession in this case."  (Dkt. # 268-8 at 22.)

While it is true, as Petitioner suggests, that Respondents made a different representation at trial regarding Petitioner's alleged confession than was made at the habeas proceedings and before the Ninth Circuit, there is not sufficient evidence that counsel's inconsistent statements amounted to a fraud on the habeas court.  Prior to the Ninth Circuit hearing, the magistrate judge had already recognized Respondents' contention at trial that Petitioner made a confession to Kimmey; however, when issuing his report on Petitioner's habeas petition, the magistrate judge stated that "[b]oth of the audio experts in this case agreed [at the evidentiary hearing] that there are two denials on the Christian-Kimmey tape," but that there are "numerous other areas in the tape where [Petitioner] admits liability, either directly or by implication."  (Id. at 79.)

The Ninth Circuit was presented with the whole record, including the transcript of Petitioner's trial, the evidentiary hearing in Petitioner's habeas case, as well as the magistrate judge's report, before it issued its opinion reversing the Court's decision on Petitioner's habeas petition.  Although Respondents represented to the Ninth Circuit that Petitioner had not made a prior confession, the record is replete with instances where the Ninth Circuit could infer on its own that

40

Petitioner had made a confession in the Christian-Kimmey tape without any affirmative or negative statement regarding Petitioner's alleged confession from Respondents.[10]  Thus, Respondents' representation to the Ninth Circuit does not appear to be a fraud on the habeas court because the inconsistent statement did not "significantly change[] the information available to the [habeas] court." Estate of Stonehill, 660 F.3d at 446.

Furthermore, Petitioner has not presented any evidence that Respondents manipulated the Christian-Kimmey tape.  To the extent there are inconsistencies in what can be heard on the tape, the magistrate judge previously made note of it.  The magistrate judge stated that the places where Mitchell contends he heard Petitioner's denials on the audio "could only be heard if the volume was temporarily increased at those points in the recording."  (Dkt. # 126 at 52.)  As such, any inconsistencies on the tape appear to be evidence of the quality of the tape, and not evidence of Respondents' manipulation.

Accordingly, Petitioner's contention that Respondents committed fraud on the habeas court on this basis is without merit.

---

[10] Indeed, the Ninth Circuit may have acknowledged a confession by Petitioner when it stated that "[t]hree days after the attack, Christian told his former girlfriend that he had killed Cabaccang." Christian v. Frank, 595 F.3d 1076, 1078 (9th Cir. 2010).

VII.   <u>Withholding of Additional Burkhart Confession Witnesses</u>

Petitioner alleges that Respondents committed a fraud on the habeas court by withholding information that an additional witness heard Burkhart confess to killing Cabaccang.  (Dkt. # 267 at 22.)  Specifically, he contends that in November 2010, he learned that an additional witness to Burkhart's confession, John Iona ("Iona"), had been known to prosecutors since at least a year prior to Petitioner's trial.  (<u>Id.</u>)

In response, Respondents contend that they had no knowledge that Burkhart had made a confession to Iona prior to Petitioner's first motion to reopen his case in 2001.  (Dkt. # 287 at 29.)  Respondents assert that they were unaware of any police report from the case referencing Iona or Burkhart's confession to him prior to that time, and therefore, they could not have withheld something they never knew existed.  (<u>Id.</u>)

Petitioner has failed to present any evidence, much less clear and convincing evidence, that Respondents knew about Burkhart's alleged confession to Iona prior to Petitioner's trial, and then later withheld that confession from the habeas court.  Petitioner's only evidence in support of his contention is a declaration from Iona, dated after the habeas proceedings in November 2010, in which he declares that he met Burkhart while in prison and that Burkhart confessed

to killing Cabaccang to him on two occasions.  (Dkt. # 268-7.)  Petitioner does not

provide a police report or any other evidence that Iona was identified as a witness

to Burkhart's confession prior to Petitioner's trial.  Accordingly, Petitioner has not

met his burden to produce clear and convincing evidence of fraud on the habeas

court for this contention.

VIII.  Withholding of the Seidel Shorts

        Petitioner alleges that evidence was uncovered after the habeas

proceedings that Respondents schemed to deceive the habeas court by claiming

that Seidel's bloody shorts, one of the exhibits from trial, had been destroyed and

could not be forensically tested.  (Dkt. # 267 at 22.)  Petitioner claims that

Respondents' representation concerning the shorts is false because the shorts have

not been destroyed, and that the Maui Prosecutor's Office has had actual

possession, custody, and control of all the trial exhibits, including Seidel's shorts,

since the end of Petitioner's trial in 1997.  (Id. at 23.)  Petitioner also alleges that

Respondents improperly denied the existence of blood swab evidence.  (Id.)

        Respondents contend that their statement that the shorts were

destroyed was made in good faith.  (Dkt. # 287 at 30.)  They claim that in making

this representation to the habeas court, they relied on a letter from the Hawaii state

court, dated on October 9, 2000, that all exhibits and depositions from criminal

cases for the years 1990 to 1995 were deemed abandoned and destroyed.  (Id.; Dkt. # 287-12.)  Respondents also state that the Maui Prosecutor's Office was not in possession of all the withdrawn trial exhibits, including Seidel's shorts, in 1997 as Petitioner contends.  (Dkt. # 287 at 30.)

As for the blood swab evidence, Respondents assert that on April 8, 2008, his habeas counsel and an investigator met with the MPD Evidence Custodian to review the evidence still in the possession of the MPD.  (Id. at 31.)  According to Respondents, the investigator stated that the MPD "does not currently have ANY swabs associated with the case within its custody."  (Id.)  Additionally, the investigator stated that "it is currently undetermined whether the shorts were inadvertently destroyed by the State court."  (Id.)  Respondents note that the Court subsequently issued an order on May 2, 2008, denying Petitioner's motion to compel production of the swabs, stating "there are currently no additional swabs connected with this case in [the MPD's] possession."  (Id.)  Finally, Respondents argue that all of the swabs initially requested to be sent for testing were in fact tested by Petitioner's expert.  (Id.)  For these reasons, Respondents argue they could not have committed a fraud on the habeas court for this contention.

Seidel's shorts were a defense exhibit at Petitioner's trial.  (Dkt. # 349-18 at 5.)  The record on appeal from the Supreme Court of Hawaii indicates that on March 6, 1997, the shorts were "withheld" from being sent to that court and remained in the custody of the Hawaii Second Circuit Court ("Hawaii Second Circuit").  (Id.)  Seidel's shorts were apparently still in the custody of the Hawaii Second Circuit on April 6, 1999.  (Dkt. # 349-19 at 4.)  On October 9, 2000, the Hawaii Second Circuit issued a general order for any unclaimed exhibits in its custody, which stated that "all Exhibits and Depositions filed in Criminal cases" from the years 1990 to 1995[11] would "be deemed abandoned and disposed forthwith."  (Dkt. # 349-23 at 2.)

However, two different evidence cards obtained from the Hawaii Second Circuit indicates that in 2006, there were still two boxes of withheld evidence in its custody from Petitioner's criminal case.  (Dkts. ## 349-21, 349-22.)  The evidence cards do not specify what the boxes contained or if they included Seidel's shorts.  One of the evidence cards has the Hawaii Second Circuit clerk's certification seal on it and includes the notation "6/15/06 Gave to Susan for Review" and "6/16/06 Returned" (Dkt. # 22); the second evidence card, without

_____

[11] Petitioner's criminal case had a 1995 case number in state court.  (See, e.g., Dkt. # 349-18 at 1.)

the clerk's seal, also includes the notation "6/15/06 Gave to Susan for Review," but follows with "6/16/06 Returned to Pros" (Dkt. # 21).

In support of his contention that Respondents committed fraud on the habeas court regarding Seidel's missing shorts, Petitioner argues that the notations on the evidence cards were altered or forged in an attempt to cover up the intentional disappearance of the shorts by Respondent.  (Dkt. # 390 at 43.) Petitioner contends that the words "To Pros" were erased and replaced with the word "Returned" on the second evidence card.  (Id.)  Petitioner also contends that the prosecutors requested that the Hawaii Second Circuit create the 2006 memo to them with a blanket order disposing of cases from 1990 to 1995 in an attempt to cover up the disappearance of the shorts from evidence.  (Id.; see Dkt. # 349-23 at 1.)

A handwriting expert, Reed Hayes, testified on behalf of Petitioner at the evidentiary hearing on Petitioner's instant motion that he was "entirely certain" that an erasure had occurred on one of the evidence cards.  (Dkt. # 359 at 15.) However, Hayes was unable to state when he believed the alleged erasure had occurred.  (Id. at 16.)  Also, Kathleen Moniz, a former clerk of the Hawaii Second Circuit, testified at the evidentiary hearing on Petitioner's Rule 60 motion that it was not her handwriting on the second evidence card, without the Hawaii Second

46

Circuit's seal, that stated "to Pros." (Id. at 19, 25.)  Nevertheless, Moniz testified

that "the only people who would be granted . . . authority [to make a notation on an

evidence card] are court personnel." (Id. at 29.)

       Hawaii Second Circuit employee Susan Gushiken, a judicial assistant

with that court, testified that in June 2006 she was given Petitioner's evidence

boxes by the legal documents section of the Hawaii Second Circuit so that the

prosecutors could review the contents of the boxes. (Id. at 45.)  She testified that it

was not her handwriting on the evidence cards because her job "wouldn't include

signing in and signing out boxes full of evidence." (Id. at 44–45.)  Still, Gushiken

testified that she was present when the prosecutors viewed the contents of the

boxes in question in the court's jury room and that it "would have been a breach of

court protocol" to release any of the evidence to the prosecutors. (Id. at 47, 51.)

She further testified that she "personally" took "the boxes back down to the legal

documents section to be placed back into the vault" after the prosecution's review

of them. (Id. at 46, 47.)  Gushiken testified that she did not remember what was in

the boxes. (Id. at 53.)

       Petitioner has not met his heavy burden to produce clear and

convincing evidence that Respondents committed any fraud on the habeas court in

their representation that the Seidel shorts were destroyed and unavailable for

forensic testing.  Instead, Petitioner has produced only speculation that Respondents had a part in the whereabouts of Seidel's shorts following the last notation from the Hawaii Second Circuit in 1999 that they were still in its custody. (See Dkt. # 349-19 at 4.)  While Petitioner has produced evidence that two boxes of evidence withheld from transfer to the Supreme Court of Hawaii from Petitioner's trial were still in existence and viewed by the prosecution in 2006, he does not have any evidence that the shorts were in fact in the boxes of evidence, much less that they were taken or stolen from the evidence at that time by the prosecution.[12]  Additionally, Petitioner's evidence that an alleged erasure occurred on an unofficial evidence card does not show that Respondents were responsible for the erasure and therefore this evidence is not sufficient proof of fraud on the habeas court.

On the other hand, the testimony from Gushiken, a disinterested witness, is evidence that the prosecution was never left alone with the boxes of evidence, and that she personally took the boxes back to the legal document section of the Hawaii Second Circuit to be returned to their location in the court's vault following their inspection by the prosecution.  Any potential inconsistencies

--------

[12] Moreover, Petitioner has not presented evidence that Respondent was involved in any disappearance of Seidel's shorts prior to 2006.

in the two evidence cards appears only to be an internal chain of custody issue

within the Hawaii Second Circuit, which does not lend support to Petitioner's

theory that Respondents somehow had a hand in that court's chain of custody for

the evidence held in its storage.  Likewise, Petitioner has failed to produce any

evidence that Respondents somehow conspired with employees at the Hawaii

Second Circuit in a concerted effort to dispose of Seidel's shorts.

On this record, Petitioner has failed to demonstrate that Respondents

committed fraud on the habeas court in their representation that Seidel's shorts had

been destroyed and were not available for forensic testing.  Instead, Respondents'

representation appears to be a good faith statement that, to the best of their

knowledge, the shorts had in fact been destroyed by the Hawaii Second Circuit.

Petitioner's contention that this representation is fraud on the habeas court is not

supported by the record.

Additionally, Petitioner has not presented any evidence of fraud on

the habeas court in his contention that Respondents denied him access to blood

swab evidence.  Respondents were ordered during the discovery phase of the

habeas case to "inspect the evidence still in possession of the MPD and determine

if there are still swabs relating to this case."  (Dkt. # 101 at 7.)  The record

indicates that Respondents' investigator determined on April 8, 2008, that the

MPD did not have any blood swabs associated with Petitioner's case in its custody. (Dkt. # 102 at 3.)  On May 2, 2008, the Court held that "there are currently no additional swabs connected with this case in the MPD's possession."  (Dkt. # 104.) Petitioner has not presented any evidence to controvert this finding nor any evidence that Respondents lied about other swab evidence to the habeas court.  On this record, Petitioner has not provided clear and convincing evidence of fraud on the habeas court for his contention that Respondents withheld the existence of blood swab evidence.

IX.    Newly Discovered Impeachment Evidence on the 911 Tape

        Finally, Petitioner alleges that in 2009, he listened to the 911 recording for the first time, and that new evidence was uncovered that a male's voice, originally identified as an unknown male voice, can be heard shouting out, "You get help.  This is serious."  (Dkt. # 267 at 23.)  He contends that this voice is his own, shouting out to Seidel just before he fled the scene.  (Id.)  Petitioner argues that this tape presents evidence that could impeach Seidel's entire trial testimony and provides exculpatory evidence demonstrating that Petitioner could not have been the person Schmidt saw leaving the scene.  (Id. at 23–24.)  Petitioner alleges that prosecutors deliberately misled the court by providing an inaudible copy of the 911 tape prior to trial.  (Id.)

50

In response, Respondents contend that Petitioner's claims are without

merit because Petitioner had access to a copy of the 911 tape as far back as his

criminal trial in 1997.  (Dkt. # 287 at 32.)  Respondents also deny that any

statements on the tape would impeach Seidel's testimony or prove exculpatory.

(Id.)

Petitioner's contention that he recognized his voice on the 911 tape

for the first time, and that this constitutes newly discovered evidence, is without

merit.  The record demonstrates that Petitioner and his counsel knew that the 911

tape contained audio of a person uttering the described words prior to the habeas

proceedings in 2008.  The transcript from Petitioner's trial in 1997 shows that his

trial counsel told the jury during his closing arguments, "[r]emember what Taryn

Christian said to Serena [Seidel] as he left the scene when [he] finally got up and

saw for the first time how badly Vilmar was wounded?  He spoke of the need to

get help, to call 911."  (Dkt. # 234-6 at 45.)

Furthermore, the record demonstrates that Petitioner's audio expert

was aware of someone's voice on the 911 tape uttering the words "You get help.

This is serious," because he included it in his expert report dated December 3,

2007, and filed with this Court prior to the habeas proceedings on March 27, 2008.

(Dkt. # 99-2 at 4.)  Petitioner has also not provided any evidence that Respondents

51

provided an inaudible copy of the tape to the trial court.  Accordingly, Petitioner has failed to provide clear and convincing evidence of fraud on the habeas court based on supposed newly discovered impeachment evidence on the 911 tape.

CONCLUSION

For the foregoing reasons, Petitioner's Motion to Reopen Habeas Corpus Proceedings Pursuant to FRCP 60(b)/Independent Action Due to Newly Discovered Evidence of Fraud on the Court (Dkt. # 267) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:**  Honolulu, Hawaii, December 28, 2015.



David Alan Ezra
Senior United States Distict Judge